1    really meet, is a survey available?

2              Q        I have photographs.

3              A        Okay.

4              Q        Were there photographs taken of

5    this location of the wall?

6              A        Yes.

7              Q        Do you know who took them?

8              A        David Geossl.

9              Q        Were they taken on the day you were

10   present?

11             A        Correct.

12             Q        Are these pictures part of the

13   building department's file?

14             A        I have a file in my office for

15   Lafayette, yes.

16             Q        I will ask you to take a look at

17   those photographs?

18             A        Okay.

19             Q        Take a look at them and look over

20   them please?

21             A        Okay.

22             Q        Is there a date on those

23   photographs?

24             A        10/20/06.

25             Q        Are they photographs that were

1    taken by you or a colleague of the building
2    department?
3              A      It was taken by David Geossl
4              Q      Are those photograph a fair and
5    accurate representation of the property as it
6    existed at the time of your inspection?
7              A      Yes.
8                     MRS. FIORE: At this time, I move to
9              offer the photographs into evidence as
10             People'S 1.
11                    MRS. MULLINS: I object, first of
12             all, the individual who took the photos is
13             not here to testify apparently with regard
14             to them. Secondly, I thought that
15             Mr. Carpaneto said that the photos were
16             taken on the occasion of his first
17             inspection and these are dated October 20th
18             so, on that basis, I object to them as it's
19             not accurate as of when they were taken.
20                    MRS. MULLINS: Sustained, you could
21             keep going.
22             Q      Is the wall in question, depicted in
23    the photograph you are viewing?
24             A      Yes.
25             Q      The wall is comprised of two --

1       A       The wall runs along the backyard

2   between 2 and 5 and runs along the side yard.

3       Q       The wall that was sited and is the

4   subject of this violation is the rear portion of

5   the wall that abuts the 5 Huguenot and 2 Lafayette?

6       A       Correct.

7       Q       If you were observing the wall from

8   the yard of 5 Huguenot Drive, if you were looking

9   at the wall --

10      A       Right.

11      Q       Is the sidewall that is not in

12  disrepair to your left or to your right?

13      A       When you go down the driveway, it's

14  to your left.

15      Q       Is there any other portion of the

16  wall other than the two portions that meet

17  perpendicular?

18      A       No, that is it.

19      Q       What did you do as a result of your

20  observations?

21      A       We, at this point, asked Anthony

22  Oliveri to come in and take a look at the wall. He

23  is the town consulting engineer and he works for

24  Dolph Rotfeld(ph).

25      Q       What was the purpose of consulting

1    this other individual?

2          A      Just to have another opinion on the

3    wall.

4          Q      Do you know if Mr. Oliveri indeed

5    did go to inspect the wall at 5 Huguenot Drive?

6          A      Yes, he did. I was present when he

7    went there.

8          Q      Do you recall when that was?

9          A      Not exactly.

10         Q      Do you recall, approximately, how

11   long after your first visit to the property?

12         A      Probably a week or so, maybe a

13   couple weeks.

14               MRS. MULLINS: Could we have

15               established for the record when that visit

16               was. I don't believe he testified to a date

17               at the wall?

18               MRS. FIORE: Which visit?

19               THE COURT: I don't really know when

20               the first visit is and I don't know when

21               the second visit is, so I would like to

22               know when both were.

23               MRS. FIORE: Okay. I thought you said

24               it.

25         A      I could look in the records but I

1    don't have it with me now.

2          Q      Do you have an approximate idea of

3    when you first --

4          A      I may have it written down.

5          Q      Do you have an idea now, as you

6    testify here?

7          A      Probably.

8          Q      Was it in the summer, fall?

9          A      About a month ago.

10         THE COURT: When did you first go to

11         the property, about, give me a month?

12         A      The end of September, I believe

13         October.

14         THE COURT: Okay.

15         Q      2006?

16         A      Yes, 2006.

17         Q      How many times before you called Mr.

18    Oliveri, did you visit the property?

19         A      Once.

20         Q      And the time that you visited the

21    property that you testified to already with your

22    colleague David, that is the first time you visited

23    the property?

24         A      From the yard, yes, not actually

25    going on the property. You could see the wall from

1    the road, which I saw-- you know, also prior.

2              Q       But you were on the property at 5

3    Huguenot Drive?

4              A       Yes.

5              Q       That was approximately September or

6    October of 2006?

7              A       Yes, correct.

8              Q       At that time, you retained the

9    services of a consulting engineer?

10             A       Yes.

11             Q       Who was that consulting engineer?

12             A       Anthony Oliveri.

13             Q       Did you have a conversation with

14   Mr. Oliveri regarding his findings of the wall?

15             A       He supplied us with a report.

16             Q       Did you have a conversation with

17   him prior to the report?

18             A       I asked him to come out and look at

19   the wall.

20             Q       Once he did that, did you talk to

21   him about it?

22             A       Yes, and he felt that the wall --

23                     MRS. MULLINS: Objection.

24                     THE COURT: Sustained.

25             Q       Don't tell me what was said, that

1      is not admissible, but did you discuss anything in

2      addition to the plan for 5 Huguenot Drive?

3              A       No.

4              Q       Did you receive a report from Mr.

5      Oliveri regarding his findings of the wall?

6              A       Yes.

7              Q       Did you have occasion to go back to

8      the property after Mr. Oliveri inspected the wall?

9              A       No.

10             Q       Did you receive any further

11     information from any other sources regarding 5

12     Huguenot Drive?

13             A       No.

14             Q       Did any of your colleagues visit 5

15     Huguenot Drive?

16             A       Not to my knowledge.

17             Q       At any point, did you issue a

18     summons for 5 Huguenot Drive?

19             A       The summonses are right there, I'm

20     not sure of the date but yes.

21             Q       A summons was issued; correct?

22             A       Yes, the reason why it was issued

23     was because the people at 5 Huguenot had not

24     furnished a report yet from their engineer.

25             Q       Did you have a discussion with the

1    home owners regarding 5 Huguenot Drive?

2                    MRS. MULLINS: Which home owners?

3                    MRS. FIORE: The home owners of 5

4            Huguenot Drive.

5            A       No.

6            Q       Did you issue any formal citation

7    from the building department concerning the

8    property at 5 Huguenot Drive?

9            A       The summons.

10           Q       And what was the nature of the

11   summons violation?

12           A       Property maintenance code.

13           Q       Could you describe what constitutes

14   the violations of the property maintenance code?

15           A       Property maintenance code could be

16   violated if there is structures that are in need of

17   repair, structures that need upkeep as far as

18   maintenance, anything that could possibly be

19   dangerous.

20           Q       What kind of structures are the

21   subject of the property maintenance code?

22           A       Walls, buildings, stairs,

23   sidewalks, electrical, everything.

24           Q       This structure was what kind of

25   structure?

1        A    Retaining wall.

2           MRS. FIORE: I have no further

3       questions at this time.

4           THE COURT: Cross examination?

5  CROSS EXAMINATION BY MRS. MULLINS:

6        Q    Mr. Carpaneto, you have no formal

7  training at all in engineering or architecture?

8        A    That is correct.

9        Q    Is it your testimony that the first

10  time that you inspected, personally, the site, the

11  wall in question, was sometime in either late

12  September or early October?

13        A    Correct.

14        Q    Somewhere around there?

15        A    Yes.

16        Q    So, is it true that did you not

17  visit the site at all prior to issuing the summons

18  or the notices of violation in this case?

19        A    No, I saw the wall from the road,

20  you could see the wall from the road clearly.

21        Q    Is it true that you did not inspect

22  the wall up close --

23        A    That is true.

24        Q    Prior to issuing the violations?

25        A    Yes.

```
 1                 Q      Is it also true that nobody from
 2      your building department inspected the wall prior
 3      to the issuance of the violations or the summons in
 4      this case?
 5                 A      As far as I know.
 6                 Q      It is true that the violations and
 7      the summons in this case were issued based on the
 8      phone call that the building department received
 9      from Mr. Greenwald?
10                      MRS. FIORE: Objection.
11                      THE COURT: Overruled.
12                 A      They were based on the phone call
13      plus the engineering report, which was in the file
14      from Detective Benedict Salanitro .
15                 Q      I think your testimony was,
16      Mr. Carpaneto, that the building department
17      received a call, by the way, do you know who in the
18      building department received that call?
19                      MRS. FIORE: Objection, we have
20                 three questions.
21                      THE COURT: Sustained, give me one
22                 question.
23                 Q      Who, on behalf of the building
24      department, received the call from the Greenwalds,
25      if you know the name?
```

```
 1              A        The secretary.

 2              Q        Do you know her name?

 3              A        I don't know which one took the

 4    call.

 5              Q        As a result of that call, was some

 6    sort of a memo or written message recorded by the

 7    secretary?

 8              A        Probably a phone message to return

 9    the call.

10              Q        Did you receive a copy of that?

11              A        I probably did, there is probably a

12    copy somewhere. I just don't get all the questions

13    about why the phone call came in. It's obvious that

14    the wall is there, it's been there for a long time.

15                       THE COURT: She is entitled to

16              explore the various areas surrounding this

17              case and this is one line of questioning.

18              A        Okay.

19                       THE COURT: It can't go on forever

20              but she could start.

21              A        Okay.

22              Q        You testified that there is a file

23    that you maintain in your office?

24              A        Right.

25              Q        And is that file other than or
```

1    separate from the building file?

2

3    A        That is a separate file but it has
     the same information in it.

4

5    Q        Exactly the same information?

6    A        It should.

7    Q        Do you have that file with you
     today?

8

9    A        No.

10   Q        Is it in your office?

11   A        Yes.

12       MRS. MULLINS: I call for a copy of
         the file that Mr. Carpaneto has testified

13

14       about.

15   A        I could go get it, it will take me
         two minutes.

16

17       THE COURT: What exactly are we
         asking for?

18

19       MRS. MULLINS: Apparently, there is a
         file other than the building department

20

21       official file, which I have seen. I have
         seen the building department's file but

22

23       apparently, there is another file that Mr.
         Carpaneto has in his office that has some

24

25       information and he referred to it while he
         was testifying on direct.

1              A        It's just a file that I keep handy,
2    so I don't have to go back and forth to the
3    building file, that is it, I am more than happy to
4    get it.

5                   MRS. FIORE: I will object. I think
6                   Mr. Carpaneto has testified that it's
7                   repetitive, it contains the same
8                   information that is contained in the
9                   building file, I object at this time.

10                  THE COURT: Okay, for now we will not
11                  stop the questioning to get the file. It
12                  may turn out that if it becomes relevant
13                  but right now it is not based upon the
14                  witness's testimony right now.

15                  MRS. MULLINS: Thank you.

16                  THE COURT: Please continue.

17             Q        Your testimony regarding your
18   visual inspection of the wall, was that it did not
19   look right; is that correct?

20                  MRS. FIORE: Objection, which visual
21                  inspection you are referring to? Are you
22                  referring to the visual inspection from the
23                  road or --

24                  THE COURT: Overruled, sit down.

25             Q        I'm referring to the inspection

1    where you wall on it
2    were with--

3        A    Mr. Geossl.

4        Q    Could you spell that for me?

5        A    G-E-O-S-S-L.

6        Q    That was the only inspection that
7    you made of the wall; is that right?

8        A    At a distance, yes.

9        Q    And your testimony was that the
10   wall, I believe you said, does not look right?

11       A    That is correct.

12       Q    Did you make any measurements of
13   the wall?

14       A    Just observations.

15       Q    Did you make any measurements?

16       A    No, not with David.

17       Q    I'm asking whether you did?

18       A    No.

19       Q    Personally?

20       A    No.

21       Q    Did you make any notes?

22       A    No.

23       Q    Did you take a pad along with you
24   that day?

25       A    No, it's obvious.

```
 1            Q        With regard to the steel tie backs?

 2            A        Yes.

 3            Q        I think your testimony was that

 4     they seem to be rusted?

 5            A        I said some of them are rusted, the

 6     upper ones seem to be but not as bad.

 7            Q        Which ones seem to be rusted in the

 8     stone portion --

 9            A        The stone portion mainly.

10            Q        And there are tie backs in the

11     masonry portion of the wall as well; isn't that

12     right?

13            A        Yes.

14            Q        How many are in the masonry portion

15     OF the wall?

16            A        About four or five.

17                     MRS. MULLINS: Let the record

18                reflect that Mr. Carpaneto is looking at

19                the photographs.

20            A        Yes.

21            Q        What kind of condition are those

22     steel tie backs in?

23            A        They appear to be not rusted.

24            Q        Good condition?

25            A        Fairly good.
```

```
 1              Q       From your observation and
 2   inspection of the wall, does it seem to you that
 3   those steel tie backs that are in the masonry
 4   portion are performing the task that they are ment
 5   to perform?
 6              A       No.
 7              Q       Why is that?
 8              A       The wall was cracking and moving,
 9   the wall has moved.
10              Q       When you say the wall is moving, do
11   you mean it is currently moving?
12              A       It has moved.
13              Q       Let me finish the question --
14              A       Yes.
15              Q       It has moved?
16              A       Yes.
17              Q       And based on your observations an
18   inspection, when did that occur, that movement?
19              A       Over time.
20              Q       Over what period of time?
21              MRS. FIORE: Objection.
22              THE COURT: Overruled, if you could
23           answer, could you?
24              A       I don't know, just over time, a
25   period of time.
```

1          Q       I think you testified that there

2   seems to be some gap, I guess, I don't know if you

3   used the word gap but between the stone portion and

4   the masonry portion?

5          A       Where it's over; correct.

6          Q       And I think you estimated --

7          A       About four or five inches.

8          Q       Did you measure that with a ruler?

9          A       No.

10         Q       And you also testified that there

11  was some-- I think you called it lifting?

12         A       Yes.

13         Q       At four to five degrees?

14         A       Just an observations from the

15  property at 5.

16         Q       From the property?

17         A       At 5, I went on both properties.

18         Q       In order to come to that

19  determination that there was some listing, what did

20  you do?

21         A       Looked at it, just visually looked

22  at the wall, it's obvious.

23         Q       During this time that we are

24  talking about, I think it began maybe in the late

25  spring or early summer through present--

1          A        Whatever.

2          Q        Did the building department have

3   occasion to go to 5 Huguenot Drive?

4          A        I went October 20, 2006.

5          Q        Is that the date now, October 20,

6   is that the date?

7          A        That is when I took pictures, the

8   pictures were taken on that day.

9          Q        When you are talking about that

10  inspection, it's not September, it is October 20th?

11                  MRS. FIORE: Objection.

12                  THE COURT: Let the witness answer.

13         Q        I just want to be clear on the date

14  that you were at the property?

15         A        October 20, 2006 for sure.

16         Q        Thank you.

17         A        I may have been there prior to that

18  too, by myself, I don't actually remember.

19         Q        You testified before that you were

20  not there prior to issuing the summons --

21         A        I had seen the wall from the road

22  and I'm not sure if I went there by myself and took

23  David the following time --

24                  MRS. MULLINS: I understand that.

25                  MRS. FIORE: Let him finish.

1      A      I don't see why that is relevant.

2             THE COURT: It's my job to decide

3      what is relevant. It's your job to answer

4      the questions fully and truthfully.

5      A      I am.

6             THE COURT: Now wait for the next

7      one.

8      Q      I think my question was before that,

9      during the summer months, even the late spring, the

10     summer months, did the building department, not you

11     in particular, but did the building department, to

12     your knowledge, have occasion to go out and visit

13     the property at 5 Huguenot Drive?

14     A      I did but not physically going on

15     to the property, I just drove down when I got the

16     call and took a look from Lafayette.

17     Q      Are you aware that the Defendants

18     in this action had filed building permits to have

19     worked performed at 5 Huguenot Drive at this time

20     period?

21     A      No.

22     Q      Are you aware that Kevin Moore-- is

23     that your employee?

24     A      Yes.

25     Q      What is his position?

1          A          Assistant building inspector.

2          Q          Are you aware that Mr. Moore went

3    out to 5 Huguenot Drive during the summer months of

4    2006?

5          A          For what?

6                     MRS. FIORE: I object, Your Honor.

7                     THE COURT: Overruled, could you

8    answer the question?

9          A          No, was there a building permit that

10    was issued for something?

11          Q          I'm just asking you if you-- there

12    were building permits that were issued for my

13    clients property, for the record.

14          A          Did he go out and do an inspection?

15          Q          I'm asking you if you were aware

16    that he went out to do an inspection?

17          A          I don't keep track of every

18    inspection that comes into the office, no.

19          Q          Isn't it true that Mr. Moore

20    informed you that the wall looked fine to him?

21          A          No.

22          Q          That is not true?

23          A          Not true, Kevin actually told me

24    that two other home owners mentioned that the wall

25    is bad, somehow he had gotten that.

1          MRS. MULLINS: Move to strike.

2                    MRS. FIORE: Objection, she opened

3          the door, Your Honor.

4                    THE COURT: It's not stricken.

5          A        That was the conversation.

6          Q        You testified that you did, in

7     fact, have a conversation with Mr. Greenwald; is

8     that correct?

9          A        Yes, Mr. Or Mrs.

10         Q        You are not sure which one?

11         A        I spoke with them both at some

12    point. I don't know which you are referring to.

13         Q        On how many occasions, did you have

14    conversations with the Greenwalds?

15         A        A couple of times.

16         Q        Did they come and visit you in the

17    building department?

18         A        She came in for some copies but I

19    never saw her there.

20         Q        Did Mr. Greenwald come to the

21    building department?

22         A        Not to my knowledge.

23         Q        And the conversations that you had

24    with the Greenwalds, were they by telephone or in

25    person?

1          A      I talked to Mrs. Greenwald at the

2     site the day we were there with David and prior to

3     that on the telephone.

4          Q      Do you recall the date of the of

5     issuance of the first violation in this matter?

6          A      No.

7          Q      Your summons refers to an act that

8     first occurred or I guess it's an act of July of

9     2006?

10         A      Yes.

11         Q      Does that refresh your recollection

12    as to when you first issued a violation?

13         A      That sounds normal. Normally, for a

14    violation we give people a certain amount of time

15    to correct the violation and if there is a second

16    violation, we give them more time and after that,

17    if nothing happens, we issue the summons, that is

18    the policy.

19         Q      When you issued the first violation

20    and nothing happened, did you ever call the home

21    owners?

22              MRS. FIORE: Are we referring to the

23         Rotenbergs?

24              MRS. MULLINS: These home owners

25         right here, the Defendants.

1          A     No.

2          Q     Did you contact anyone on their

3    behalf, their attorneys?

4          A     They were sent a registered letter

5    I believe with the violations in it.

6          Q     And then there was some passage of

7    time; is that right?

8          A     Yes.

9          Q     And you issued a second violation;

10   is that right?

11         A     Normally, yes.

12         Q     Did you in this case?

13         A     I don't remember exactly but I may

14   have not have done it personally but one of my

15   staff may have. Is there a second violation there?

16         Q     Yes. And during the passage of time

17   from the issuance of the first violation and the

18   second violation and up to the time that there was

19   a summons issued in this case, did you ever have

20   any conversations with home owner at all regarding

21   the particulars of this violation?

22         A     No.

23         Q     Did you ever inform them in writing

24   or otherwise as to what the basis of the

25   department's violation was?

1        A        I sent them a notice of violation.

2        Q        My question is, other than what is

3   in the notice of violation, did you send them

4   anything in writing or have any conversation with

5   the home owners regarding the particulars of the

6   violation?

7        A        No.

8        Q        Did you ever issue anything in

9   writing or otherwise to the home owners or anyone

10  on their behalf, and I'm referring to the

11  Defendants, about what needed to be done to the

12  wall in order to have it not violate your code?

13              MRS. FIORE: Objection, again

14          referring beyond the notice of violation,

15          which has been testified to several times.

16              THE COURT: Overruled.

17       A        Could I have the question again.

18              THE COURT: We will have the court

19          reporter read it back.

20              (Whereupon, the last question was

21          read back by the reporter.)

22       A        No.

23       Q        Lastly, Mr. Carpaneto, after you

24  retained the services of Anthony Oliveri and Dolph

25  Rotfeld engineering and received his report and had

1    discussions with him, at that time, did you give

2    any indication to the home owners, the Defendants

3    in this case, in writing or otherwise as to what

4    could be done to the wall so that it did not

5    violate the building code?

6         A       No, but if they would have called

7    me, I certainly would have given them some

8    information?

9         Q       Did you contact them though, that

10   is my question?

11        A       No.

12                MRS. MULLINS: Nothing further.

13                THE COURT: Any Redirect?

14                MRS. FIORE: Yes.

15   REDIRECT EXAMINATION BY MRS. FIORE:

16        Q       You said that you observed the wall

17   visually from the road; is that correct?

18        A       Yes, prior to going actually on the

19   property, yes.

20        Q       Could you describe what your

21   observations of the wall were at that time?

22        A       You could see-- it's obvious that

23   you could see the wall is in the same condition

24   that it is in the closer photos, it just was a

25   closer look at it, you could see shifting,

1    cracking, it's not far from the year.

2              Q         Okay. In this case, you said you

3    issued two violations; is that correct?

4              A         Yes.

5              Q         When a final notice of violation is

6    served, approximately, how long do you allow if

7    there has been --

8              A         I believe ten days.

9              Q         If there has been no correction or

10   improvement or resolution to the original problem?

11             A         Right --

12             Q         Approximately, how long do you wait

13   before you issue a summons?

14             A         It depends, we try to keep it to

15   ten days but we are willing to work with anybody

16   who is willing to work with us, so we had not heard

17   from anybody at that time, so we issued a summons.

18   After the summons is when we got the engineering

19   report, so they had to be nudged a little bit.

20             Q         Sorry, I did not hear that?

21             A         They had to be nudged.

22             Q         During the time from the initial

23   notice of violation to the time of the summons was

24   issued, you received no indication from the home

25   owners that they were working at attempting to fix