1        further.

2                        THE COURT: Mrs. Fiore, any redirect?

3                        MRS. FIORE: Yes.

4        REDIRECT EXAMINAITON BY MRS. FIORE:

5                Q        In your opinion, what would a more

6        thorough investigation entail by a structural

7        engineer?

8                A        A more detailed measurement of the

9        wall, they could go so far as doing investigation

10       of the soil behind the wall.

11               Q        What does investigation of the soil

12       show?

13               A        That would show what type of soils

14       are there, it might be an indication as to why tie

15       backs were put in, if it was sandy soil or

16       something, that would lead to an unstable wall,

17       that would give some explanation to the tie back

18       and also when you get a structural engineer, you

19       are just getting somebody who is more experienced

20       with this type of thing, with retaining walls in

21       particular, not that I'm not experienced with them

22       but a structural engineer specializes it. He is a

23       specialist, he would have a longer history with

24       this type of situation maybe he has seen something

25       like this before.

1          Q          The tie backs that you identified

2    that are present on the concrete block portion,

3    were they rusted anywhere?

4          A          There was some rust on them but not

5    severe like the lower tie backs.

6          Q          In comparison to the ones below,

7    they were better?

8          A          Yes.

9          Q          But there was some indication of

10   rust; is that correct?

11         A          Yes.

12         Q          In your experience, if there has

13   been a condition of rust, is it fair to say that

14   those tie backs have been on the wall for a length

15   of time, a short amount of time?

16                    MRS. MULLINS: I object, Your Honor

17              it is a leading question.

18                    THE COURT: Overruled.

19         A          I could not say.

20         Q          If there is rust on a tie back, in

21   your experience, is it fair to say that it's been

22   on there for more than a year?

23         A          Sure, it's possible there was some

24   surface rust on it, it could have occurred very

25   quickly or it could have been like that for a long





1      correct?

```
 1                    on to the next question.
 2            Q      Did you observe vehicles parked on
 3      the--
 4            A      No.
 5            Q      Property at that time?
 6            A      No.
 7            Q      How many of the stoppers, are they
 8      call?
 9            A      Wheel stops.
10            Q      Okay, wheel stops?
11            A      I don't recall how many.
12            Q      More than one?
13            A      Yes.
14                   MRS. FIORE: I have nothing further
15            at this time.
16                   THE COURT: Call your next witness.
17                   MRS. FIORE: The People call Mr.
18            Greenwald.
19                   THE COURT: I will swear you in.
20      B L A I N E  G R E E N W A L D, a witness herein,
21      having been first duly sworn by the Court, was
22      examined and testified as follows:
23      EXAMINATION BY FIORE:
24                   MRS. MULLINS: I just ask if the
25            town prosecutor could give the Court an
```

1    indication of an offer of proof with regard

2    to this witness, since we know now that,

3    apparently, this witness made a complainant

4    to the building department and it was

5    followed up in some fashion by the building

6    department.

7         So, I would just like to just know

8    what the relevance and probative value of

9    the testimony in general is at the outset.

10        THE COURT: I don't think that is

11   necessary at this time, please take a seat

12   and proceed with the questioning.

13        MRS. MULLINS: Thank you.

14   Q    Good morning, where do you reside?

15   A    2 Lafayette road.

16   Q    Does your property abut another

17   property?

18   A    Yes.

19   Q    Do you know the address of that

20   property?

21   A    5 Huguenot Drive.

22   Q    Is there a wall that separates your

23   two properties?

24   A    Yes.

25   Q    Have you had occasion to observe

```
 1    that wall?
 2               A      Yes.
 3               Q      Could you describe for the Court
 4    your visual observations of the wall?
 5               A      The wall is a massive structure I
 6    would guess ranges maybe ten to twenty feet at
 7    different levels across the width of the backyard.
 8               Q      Ten to twenty feet in height?
 9               A      Yes, high that is just an estimate
10    and there are two parts to the wall, a stone part
11    that goes up probably, I don't know, maybe eight
12    feet and then a second part that looks like it was
13    built on top of that part made of cinder blocks and
14    that part of the wall has-- it's obvious if you
15    look at it, that it moved forward because there is
16    a gap between --
17                       MRS. MULLINS: Move to strike, Your
18               Honor.
19                       THE COURT: Overruled with one
20               notation, that this witness is not an
21               expert. I'm not crediting Mr. Greenwald's
22               conclusion because he is not an expert but
23               I can credit his eyewitness observations.
24                       MRS. FIORE: Thank you.
25               Q      Did you have an occasion to contact
```

1    any local town officials regarding your

2    observations of this wall?

3              A      Yes.

4              Q      Who did you contact?

5              A      Well, first we contacted-- well,

6    actually first Mr. Rotenberg contacted us in April.

7              Q      April of 2006?

8              A      Yes, in order to request permission

9    to have a mason come onto our property, to my

10   understanding, cosmetically cover the wall. We

11   objected to that and both my wife and I had

12   discussions with Mr. Rotenberg that before you

13   bring an in mason to just cover the cosmetic

14   elements of the wall, shouldn't we have a

15   structural engineer to come and look at the wall

16   and this was in the wake of that collapse of the

17   wall on the Henry Hudson Parkway, so it was

18   highlighted as a concern to us.

19                    We then learned that Mr. Rotenberg

20   was selling his house. So when I spoke with him on

21   the phone, I said shouldn't we have a structural

22   engineer come to evaluate the safety of the wall

23   both for you, the potential buyers and us and our

24   family and Mr. Rotenberg indicated that he had no

25   intention of bringing a structural engineer and

1   "it's my wall and I will do what I want with it".

2                    I was baffled by the attitude about

3   it because it seemed like it was appropriate to

4   bring somebody who was an expert and not just cover

5   it up.

6                    After that, it was that with a

7   backdrop that led us to communicate with the

8   building department about, look we don't want this

9   wall to be just cosmetically covered up, shouldn't

10  we have an engineer come.

11                   Then, nothing really happened and

12  we probably had a couple other phone calls to Mr.

13  Carpaneto but nothing really happened in terms of

14  any action and then finally we ended up getting a

15  name of an engineer whose name was Benny Salanitro

16  and we ended up asking him to come and do an

17  analysis, that analysis included both --

18                   MRS. MULLINS: Objection.

19                   THE COURT: Sustained.

20        Q        Did you retain the service of an

21  engineer?

22        A        Yes.

23        Q        Did that engineer come to the

24  property to inspect the wall to your knowledge?

25        A        Yes.

1          Q    Did he provide you with a report?
2          A    He provided the town with a report
3     and I just--
4               THE COURT: No, answer the question
5          and wait for the next question.
6          Q    Have you noticed any change in the
7     wall regarding the condition that caused your
8     concern in the first place?
9          A    No, the mason came and did stuff on
10    his side and maybe at the neighbor to the right
11    side but not on our side because we said, look we
12    don't want anybody coming to just cover up the
13    wall.
14         Q    There has been no correction for
15    the condition that caused you to call the building
16    department in the first place?
17         A    Not to my knowledge, no.
18              MRS. FIORE: I have nothing further.
19              THE COURT: Cross examination?
20              MRS. MULLINS: Yes.
21    CROSS EXAMINATION BY MRS. MULLINS:
22         Q    Your testimony is that nothing was
23    done to the wall on your side; is that right?
24         A    Yes.
25         Q    And is it true that you denied

1      access to the wall by Mr. Rotenberg's contractor

2                A      Just Mr. Rotenberg statement of

3      having a mason come --

4                Q      No, my question is, did you deny

5      access to the property, to your side of the wall?

6                A      To Mr. Rotenberg's request to have

7      a mason come onto the property.

8                Q      Maybe my question is not clear, did

9      there come a time that Mr. Rotenberg's contractor

10     came to your premises to do work on on your side of

11     wall?

12               A      I'm not aware of it.

13               Q      You are not aware of it?

14               A      No, my wife may be aware of it but

15     she did not communicate that with me, other than

16     Mr. Rotenberg ringing our doorbell and I'm not

17     aware of anybody else coming because we basically

18     explicitly in April denied to Mr. Rotenberg the

19     ability to have a mason come as I keep saying

20     because we did not want the wall just covered up.

21               Q      Is it true that initially you gave

22     your permission to Mr. Rotenberg to have work done

23     on the wall?

24               A      If that happened-- you mean about

25     the mason coming?



A    April 14th, no the letter was to

Mr. Rotenberg.

Q    Did you send a copy of that letter
to the building department?

A    Yes, and it's in the building
department's file.

Q    When did you send that letter to
Mr. Rotenberg and to the building department?

A    April 14, 2006.

Q    Was that before or after you had
any conversation with Mr. Rotenberg?

A    That was immediately shortly after
I had my conversation with him because I wanted to
communicate to him that we held him responsible for
any damages associated should the wall fail and
that it was a letter of consolatory tone to say
shouldn't we work to have this evaluated because it
would be dangerous for him and anybody purchasing
it and us and that it seemed reasonable and that
the conclusion of letter was, let's work amicably
to try to get a good evaluation.

Q    When you wrote that letter, upon
what facts did you come to the conclusion that the
wall was in a dangerous condition?

A    Looking at it.

1                    Q        You, yourself?

2               A        Yes and also the fact that Mr.

3    Carpaneto, I believe, had said that there was an

4    awareness of this wall over resent past because of

5    the fact that the town had addressed-- I'm sorry,

6    what happened is when it really, really rains on

7    Huguenot Street, and this relevant --

8                    MRS. MULLINS: I move to strike --

9               A        It's relevant to answer your

10              question.

11                   THE COURT: You have to hold on. We

12              are talking about the letter.

13              A        The thing is --

14                   THE COURT: No, don't say anything,

15              that could come out in some other question.

16              Q        My question is, when you wrote the

17   letter in April and I think you said it was April

18   14th of 2006, what facts did you have to base your

19   opinion or your conclusion that the wall was

20   dangerous?

21              A        Two elements, one, my own

22   observations of the wall. It is actually three

23   elements, my own observation that it looked like

24   there is a problem because the top part overhangs

25   the bottom part.

1          Secondly, when we had a landscape
2    person come in to remove trees that were in that
3    backyard, she had commented that that wall ought to
4    be looked at.
5          Third, this is the point that made
6    me aware that the town had an awareness of the wall
7    because of when it rains on Huguenot Street the
8    water, prior to them fixing the curb, would
9    literally be like a waterfall coming over that left
10   part of that wall. That would come into our yard
11   and cause a flood like, like a river.
12         So, when the town attempted to fix
13   the curbs had commented that the ought to be looked
14   at because it's obvious --
15         Q      When was that.
16         A      Maybe a year before.
17         Q      Was it possible that was in the
18   time period when you complained about the other
19   neighbors work being done on 3 Huguenot Drive?
20                MRS. FIORE: Objection.
21         A      I could answer that.
22                THE COURT: Overruled.
23         Q      This time period that you are
24   referring to that the town being aware of this run
25   off issue, you said on the left side of the wall