more questions.

    MRS. FIORE: I don't want to lose my ground for objection by questioning the witness.

    THE COURT: You won't, you could question the witness, your objection is noted on the record, it stays, it's on the record, have a seat and you could cross examine this witness if you wish.

    MRS. FIORE: Yes.

Q    You said earlier that you prepared a report?

A    Yes.

Q    Did you provide Mrs. Mullins a copy of that report?

A    Yes, I think it was addressed to her and copy to Mr. Annunziata. This was late last week, so I don't know if it went out really.

Q    But you prepared it?

A    Yes, I prepared it.

    MRS. FIORE: I have no further questions.

    THE COURT: Okay, you are excused, you could go home or sit in the courtroom.

    THE COURT: Do you have any other

```
 1            testimony or evidence you would like to
 2       present?
 3                MRS. MULLINS: Yes, Mr. Rotenberg
 4       will take the stand.
 5                THE COURT: Okay, Mrs. Fiore, if you
 6       wish to contact your other witness, go
 7       right ahead we have a few minutes.
 8                MRS. FIORE: I will be happy to do
 9       that.
10                THE COURT: We will take a break.
11                (Whereupon, a short recess was taken
12       by all parties.)
13                MRS. MULLINS: Just so I understand,
14       is Mrs. Fiore talking about consulting with
15       the witnesses that she has put on the stand
16       this morning?
17                MRS. FIORE: No.
18                THE COURT: She is telling me no.
19                MRS. MULLINS: At this time, she is
20       going to have the opportunity to call
21       another witness.
22                THE COURT: She could certainly
23       present a rebuttal case if they so choose,
24       that all I'm saying.
25                MRS. MULLINS: Okay.
```

```
 1                    THE COURT: Call your next witness.
 2                    MRS. MULLINS: We call Gary
 3          Rotenberg.
 4                    THE COURT: Remain standing and I
 5          will swear you in.
 6   G A R Y   R O T E N B E R G, the Defendant herein,
 7   having been first duly sworn by the Court, was
 8   examined and testified as follows:
 9   DIRECT EXAMINATION BY MRS. MULLINS:
10            Q       Good afternoon, Mr. Rotenberg?
11            A       Good afternoon.
12            Q       Are you the one of the owners of 5
13   Huguenot Drive?
14            A       Yes.
15            Q       When did you purchase the property?
16            A       We purchased the property in April
17   or May of 1988 and we moved in August 3rd of 1988.
18            Q       With whom do you reside at 5
19   Huguenot, I'm sorry I know you don't reside there
20   presently but with whom did you reside?
21            A       My wife Jane Dickson.
22            Q       Do you have children?
23            A       Three children.
24            Q       And you resided there continuously
25   from 1988 through the resent past?
```

1        A        It was brought to my attention that

2   there was a crack in the rear cinder block portion

3   of the wall that divides our property between 2

4   Lafayette Road.

5        Q        The crack is on your side or on the

6   Lafayette side?

7        A        Primarily on our side.

8        Q        What, if anything, did you do with

9   respect to coming into possession of that

10  information?

11       A        On or about March 30th of 2006, I

12  contacted Alfredo Calvi and Son(ph) a masonry

13  company located in Yonkers, with whom I done

14  business with before.

15       Q        They performed other masonry

16  services at your premises?

17       A        Yes, they worked on my premises

18  before and in the area.

19       Q        You had Mr. Calvi come out to the

20  property?

21       A        On or about April 7th of 2006, the

22  president of the company Fulvio Calvi came to the

23  premises and met me at the house and went to the

24  backyard, where I instructed him what I wanted done

25  to the property.

1           Q        What instructions or information

2     did you give to Mr. Calvi(ph)?

3           A        I told Fulvio that we were putting

4     the house on the market and I wanted him to affect

5     what the repairs he thought were necessary and I

6     told him directly, if ther are any structural

7     problems with the wall, Fulvio, I want you to fix

8     them.

9           Q        That was what period of time?

10          A        That was probably around April 7th

11    because I contacted Fulvio around March 30th, he is

12    a busy man, so it took him about a week to get to

13    our house.

14          Q        As a result of your discussions

15    with Mr. Calvi, did he propose to do certain work

16    at the premises?

17          A        Yes, he did.

18          Q        Did that work involve the wall?

19          A        Yes.

20          Q        Did that work involve various areas

21    of the wall or parts of the wall?

22          A        Yes, it did.

23          Q        Could you describe what areas of

24    the wall it involved?

25          A        I observed the Calvi Firm working

1    on the crack in the cinder block portion of the

2    wall and also the wall, the concrete wall that

3    separates the 3 Huguenot Drive address from the 5

4    Huguenot address, the left.

5           Q      Before you observed work being

6    done, with regard to the proposal for working, what

7    did the Calvi Firm propose to do to the wall?

8           A      They had also proposed to do work

9    on the other side of the wall facing 2 Lafayette

10   Road.

11          Q      What was the nature of that work?

12          A      The nature was water proofing. As

13   we know, water intruding into a wall causes

14   problems during the winter. Mr. Calvi had proposed

15   removing two cinder blocks from the cinder block

16   wall, which had turned slightly.

17          Q      On the Lafayette side?

18          A      Removing those two cinder blocks,

19   filling it with some kind of fill and concreting it

20   over and that is what he had proposed doing to make

21   certain that the wall was water tight for the next

22   buyers.

23          Q      As a result of the proposal by the

24   Calvi Firm to do work on both your side and the

25   other side of the wall, did there come a time that

1  you contacted your neighbors at 2 Lafayette?

2         A      Yes, we did.

3         Q      Is this the first time that you had

4  any contact at all with the Greenwalds?

5         A      In the eighteen years in which we

6  lived in that house, we never heard one syllable

7  from them on any subject whatsoever.

8         Q      So, you contacted them for the

9  first time in what month of 2006?

10        A      I knocked on their door to contact

11  them at approximately April 8th, it was the day

12  after Mr. Calvi came by and gave me this proposal.

13        Q      Who answered the door?

14        A      A person whom I later learned was

15  Jane Greenwald.

16        Q      And --

17        A      I had never seen her before.

18        Q      And you had some discussions with

19  Mrs. Greenwald?

20        A      Yes, I did.

21        Q      Concerning the repairs to be done

22  to the wall?

23        A      Yes.

24        Q      Did you request anything of Mrs.

25  Greenwald at that time?

```
 1              A        I knocked on the door and she
 2    invited me in, normal pleasantries, we went to the
 3    back of the house, looked at the wall and I told
 4    her that we were planing to put the house on the
 5    market and I just had my mason, the most expensive
 6    one in Westchester, come and examine the wall and
 7    he found it to be in structurally sound condition
 8    but it needs some minor repair work in terms of
 9    water proofing integrity.
10              Q        At that time, did you request
11    permission for the Calvi Firm to gain access to
12    that side of the wall?
13              A        Yes, I asked her directly if the
14    Calvis could have access to the backyard, they
15    estimated it would take maybe a day at the most to
16    effect the repairs but they did not want to do
17    anything without getting all the proper permission.
18              Q        Did the Calvi Firm indicate to you
19    in this proposal to do the work on that side, on
20    the left side they that would have to erect some
21    scaffolding?
22              A        And it would come down in a day.
23              Q        Did you inform Mrs. Greenwald of
24    that?
25              A        Yes.
```

```
 1              Q       What, if anything, did she do in

 2    response to your request?

 3              A       She granted the request and she

 4    then mentioned the West Side Highway collapse.

 5              Q       You had some further discussions?

 6              A       With Mrs. Greenwald, yes.

 7              Q       As a result of your conversation

 8    with Mrs. Greenwald, did you then contact Calvi to

 9    go ahead and perform the repairs?

10              A       Yes.

11              Q       Did that take place?

12              A       On or about April 10th, maybe two

13    days later, the Calvi Firm, Fred Calvi who was the

14    senior vice president, the number two man there,

15    arrived on my premises with a full crew of workers,

16    cement, stucko, all sorts of scaffolding equipment

17    and was driving down my driveway.

18              Q       Then what happened?

19              A       Simultaneously, with the arrival of

20    Fred Calvi in his truck, the phone rang and there

21    was a person who introduced himself as Blaine

22    Greenwald.

23              Q       And you had a conversation with Mr.

24    Greenwald at that time?

25              A       Yes, I had a conversation with him.
```

1          Q       As a result of that conversation,

2     what happened?

3          A       Mr. Greenwald insisted that we get

4     a structural engineer because a mason knows nothing

5     and he does not trust a mason. I replied every

6     engineer will hire a mason to do all of the work

7     and we are paying alot of money to the Calvi Firm,

8     they have seen no problems with the wall and we

9     have to fix the water intrusion, such as it is,

10    because that would cause problems way down the

11    road.

12                 I told that to Mr. Greenwald and he

13    refused, he said no, I want a structural engineer

14    and if you don't get one, I am withdrawing

15    permission to have access to my backyard.

16                 I said the Calvi Firm is driving

17    down the driveway to setup the Scaffolding to start

18    work. He said they don't have permission to go to

19    my backyard and I said, I'm sorry I have to go

20    because I have to greet my masons.

21         Q       Was it your understanding that the

22    repairs to the Lafayette side could not be

23    effectuated without the access to the wall from

24    their property.

25         A       It would be impossible.