UNITED STATES DISTRICT COURT
SOUTHERN DISRTICT OF NEW YORK
--------------------------------------------------------X
GARY R. ROTENBERG and JANE J. DICKENSON,
                                    Plaintiff(s),

                    vs.


THE TOWN OF MAMARONECK, RONALD A.
CARPANETO (individually), JAYNE GREENWALD
and BLAINE GREENWALD

                              Defendants.
--------------------------------------------------------X

**DECLARATION OF
ONDINE SLONE**

Docket No.
08 Civ. 4703 (SCR)

ONDINE SLONE, an attorney duly admitted to practice law in the Southern District

Court of New York hereby affirms under the penalties of perjury, the following.

1.      I am a member of the law firm of Miranda Sokoloff Sambursky Slone

Verveniotis LLP, attorneys of record for defendants the the Town of Mamaroneck ("the

Town") and Ronald A. Carpaneto ("Ron Carpaneto") and as such, am fully familiar with the

facts and circumstances of this matter.

2.      I submit this Declaration in support of defendants' motion to dismiss this

action pursuant to Fed. R. Civ. P. 12(b)(6).

3.      Annexed hereto are the following exhibits relevant to defendants' motion.

4.      Annexed hereto as Exhibit A is the Complaint in this action.

5.      Annexed hereto as Exhibit B is a copy of the Complaint plaintiffs previously

filed in New York State Supreme Court, County of Westchester.

6.      Annexed hereto as Exhibit C is a copy of the Decision and Order of

Honorable Richard B. Liebowitz, J.S.C. dated January 16, 2008, which dismissed plaintiffs'

state court action.

7.    Annexed hereto as Exhibit D is a copy of the affidavit of Ron Carpaneto, sworn to on September 13, 2007.

8.    Annexed hereto as Exhibit E is a copy of the Notice of Violation issued to the plaintiffs' on June 23, 2006, referenced in the affidavit of Ron Carpaneto.

9.    Annexed hereto as Exhibit F is a copy of the Final Notice of Violation issued to the plaintiffs' on September 29, 2006, referenced in the affidavit of Ron Carpaneto.

10.    Annexed hereto as Exhibit G is a copy of the Summons and Information issued to the plaintiffs' on October 17, 2006, referenced in the affidavit of Ron Carpaneto.

11.    Annexed hereto as Exhibit H is a copy of the report of John Annunziata, P.E., P.C., referenced in the affidavit of Ron Carpaneto.

12.    Annexed hereto as Exhibit I is a copy of the report of Anthony Oliveri, P.E., referenced in the affidavit of Ron Carpaneto.

13.    Annexed hereto as Exhibit J is a copy of the transcript of the hearing held with regard to the plaintiffs' retaining wall at Mamaroneck Town Court on November 20, 2006, referenced in the affidavit of Ron Carpaneto.

14.    Annexed hereto as Exhibit K is a copy of plaintiffs' Notice of Claim.

15.    For the reasons set forth in the accompanying memorandum of law, defendants respectfully submit that their motion to dismiss should be granted and this action dismissed in its entirety.

Dated:  Mineola, New York
        August 4, 2008

ONDINE SLONE [OS-8351]
Miranda Sokoloff Sambursky
Slone Verveniotis LLP

2

Attorneys for Defendants
The Town of Mamaroneck and
Ronald A. Carpaneto
240 Mineola Boulevard
Mineola, New York 11501
(516) 741-7676
Our File No.: 07-508

# EXHIBIT A

*JUDGE ROBINSON*

4-2008

AO 440 (Rev. 5/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

Southern                 District of                 New York

GARY R. ROTENBERG and JANE J. DICKSON

**SUMMONS IN A CIVIL ACTION**

V.

THE TOWN OF MAMARONECK, RONALD A
CARPANETO (individually), JAYNE
GREENWALD, and BLAINE GREENWALD

CASE NUMBER:  **08 CIV 4703**

## AC



TO: (Name and address of Defendant)

SEE ATTACHED RIDER

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

MICHAEL J. ANDREWS, P.C.
The Lincoln Building
60 East 42nd Street, 47th Floor
New York, NY 10165

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

### J. MICHAEL McMAHON

_____                    MAY 2 0 2008
CLERK                                       _____
                                            DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |

| NAME OF SERVER *(PRINT)* | TITLE |
|---|---|
| | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

   Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|
| | | |

## DECLARATION OF SERVER

   I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                    Date                    *Signature of Server*


                                  _____
                                  *Address of Server*

---

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

**RIDER TO SUMMONS**

To:

TOWN OF MAMARONECK
740 West Boston Post Road
Mamaroneck, NY 10543

RONALD CARPANETO
c/o Town of Mamaroneck
740 West Boston Post Road
Mamaroneck, NY 10543

JAYNE GREENWALD
2 Lafayette Drive
Larchmont, NY 10538

BLAINE GREENWALD
2 Lafayette Drive
Larchmont, NY 10538



## Town of Mamaroneck

Town Center
740 West Boston Post Road, Mamaroneck, NY 10543-3353

CHRISTINA BATTALIA
Town Clerk

TEL: 914/381-7870
FAX: 914/381-7813
townclerk@townofmamaroneck.org

DATE:             May 30, 2008

MEMO TO:          Town Attorney
                  Supervisor
                  Town Administrator
                  Asst to the Town Administrator


MEMO FROM:        Christina Battalia

RE:               Notice of Claim # 4-2008


Our office received a Notice of Claim against the Town of Mamaroneck; the claim
was filed in our office on May 30, 2008, our file #4-2008.  Please be advised the
incident occurred on July 6, 2007 at the location of 5 Huguenot Drive,
Larchmont,, New York.


Christina Battalia
Town Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**'08 CIV 4703**

**JUDGE ROBINSON**

GARY R. ROTENBERG and JANE J. DICKSON

                                                Plaintiff,

- against -

THE TOWN OF MAMARONECK,
RONALD A. CARPANETO, (individually);
JAYNE GREENWALD, and
BLAINE GREENWALD,

                                                Defendants.

**COMPLAINT**



Plaintiffs Demand Trial
By Jury
MAY 20 2008
U.S.D.C. S.D. N.Y.
CASHIERS

The plaintiffs, complaining of the defendants by their attorneys, MICHAEL J. ANDREWS, P.C., hereby allege upon information and belief as follows:

## PREAMBLE

1.    As alleged with more particularity below, the defendants are alleged to have maliciously prosecuted the plaintiffs and committed other tortious conduct against the plaintiffs.

2.    Jurisdiction of this Court is invoked under the provisions of Sections 1331, 1332, 1343(3), and 1367(a) of Title 28, United States Code and pursuant to Sections 1983 and 1988 of Title 42, United States Code.

3.    The amount in controversy exceeds $75,000.00.

4.    Venue is placed in the Southern District of New York because it is a district in which a substantial part of the events giving rise to the claims occurred.

## THE PARTIES

5.    The plaintiff GARY R. ROTENBERG ("ROTENBERG") is an adult citizen of the State of New Jersey.

6.    The plaintiff JANE J. DICKSON ("DICKSON") is an adult citizen of the State of New Jersey.

7.    At all relevant times, Gary R. Rotenberg and Jane J. Dickson have been lawfully married to one another.

8.    The defendant TOWN OF MAMARONECK ("MAMARONECK") is a municipal corporation duly organized under the laws of the State of New York.

9.    At all relevant times, defendant TOWN OF MAMARONECK was acting under color of law, to wit the laws of the State of New York and the Town of Mamaroneck.

10.    The defendant RONALD A. CARPANETO ("CARPANETO") is an adult citizen of the State of New York.

11.    At all relevant times, defendant CARPANETO was and is an employee of the defendant MAMARONECK.

12.    At all relevant times, defendant CARPANETO was employed by the defendant MAMARONECK as its Director of Buildings.

13.    At all relevant times, defendant CARPANETO was acting within the scope of his employment and in the furtherance of his duties with defendant MAMARONECK.  Defendant CARPANETO is sued in his individual capacity.

14.    At all relevant times, defendant CARPANETO was acting under color of law, to wit the laws of the State of New York and the Town of Mamaroneck.

15.    The defendant JAYNE GREENWALD is an adult person who is a citizen of the State of New York.

16.    The defendant BLAINE GREENWALD is an adult person who is a citizen of the State of New York.

2

## TIMELY COMMENCEMENT OF ACTION

17.     On July 6, 2007, the plaintiffs commenced an action against the defendants herein in the Supreme Court, State of New York, County of Westchester under index number 12167 / 2007 ("the State Court Action").

18.     The State Court Action was timely commenced.

19.     On or about January 17, 2008 the State Court Action was dismissed without prejudice.

20.     The dismissal of the State Court Action was not due to a voluntary discontinuance, by a failure to obtain personal jurisdiction over any defendant, a neglect to prosecute, or by a final judgment on the merits.

21.     This action is based upon the same transaction or occurrence or series of transactions or occurrences as set forth in the State Court Action.

22.     This action is commenced within 6 months of the January 17, 2008 dismissal of the State Court Action.

23.     Pursuant to New York's Civil Practice Law and Rules §205(a), this action is commenced timely.

## BACKGROUND FACTS

24.     Approximately 20 years ago, during approximately April or May 1988, the plaintiffs, as husband and wife, signed a contract to purchase a residential home located at 5 Huguenot Drive, Larchmont, New York. During approximately August 1988, the plaintiffs moved into the residence at 5 Huguenot Drive ("5 Huguenot Drive").

25.     The plaintiffs used the home at 5 Huguenot Drive as their residence until approximately July 7, 2006.

3

26.     On or about December 7, 2006, the plaintiffs entered into a contract to sell their residential property located at 5 Huguenot Drive.  On or about December 18, 2006, the plaintiffs home was sold.

27.     Also approximately 20 years ago, during approximately December 1988, the defendants Jayne and Blaine Greenwald purchased a residential home located at 2 Lafayette Road, Larchmont, New York ("2 Lafayette Road").

28.     The aforesaid residential property located at 5 Huguenot Drive abuts the aforesaid residential property located at 2 Lafayette Road.

29.     The two residential properties referred to herein as 5 Huguenot Drive and 2 Lafayette Road were constructed at or near the same time and as part of a subdivision.

30.     A retaining wall ("the retaining wall"), approximately fifteen feet in height, is situated at the rear of the residential property located at 5 Huguenot Drive.  The retaining wall faces into the residential property located at 2 Lafayette Road.

31.     The retaining wall has a lower portion constructed of stone and an upper portion constructed of cinder blocks.

32.     The retaining wall benefits both 5 Huguenot Drive and 2 Lafayette Road.

33.     At the time the plaintiffs purchased their home at 5 Huguenot Drive, the retaining wall already contained materials known as, or referred to as, tie back plates and tie back rods.

34.     At no time prior to April 14, 2006 had anyone, including but not limited to defendants Jayne Greenwald, Blaine Greenwald, the Town of Mamaroneck, and/or defendant Ronald Carpaneto made any complaints to either Gary R. Rotenberg or Jane J. Dickson concerning the structural integrity of the retaining wall.

4

35.    The defendant Town of Mamaroneck maintains a file concerning each parcel of property within the Town of Mamaroneck. More particularly, the defendant Town of Mamaroneck maintained a file concerning the plaintiffs' residential property located at 5 Huguenot Drive. The file maintained by the defendant Town of Mamaroneck is available for public inspection and contains records such as deeds, subdivision maps, violations, and correspondence.

36.    On or about March 22, 2006, the plaintiffs entered into a contract with Jackie Carroll of Coldwell Banker for Coldwell Banker to act as the plaintiffs' real estate broker and to sell the plaintiffs' home at 5 Huguenot Drive, Larchmont, New York.

37.    On or about March 22, 2006, the plaintiffs listed their home for sale and their home was formally and publicly listed for sale. Based upon the advice and recommendations of their real estate broker, based upon the current real estate market, and based upon the then fair market value of their home, the plaintiffs listed their home for sale for the price of $1,995,000.00.

38.    By letter dated April 14, 2006, defendants Jayne Greenwald and Blaine Greenwald wrote to the plaintiffs to claim their purported concern with "the structural integrity of your retaining wall that separates our properties ..." and that "Should the wall collapse, damage would occur to both of our properties and houses not to mention the possibility of human injury." The defendants Greenwald further threatened to "hold [the plaintiffs] responsible for any such damage to our property, home, or person resulting from the breakdown or collapse of your retaining wall."

39.    The defendants Greenwald knew that they had no reason to believe that the retaining wall was in danger of collapse or was of an impaired structural integrity, or would cause damage to their properties, homes, or humans.

40.    The defendants Greenwald further falsely stated that the plaintiffs were intending to "put a cosmetic band-aid on a potentially greater problem." The defendants further falsely stated that

the plaintiffs did not want the retaining wall "professionally assessed." In fact, the defendants Greenwald knew that the plaintiffs had never used the word "cosmetic" and the defendants Greenwald knew that the plaintiffs had requested access to the Greenwald's property so that the plaintiffs' professional mason could evaluate and assess the retaining wall.

41.    Defendants Jane Greenwald and Blaine Greenwald purposefully excluded from their April 14, 2006 letter the fact that the retaining wall had remained in substantially the same physical condition for more than 17 years.

42.    The defendants Blaine Greenwald and Jayne Greenwald each knew or were aware that the omission from the April 14, 2006 letter of the fact that the retaining wall had remained in substantially the same physical condition for more than 17 years was one cause of that letter being materially misleading.

43.    By their letter dated April 14, 2006, the defendants Greenwald admitted their knowledge that the plaintiffs' home was then for sale and on the market.

44.    According to defendants Jayne Greenwald and Blaine Greenwald, between April 6, 2006 (the date the Greenwalds contend Gary Rotenberg spoke to them) and April 14, 2006 (the date of their letter), they spoke with defendant Ronald Carpaneto regarding the retaining wall.

45.    Defendant Blaine Greenwald has claimed that approximately one year prior to April 2006, he spoke with defendant Ronald Carpaneto about the residential property located at 3 Huguenot Drive - one of the plaintiffs' neighbors.

46.    Although defendant Blaine Greenwald has claimed that he spoke with defendant Ronald Carpaneto approximately one year prior to April 2006, defendant Blaine Greenwald did not claim that he raised any concern, of any kind, with Ronald Carpaneto during that alleged meeting about the retaining wall.

6

47.     On or about Thursday, May 12, 2005, a retaining wall collapsed on the Henry Hudson Highway in Manhattan. The defendants Greenwald were aware of that event at or about the time of the collapse.

48.     Between May 12, 2005 and April 14, 2006, the defendants Greenwald raised no concern with the structural integrity of the retaining wall with either the plaintiffs or defendant Carpaneto or the defendant Town of Mamaroneck.

49.     The defendants Jayne Greenwald and Blaine Greenwald sent a copy of the aforesaid letter dated April 14, 2006 to defendant Ronald A. Carpaneto, the Town of Mamaroneck, Director of Building Code Enforcement. By sending the copy of the aforesaid letter to the defendant Town of Mamaroneck and its chief building inspector, defendant Carpaneto, defendants Jayne Greenwald and Blaine Greenwald intended to cause the letter to be publically filed with the Town of Mamaroneck's records concerning the plaintiffs' property located at 5 Huguenot Drive.

50.     By sending a copy of the April 14, 2006 letter to the defendant Town of Mamaroneck and its chief building inspector, defendant Ronald Carpaneto, defendants Jayne Greenwald and Blaine Greenwald intended to impair the plaintiffs' ability to sell their home and/or to decrease the value (or selling price) of the plaintiffs' home.

51.     Defendant Jane Greenwald and Blaine Greenwald expected and anticipated that prospective purchases of the plaintiffs' home (or persons acting on behalf of prospective purchasers) would review the files maintained by the Town of Mamaroneck concerning the plaintiffs' property and that such persons would see a copy of the April 14, 2006 letter sent by the defendants Greenwald to the defendants Town of Mamaroneck and Ronald Carpaneto.

52.     By sending a copy of the April 14, 2006 letter to the defendant Town of Mamaroneck and its chief building inspector, defendant Carpaneto, defendants Jayne Greenwald and Blaine

7

Greenwald intended to impose economic duress upon the plaintiffs (by impairing the plaintiffs' ability to sell their home) so that the defendants Greenwald could thereby coerce the plaintiffs into constructing a more esthetically pleasing retaining wall facing into the Greenwalds' property.

53.     On April 17, 2006, three days after the Greenwalds sent their April 14, 2006 letter to the plaintiffs and to the defendant Town of Mamaroneck, the plaintiffs, based upon the advice of their real estate broker, decreased the asking price of their home to $1,895,000.00; on or about May 9, 2006, the asking price was further decreased to $1,795,000.00.

54.     On or about April 24, 2006, Kevin Moore, a building inspector employed by the defendant Town of Mamaroneck in its Building Department, was present at the plaintiffs' residential home at 5 Huguenot Drive.  On that date, Mr. Moore observed the retaining wall and Mr. Moore stated to Gary R. Rotenberg that the retaining wall did not appear to have any structural defects or deficiency.

55.     After sending their April 14, 2006 letter to the defendants Town of Mamaroneck and Ronald Carpaneto the defendants Blaine and Jayne Greenwald claim that they felt that "nothing really had happened" so they placed telephone calls to the defendants Town of Mamaroneck and Ronald Carpaneto.

56.     After telephoning the defendants Town of Mamaroneck and Ronald Carpaneto, the defendants Blaine and Jayne Greenwald claim they continued to feel that "nothing really happened" so they retained an engineer to perform an analysis and to create evidence to provide to the defendant Town of Mamaroneck and to defendant Ronald Carpaneto.

57.     Defendant Blaine Greenwald has claimed that the defendant Town of Mamaroneck advised his wife and him to retain a licensed professional engineer and that the Town of Mamaroneck

specifically referred them to Benedict Salanitro, P.E. The defendants Greenwald understood and believed that Benedict Salanitro was the building inspector for the Town of Scarsdale.

58.     The defendants Greenwald expected and anticipated that by retaining Benedict Salanitro, the person allegedly referred to them by the Town of Mamaroneck, they would derive a benefit and that the plaintiffs would suffer a detriment as a result.

59.     By letter dated June 14, 2006, the defendants Greenwald caused a further letter / report to be sent to defendant Ronald Carpaneto, the Town of Mamaroneck Director of Buildings. By sending the June 14, 2006 letter / report to the defendant Town of Mamaroneck and its chief building inspector, defendant Carpaneto, defendants Jayne Greenwald and Blaine Greenwald intended to cause the letter / report to be publically filed with the Town of Mamaroneck's records concerning the plaintiffs' property located at 5 Huguenot Drive.

60.     Defendants Jane Greenwald and Blaine Greenwald once again purposefully caused the fact that the retaining wall had remained in substantially the same physical condition for more than 17 years to be excluded from the June 14, 2006 letter / report.

61.     The June 14, 2006 letter falsely stated that the plaintiffs were intending to make "cosmetic repairs to the wall...."

62.     The defendants Blaine Greenwald and Jayne Greenwald each knew or were aware that the omission from the June 14, 2006 letter of the fact that the retaining wall had remained in substantially the same physical condition for more than 17 years was one cause of that letter being materially misleading.

63.     By sending the June 14, 2006 letter / report to the defendant Town of Mamaroneck's chief building inspector, defendant Carpaneto, defendants Jayne Greenwald and Blaine Greenwald

9

intended to impair the plaintiffs' ability to sell their home and/or to decrease the value (or selling price) of the plaintiffs' home.

64. Defendant Jane Greenwald and Blaine Greenwald expected and anticipated that prospective purchases of the plaintiffs' home (or persons acting on behalf of prospective purchasers) would review the files maintained by the Town of Mamaroneck concerning the plaintiffs' property and that such persons would see a copy of the June 14, 2006 letter / report sent on behalf of the defendants Greenwald to the defendants Town of Mamaroneck and Ronald Carpaneto.

65. By sending the June 14, 2006 letter / report to the defendant Town of Mamaroneck's chief building inspector, defendant Carpaneto, defendants Jayne Greenwald and Blaine Greenwald intended to impose further economic duress upon the plaintiffs so that the defendants Greenwald could coerce the plaintiffs into constructing a more esthetically pleasing wall facing into the Greenwald's property.

66. On or about June 14, 2006, the plaintiffs, based upon the advice of their real estate broker, decreased the asking price of their home from $1,795,000.00 to $1,695,000.00.

67. On or about June 23, 2006, the defendant Town of Mamaroneck issued a "Notice of Violation and Order to Remedy the Same" to the plaintiffs. The "Notice of Violation" was signed by defendant Ronald A. Carpaneto.

68. The June 23, 2006 Notice of Violation referenced section 302.7 of the New York State Property Maintenance Code, however, the Notice of Violation failed to state or identify, in any manner, the underlying alleged factual basis allegedly supporting the Notice of Violation. The June 23, 2006 Notice of Violation did not identify any particular "accessory structure(s)" allegedly violating the code.

10

69.     Moreover, the June 23, 2006 Notice of Violation also failed to state, in any manner, the nature of the "remedy" sought by the defendant Town of Mamaroneck. Similarly, the June 23, 2006 Notice of Violation failed to inform the plaintiffs the actions, if any, they should (or could) take to remedy the alleged, but unspecified, violation.

70.     The June 23, 2006 Notice of Violation threatened the plaintiffs with possible fines and imprisonment if they did not "remedy" the unspecified condition by Monday, July 3, 2006 - i.e. within five business days from the issuance of the Notice of Violation

71.     Prior to issuing the June 23, 2006 Notice of Violation, defendant Ronald Carpaneto had not conducted any inspection of the plaintiffs' premises; he had no basis in fact to issue the Notice of Violation; he lacked a good faith basis to issue the Notice of Violation, and he lacked probable cause to issue the Notice of Violation.

72.     The June 23, 2006 Notice of Violation was not issued based upon any reasoned judgment or discretion of either defendant Ronald Carpaneto or defendant Town of Mamaroneck.

73.     Defendant Ronald Carpaneto is not an architect.

74.     Defendant Ronald Carpaneto is not an engineer.

75.     Defendant Ronald Carpaneto is not a structural engineer.

76.     Defendant Carpaneto lacked the requisite skill, training, and expertise to render an opinion as to the structural integrity of the retaining wall.

77.     The June 23, 2006 Notice of Violation was issued as a ministerial act by the defendants Ronald Carpaneto and the Town of Mamaroneck.

78.     On June 23, 2006, defendants Town of Mamaroneck and Ronald Carpaneto each were aware that the plaintiffs' home was for sale.

11

79.    On or about June 23, 2006, the defendants Blaine Greenwald and Jayne Greenwald became aware of the existence of the notice of violation issued on June 23, 2006.

80.    On June 23, 2006, defendants Town of Mamaroneck, Ronald Carpaneto, Blaine Greenwald, and Jayne Greenwald each knew that the issuance of a Notice of Violation against the plaintiffs' property would have a significant detrimental impact on the plaintiffs' ability to sell their home and on the value of the plaintiffs' home.

81.    The defendants Blaine Greenwald, Jayne Greenwald, Ronald Carpaneto, and the Town of Mamaroneck were each aware that a typical provision in contracts to buy and sell residential property within the Town of Mamaroneck requires the seller of the residential property to convey the property free of any governmental notices of violations.

82.    The defendants Blaine Greenwald, Jayne Greenwald, Ronald Carpaneto, and the Town of Mamaroneck were each aware that a seller of residential property would be obligated to disclosure to potential purchasers of the residential property of the existence of any outstanding notices of violation.

83.    The defendants Blaine Greenwald, Jayne Greenwald, Ronald Carpaneto, and the Town of Mamaroneck were each aware that the plaintiffs, as a seller of residential property, would be obligated to disclosure to potential purchasers of the plaintiffs' home at 5 Huguenot Drive of the existence of any outstanding notices of violation.

84.    The defendants Blaine Greenwald, Jayne Greenwald, Ronald Carpaneto, and the Town of Mamaroneck sought to, intended to, and did use the threat of penal code sanctions including imprisonment and fines to obtain or to seek to obtain leverage in, at most, a possible civil dispute.

85.    After receiving the Notice of Violation and Order to Remedy the Same dated Friday, June 23, 2006, the plaintiffs promptly contacted an attorney, Dolores Battalia, Esq., to assist them

12

with this matter and to discuss this matter, on their behalf, with the Town of Mamaroneck and its officials.

86.     One reason the plaintiffs promptly contacted an attorney was because the Notice of Violation did not inform the plaintiffs as to (i) what "accessory structure" was alleged to violate the code, (ii) the manner in which the unspecified "accessory structure" was alleged to violate the code, nor (iii) were they advised as to the "remedy" being sought by the Town.

87.     Additionally, the plaintiffs, as attorneys admitted to the practice of law in the State of New York, were highly concerned with the threat that they could be fined and imprisoned if they did not "remedy" the unspecified condition by Monday, July 3, 2006 - i.e. within five business days from the issuance of the Notice of Violation and just at the beginning of the Fourth of July holiday.

88.     The plaintiffs were also concerned about the potential implications that the Notice may have had on their ability to sell their home.  Upon information and belief, Attorney Battalia discussed this matter, on the plaintiffs' behalf, with the Town and its various officials during a period of approximately the end of June 2006 through perhaps mid-September 2006.

89.     During mid-September 2006, because Attorney Battalia had not been able to resolve the issue with the Town, the plaintiffs retained the legal services of Mary Beth Mullins, Esq.

90.     On or about September 14, 2006, the plaintiffs, based upon the advice of their real estate broker, decreased the asking price of their home from $1,695,000.00 to $1,550,000.00.

91.     By letter dated September 18, 2006 and addressed to defendant Ronald Carpaneto, Ms. Mullins, in her capacity as counsel for the plaintiffs, set forth her legal analysis of the issue and she asked Mr. Carpaneto to contact her if he had any questions regarding the matter.

13

92.     On or about September 29, 2006, the defendant Town of Mamaroneck issued a "Notice of Violation and Order to Remedy the Same" to the plaintiffs. The September 29, 2006 "Notice of Violation" was also signed by defendant Ronald A. Carpaneto.

93.     The September 29, 2006 Notice of Violation again referenced section 302.7 of the New York State Property Maintenance Code, however, the Notice of Violation again failed to state or identify, in any manner, the underlying alleged factual basis allegedly supporting the Notice of Violation. The September 29, 2006 Notice of Violation again did not identify any particular "accessory structure(s)" allegedly violating the code.

94.     Like the June 23, 2006 Notice of Violation, the September 29, 2006 Notice of Violation also failed to state, in any manner, the nature of the "remedy" sought by the defendant Town of Mamaroneck. Similarly, the September 29, 2006 Notice of Violation again failed to inform the plaintiffs the actions, if any, they should (or could) take to correct the alleged violation.

95.     Prior to issuing the September 29, 2006 Notice of Violation, defendant Ronald Carpaneto had not conducted any inspection of the plaintiffs' premises; he had no basis in fact to issue the Notice of Violation; he lacked a good faith basis to issue the Notice of Violation, and, he lacked probable cause to issue the Notice of Violation.

96.     The September 29, 2006 Notice of Violation once again threatened the plaintiffs with being fined and imprisoned if they did not "immediately" "remedy" the unspecified condition.

97.     The September 29, 2006 Notice of Violation was not issued based upon any reasoned judgment or discretion of either defendant Ronald Carpaneto or defendant Town of Mamaroneck.

98.     The September 29, 2006 Notice of Violation was issued as a ministerial act by the defendants Ronald Carpaneto and the Town of Mamaroneck.

99.     On October 17, 2006, a criminal prosecution of the plaintiffs was commenced.

14

100. On October 17, 2006, the defendant Town of Mamaroneck issued a Summons (summons number 666-06) with a criminal information to the plaintiffs Gary R. Rotenberg and Jane J. Dickson. The summons and criminal information alleged that the plaintiffs, on July 3, 2006, had violated the Property Maintenance Code §302.7 of New York State.

101. According to the criminal information, the facts upon which the criminal information was based were (i) a July 3, 2006 violation issued, (ii) a September 29, 2006 final notice of violation issued, and (iii) October 17, 2006 summons issued.

102. The Summons was signed by defendant Ronald Carpaneto and directed the plaintiffs to appear in the Town Court of Mamaroneck on October 30, 2006 at 7:00 p.m. (The matter was then adjourned to Monday, November 6, 2006, and then to November 20, 2006.)

103. Prior to issuing the October 17, 2006 Summons and criminal information, defendant Ronald Carpaneto had not conducted any inspection of the plaintiffs' premises; he had no basis in fact to issue the Summons or criminal information, he lacked a good faith basis to issue the Summons and criminal information, and, he lacked probable cause to issue the Summons and criminal information.

104. According to defendant Ronald Carpaneto, the two violations (i.e. the June 23, 2006 Notice of Violation and the September 29, 2006 Notice of Violation) and the summons were based upon the telephone calls of the defendants Greenwald and an engineering report sent to the defendants Town of Mamaroneck and Ronald Carpaneto on behalf of the defendants Greenwald.

105. On or about October 25, 2006, after the criminal prosecution had already been commenced, an engineer, Anthony Oliveri, retained by the defendant Town of Mamaroneck examined the retaining wall.

15

106.    Mr. Oliveri subsequently opined that the lower stone wall appeared straight, he did not see any immediate concerns with the stone part of the wall, and the stone portion of the wall appeared to be in acceptable condition.

107.    Mr. Oliveri further opined that a structural engineer, somebody specializing in retaining walls, would be better suited to give a more thorough evaluation and examination.

108.    On November 20, 2006, the plaintiffs appeared and a trial was held with respect to the Summons issued to the plaintiffs.

109.    Jane Evans, a prospective purchaser of the plaintiffs' property sat in the courtroom throughout the trial.

110.    On November 20, 2006, the plaintiffs were acquitted and found not guilty of the criminal charge brought against them.

111.    On November 22, 2006, the defendants Town of Mamaroneck and Ronald Carpaneto issued a "Notice of Violation Removal" to the plaintiffs which indicated that the violation dated September 29, 2006 which "had been issued for Accessory structures (wall) has been removed."

112.    Between the date on which the plaintiffs moved into their home at 5 Huguenot Drive and until they sold their home at 5 Huguenot Drive, the retaining wall remained in substantially the same physical condition.

113.    Between June 23, 2006 (the date of the first Notice of Violation) and November 22, 2006 (the date of the Notice of Violation Removal) the retaining wall remained in substantially the same physical condition.

114.    On or about December 18, 2006, the plaintiffs sold their home to Douglas Mason and Jane Evans for the price of $1,400,000.00.

16

115.    As part of the sale, and because of the baseless allegations made by the defendants Jayne Greenwald, Blaine Greenwald, Town of Mamaroneck, and Ronald Carpaneto, the plaintiffs were forced to provide an additional $50,000.00 reduction in the price of their home.  Said $50,000.00 represented consideration for Douglas Mason and Jane Evans accepting the retaining wall in an "as is" condition at closing.

### NOTICE OF CLAIM PROVISIONS

116.    On February 12, 2007 a Notice of Claim was duly served and filed with the Clerk of the Town of Mamaroneck; this action was timely commenced, and that at least thirty days have elapsed since the service of the Notice of Claim and an adjustment or payment thereof has been neglected or refused.

### AS AND FOR A CAUSE OF ACTION FOR MALICIOUS PROSECUTION AGAINST DEFENDANTS JAYNE GREENWALD and BLAINE GREENWALD

117.    As more fully described above in the "Background Facts" section of this complaint, the defendants Blaine Greenwald and Jayne Greenwald initiated the criminal prosecution of the plaintiffs.

118.    Defendants Jayne Greenwald and Blaine Greenwald provided false information to the law enforcement authorities and/or they withheld material information and evidence from law enforcement authorities in order to affect the decision as to whether to prosecute the plaintiffs and/or to cause the prosecution of the plaintiffs.  Such facts include, but are not limited to withholding from the law enforcement officials the fact that the retaining wall had remained in substantially the same physical condition for more than 17 years.

119.    As more fully described above in the "Background Facts" section of this complaint, defendants Blaine Greenwald and Jayne Greenwald gave advice, had evidence created, and encouraged and importuned defendants Town of Mamaroneck and Carpaneto to act, including but not limited to paying to have an expert create evidence to be used against the plaintiffs (and by withholding from

17

their expert or by instructing their expert to withhold from his report) the fact that the retaining wall had remained in substantially the same physical condition for more than 17 years.

120.   As more fully described above in the "Background Facts" section of this complaint, defendants Blaine Greenwald and Jayne Greenwald acted without probable cause in causing the commencement of the prosecution of the plaintiffs.

121.   As described above in the "Background Facts" section of this complaint, defendants Blaine Greenwald and Jayne Greenwald acted with malice in causing the prosecution of the plaintiffs.

122.   In addition, the defendant Blaine Greenwald and Jayne Greenwald, in concert and in conjunction, with defendants Town of Mamaroneck and Ronald Carpaneto maliciously used the threat of criminal proceedings and an actual criminal prosecution to seek to resolve, at most, a civil dispute.

123.   As described above in the "Background Facts" section of this complaint, on November 20, 2006, the prosecution of the plaintiffs ended favorably to the plaintiffs when they were acquitted of the charge brought against them.

124.   The plaintiffs seek special damages against the defendants Blaine Greenwald and Jayne Greenwald in (i) the amount of $50,000.00 as the result of the specific reduction in the contract price of the plaintiffs' home, (ii) in excess of $8,727.00 in legal fees incurred as a result of the baseless allegations against the plaintiffs, (iii) in excess of $2,268.00 in expert fees  incurred as a result of the baseless allegations against the plaintiffs, (iv) the diminution in the fair market value of the plaintiffs' home, and (v) the cost of additional mortgage and escrow payments. The plaintiffs also seek general compensatory damages and punitive damages against the defendants Jayne Greenwald and Blaine Greenwald.

18

## AS AND FOR A CAUSE OF ACTION FOR INJURIOUS FALSEHOOD AGAINST DEFENDANTS JAYNE GREENWALD and BLAINE GREENWALD.

125.    As described above in the "Background Facts" section of this complaint, the defendants Blaine Greenwald and Jayne Greenwald each made, or caused to be made, communications falsely casting doubt as to the quality of the plaintiffs' property.

126.    As described above in the "Background Facts" section of this complaint, the communications of defendants Blaine Greenwald and Jayne Greenwald were intended to cast doubt as to the quality of the plaintiffs' property.

127.    As more described above in the "Background Facts" section of this complaint, the communications of defendants Blaine Greenwald and Jayne Greenwald were reasonably calculated to cause harm.

128.    In both of their communications, the defendants Jane Greenwald and Blaine Greenwald purposefully excluded the fact that they had never complained about the structural integrity of the retaining wall at any time during the prior 17 years and they also purposefully excluded the fact that the retaining wall had remained in substantially the same physical condition for more than 17 years.

129.    The defendants Greenwald had no true or genuine interest in seeking governmental action regarding the alleged structural integrity of the retaining wall.

130.    The April 14, 2006 and the June 14, 2006 communications of defendants Blaine Greenwald and Jayne Greenwald caused the plaintiffs' special damages.

131.    The plaintiffs seek special damages against the defendants Blaine Greenwald and Jayne Greenwald in (i) the amount of $50,000.00 as the result of the specific reduction in the contract price of the plaintiffs' home, (ii) in excess of $8,727.00 in legal fees incurred as a result of the baseless allegations against the plaintiffs, (iii) in excess of $2,268.00 in expert fees incurred as a result of the baseless allegations against the plaintiffs, (iv) the diminution in the fair market value of the plaintiffs'

19

home, and (v) the cost of additional mortgage and escrow payments. The plaintiffs also seek general compensatory damages and punitive damages against the defendants Jayne Greenwald and Blaine Greenwald.

## AS AND FOR A CAUSE OF ACTION FOR PRIMA FACIE TORT AGAINST THE DEFENDANTS JANE GREENWALD and BLAINE GREENWALD.

132.   As described above in the "Background Facts" section of this complaint, defendants Blaine Greenwald and Jayne Greenwald intended to inflict harm upon the plaintiffs. Defendants Jane Greenwald and Blaine Greenwald acted solely with malice and disinterested malevolence.

133.   The actions of the defendants Jane Greenwald and Blaine Greenwald were undertaken through an act or a series of acts which might otherwise be lawful.

134.   The actions of defendants Blaine Greenwald and Jayne Greenwald were without any legal justification or excuse.

135.   As a result of the actions of defendants Blaine Greenwald and Jayne Greenwald the plaintiffs suffered special damages

136.   The plaintiffs seek special damages against the defendants Blaine Greenwald and Jayne Greenwald in (i) the amount of $50,000.00 as the result of the specific reduction in the contract price of the plaintiffs' home, (ii) in excess of $8,727.00 in legal fees incurred as a result of the baseless allegations against the plaintiffs, (iii) in excess of $2,268.00 in expert fees incurred as a result of the baseless allegations against the plaintiffs, (iv) the diminution in the fair market value of the plaintiffs' home, and (v) the cost of additional mortgage and escrow payments. The plaintiffs also seek general compensatory damages and punitive damages against the defendants Jayne Greenwald and Blaine Greenwald.

20

## AS AND FOR A CAUSE OF ACTION AGAINST DEFENDANTS JANE GREENWALD AND BLAINE GREENWALD FOR INTERFERENCE WITH PROSPECTIVE ADVANTAGE

137.    The defendants Blaine Greenwald and Jayne Greenwald were aware of the plaintiffs' contract with Coldwell Banker to sell the plaintiffs' home at 5 Huguenot Road.

138.    The defendants Blaine Greenwald and Jayne Greenwald each intentionally interfered with that contract.

139.    The actions of defendants Blaine Greenwald and Jayne Greenwald described herein interfered with the plaintiffs' contract with Coldwell Banker to sell the plaintiffs' home.

140.    The actions of defendants Blaine Greenwald and Jayne Greenwald were wrongful.

141.    The defendants Blaine Greenwald and Jayne Greenwald intended to cause harm to the plaintiffs.

142.    The plaintiffs suffered damages as the result of the wrongful conduct of defendants Blaine Greenwald and Jayne Greenwald.

143.    The plaintiffs seek special damages against the defendants Blaine Greenwald and Jayne Greenwald in (i) the amount of $50,000.00 as the result of the specific reduction in the contract price of the plaintiffs' home, (ii) in excess of $8,727.00 in legal fees incurred as a result of the baseless allegations against the plaintiffs, (iii) in excess of $2,268.00 in expert fees incurred as a result of the baseless allegations against the plaintiffs, (iv) the diminution in the fair market value of the plaintiffs' home, and (v) the cost of additional mortgage and escrow payments. The plaintiffs also seek general compensatory damages and punitive damages against the defendants Jayne Greenwald and Blaine Greenwald.

21

## AS AND FOR A CAUSE OF ACTION AGAINST DEFENDANTS JANE GREENWALD AND BLAINE GREENWALD FOR NEGLIGENCE.

144.    The negligence of defendants Blaine Greenwald and Jayne Greenwald caused economic harm to the plaintiffs.

145.    The plaintiffs seek special damages against the defendants Blaine Greenwald and Jayne Greenwald in (i) the amount of $50,000.00 as the result of the specific reduction in the contract price of the plaintiffs' home, (ii) in excess of $8,727.00 in legal fees incurred as a result of the baseless allegations against the plaintiffs, (iii) in excess of $2,268.00 in expert fees incurred as a result of the baseless allegations against the plaintiffs, (iv) the diminution in the fair market value of the plaintiffs' home, and (v) the cost of additional mortgage and escrow payments. The plaintiffs also seek general compensatory damages and punitive damages against the defendants Jayne Greenwald and Blaine Greenwald.

## AS AND FOR A CAUSE OF ACTION FOR MALICIOUS PROSECUTION AGAINST DEFENDANTS TOWN OF MAMARONECK and RONALD A. CARPANETO.

146.    As more fully described above in the "Background Facts" section of this complaint, the defendants Town of Mamaroneck and Ronald Carpaneto, on October 17, 2006, defendants Town of Mamaroneck and Ronald Carpaneto commenced a criminal proceeding against the plaintiffs.

147.    There was no probable cause to commence the criminal prosecution of the plaintiffs.

148.    The defendants Town of Mamaroneck and Ronald Carpaneto acted maliciously in commencing the prosecution of the plaintiffs.

149.    The defendants Town of Mamaroneck and Ronald Carpaneto maliciously, wilfully, and unconstitutionally used the threat of criminal proceedings and an actual criminal prosecution to seek to resolve, at most, a civil dispute.

22

150.    At the time the criminal prosecution was commenced, other than the inspection conducted by Kevin Moore on or about April 24, 2006 (which determined that the retaining wall did not appear to have any structural defects or deficiency), neither the Town of Mamaroneck nor Ronald Carpaneto had even inspected the plaintiffs' property.

151.    The prosecution of the plaintiffs ended in favor of the plaintiffs when they were acquitted of the charge on November 20, 2006.

152.    The actions of defendants Town of Mamaroneck and Carpaneto deprived the plaintiffs of property without due process.

153.    The acts of defendant Ronald Carpaneto violated the rights granted to the plaintiffs pursuant to the Fourth and Fourteenth Amendments to the United States Constitution. As such, the plaintiffs seek relief against defendant Ronald Carpaneto pursuant to 42 U.S.C. §1983.

154.    The plaintiffs seek special damages against the defendants Town of Mamaroneck and Ronald Carpaneto in (i) the amount of $50,000.00 as the result of the specific reduction in the contract price of the plaintiffs' home, (ii) in excess of $8,727.00 in legal fees incurred as a result of the baseless allegations against the plaintiffs, (iii) in excess of $2,268.00 in expert fees incurred as a result of the baseless allegations against the plaintiffs, (iv) the diminution in the fair market value of the plaintiffs' home, and (v) the cost of additional mortgage and escrow payments. The plaintiffs also seek general compensatory damages against the defendants Town of Mamaroneck and Ronald Carpaneto and also punitive damages against defendant Ronald Carpaneto.

## AS AND FOR A CAUSE OF ACTION FOR INJURIOUS FALSEHOOD AGAINST DEFENDANTS TOWN OF MAMARONECK and RONALD A. CARPANETO.

155.    The defendants Town of Mamaroneck and Ronald Carpaneto made, or caused to be made, communications falsely casting doubt as to the quality of the plaintiffs' property.

23

156. Those communications include the June 23, 2006 Notice of Violation, the September 29, 2006 Notice of Violation, and the October 17, 2006 summons and criminal complaint.

157. The communications of defendants Town of Mamaroneck and Ronald Carpaneto were intended to cast doubt as to the quality of the plaintiffs' property.

158. The communications of defendants Town of Mamaroneck and Ronald Carpaneto were reasonably calculated to cause harm.

159. The communications of the defendants Town of Mamaroneck and Ronald Carpaneto were not based upon reasoned judgment.

160. The communications of defendants Town of Mamaroneck and Ronald Carpaneto caused the plaintiffs' special damages.

161. The plaintiffs seek special damages against the defendants Town of Mamaroneck and Ronald Carpaneto in (i) the amount of $50,000.00 as the result of the specific reduction in the contract price of the plaintiffs' home, (ii) in excess of $8,727.00 in legal fees incurred as a result of the baseless allegations against the plaintiffs, (iii) in excess of $2,268.00 in expert fees incurred as a result of the baseless allegations against the plaintiffs, (iv) the diminution in the fair market value of the plaintiffs' home, and (v) the cost of additional mortgage and escrow payments. The plaintiffs also seek general compensatory damages against the defendants Town of Mamaroneck and Ronald Carpaneto and also punitive damages against defendant Ronald Carpaneto.

## AS AND FOR A CAUSE OF ACTION FOR PRIMA FACIE TORT AGAINST DEFENDANTS TOWN OF MAMARONECK and RONALD A. CARPANETO.

162. The defendants Town of Mamaroneck and Ronald Carpaneto intended to cause harm to the plaintiffs.

24

170.    The defendants Blaine Greenwald, Jayne Greenwald, Town of Mamaroneck, and Ronald Carpaneto acted knowingly and intentionally, and in concert, to cause the acts and failures upon which liability is based.

**WHEREFORE**, the Plaintiffs demand judgment against the defendants

(i) in the amount of $50,000.00 as the result of the specific reduction in the contract price of the plaintiffs' home,

(ii) in excess of $8,727.00 in legal fees incurred as a result of the baseless allegations against the plaintiffs,

(iii) in excess of $2,268.00 in expert fees incurred as a result of the baseless allegations against the plaintiffs,

(iv) the amount of the diminution in the fair market value of the plaintiffs' home,

(v) the cost of additional mortgage and escrow payments;

(vi) general compensatory damages;

(vii) punitive damages against defendants Jayne Greenwald, Blaine Greenwald, and Ronald Carpaneto;

(viii) attorneys' fees,

(ix) the interest, costs and disbursements of this action; and

(x) such other relief as is fair, just, or equitable

Dated: New York, NY
      May 14, 2008

By: _Michael J. Andrews_

Michael J. Andrews (MA 1441)
MICHAEL J. ANDREWS, P.C.
Attorneys for Plaintiffs
Post Office Address
60 East 42nd Street, 47th Floor
New York, N.Y. 10165
(212) 557-7767

EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

-----------------------------------------------------------x

GARY R. ROTENBERG and JANE J. DICKSON



Plaintiffs,

-against-

THE TOWN OF MAMARONECK,
RONALD A. CARPANETO, (individually);
JAYNE GREENWALD, and
BLAINE GREENWALD,

over ⟩

Defendants.

-----------------------------------------------------------x

Date Purchased: 7/6/07

Index No. 12167/2007
Plaintiffs designates
WESTCHESTER County
as the place of trial
The basis of venue is
CPLR §504(2)

**SUMMONS**



RECEIVED

JUL -6 2007

TIMOTHY C. IDONI
COUNTY CLERK
COUNTY OF WESTCHESTER

To the above-named Defendant(s):

        You are hereby summoned to answer the complaint in this action and to
serve a copy of your answer, or, if the complaint is not served with this summons, to
serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the
service of this summons, exclusive of the day of service (or within 30 days after the
service is complete if this summons is not personally delivered to you within the State
of New York); and in case of your failure to appear or answer, judgment will be taken
against you by default for the relief demanded in the complaint.

Dated: New York, N.Y.
        July 3, 2007

RECEIVED

JUL 2 4 2007

MAMARONECK TOWN CLERK

Defendant's addresses:

TOWN OF MAMARONECK
740 West Boston Post Road
Mamaroneck, NY 10543

RONALD CARPANETO
c/o Town of Mamaroneck
740 West Boston Post Road
Mamaroneck, NY 10543

JAYNE GREENWALD
2 Lafayette Drive
Larchmont, NY 10538

BLAINE GREENWALD
2 Lafayette Drive
Larchmont, NY 10538

By:  _____
MICHAEL J. ANDREWS

MICHAEL J. ANDREWS, P.C.
Attorneys for Plaintiff(s)
Post Office Address
60 East 42nd Street
47th Floor
New York, N.Y. 10165
(212) 557-7767

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
--------------------------------------------------------------X

GARY R. ROTENBERG and JANE J. DICKSON

                                    Plaintiff,                    **COMPLAINT**

    - against -                    RECEIVED                   Index number: 12167/2--

THE TOWN OF MAMARONECK,
RONALD A. CARPANETO, (individually);
JAYNE GREENWALD, and                    JUL - 6 2007          Plaintiffs Demand Trial
BLAINE GREENWALD,                                             By Jury
                                        TIMOTHY C. IDONI
                                        COUNTY CLERK
                                        COUNTY OF WESTCHESTER

--------------------------------------------------------------X

The plaintiffs, complaining of the defendants by their attorneys, MICHAEL J. ANDREWS,

P.C., hereby allege upon information and belief as follows:

### THE PARTIES

1.      The plaintiff GARY R. ROTENBERG ("ROTENBERG") is an adult.

2.      The plaintiff JANE J. DICKSON ("DICKSON") is an adult.

3.      At all relevant times, Gary R. Rotenberg and Jane J. Dickson have been lawfully married

to one another.

4.      The defendant TOWN OF MAMARONECK ("MAMARONECK") is a municipal

corporation duly organized under the laws of the State of New York.

5.      At all relevant times, defendant TOWN OF MAMARONECK was acting under color

of law, to wit: the laws of the State of New York and the Town of Mamaroneck.

6.      The defendant RONALD A. CARPANETO ("CARPANETO") is an adult.

7.      At all relevant times, defendant CARPANETO was and is an employee of the defendant

MAMARONECK.

8.    At all relevant times, defendant CARPANETO was employed by the defendant MAMARONECK as its Director of Buildings.

9.    At all relevant times, defendant CARPANETO was acting within the scope of his employment and in the furtherance of his duties with defendant MAMARONECK. Defendant CARPANETO is sued only in his individual capacity.

10.    Upon information and belief, defendant CARPANETO had final decision making authority, on behalf of the defendant Town of Mamaroneck, for the events described in this complaint.

11.    At all relevant times, defendant CARPANETO was acting under color of law, to wit the laws of the State of New York and the Town of Mamaroneck.

12.    The defendant JAYNE GREENWALD is an adult person.

13.    The defendant BLAINE GREENWALD is an adult person.

## BACKGROUND FACTS

14.    During approximately April or May 1988, the plaintiffs, as husband and wife, signed a contract to purchase a residential home located at 5 Huguenot Drive, Larchmont, New York. During approximately August 1988, the plaintiffs moved into the residence at 5 Huguenot Drive ("5 Huguenot Drive").

15.    The plaintiffs used the home at 5 Huguenot Drive as their residence until approximately July 7, 2006.

16.    On or about December 7, 2006, the plaintiffs entered into a contract to sell their residential property located at 5 Huguenot Drive. On or about December 18, 2006, the plaintiffs home was sold.

17.    During approximately December 1988, the defendants Jayne and Blaine Greenwald purchased a residential home located at 2 Lafayette Road, Larchmont, New York ("2 Lafayette Road").

2

18.    The aforesaid residential property located at 5 Huguenot Drive abuts the aforesaid residential property located at 2 Lafayette Road.

19.    The two residential properties referred to herein as 5 Huguenot Drive and 2 Lafayette Road were constructed at or near the same time and as part of a subdivision.

20.    A retaining wall ("the retaining wall"), approximately fifteen feet in height, is situated at the rear of the residential property located at 5 Huguenot Drive. The retaining wall faces into the residential property located at 2 Lafayette Road.

21.    The retaining wall has a lower portion constructed of stone and an upper portion constructed of cinder blocks.

22.    The retaining wall benefits both 5 Huguenot Drive and 2 Lafayette Road.

23.    At the time the plaintiffs purchased their home at 5 Huguenot Drive, the retaining wall already contained materials known as, or referred to as, tie back plates and tie back rods.

24.    At no time prior to April 14, 2006 had anyone, including but not limited to defendants Jayne Greenwald, Blaine Greenwald, the Town of Mamaroneck, and/or defendant Ronald Carpaneto made any complaints to either Gary R. Rotenberg or Jane J. Dickson concerning the structural integrity of the retaining wall.

25.    The defendant Town of Mamaroneck maintains a file concerning each parcel of property within the Town of Mamaroneck. More particularly, the defendant Town of Mamaroneck maintained a file concerning the plaintiffs' residential property located at 5 Huguenot Drive. The file maintained by the defendant Town of Mamaroneck is available for public inspection and contains records such as deeds, subdivision maps, violations, and correspondence.

3

26.     On or about March 22, 2006, the plaintiffs entered into a contract with Jackie Carroll of Coldwell Banker for Coldwell Banker to act as the plaintiffs' real estate broker and to sell the plaintiffs' home at 5 Huguenot Drive, Larchmont, New York.

27.     On or about March 22, 2006, the plaintiffs listed their home for sale and their home was formally and publically listed for sale. Based upon the advice and recommendations of their real estate broker, based upon the current real estate market, and based upon the then fair market value of their home, the plaintiffs listed their home for sale for the price of $1,995,000.00.

28.     By letter dated April 14, 2006, defendants Jayne Greenwald and Blaine Greenwald wrote to the plaintiffs to claim their purported concern with "the structural integrity of your retaining wall that separates our properties ..." The defendants Greenwald further threatened to "hold [the plaintiffs] responsible for any such damage to our property, home, or person resulting from the breakdown or collapse of your retaining wall." The defendants Greenwald had no reason to believe that the retaining wall was in danger of collapse or was of an impaired structural integrity.

29.     By their letter dated April 14, 2006, the defendants Greenwald admitted their knowledge that the plaintiffs' home was then for sale and on the market.

30.     The defendants Jayne Greenwald and Blaine Greenwald sent a copy of the aforesaid letter dated April 14, 2006 to defendant Ronald A. Carpaneto, the Town of Mamaroneck, Director of Building Code Enforcement. By sending the copy of the aforesaid letter to the defendant Town of Mamaroneck and its chief building inspector, defendant Carpaneto, defendants Jayne Greenwald and Blaine Greenwald intended to cause the letter to be publically filed with the Town of Mamaroneck's records concerning the plaintiffs' property located at 5 Huguenot Drive.

31.     By sending a copy of the April 14, 2006 letter to the defendant Town of Mamaroneck and its chief building inspector, defendant Ronald Carpaneto, defendants Jayne Greenwald and Blaine

4

Greenwald intended to impair the plaintiffs' ability to sell their home and/or to decrease the value (or selling price) of the plaintiffs' home.

32.    By sending a copy of the April 14, 2006 letter to the defendant Town of Mamaroneck and its chief building inspector, defendant Carpaneto, defendants Jayne Greenwald and Blaine Greenwald intended to impose economic duress upon the plaintiffs (by impairing the plaintiffs' ability to sell their home) so that the defendants Greenwald could thereby coerce the plaintiffs into constructing a more esthetically pleasing retaining wall facing into the Greenwald's property.

33.    Defendant Jane Greenwald and Blaine Greenwald expected and anticipated that prospective purchases of the plaintiffs' home (or persons acting on behalf of prospective purchasers) would review the files maintained by the Town of Mamaroneck concerning the plaintiffs' property and that such persons would see a copy of the April 14, 2006 letter sent by the defendants Greenwald to the defendants Town of Mamaroneck and Ronald Carpaneto.

34.    On April 17, 2006, three days after the Greenwald's sent their April 14, 2006 letter to the plaintiffs and to the defendant Town of Mamaroneck, the plaintiffs, based upon the advice of their real estate broker, decreased the asking price of their home to $1,895,000.00; on or about May 9, 2006, the asking price was further decreased to $1,795,000.00.

35.    On or about April 24, 2006, Kevin Moore of the defendant Town of Mamaroneck Building Department, was present at the plaintiffs' residential home at 5 Huguenot Drive. On that date, Mr. Moore observed the retaining wall and Mr. Moore stated to Gary R. Rotenberg that the retaining wall did not appear to have any structural defects or deficiency.

36.    After sending their April 14, 2006 letter to the defendants Town of Mamaroneck and Ronald Carpaneto the defendants Blaine and Jayne Greenwald felt that "nothing really had happened" so they placed telephone calls to the defendants Town of Mamaroneck and Ronald Carpaneto.

5

37. After telephoning the defendants Town of Mamaroneck and Ronald Carpaneto, the defendants Blaine and Jayne Greenwald continued to feel that "nothing really happened" so they retained an engineer to perform an analysis so they could provide to the defendant Town of Mamaroneck and defendant Ronald Carpaneto with a written report.

38. By letter dated June 14, 2006, the defendants Greenwald caused a further letter / report to be sent to defendant Ronald Carpaneto, the Town of Mamaroneck Director of Buildings. By sending the June 14, 2006 letter / report to the defendant Town of Mamaroneck and its chief building inspector, defendant Carpaneto, defendants Jayne Greenwald and Blaine Greenwald intended to cause the letter / report to be publically filed with the Town of Mamaroneck's records concerning the plaintiffs' property located at 5 Huguenot Drive.

39. By sending the June 14, 2006 letter / report to the defendant Town of Mamaroneck's chief building inspector, defendant Carpaneto, defendants Jayne Greenwald and Blaine Greenwald intended to impair the plaintiffs' ability to sell their home and/or to decrease the value (or selling price) of the plaintiffs' home.

40. By sending the June 14, 2006 letter / report to the defendant Town of Mamaroneck's chief building inspector, defendant Carpaneto, defendants Jayne Greenwald and Blaine Greenwald intended to impose further economic duress upon the plaintiffs so that the defendants Greenwald could coerce the plaintiffs into constructing a more esthetically pleasing wall facing into the Greenwald's property.

41. Defendant Jane Greenwald and Blaine Greenwald expected and anticipated that prospective purchases of the plaintiffs' home (or persons acting on behalf of prospective purchasers) would review the files maintained by the Town of Mamaroneck concerning the plaintiffs' property and

6

that such persons would see a copy of the June 14, 2006 letter / report sent on behalf of the defendants Greenwald to the defendants Town of Mamaroneck and Ronald Carpaneto.

42.     On or about June 14, 2006, the plaintiffs, based upon the advice of their real estate broker, decreased the asking price of their home from $1,795,000.00 to $1,695,000.00.

43.     On or about June 23, 2006, the defendant Town of Mamaroneck issued a "Notice of Violation and Order to Remedy the Same" to the plaintiffs. The "Notice of Violation" was signed by defendant Ronald A. Carpaneto.

44.     On June 23, 2006, defendants Town of Mamaroneck and Ronald Carpaneto each were aware that the plaintiffs' home was for sale.

45.     On June 23, 2006, defendants Town of Mamaroneck and Ronald Carpaneto each knew that the issuance of a Notice of Violation against the plaintiffs' property would have a significant detrimental impact on the plaintiffs' ability to sell their home and on the value of the plaintiffs' home.

46.     The June 23, 2006 Notice of Violation referenced section 302.7 of the New York State Property Maintenance Code, however, the Notice of Violation failed to state or identify the underlying alleged factual basis allegedly supporting the Notice of Violation. The June 23, 2006 Notice of Violation did not identify any particular "accessory structure(s)" allegedly violating the code.

47.     Moreover, the June 23, 2006 Notice of Violation also failed to state, in any manner, the nature of the "remedy" sought by the defendant Town of Mamaroneck. Similarly, the Notice of Violation failed to inform the plaintiffs the actions, if any, they should (or could) take to correct the alleged violation.

48.     Prior to issuing the June 23, 2006 Notice of Violation, defendant Ronald Carpaneto had not conducted any inspection of the plaintiffs' premises; he had no basis in fact to issue the Notice of

7

Violation; he lacked a good faith basis to issue the Notice of Violation, and he lacked probable cause to issue the Notice of Violation.

49.    On or about September 14, 2006, the plaintiffs, based upon the advice of their real estate broker, decreased the asking price of their home from $1,695,000.00 to $1,550,000.00.

50.    On or about September 29, 2006, the defendant Town of Mamaroneck issued a "Notice of Violation and Order to Remedy the Same" to the plaintiffs. The September 29, 2006 "Notice of Violation" was also signed by defendant Ronald A. Carpaneto.

51.    The September 29, 2006 Notice of Violation again referenced section 302.7 of the New York State Property Maintenance Code, however, the Notice of Violation again failed to state or identify, in any manner, the underlying alleged factual basis allegedly supporting the Notice of Violation. The September 29, 2006 Notice of Violation again did not identify any particular "accessory structure(s)" allegedly violating the code.

52.    The September 29, 2006 Notice of Violation also failed to state, in any manner, the nature of the "remedy" sought by the defendant Town of Mamaroneck. Similarly, the September 29, 2006 Notice of Violation again failed to inform the plaintiffs the actions, if any, they should (or could) take to correct the alleged violation.

53.    Prior to issuing the September 29, 2006 Notice of Violation, defendant Ronald Carpaneto had not conducted any inspection of the plaintiffs' premises; he had no basis in fact to issue the Notice of Violation; he lacked a good faith basis to issue the Notice of Violation, and, he lacked probable cause to issue the Notice of Violation.

54.    On October 17, 2006, the defendant Town of Mamaroneck issued a Summons (summons number 666-06) to the plaintiffs Gary R. Rotenberg and Jane J. Dickson. The Summons was signed by defendant Ronald Carpaneto and directed the plaintiffs to appear in the Town Court of

8

Mamaroneck on October 30, 2006 at 7:00 p.m. (The matter was then adjourned to Monday November 6, 2006, and then to November 20, 2006.)

55.    The proceeding commenced against the plaintiffs was a criminal proceeding.

56.    Prior to issuing the October 17, 2006 Summons, defendant Ronald Carpaneto had not conducted any inspection of the plaintiffs' premises; he had no basis in fact to issue the Summons, he lacked a good faith basis to issue the Summons; and, he lacked probable cause to issue the Summons.

57.    According to defendant Ronald Carpaneto, the two violations and the summons were based upon the telephone calls of the defendants Greenwald and an engineering report sent to the defendants Town of Mamaroneck and Ronald Carpaneto on behalf of the defendants Greenwald.

58.    On or about October 25, 2006, an engineer, Anthony Oliveri, retained by the defendant Town of Mamaroneck examined the retaining wall.

59.    Mr. Oliveri subsequently opined that the lower stone wall appeared straight, he did not see any immediate concerns with the stone part of the wall, and the stone portion of the wall appeared to be in acceptable condition.

60.    Mr. Oliveri further opined that a structural engineer, somebody specializing in retaining walls, would be better suited to give a more thorough evaluation and examination.

61.    On November 20, 2006, the plaintiffs appeared and a trial was held with respect to Summons issued to the plaintiffs.

62.    One of the prospective purchasers of the plaintiffs' property sat in the courtroom throughout the trial.

63.    On November 20, 2006, the plaintiffs received a favorable termination of the proceeding commenced against them.

9

64.    On November 22, 2006, the defendants Town of Mamaroneck and Ronald Carpaneto issued a "Notice of Violation Removal" to the plaintiffs which indicated that the violation dated September 29, 2006 which "had been issued for Accessory structures (wall) has been removed."

65.    Between the date on which the plaintiffs moved into their home at 5 Huguenot Drive and until they sold their home at 5 Huguenot Drive, the retaining wall remained in substantially the same physical condition.

66.    Between June 23, 2006 and November 22, 2006, the retaining wall remained in substantially the same physical condition.

67.    Upon information and belief, the retaining wall continues to remain in substantially the same physical condition as it did throughout the plaintiffs' ownership of 5 Huguenot Drive.

68.    On or about September 23, 2006, the plaintiffs entered into a memorandum of understanding to sell their home to Douglas Mason and Jane Evans.  The agreed upon price was $1,450,000.00.

69.    On or about December 18, 2006, the plaintiffs sold their home to Douglas Mason and Jane Evans for the price of $1,400,000.00.

70.    As part of the sale, and because of the baseless allegations made by the defendants Jayne Greenwald, Blaine Greenwald, Town of Mamaroneck, and Ronald Carpaneto, the plaintiffs were forced to provide an additional $50,000.00 reduction in the price of their home.  Said $50,000.00 represented consideration for Douglas Mason and Jane Evans accepting the retaining wall in an "as is" condition at closing.

### NOTICE OF CLAIM PROVISIONS

71.    On February 12, 2007 a Notice of Claim was duly served and filed with the Clerk of the Town of Mamaroneck; this action was commenced within one year and ninety days from the accrual

10

of the action; and that at least thirty days have elapsed since the service of the Notice of Claim and an adjustment or payment thereof has been neglected or refused.

## AS AND FOR CLAIMS AGAINST DEFENDANTS JAYNE GREENWALD and BLAINE GREENWALD

72.    The defendants Blaine Greenwald and Jayne Greenwald each made, or caused to be made, communications falsely casting doubt as to the quality of the plaintiffs' property.

73.    The communications of defendants Blaine Greenwald and Jayne Greenwald were intended to cast doubt as to the quality of the plaintiffs' property.

74.    The communications of defendants Blaine Greenwald and Jayne Greenwald were reasonably calculated to cause harm.

75.    The communications of defendants Blaine Greenwald and Jayne Greenwald caused the plaintiffs' special damages, including diminution in the value of the plaintiffs' home, additional mortgage and escrow payments, and attorneys' fees and expert fees.

76.    The defendants Blaine Greenwald and Jayne Greenwald were aware of the plaintiffs' contract with Coldwell Banker to sell the plaintiffs' home at 5 Huguenot Road.

77.    The defendants Blaine Greenwald and Jayne Greenwald each intentionally interfered with that contract.

78.    The actions of defendants Blaine Greenwald and Jayne Greenwald interfered with the plaintiffs' contract with Coldwell Banker to sell the plaintiffs' home.

79.    The actions of defendants Blaine Greenwald and Jayne Greenwald were wrongful.

80.    The defendants Blaine Greenwald and Jayne Greenwald intended to cause harm to the plaintiffs.

11

81.    The plaintiffs suffered damages as the result of the wrongful conduct of defendants Blaine Greenwald and Jayne Greenwald.

82.    Defendants Blaine Greenwald and Jayne Greenwald intended to inflict harm upon the plaintiffs.

83.    As a result of the actions of defendants Blaine Greenwald and Jayne Greenwald the plaintiffs suffered special damages, including diminution in the value of the plaintiffs' home, additional mortgage and escrow payments, and attorneys' fees and expert fees.

84.    The actions of defendants Blaine Greenwald and Jayne Greenwald were without any legal justification or excuse.

85.    The actions of defendants Blaine Greenwald and Jayne Greenwald caused the commencement of the prosecution of the plaintiffs.

86.    Defendants Blaine Greenwald and Jayne Greenwald gave advice, had evidence created, and encouraged and importuned defendants Town of Mamaroneck and Carpaneto to act.

87.    Defendants Blaine Greenwald and Jayne Greenwald acted without probable cause in causing the commencement of the prosecution of the plaintiffs.

88.    Defendants Blaine Greenwald and Jayne Greenwald acted with malice in causing the prosecution of the plaintiffs.

89.    The prosecution of the plaintiffs ended favorably to the plaintiffs.

90.    The plaintiffs seek special damages against the defendants Blaine Greenwald and Jayne Greenwald in the amount of $350,000.00 and general compensatory damages an amount of money exceeding the monetary jurisdiction of all lower courts which would otherwise have jurisdiction over this action.

12

102. As a result of the actions of defendants Town of Mamaroneck and Ronald Carpaneto the plaintiffs suffered special damages, including diminution in the value of the plaintiffs' home, additional mortgage and escrow payments, and attorneys' fees and expert fees.

103. The actions of defendants Town of Mamaroneck and Ronald Carpaneto were without any legal justification or excuse.

104. On October 17, 2006, defendants Town of Mamaroneck and Ronald Carpaneto commenced a criminal proceeding against the plaintiffs.

105. There was no probable cause to commence the criminal prosecution of the plaintiffs.

106. The defendants Town of Mamaroneck and Ronald Carpaneto acted maliciously in commencing the prosecution of the plaintiffs.

107. The prosecution of the plaintiffs ended in favor of the plaintiffs.

108. The actions of defendants Town of Mamaroneck and Carpaneto deprived the plaintiffs of property without due process.

109. The acts of defendants Town of Mamaroneck and Ronald Carpaneto violated the rights granted to the plaintiffs pursuant to the Fourth and Fourteenth Amendments to the United States Constitution. As such, the plaintiffs seek relief pursuant to 42 U.S.C. §1983.

110. The plaintiffs seek special damages against the defendants the Town of Mamaroneck and Ronald Carpaneto in the amount of $350,000.00 and general compensatory damages in an amount of money exceeding the monetary jurisdiction of all lower courts which would otherwise have jurisdiction over this action.

WHEREFORE, the Plaintiffs demand judgment against the defendants (i) in special damages in the amount of $350,000.00, (ii) general compensatory damages in an amount of money exceeding the monetary jurisdiction of all lower courts which would otherwise have jurisdiction over this action,

14

(iii) punitive damages, (iv) attorneys' fees, together with the interest, costs and disbursements of this action.

Dated: New York, NY
     July 3, 2007

By:     *Michael J. Andrews*

      Michael J. Andrews

MICHAEL J. ANDREWS, P.C.
Attorneys for Plaintiffs
Post Office Address
60 East 42nd Street, 47th Floor
New York, N.Y. 10165
(212) 557-7767

15

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-------------------------------------------------------------------- X
GARY R. ROTENBERG and JANE J. DICKSON,                        Index No.: 12167/2007

                                    Plaintiff(s)
                                                              NOTICE OF ENTRY
            - against --

THE TOWN OF MAMARONECK, RONALD A.
CARPANETO, (individually), JAYNE GREENWALD,
and BLAINE GREENWALD,

                                    Defendant(s)
-------------------------------------------------------------------- X

        PLEASE TAKE NOTICE, that the within is a true copy of a Decision and Order entered

in the Office of the Clerk of the within named court on January 17, 2008.

Dated:  White Plains, New York
        January 21, 2008

                                Yours, etc.,

                                VOUTÉ, LOHRFINK, MAGRO & COLLINS, LLP
                                Attorney for Defendants GREENWALD

                                By: _____
                                Ralph F. Schoene
                                170 Hamilton Avenue
                                White Plains, NY 10601
                                914-946-1400

TO:     MICHAEL J. ANDREWS, P.C.
        Attorneys for Plaintiffs
        60 East 42nd Street, 47th Floor
        New York, New York  10165
        (212) 557-7767

        MIRANDA & SOKOLOFF, ESQS.
        Attorneys for Defendants
        THE TOWN OF MAMARONECK and
        RONALD A. CARPANETO
        240 Mineola Blvd.
        Mineola, New York  11501
        (516) 741-8388

9-9-11-20325
TM

To commence the statutory time for
appeals as of right (CPLR 5513 [a]),
you are advised to serve a copy of this
order, with notice of entry, upon all
parties.

```
┌─────────────────────────────┐
│                             │
│          FILED              │
│           AND               │
│         ENTERED             │
│   ON  1-17  20 08           │
│       WESTCHESTER           │
│       COUNTY CLERK          │
│                             │
└─────────────────────────────┘
```

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-------------------------------------------------------------------X
GARY R. ROTENBERG and JANE J. DICKSON,

                                    Plaintiffs,

              - against -

                                                    DECISION AND ORDER

THE TOWN OF MAMARONECK,                             Index No. 12167/07
RONALD A. CARPANETO, (individually),
JAYNE GREENWALD, and BLAINE GREENWALD,

                                    Defendants.

-------------------------------------------------------------------X
LIEBOWITZ, J.

        The following documents numbered 1 to 32 were read in connection with the

motion to dismiss of defendants Janye Greenwald and Blaine Greenwald, and the motion to

dismiss of defendants The Town of Mamaroneck (the "Town")and Ronald A. Carpaneto.

        Greenwald Defendants' Notice of Motion, Affidavits and Supporting Papers      1-8
        Town and Carpaneto's Notice of Motion, Affidavits and Supporting Papers       9-20
        Opposing Affidavits and Supporting Papers                                     21-29
        Reply Affidavits and Supporting Papers                                        30-31; 32

        Defendants, Blaine Greenwald and Jayne Greenwald  reside at 2 Lafayette Road, Larchmont,

New York.  Their residence is located is within the Town of Mamaroneck.  A portion of the

JAN 1 8 2008

Greenwald's property abuts property that is owned by plaintiffs. There exists a retaining wall on plaintiff's property, where the two properties join. Plaintiffs' premises are situated some 15 to 20 feet higher than the Greenwald's property. The wall is constructed of stone at the base. The upper five (5) feet of the wall is comprised of cement block. Over a period of time, the wall shifted so that it is leaning out over the Greenwald's property.

A series of communications between plaintiffs and the Greenwalds concerning the wall took place, beginning on April 6, 2006. Plaintiffs had requested permission that a mason be allowed on the Greenwald's property to gain access to the wall to effect repairs. The Greenwalds countered by saying that they wanted an engineer to evaluate the wall's condition before any repairs were undertaken. This was refused by plaintiffs. The Greenwalds then sent a letter to plaintiffs on April 14, 2006, with a copy sent to Ronald A. Carpeneto, the Building Inspector for the Town. This letter documented the Greenwald's concerns, as previously stated. The Town then advised the Greenwalds to retain a licensed engineer and recommended Benedict A. Salanitro, P.E. The Town ultimately prosecuted plaintiffs for a building code violation, which case was dismissed after trial.

While the foregoing was taking place, but after the letter was issued by the Greenwalds, plaintiffs placed their home on the market. Originally priced at $1,995,000.00, the house ultimately sold for $1,450,000.00 on December 7, 2006.

The complaint served in this action contains one hundred and ten (110) allegations against the Greenwalds, the Town and Ronald A. Carpeneto. Motions have been made by the various defendants seeking dismissal pursuant to CPLR §§3211(a) (7) and 3211(a) (5). The Town has also moved to dismiss pursuant to General Municipal Law §50-e. A review of the complaint reveals a

2

detailed recitation of the facts in issue with a reference to a violation of 42 USC§1983. There is also an allegation that by reason of the factual circumstances, defendants are liable to plaintiffs for special damages in the sum of $350,000.00.

In the affirmation in support of the Greenwald's motion, the affirmant offers an interpretation as to what causes of action <u>might</u> be contained in the complaint. The complaint in a lawsuit is intended to provide a defendant with official notice regarding the matters for which a plaintiff intends to seek redress. In addition to a factual matrix, the complaint must contain a cognizable cause of action. In this case, the complaint is an aggregation of allegations which do not rise to the level of specificity required by law. This conclusion is underscored by defense counsel's attempt to opine as to the essence of plaintiffs' cause of action. Under these circumstances, the Court has no choice but to dismiss the complaint.

On the basis of the foregoing, it is hereby

ORDERED that the motion to dismiss of defendant Janye Greenwald and Blaine Greenwald is granted; and it is further

ORDERED that the motion to dismiss of defendant The Town of Mamaroneck and Ronald A. Carpaneto is granted; and it is further

ORDERED that the complaint herein is dismissed.

This constitutes the Decision and Order of this Court.

Dated: White Plains, New York
      January 16, 2008

                                  *Richard B. Liebowitz*
                                RICHARD B. LIEBOWITZ
                                SUPREME COURT JUSTICE

3

Voute, Lohrfink, Magro & Collins, LLP
Attorneys for Defendants
Jayne Greenwald and Blaine Greenwald
170 Hamilton Avenue
White Plains, New York 10601

Miranda Sokoloff Sambursky Slone Verveniotis LLP
Attorneys for Defendants
The Town of Mamaroneck and
Ronald A. Carpaneto
240 Mineola Blvd.
Mineola, New York 11501

Michael J. Andrews, P.C.
Attorneys for Plaintiffs
60 East 42nd Street, Suite 4700
New York , New York 10165

4

Affidavit of Service

STATE OF NEW YORK      )
                              ) SS:
COUNTY OF WESTCHESTER  )

        Mary Ann Fera being sworn says:

        I am not a party to the action, am over 18 years of age and reside in Bronx, N.Y.

        On January 21, 2008, I served a true copy of the annexed

        NOTICE OF ENTRY OF DECISION AND ORDER

by mailing the same in a sealed envelope, with postage prepaid thereon, in a post-office or official depository of the U.S. Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

TO:     MICHAEL J. ANDREWS, P.C.
        Attorneys for Plaintiffs
        60 East 42nd Street, 47th Floor
        New York, New York 10165
        (212) 557-7767

        MIRANDA & SOKOLOFF, ESQS.
        Attorneys for Defendants
        THE TOWN OF MAMARONECK and
        RONALD A. CARPANETO
        240 Mineola Blvd.
        Mineola, New York 11501
        (516) 741-8388

                                 Mary Ann Fera

Sworn to before me on the
21st day of January, 2008.

RALPH F. SCHOENE
Notary Public, State of New York
No. 4713988
Qualified in Westchester County
Commission Expires 4/30/10

# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTHCESTER

-------------------------------------------------------------x

GARY R. ROTENBERG and JANE J. DICKSON,

                           Plaintiff(s),

     -against-

THE TOWN OF MAMARONECK, RONALD A.
CARPANETO, (individually), JAYNE GREENWALD
and BLAINE GREENWALD

                        Defendant(s).

-------------------------------------------------------------x

Index No.: 12167/07

**AFFIDAVIT OF
RONALD A. CARPANETO**

STATE OF NEW YORK    )
                         : SS
COUNTY OF WESTCHESTER)

     **RONALD A. CARPANETO**, being duly sworn deposes and says:

    1.     I am the Director of Building Code Enforcement and Land Use Administration for the Town of Mamaroneck and have held that position for 10 years.

    2.     I submit this affidavit based on my knowledge of the facts and circumstances surrounding the claims being made against me and the Town, as well as the documents involved in this matter.

    3.     I submit this affidavit in support of the motion being made by counsel on behalf of myself and the Town to dismiss the plaintiffs' complaint.

    4.     As part of my duties and responsibilities as the Director of Building Code Enforcement and Land Use Administration, I respond to complaints made by concerned citizens regarding issues in the Town. I help to protect the safety of Town residents and add to residents' quality of life by helping to ensure compliance with municipal regulations. I am

authorized by the Town to issue Notices of Violation. In the event that the Notices are not corrected, I am authorized by the Town to issue a Summons.

5.    Sometime in April 2006, I was contacted by Jayne and Blaine Greenwald because they were concerned about the structural integrity of the retaining wall located between the Greenwald's property located at 2 Lafayette Road and the property formerly owned by the plaintiffs (hereinafter "the Rotenbergs"), located at 5 Huguenot Drive.

6.    There is no dispute that the wall is located on the Rotenbergs' property, 5 Huguenot Drive.

7.    After several visits to the property, I determined, based on a visual inspection, that the wall did not appear safe and could potentially cause damage to the Greenwald's property or worse, result in personal injury.

8.    The wall, which is approximately 20' high, is made partially of stone on the lower half and cinderblock on the upper portion. There is some cracking in the lower portion where water comes through. But my main concern was that the top portion shifted out over the edge of the stone and there was a difference of four or fire inches on the face of the wall. The wall appeared to be leaning. Also, the tie backs were rusted.

9.    Based on my opinion that it was in the public's interest that the wall be repaired, I issued a Notice of Violation, dated June 23, 2006 to the Rotenbergs. A copy of the Notice is annexed hereto as Exhibit A.

10.   The Notice of Violation indicated a violation of NY State Code PM302.7 in that all Accessory Structures, including walls, must be maintained structurally sound and in good repair.

2

11.    Although the Notice gave the plaintiffs until July 3, 2006 to remedy the condition, in fact the Town gave them much more time. It was not until September 29, 2006 that a Final Notice was sent to the Rotenbergs. A copy of the Notice is annexed hereto as Exhibit B.

12.    The Rotenbergs made no effort to correct the problem or contact the Town to discuss the matter.

13.    On October 17, 2006, a summons was issued by the Town to the Rotenbergs for their failure to correct the Violation. A copy of the Summons is annexed hereto as Exhibit C.

14.    At around the time the plaintiffs hired John Annunziata, P.E., P.C. who submitted a report (copy attached hereto as Exhibit D) that the wall was stable, the Town hired Anthony Oliveri, P.E. to examine the wall. A copy of Oliveri's report dated October 26, 2006 is annexed hereto as Exhibit E. Oliveri advised that a qualified structural engineer should evaluate the wall. He found the wall's stability to be questionable.

15.    On November 20, 2006, a hearing was held and the Violation was dismissed. (A copy of the transcript is annexed hereto as Exhibit F).

16.    Although the Judge dismissed the Violation, she did indicate that the wall looks troubling to her (Exhibit F, p. 171, line 2), that the condition will not improve over time (Exhibit F, p. 173, lines 11-13) and the parties should work together to correct the problem. Furthermore, she suggested that the Town continue to "keep an eye" on the property. (Exhibit F, p. 173, lines 10-12).

17.    On November 21, 2006, structural engineers Grigg & Davis Engineers, P.C., visited the premises and prepared a report. A complete copy of the report is annexed hereto as Exhibit G.

18.    The report gives specific details of the structural problems with the wall and specific recommendations on what needs to be done to make the wall safe. Until the recommendations are complied with, Grigg and Davis opines that the wall is dangerous.

19.    The Violation and the Summons issued to the Rotenbergs were not intended to harass or harm the Rotenbergs. My sole intention was to make sure that necessary repairs were made to the wall so that there was no injury to people or property.

20.    I did not know that the Rotenbergs had a contract to sell their house and I had no intention of interfering with the sale of their property.

21.    I did not personally know either the Rotenbergs or the Greenwalds prior to this matter and did not confer with either couple before issuing the Violation or the Summons to the Rotenbergs.

22.    Based on the above, the Rotenbergs have failed to set forth any viable claims against me or the Town and their complaint should be dismissed accordingly.

RONALD A. CARPANETO

Sworn to before me this 13th
day of September, 2007.

NOTARY PUBLIC

MICHELLE T. IANNARELLI
NOTARY PUBLIC - STATE OF NEW YORK
NO. 01IA6165425
QUALIFIED IN WESTCHESTER COUNTY
MY COMMISSION EXPIRES MAY 7, 20__

4

# EXHIBIT E

# TOWN OF MAMARONECK

740 W. BOSTON POST ROAD
MAMARONECK, N.Y. 10543
(914) 381 - 7830

## NOTICE OF VIOLATION

### AND ORDER TO REMEDY THE SAME

To:   Gary & Jane Rotenberg
5 Huguenot Drive
Larchmont, NY 10538

Re: Location:    5 Huguenot Drive
Block:  130    Lot: 415

**PLEASE TAKE NOTICE THAT THE FOLLOWING VIOLATION(S) EXIST AT THE ABOVE LISTED PREMISES:**

| ARTICLE | SECTION | CODE | DESCRIPTION |
|---|---|---|---|
| Property Maintenance | PM302.7 | NY State | **Accessory structures.** All accessory structures, including detached garages, fences and walls, shall be maintained structurally sound and in good repair. |

**YOU ARE THEREFORE DIRECTED AND ORDERED** to remedy the conditions above mentioned on or before the _3rd_ day of _July, 2006_. Failure to remedy the conditions aforesaid and to comply with the applicable provisions may constitute an offense punishable by fine or imprisonment or both.

Date: __June 23, 2006__

_____
Ronald A. Carpaneto
Director of Building

Violation File:   350-06
Property File:   130-415

EXHIBIT F

**BUILDING AND ENGINEERING DEPARTMENT**

# TOWN OF MAMARONECK

740 W. BOSTON POST ROAD
MAMARONECK, N.Y. 10543
(914) 381 - 7830

# FINAL
## NOTICE OF VIOLATION

### AND ORDER TO REMEDY THE SAME

To:    Gary & Jane Rotenberg
5 Huguenot Drive
Larchmont, NY 10538

Re: Location:    5 Huguenot Drive
Block: 130   Lot: 415

**PLEASE TAKE NOTICE THAT THE FOLLOWING VIOLATION(S) EXIST AT THE ABOVE LISTED PREMISES:**

| ARTICLE | SECTION | CODE | DESCRIPTION |
|---------|---------|------|-------------|
| Property Maintenance | PM302.7 | NY State | **Accessory structures.** All accessory structures, including detached garages, fences and walls, shall be maintained structurally sound and in good repair. |

**YOU ARE THEREFORE DIRECTED AND ORDERED** to remedy the conditions above immediately. Failure to remedy the conditions aforesaid and to comply with the applicable provisions may constitute an offense punishable by fine or imprisonment or both.

Date:  September 29, 2006

Ronald A. Carpaneto
Director of Building

Violation File:   350-06
Property File:   130-415

EXHIBIT G

To:    **Gary & Jane Rotenberg**

Address:    **5 Huguenot Drive**

City:    **Larchmont, NY 10538**

You are hereby directed to appear before the presiding Justice of the Town Court of Mamaroneck, at the Court house at 740 W. Boston Post Road, New York at **7:00 pm**    O'Clock.

of the: _____**30th**_____ day of _____**October**_____ , **2006** , to answer the charge that on the _____**3rd**_____ day of _____**July**_____ , **2006** at _____

**5 Huguenot Drive**    Block: **130**    Lot: **415**

You did committ a violation of    **Property Maintenance Code 302.7 of New York State - Accessory Structures - All accessory structures, including detached garages, fences and walls, shall be maintained structurally sound and in good repair.**

of the Town of Mamaroneck

Upon your failure to appear a warrant may be issued for your arrest.

Date: _____**October 17**_____ , **2006**    Issued By: _____

Title:    **Building Inspector**

STATE OF NEW YORK : COUNTY OF __WESTCHESTER__

__TOWN_____ COURT_____ __TOWN_____ OF __MAMARONECK__

The People of the State of New York

*against*

Gary & Jane Rotenberg

Defendant

Information

Ronald Carpaneto, Director of Building _____ with offices _____, residing

_____740 W. Boston Post Road, Mamaroneck, New York 10543_____, by this information mak-
written accusation as follows:

That ____Gary & June Rotenberg_____, on the __3rd__

day of __July_____, ___2006___, at ___5 Huguenot Drive_____

(Location)

in the _____Town_____ of _Mamaroneck_____

County of _____Westchester_____, New York, c

commit the offense of ____Property Maintenance - Accessory Structures_____

_____, a (misdemeanor) (violation) in violation of Section __302.7__

of the ___NYS Prop. Maint._____ Law of the State of New York, in that (s)he did, at the aforesaid time and plac

Count One:

The facts upon which this information is based are as follows:

July 3, 2006          - Violation Issued
September 29, 2006 - Final Notice of Violation Issued
October 17, 2006    - Summons Issued

EXHIBIT H

# JOHN R. ANNUNZIATA, P.E., P.C.

CIVIL ENGINEER
24 CHESLEY ROAD • WHITE PLAINS, N.Y. 10605
(914) 949-0270 • FAX (914) 428-6435

October 17, 2006

Mary Beth Mullins, Esq., P.C.
2001 Palmer Avenue, Suite 204
Larchmont, New York 10538

Attn: Mary Beth Mullins

RE: 5 Huguenot Drive, Larchmont, New York
       Block 130, Lot 415, Rotenberg Residence

Dear Mary Beth:

I inspected the retaining wall of the properties of 5 Huguenot Drive and 2 Lafayette Road. I did this with you present on October 11, 2006. I found the following:

The wall is an older wall. The stone and mortar lower section, which is approximately two thirds the wall's height, is probably original to the construction of 5 Huguenot Drive. This wall is stable, in my opinion, and considered structurally safe and sound.

It is interesting to note the right side of the stone wall, as viewed from 2 Lafayette Road was reinforced using tie backs or anchors. It appears when that work was done, several weep holes to allow for drainage were installed. There does not appear to be evidence of water running through these weep holes.

I do not know the cause for these repairs, but the end result is aiding to the stone walls stability.

On top of the stone wall is a concrete block wall. This is some seven (7) courses high. The driveway surface on the Huguenot side is mid-height of the block wall. This concrete block wall has tie backs, with steel plates to keep the wall stable. I suspect these were part of an original design, since they appear old. This upper wall shifted toward 2 Lafayette and developed some cracks. The cracks are old, as one can detect by the discolored areas inside the cracks.

1

At the Huguenot side, I found a newer asphalt driveway that goes back to the wall in question. The asphalt was swaled to divert the water to the rear yard of 5 Huguenot Drive.

Also, I noted three wheel stops some three (3) feet from the wall, apparently designed to keep cars from parking too close to the wall in question.

The block wall on the Huguenot side is nicely stucco coated, so all of the above would seem to keep water from the wall, thereby preserving the existing condition.

You inquired who this wall benefits, and how. In my opinion, both owners benefit from this wall.

Without the wall, 5 Huguenot would have an unusable rear yard.

Without the wall, 2 Lafayette would have serious water run-off problems, and they would have an unusable rear yard and property.

In summary, I feel the wall in question is stable; work has been done on the Huguenot side to reduce external forces, and cosmetic repair to the Lafayette side would improve the esthetics of the wall. Structural repairs appear not needed at this time.

I hope this is useful, but I am available should there by the need.

Very truly yours,

John J. Annunziata, P.E.

Photos Enclosed

2

EXHIBIT I

# Dolph Rotfeld Engineering, P.C.

FAX MEMO

**TO:**       Ron Carpaneto, Town Building Inspector, 914-381-7809

**C:**        Stephen V. Altieri, Town Administrator, 381-7809

**FROM:**     Anthony Oliveri, P.E., Project Manager          OCT 2 7 2004

**DATE:**     October 26, 2006

**SUBJECT:**  2 Lafayette Road – Retaining Wall

As requested we have observed the conditions with regard to the retaining wall in the rear yard of 2 Lafayette Road. The following are our observations and comments:

1.  The existing wall consists of a stone and mortar wall with a maximum height of approximately 15 feet and a concrete block extension to this wall built directly on top of the stone wall with a maximum height of approximately 5 feet, resulting in a maximum combined height of approximately 20'.

2.  The concrete block wall appears to have been built on top of the stone wall at some later undetermined date. This wall supports an asphalt parking area for the adjoining property on Huguenot Drive.

3.  The stone and mortar wall seems to be in generally acceptable condition, not exhibiting any bow or lean, however there is a vertical crack about midway along the length of the wall extending to the top of the stone wall. An attempt to stabilize this condition seems to have been made by the addition of metal tiebacks which are apparent by the presence of metal plates, bolted on either side of the crack. These tieback plates are severely rusted and their integrity is questionable.

4.  The concrete block wall sits atop the stone wall and does not seem to be original. A large gap exists along the joint of the block and stone walls. Multiple cracks along the joints can be seen as well as an obvious lean outward to the wall. In addition the wall has moved away from the face of the stone wall and overhangs it by at least 3 to 5 inches at one point. Apparently an attempt to stabilize this wall has also been made by the use of steel tiebacks; large plates and bolts are present on the face of the block wall. It is also possible that these tiebacks were original to the block wall construction.

## Dolph Rotfeld Engineering, P.C.

5.    In addition a return section of the stone wall is topped by a poured concrete wall which appears to be straight and true and does not exhibit the distress of the block wall.

Our recommendation is that as soon as possible a *qualified structural engineer* be engaged to do a thorough evaluation of the structural integrity of the entire wall. Certainly there are obvious conditions that suggest the block wall has moved and its stability is very questionable.

The property owner should refrain from driving vehicles or any heavy loading within 10' of this wall until the investigation is completed.

Should you have any questions, please feel free to call.

Thank you,

2 Lafayette Road.doc

2 Lafayette Road
Retaining Wall

EXHIBIT J

TOWN COURT: TOWN OF MAMARONECK
COUNTY OF WESTCHESTER
--------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK


                    -against-

GARY AND JANE ROTENBERG,

                    Defendant.
--------------------------------------x
                    740 West Boston Post Road
                    Mamaroneck, New York
                    November 20, 2006
                    9:00 a.m.



B E F O R E:    HON. JEAN MARIE BRESCIA
                TOWN JUSTICE




                N O N J U R Y   T R I A L




                CARBONE & ASSOCIATES, LTD.
                    Maureen O'Hare
            111 North Central Park Avenue
            Hartsdale, New York  10530
                    (914) 684-0201

Proceedings                                  2

1

    A P P E A R A N C E S:

2

3              SUSAN FIORE, ESQ.

4              Attorney for the Town of Mamaroneck

5              740 West Boston Post Road

6              Mamaroneck, New York

7

8

9

10

11             MARY BETH MULLINS, ESQ.

12             Attorney for the Defendant

13             2001 Palmer Avenue

14             Larchmont, New York 10538

15

16

17

18

19

20

21

22

23

24

25

Proceedings                              3

1                    THE COURT: We are here for the

2         matter of the Town of Mamaroneck against

3         Gary and Jane Rotenberg. Mrs. Fiore, are

4         you ready to proceed?

5                    MRS. FIORE: Yes, the People have an

6         application.

7                    THE COURT: Go ahead please.

8                    MRS. FIORE: The people have an

9         application that, at this time, we are

10        requesting an adjournment. I made a phone

11        call to Counsel, Mary Beth Mullins, on

12        Friday November 17th advising her that I

13        would be seeking the adjournment.

14                   After several conversations with Ron

15        Carpaneto, the building inspector for the

16        town and Steve Alteri, the town

17        administrator, the town has decided to

18        engage the services of a structural

19        engineer for a structural evaluation of the

20        structural integrity of the subject wall.

21                   At this point in time, a structural

22        engineer has been retained and has been on

23        the premises to make a preliminary

24        evaluation as too what the cost of his

25        service would be and the People are asking

Proceedings                              4

1        for another week for the preparation of the

2        structural engineer's finds.

3                    THE COURT: Let me hear Mrs. Mullins

4        response, if any. I see that a letter was

5        sent to the Court, let me just read it

6        first.

7                    MRS. MULLINS: Thank you, Your Honor.

8                    THE COURT: Please proceed.

9                    MRS. MULLINS: Yes, Your Honor,

10       obviously we strenuously object to the

11       request for an adjournment and the reasons

12       for the objections are set forth in my

13       letter that I faxed to both Mrs. Fiore and

14       the Court on November 17th.

15                   The case has been pending now since

16       the issuance of the summons back in

17       September. The building department has had

18       ample opportunity to prepare the file along

19       with the prosecutor. They have engaged an

20       engineer. That engineer has visited the

21       site, it's done a thorough inspection, has

22       rendered a written report and it appears

23       now that they are not happy with that

24       written report and in some way now want to

25       supplement it, amend it, change it and have

Proceedings                                    5

1          a new engineer inspect the premises.

2                    Secondly, we were here before Your

3          Honor on November 6th, which was two weeks

4          ago. The matter was set down for trial,

5          everyone was notified of the date and we

6          all new. I specifically put on the record

7          that night that time was of the essence.

8                    What I did not go into any detail in

9          the letter is that Mr. Rotenberg and Mrs.

10         Dixson have this house on the market since

11         the spring and they unfortunately purchased

12         another home and are in the financial

13         predicament right now of paying two

14         mortgages. They cannot sell this house and

15         we believe solely for the reason that there

16         are these violations pending.

17                   Two contracts of sale have been --

18                   THE COURT: That is not really what

19         we are here to discuss today.

20                   MRS. MULLINS: All right. Your Honor,

21         in any event, Your Honor, we are ready to

22         proceed. I have my witnesses here, everyone

23         is ready and we respectfully request that

24         the Court not grant the application.

25                   THE COURT: The People's application

1    is denied on the following grounds. The

2    matter has been on twice previously. The

3    initial summons was served back in

4    September and followed up with further

5    documentation in October, that should have

6    been sufficient time for the People to

7    gather their evidence.

8         So, between September and the

9    initial trial date of October 30th and then

10   from the October 30th date to the November

11   6th date, then to today, that should have

12   been adequate time for the People to gather

13   their evidence in this case.

14        We need to move forward today. The

15   case is marked down for trial and it's not

16   the first time the case has been on.

17   Therefore, we are going to proceed today.

18        MRS. FIORE: For the record may I be

19   heard?

20        THE COURT: Yes.

21        MRS. FIORE: Respectfully, I would

22   just add that when the summonses are issued

23   by the building department, there is no

24   presumption that the case will proceed

25   forward to trial. The case was marked for

1            trial not even two weeks ago and it's not a

2            question for --

3                    THE COURT: You know what --

4                    MRS. FIORE: Just for the record,

5            Your Honor.

6                    THE COURT: But what you are saying

7            is not relevant because, you filed is a

8            criminal information. A criminal

9            information is supposed to be based upon

10           nonhearsay allegations substantiating every

11           element of the crime charged.

12                   Now, under our town code, this is a

13           crime.

14                   MRS. FIORE: Correct.

15                   THE COURT: Because I could sentence

16           the Defendant to an undetermined amount of

17           jail time, I would not but --

18                   MRS. FIORE: This is not a violation

19           under the town code.

20                   THE COURT: Yes, but if you read the

21           property maintenance code, it specifically

22           says in 106.6 that each town sets it's own

23           penalties. Since the town choose to set

24           criminal penalties for this, under 161.11,

25           I have to treat this like a criminal case.

1          That is no mystery, I think it happens all

2     over Westchester.

3               MRS. FIORE: Yes, Your Honor.

4               THE COURT: But that is not what I

5     wanted to say, what I wanted to say was,

6     the information should have been based upon

7     nonhearsay allegations of every element of

8     the crime charged. One should have been

9     knowledge by someone who knows something

10    about retaining walls that this wall was in

11    fact not structurally sound or in good

12    repair.

13              MRS. FIORE: Correct.

14              THE COURT: So, at the time the

15    information was filed, there should have

16    been information of an evidentiary nature

17    that could have been brought in to try this

18    case because the information is, in fact,

19    under the CPL the document upon which the

20    trial proceeds, all right, so, having said

21    all that and given the passage of time,

22    it's time for this case to go forward.

23              MRS. FIORE: I just respectfully note

24    my exception to Your Honor's ruling.

25              THE COURT: Your exception is noted.

Proceedings                          9

1              MRS. FIORE: Thank you, Your Honor.

2              THE COURT: Let's sort out who is

3        here, who is going to testify and who has

4        to go outside. Who are the People going to

5        call?

6              MRS. FIORE: We have Ron Carpaneto,

7        the town building department,

8        Mr. Greenwald, a town resident and

9        Mr. Oliveri, an expert for the town as

10       well, next to Mr.Carpaneto.

11             THE COURT: Okay, Mrs. Mullins, who

12       do you plan on calling?

13             MRS. MULLINS: I have my two

14       engineers here and the partys of course and

15       their broker is here but she is not going

16       to testify, so she could stay. So just the

17       two engineers.

18             THE COURT: So, obviously the partys

19       get to stay. I ask that all the other

20       witnesses go out in the hall just so you

21       don't hear each other's testimony and are

22       effected by it, so please go out and we

23       will call you when it is your time to

24       testify.

25             THE COURT: Do you wish to make

Proceedings                                    10

1           opening statements?

2                   MRS. FIORE: Yes.

3                   THE COURT: Go ahead please.

4                   MRS. FIORE: Yes, Your Honor, the

5           People plan to prove beyond a reasonable

6           doubt that the Defendant as so named in the

7           summons Gary and Jane Rotenberg who

8           formally resided at the premises of 5

9           Huguenot Drive Larchmont, New York 10538 a

10          location located within the Town of

11          Mamaroneck, did on the 3rd of July 2006,

12          September 29th 2006 and continuing violate

13          the property maintenance code section

14          3.02.7 of New York State, which, in

15          essence, requires accessory structures to

16          be maintained structurally sound and in

17          good repair.

18                  The People intend to prove said

19          violation by calling three witnesses at

20          this time, Ronald Carpaneto, building

21          inspector for the Town of Mamaroneck,

22          Mr. Greeenwald, a Town of Mamaroneck

23          resident and Mr. Oliveri an engineer

24          retained by the Town of Mamaroneck.

25                  The People believe said violations

Proceedings                    11

1          will be proofed beyond a reasonable doubt

2          against the Defendants, thank you.

3                    THE COURT: Mrs. Mullins, do you wish

4          to do it now or reserve for later?

5                    MRS. MULLINS: I will reserve, Your

6          Honor.

7                    THE COURT: Okay, call your first

8          witness.

9                    MRS. FIORE: At this time, the People

10         call Ronald Carpaneto.

11    R O N A L D   C A R P A N E T O, a witness herein,

12    having been first duly sworn by the Court, was

13    examined and testified as follows:

14    EXAMINATION BY MRS. FIORE:

15              Q       Are you currently employed?

16              A       Yes.

17              Q       Where are you employed?

18              A       By the Town of Mamaroneck.

19              Q       In what capacity?

20              A       Director of building.

21              Q       Could you elaborate for the Court

22    what your responsibilities include as the director

23    of the building department?

24              A       We do inspections, issue building

25    permits, I administer plans to the planning board,

1    zoning board and board of architectural review.

2            Q      How long have you been the building

3    inspector for the Town of Mamaroneck?

4            A      About ten years.

5            Q      Did you hold a comparable position

6    prior to this one?

7            A      Yes.

8            Q      Where was that?

9            A      Town of Somers.

10           Q      What was your position in the Town

11   of Somers?

12           A      I was the building inspector there

13   for nine years.

14           Q      Is it fair to say that you carried

15   out the same responsibilities as you do for the

16   Town of Mamaroneck?

17           A      Exactly.

18           Q      Do you have any formal education so

19   as to carry out your responsibilities as building

20   inspector?

21           A      We are certified every year by the

22   State of New York.

23           Q      You personally?

24           A      Personally, just experience. I'm

25   not a P.E. or an architect.

```
 1              Q      Do you have any formal education?
 2              A      Yes.
 3              Q      Could you elaborate for the Court?
 4              A      Two years of college, high school,
 5      trade schools.
 6              Q      Which?
 7              A      Plumbing and heating, air
 8      conditions.
 9              Q      Okay. How many inspections of
10      private homes would you say you performed in the
11      course of a year?
12              A      Myself?
13              Q      Yes.
14              A      Three or four a day in the course
15      of a year, eight hundred.
16              Q      And in connection with those
17      inspections, what does your job responsibility
18      require you to do?
19              A      Reinspect footings.
20              Q      Footings being -- I am going to ask
21      you to elaborate on any term that as a lay person,
22      we would not understand.
23              A      Footing inspection, let's say if
24      you are going to build a house, you check the
25      ground prior to pour, check the forms prior to
```

1    putting concrete, make sure there is rebar

2    according to plans, make sure that the wall is

3    built once it comes out of the ground according to

4    plan, that the water is draining.

5                        After that we do a draining

6    inspection, a plumbing inspection, we have a third

7    party doing electrical inspection, fire inspection

8    for all the mechanical. We do erosion control as

9    far as dry wall, silt fencing to make sure the run

10   off is going to be contained on the actual property

11   and issue a C.O.

12              Q       How do you determine which location

13   you will inspect --

14              A       We are called.

15              Q       On a given time --

16              A       We are called as a needed basis.

17              Q       You are called by home owners?

18              A       Or contractors, yes.

19              Q       I'm going to direct your attention

20   to the summer of 2006, were you working in your

21   capacity as building inspector for the Town of

22   Mamaroneck in the summer of 2006?

23              A       Yes.

24              Q       Did you, at any time, receive

25   notification regarding a location at 5 Huguenot

1    Drive in the Town of Mamaroneck?

2              A      Yes.

3              Q      How did that location come to your

4    attention?

5              A      I had gotten a call by the

6    Greedwalds at 2 Lafayette.

7                     MRS. FIORE: Please keep your voice

8         up.

9              A      I had gotten called from the

10   Greenwalds at 2 Lafayette regarding the wall.

11             Q      2 Lafayette is --

12             A      The property below 5 Huguenot.

13             Q      What was the nature of that call?

14             A      They wanted us to take a look at

15   the retaining wall, they felt the wall was not

16   safe.

17             Q      Could you describe what a retaining

18   wall is?

19             A      Basically it holds back earth to a

20   certain point.

21             Q      Did they elaborate specifically

22   their concerns or no?

23             A      They felt that the wall did not

24   look safe.

25             Q      And could you describe briefly the

1    relationship between the two properties?

2              A         Their backyards meet at the wall,

3    basically.

4              Q         That is Lafayette Road and --

5              A         Being a lower Road and Huguenot

6    being a high road.

7              Q         What did you do in response to that

8    call?

9              A         After I took a look at it, I think

10   that is when we did the summons.

11             Q         Go to every step, when you received

12   the first call, what did you do?

13             A         When we received the first call, we

14   had gone out there to take a look at it.

15                       MRS. MULLINS: I am just going to

16             object because the witness is testifying

17             "we" received a call and "we".

18             A         Meaning my office.

19                       THE COURT: Rephrase the question,

20             sustained, let me know who "we" is.

21             Q         Did you personally receive the call

22   from the neighbors?

23             A         No, the call came into my building

24   department. When I say we, I am talking about my

25   staff.

Proceedings                                17

1           Q       Do you know exactly when the
2    building department first received that call?
3           A       Exactly, no.
4           Q       What did you personally do in
5    response to the call, if you know?
6           A       I believe I called back the
7    Greenwalds and told them I would come out and take
8    a look and asked their permission to come on their
9    property.
10          Q       Did you do that?
11          A       I did.
12          Q       Was anyone else present with you
13   when you first went out to observe the property?
14          A       I had Dave Geossl, he is the town
15   engineer, hired by the Town of Mamaroneck.
16   Normally, we have a policy if it is something that
17   we think will be controversial, to take a colleague
18   just to back up conversation.
19          Q       What did you observe when you
20   arrived at that location?
21          A       We noticed that the wall-- it's a
22   tall wall, about twenty feet probably, the corner
23   runs down about maybe twelve to fifteen feet, it's
24   a stone wall at the base with a masonry cinder
25   block wall built on top of it. The wall on top has

Proceedings                          18

1    moved out over the edge of the stone part of the

2    wall. At that point in time, you could see that the

3    wall does not look right.

4            Q        Could you describe, other than the

5    movement between the two different materials, could

6    you describe what else the wall looked like?

7            A        There are steel tie backs that

8    obviously go into the wall, behind the wall, they

9    seem to be rusted on the lower portion. There are

10   some tie backs on top that don't seem to be as

11   rusted but we can't see what they are holding

12   except for the area where they are on that wall.

13           Q        In your experience, what is the

14   purpose of tie backs?

15           A        To try to help that wall hold the

16   force of the earth behind it.

17           Q        How many tie backs would you say

18   are present on that wall?

19           A        I would say about a dozen.

20           Q        How many of them, would you say,

21   are rusted?

22           A        At least half.

23           Q        What is the material of the wall

24   again?

25           A        The bottom is natural stone filled

1    with cement and above that is cinder block, masonry

2    block.

3                Q        Could you describe the condition of

4    the stone wall?

5                A        The stone appears to be okay but

6    there is cracking there where the water is coming

7    through and some separation there, not as much

8    movement on the bottom as it appears to be on the

9    top. The top, as I said before, shifted out over

10   that edge of that stone and there is probably a

11   four or five inch difference between the face of

12   the wall, which means that wall is pushing out and

13   also is lifting back at a fairly good amount,

14   probably at least four or five degrees I would

15   think.

16               Q        When you say lifting, what do you

17   mean by lifting?

18               A        Leaning, the wall that runs

19   perpendicular to the two properties has been

20   repaired before. The section that runs from the

21   back property along the side, that has been

22   repaired before and that looked okay to me.

23               Q        What portion of the wall is in

24   question?

25               A        The portion where the two backyards

1    really meet, is a survey available?

2              Q     I have photographs.

3              A     Okay.

4              Q     Were there photographs taken of

5    this location of the wall?

6              A     Yes.

7              Q     Do you know who took them?

8              A     David Geossl.

9              Q     Were they taken on the day you were

10   present?

11             A     Correct.

12             Q     Are these pictures part of the

13   building department's file?

14             A     I have a file in my office for

15   Lafayette, yes.

16             Q     I will ask you to take a look at

17   those photographs?

18             A     Okay.

19             Q     Take a look at them and look over

20   them please?

21             A     Okay.

22             Q     Is there a date on those

23   photographs?

24             A     10/20/06.

25             Q     Are they photographs that were

 1    taken by you or a colleague of the building

 2    department?

 3                A       It was taken by David Geossl

 4                Q       Are those photograph a fair and

 5    accurate representation of the property as it

 6    existed at the time of your inspection?

 7                A       Yes.

 8                MRS. FIORE: At this time, I move to

 9                offer the photographs into evidence as

10                People'S 1.

11                MRS. MULLINS: I object, first of

12                all, the individual who took the photos is

13                not here to testify apparently with regard

14                to them. Secondly, I thought that

15                Mr. Carpaneto said that the photos were

16                taken on the occasion of his first

17                inspection and these are dated October 20th

18                so, on that basis, I object to them as it's

19                not accurate as of when they were taken.

20                MRS. MULLINS: Sustained, you could

21                keep going.

22                Q       Is the wall in question, depicted in

23    the photograph you are viewing?

24                A       Yes.

25                Q       The wall is comprised of two --

1           A       The wall runs along the backyard

2      between 2 and 5 and runs along the side yard.

3           Q       The wall that was sited and is the

4      subject of this violation is the rear portion of

5      the wall that abuts the 5 Huguenot and 2 Lafayette?

6           A       Correct.

7           Q       If you were observing the wall from

8      the yard of 5 Huguenot Drive, if you were looking

9      at the wall --

10          A       Right.

11          Q       Is the sidewall that is not in

12     disrepair to your left or to your right?

13          A       When you go down the driveway, it's

14     to your left.

15          Q       Is there any other portion of the

16     wall other than the two portions that meet

17     perpendicular?

18          A       No, that is it.

19          Q       What did you do as a result of your

20     observations?

21          A       We, at this point, asked Anthony

22     Oliveri to come in and take a look at the wall. He

23     is the town consulting engineer and he works for

24     Dolph Rotfeld(ph).

25          Q       What was the purpose of consulting

Proceedings                                    23

1      this other individual?

2                A      Just to have another opinion on the

3      wall.

4                Q      Do you know if Mr. Oliveri indeed

5      did go to inspect the wall at 5 Huguenot Drive?

6                A      Yes, he did. I was present when he

7      went there.

8                Q      Do you recall when that was?

9                A      Not exactly.

10               Q      Do you recall, approximately, how

11     long after your first visit to the property?

12               A      Probably a week or so, maybe a

13     couple weeks.

14                      MRS. MULLINS: Could we have

15               established for the record when that visit

16               was. I don't believe he testified to a date

17               at the wall?

18                      MRS. FIORE: Which visit?

19                      THE COURT: I don't really know when

20               the first visit is and I don't know when

21               the second visit is, so I would like to

22               know when both were.

23                      MRS. FIORE: Okay. I thought you said

24               it.

25               A      I could look in the records but I

Proceedings                    24

1     don't have it with me now.

2            Q      Do you have an approximate idea of

3     when you first --

4            A      I may have it written down.

5            Q      Do you have an idea now, as you

6     testify here?

7            A      Probably.

8            Q      Was it in the summer, fall?

9            A      About a month ago.

10           THE COURT: When did you first go to

11           the property, about, give me a month?

12           A      The end of September, I believe

13           October.

14           THE COURT: Okay.

15           Q      2006?

16           A      Yes, 2006.

17           Q      How many times before you called Mr.

18    Oliveri, did you visit the property?

19           A      Once.

20           Q      And the time that you visited the

21    property that you testified to already with your

22    colleague David, that is the first time you visited

23    the property?

24           A      From the yard, yes, not actually

25    going on the property. You could see the wall from

1    the road, which I saw-- you know, also prior.

2              Q      But you were on the property at 5

3    Huguenot Drive?

4              A      Yes.

5              Q      That was approximately September or

6    October of 2006?

7              A      Yes, correct.

8              Q      At that time, you retained the

9    services of a consulting engineer?

10             A      Yes.

11             Q      Who was that consulting engineer?

12             A      Anthony Oliveri.

13             Q      Did you have a conversation with

14   Mr. Oliveri regarding his findings of the wall?

15             A      He supplied us with a report.

16             Q      Did you have a conversation with

17   him prior to the report?

18             A      I asked him to come out and look at

19   the wall.

20             Q      Once he did that, did you talk to

21   him about it?

22             A      Yes, and he felt that the wall --

23                    MRS. MULLINS: Objection.

24                    THE COURT: Sustained.

25             Q      Don't tell me what was said, that

1    is not admissible, but did you discuss anything in

2    addition to the plan for 5 Huguenot Drive?

3              A       No.

4              Q       Did you receive a report from Mr.

5    Oliveri regarding his findings of the wall?

6              A       Yes.

7              Q       Did you have occasion to go back to

8    the property after Mr. Oliveri inspected the wall?

9              A       No.

10             Q       Did you receive any further

11   information from any other sources regarding 5

12   Huguenot Drive?

13             A       No.

14             Q       Did any of your colleagues visit 5

15   Huguenot Drive?

16             A       Not to my knowledge.

17             Q       At any point, did you issue a

18   summons for 5 Huguenot Drive?

19             A       The summonses are right there, I'm

20   not sure of the date but yes.

21             Q       A summons was issued; correct?

22             A       Yes, the reason why it was issued

23   was because the people at 5 Huguenot had not

24   furnished a report yet from their engineer.

25             Q       Did you have a discussion with the

1    home owners regarding 5 Huguenot Drive?

2                    MRS. MULLINS: Which home owners?

3                    MRS. FIORE: The home owners of 5

4         Huguenot Drive.

5         A    No.

6         Q    Did you issue any formal citation

7    from the building department concerning the

8    property at 5 Huguenot Drive?

9         A    The summons.

10        Q    And what was the nature of the

11   summons violation?

12        A    Property maintenance code.

13        Q    Could you describe what constitutes

14   the violations of the property maintenance code?

15        A    Property maintenance code could be

16   violated if there is structures that are in need of

17   repair, structures that need upkeep as far as

18   maintenance, anything that could possibly be

19   dangerous.

20        Q    What kind of structures are the

21   subject of the property maintenance code?

22        A    Walls, buildings, stairs,

23   sidewalks, electrical, everything.

24        Q    This structure was what kind of

25   structure?

Proceedings                              28

1              A        Retaining wall.

2                       MRS. FIORE: I have no further

3          questions at this time.

4                       THE COURT: Cross examination?

5      CROSS EXAMINATION BY MRS. MULLINS:

6              Q        Mr. Carpaneto, you have no formal

7      training at all in engineering or architecture?

8              A        That is correct.

9              Q        Is it your testimony that the first

10     time that you inspected, personally, the site, the

11     wall in question, was sometime in either late

12     September or early October?

13             A        Correct.

14             Q        Somewhere around there?

15             A        Yes.

16             Q        So, is it true that did you not

17     visit the site at all prior to issuing the summons

18     or the notices of violation in this case?

19             A        No, I saw the wall from the road,

20     you could see the wall from the road clearly.

21             Q        Is it true that you did not inspect

22     the wall up close --

23             A        That is true.

24             Q        Prior to issuing the violations?

25             A        Yes.

Proceedings                           29

1          Q        Is it also true that nobody from

2     your building department inspected the wall prior

3     to the issuance of the violations or the summons in

4     this case?

5          A        As far as I know.

6          Q        It is true that the violations and

7     the summons in this case were issued based on the

8     phone call that the building department received

9     from Mr. Greenwald?

10                   MRS. FIORE: Objection.

11                   THE COURT: Overruled.

12         A        They were based on the phone call

13    plus the engineering report, which was in the file

14    from Detective Benedict Salanitro .

15         Q        I think your testimony was,

16    Mr. Carpaneto, that the building department

17    received a call, by the way, do you know who in the

18    building department received that call?

19                   MRS. FIORE: Objection, we have

20                   three questions.

21                   THE COURT: Sustained, give me one

22                   question.

23         Q        Who, on behalf of the building

24    department, received the call from the Greenwalds,

25    if you know the name?

Proceedings.                              30

1          A     The secretary.

2          Q     Do you know her name?

3          A     I don't know which one took the

4     call.

5          Q     As a result of that call, was some

6     sort of a memo or written message recorded by the

7     secretary?

8          A     Probably a phone message to return

9     the call.

10         Q     Did you receive a copy of that?

11         A     I probably did, there is probably a

12    copy somewhere. I just don't get all the questions

13    about why the phone call came in. It's obvious that

14    the wall is there, it's been there for a long time.

15               THE COURT: She is entitled to

16          explore the various areas surrounding this

17          case and this is one line of questioning.

18         A     Okay.

19               THE COURT: It can't go on forever

20          but she could start.

21         A     Okay.

22         Q     You testified that there is a file

23    that you maintain in your office?

24         A     Right.

25         Q     And is that file other than or

Proceedings                              31

1    separate from the building file?

2              A      That is a separate file but it has

3    the same information in it.

4              Q      Exactly the same information?

5              A      It should.

6              Q      Do you have that file with you

7    today?

8              A      No.

9              Q      Is it in your office?

10             A      Yes.

11                    MRS. MULLINS: I call for a copy of

12                    the file that Mr. Carpaneto has testified

13                    about.

14             A      I could go get it, it will take me

15                    two minutes.

16                    THE COURT: What exactly are we

17                    asking for?

18                    MRS. MULLINS: Apparently, there is a

19                    file other than the building department

20                    official file, which I have seen. I have

21                    seen the building department's file but

22                    apparently, there is another file that Mr.

23                    Carpaneto has in his office that has some

24                    information and he referred to it while he

25                    was testifying on direct.

Proceedings                                    32

1          A      It's just a file that I keep handy,

2     so I don't have to go back and forth to the

3     building file, that is it, I am more than happy to

4     get it.

5                      MRS. FIORE: I will object. I think

6              Mr. Carpaneto has testified that it's

7              repetitive, it contains the same

8              information that is contained in the

9              building file, I object at this time.

10                     THE COURT: Okay, for now we will not

11             stop the questioning to get the file. It

12             may turn out that if it becomes relevant

13             but right now it is not based upon the

14             witness's testimony right now.

15                     MRS. MULLINS: Thank you.

16                     THE COURT: Please continue.

17         Q      Your testimony regarding your

18     visual inspection of the wall, was that it did not

19     look right; is that correct?

20                     MRS. FIORE: Objection, which visual

21             inspection you are referring to? Are you

22             referring to the visual inspection from the

23             road or --

24                     THE COURT: Overruled, sit down.

25         Q      I'm referring to the inspection

1    where you walk up to the wall and I believe you

2    were with--

3             A       Mr. Geossl.

4             Q       Could you spell that for me?

5             A       G-E-O-S-S-L.

6             Q       That was the only inspection that

7    you made of the wall; is that right?

8             A       At a distance, yes.

9             Q       And your testimony was that the

10   wall, I believe you said, does not look right?

11            A       That is correct.

12            Q       Did you make any measurements of

13   the wall?

14            A       Just observations.

15            Q       Did you make any measurements?

16            A       No, not with David.

17            Q       I'm asking whether you did?

18            A       No.

19            Q       Personally?

20            A       No.

21            Q       Did you make any notes?

22            A       No.

23            Q       Did you take a pad along with you

24   that day?

25            A       No, it's obvious.

Proceedings                               34

1       Q       With regard to the steel tie backs?

2       A       Yes.

3       Q       I think your testimony was that

4    they seem to be rusted?

5       A       I said some of them are rusted, the

6    upper ones seem to be but not as bad.

7       Q       Which ones seem to be rusted in the

8    stone portion --

9       A       The stone portion mainly.

10      Q       And there are tie backs in the

11   masonry portion of the wall as well; isn't that

12   right?

13      A       Yes.

14      Q       How many are in the masonry portion

15   OF the wall?

16      A       About four or five.

17              MRS. MULLINS: Let the record

18          reflect that Mr. Carpaneto is looking at

19          the photographs.

20      A       Yes.

21      Q       What kind of condition are those

22   steel tie backs in?

23      A       They appear to be not rusted.

24      Q       Good condition?

25      A       Fairly good.

Proceedings                                    35

1              Q      From your observation and

2       inspection of the wall, does it seem to you that

3       those steel tie backs that are in the masonry

4       portion are performing the task that they are ment

5       to perform?

6              A      No.

7              Q      Why is that?

8              A      The wall was cracking and moving,

9       the wall has moved.

10             Q      When you say the wall is moving, do

11      you mean it is currently moving?

12             A      It has moved.

13             Q      Let me finish the question --

14             A      Yes.

15             Q      It has moved?

16             A      Yes.

17             Q      And based on your observations an

18      inspection, when did that occur, that movement?

19             A      Over time.

20             Q      Over what period of time?

21                    MRS. FIORE: Objection.

22                    THE COURT: Overruled, if you could

23             answer, could you?

24             A      I don't know, just over time, a

25      period of time.

Proceedings                              36

1          Q       I think you testified that there
2    seems to be some gap, I guess, I don't know if you
3    used the word gap but between the stone portion and
4    the masonry portion?
5          A       Where it's over; correct.
6          Q       And I think you estimated --
7          A       About four or five inches.
8          Q       Did you measure that with a ruler?
9          A       No.
10         Q       And you also testified that there
11   was some-- I think you called it lifting?
12         A       Yes.
13         Q       At four to five degrees?
14         A       Just an observations from the
15   property at 5.
16         Q       From the property?
17         A       At 5, I went on both properties.
18         Q       In order to come to that
19   determination that there was some listing, what did
20   you do?
21         A       Looked at it, just visually looked
22   at the wall, it's obvious.
23         Q       During this time that we are
24   talking about, I think it began maybe in the late
25   spring or early summer through present--

Proceedings                                    37

1            A       Whatever.

2            Q       Did the building department have

3    occasion to go to 5 Huguenot Drive?

4            A       I went October 20, 2006.

5            Q       Is that the date now, October 20,

6    is that the date?

7            A       That is when I took pictures, the

8    pictures were taken on that day.

9            Q       When you are talking about that

10   inspection, it's not September, it is October 20th?

11                   MRS. FIORE: Objection.

12                   THE COURT: Let the witness answer.

13           Q       I just want to be clear on the date

14   that you were at the property?

15           A       October 20, 2006 for sure.

16           Q       Thank you.

17           A       I may have been there prior to that

18   too, by myself, I don't actually remember.

19           Q       You testified before that you were

20   not there prior to issuing the summons --

21           A       I had seen the wall from the road

22   and I'm not sure if I went there by myself and took

23   David the following time --

24                   MRS. MULLINS: I understand that.

25                   MRS. FIORE: Let him finish.

Proceedings                                    38

1          A      I don't see why that is relevant.

2                 THE COURT: It's my job to decide

3          what is relevant. It's your job to answer

4          the questions fully and truthfully.

5          A      I am.

6                 THE COURT: Now wait for the next

7          one.

8          Q      I think my question was before that,

9     during the summer months, even the late spring, the

10    summer months, did the building department, not you

11    in particular, but did the building department, to

12    your knowledge, have occasion to go out and visit

13    the property at 5 Huguenot Drive?

14         A      I did but not physically going on

15    to the property, I just drove down when I got the

16    call and took a look from Lafayette.

17         Q      Are you aware that the Defendants

18    in this action had filed building permits to have

19    worked performed at 5 Huguenot Drive at this time

20    period?

21         A      No.

22         Q      Are you aware that Kevin Moore-- is

23    that your employee?

24         A      Yes.

25         Q      What is his position?

                          Proceedings                    39

1           A       Assistant building inspector.

2           Q       Are you aware that Mr. Moore went

3    out to 5 Huguenot Drive during the summer months of

4    2006?

5           A       For what?

6                   MRS. FIORE: I object, Your Honor.

7                   THE COURT: Overruled, could you

8           answer the question?

9           A       No, was there a building permit that

10   was issued for something?

11          Q       I'm just asking you if you-- there

12   were building permits that were issued for my

13   clients property, for the record.

14          A       Did he go out and do an inspection?

15          Q       I'm asking you if you were aware

16   that he went out to do an inspection?

17          A       I don't keep track of every

18   inspection that comes into the office, no.

19          Q       Isn't it true that Mr. Moore

20   informed you that the wall looked fine to him?

21          A       No.

22          Q       That is not true?

23          A       Not true, Kevin actually told me

24   that two other home owners mentioned that the wall

25   is bad, somehow he had gotten that.

Proceedings                                40

1                    MRS. MULLINS: Move to strike.

2                    MRS. FIORE: Objection, she opened

3           the door, Your Honor.

4                    THE COURT: It's not stricken.

5           A       That was the conversation.

6           Q       You testified that you did, in

7    fact, have a conversation with Mr. Greenwald; is

8    that correct?

9           A       Yes, Mr. Or Mrs.

10          Q       You are not sure which one?

11          A       I spoke with them both at some

12   point. I don't know which you are referring to.

13          Q       On how many occasions, did you have

14   conversations with the Greenwalds?

15          A       A couple of times.

16          Q       Did they come and visit you in the

17   building department?

18          A       She came in for some copies but I

19   never saw her there.

20          Q       Did Mr. Greenwald come to the

21   building department?

22          A       Not to my knowledge.

23          Q       And the conversations that you had

24   with the Greenwalds, were they by telephone or in

25   person?

Proceedings                    41

1            A     I talked to Mrs. Greenwald at the

2    site the day we were there with David and prior to

3    that on the telephone.

4            Q     Do you recall the date of the of

5    issuance of the first violation in this matter?

6            A     No.

7            Q  .   Your summons refers to an act that

8    first occurred or I guess it's an act of July of

9    2006?

10           A     Yes.

11           Q     Does that refresh your recollection

12   as to when you first issued a violation?

13           A     That sounds normal. Normally, for a

14   violation we give people a certain amount of time

15   to correct the violation and if there is a second

16   violation, we give them more time and after that,

17   if nothing happens, we issue the summons, that is

18   the policy.

19           Q     When you issued the first violation

20   and nothing happened, did you ever call the home

21   owners?

22                 MRS. FIORE: Are we referring to the

23           Rotenbergs?

24                 MRS. MULLINS: These home owners

25           right here, the Defendants.

1          A       No.

2          Q       Did you contact anyone on their

3    behalf, their attorneys?

4          A       They were sent a registered letter

5    I believe with the violations in it.

6          Q       And then there was some passage of

7    time; is that right?

8          A       Yes.

9          Q       And you issued a second violation;

10   is that right?

11         A       Normally, yes.

12         Q       Did you in this case?

13         A       I don't remember exactly but I may

14   have not have done it personally but one of my

15   staff may have. Is there a second violation there?

16         Q       Yes. And during the passage of time

17   from the issuance of the first violation and the

18   second violation and up to the time that there was

19   a summons issued in this case, did you ever have

20   any conversations with home owner at all regarding

21   the particulars of this violation?

22         A       No.

23         Q       Did you ever inform them in writing

24   or otherwise as to what the basis of the

25   department's violation was?

Proceedings                              43

```
 1            A      I sent them a notice of violation.
 2            Q      My question is, other than what is
 3     in the notice of violation, did you send them
 4     anything in writing or have any conversation with
 5     the home owners regarding the particulars of the
 6     violation?
 7            A      No.
 8            Q      Did you ever issue anything in
 9     writing or otherwise to the home owners or anyone
10     on their behalf, and I'm referring to the
11     Defendants, about what needed to be done to the
12     wall in order to have it not violate your code?
13                   MRS. FIORE: Objection, again
14              referring beyond the notice of violation,
15              which has been testified to several times.
16                   THE COURT: Overruled.
17            A      Could I have the question again.
18                   THE COURT: We will have the court
19              reporter read it back.
20                   (Whereupon, the last question was
21              read back by the reporter.)
22            A      No.
23            Q      Lastly, Mr. Carpaneto, after you
24     retained the services of Anthony Oliveri and Dolph
25     Rotfeld engineering and received his report and had
```

1      discussions with him, at that time, did you give

2      any indication to the home owners, the Defendants

3      in this case, in writing or otherwise as to what

4      could be done to the wall so that it did not

5      violate the building code?

6              A      No, but if they would have called

7      me, I certainly would have given them some

8      information?

9              Q      Did you contact them though, that

10     is my question?

11             A      No.

12                    MRS. MULLINS: Nothing further.

13                    THE COURT: Any Redirect?

14                    MRS. FIORE: Yes.

15     REDIRECT EXAMINATION BY MRS. FIORE:

16             Q      You said that you observed the wall

17     visually from the road; is that correct?

18             A      Yes, prior to going actually on the

19     property, yes.

20             Q      Could you describe what your

21     observations of the wall were at that time?

22             A      You could see-- it's obvious that

23     you could see the wall is in the same condition

24     that it is in the closer photos, it just was a

25     closer look at it, you could see shifting,

1    cracking, it's not far from the road.

2              Q       Okay. In this case, you said you

3    issued two violations; is that correct?

4              A       Yes.

5              Q       When a final notice of violation is

6    served, approximately, how long do you allow if

7    there has been --

8              A       I believe ten days.

9              Q       If there has been no correction or

10   improvement or resolution to the original problem?

11             A       Right --

12             Q       Approximately, how long do you wait

13   before you issue a summons?

14             A       It depends, we try to keep it to

15   ten days but we are willing to work with anybody

16   who is willing to work with us, so we had not heard

17   from anybody at that time, so we issued a summons.

18   After the summons is when we got the engineering

19   report, so they had to be nudged a little bit.

20             Q       Sorry, I did not hear that?

21             A       They had to be nudged.

22             Q       During the time from the initial

23   notice of violation to the time of the summons was

24   issued, you received no indication from the home

25   owners that they were working at attempting to fix

Proceedings                        46

1    the subject violations; correct?

2              A      We were told that something was

3    being done and we waited and waited and nothing

4    came, so that is when we issued a summons. I forget

5    who I talked to. I think it might have been Mary

6    Beth --

7              Q      You really have to speak up we

8    can't hear you.

9              A      I spoke to Mary Beth. I think she

10   had intervened at some point and said that the

11   engineer's report was coming and it took too long,

12   so we just issued the summons. Again, we are

13   willing to work with the people.

14                   MRS. FIORE: No further questions at

15              this time.

16                   MRS. MULLINS: No recross.

17                   THE COURT: Do you wish to excuse

18              Mr. Carpaneto?

19                   MRS. FIORE: Yes, with the

20              possibility of recalling him.

21                   THE COURT: Okay. Call your next

22              witness.

23                   MRS. FIORE: We call Anthony Oliveri.

24                   THE COURT: I will swear you in.

25   A N T H O N Y  O L I V E R I, a witness herein,

Proceedings                                    47

1    having been first duly sworn by the Court, was

2    examined and testified as follows:

3    EXAMINATION BY MRS. FIORE:

4              Q      Good morning, Mr. Oliveri.

5              A      Good morning.

6              Q      Mr. Oliveri, could you please state

7    for the record your current place of employment?

8              A      Dolph Rotfeld Engineering.

9              Q      How long have you been employed by

10   Dolph Rotfeld?

11             A      Just about ten years.

12             Q      What are you your duties in

13   connection with Dolph Rotfeld?

14             A      Project manager.

15             Q      What are your duties as the project

16   manager?

17             A      I supervise other engineers,

18   technicians for different projects that we have,

19   one of them being the town engineer for the Town of

20   Mamaroneck.

21             Q      Are you an engineer yourself?

22             A      Yes.

23             Q      Do you have a degree in connection

24   with that title?

25             A      A Bachelor of Science in Aero Space

1    Engineering Polytec University.

2              Q      What year did you receive that

3    degree?

4              A      1989.

5              Q      Have you received any other formal

6    education beyond that degree?

7              A      No.

8              Q      Could you briefly state and

9    summarize your engineering, whether it be

10   employment or of course work or anything of that

11   nature?

12             A      After graduating, I worked for a

13   small firm in Eastchester. We did mostly

14   residential work, civil engineering work, some

15   structural work on a residential level. 1997, I

16   went to work for an engineering company where I

17   started as a project engineer and now I'm a

18   manager.

19                    In 1995, I received my license in

20   engineering from New York State. I am a licensed

21   professional engineer. I did take some courses in

22   preparation for that.

23             Q      What is a licensed engineer

24   qualified to do?

25             A      A licensed engineer is qualified to

1   assign and seal certified plans for buildings or

2   any other kind of construction, municipal work, for

3   instance requires professional engineer signature

4   and seal beyond the plans, private work would be a

5   house or something like a retaining wall, where you

6   have to get a building permit, you would need a

7   professional engineer's certification.

8                   MRS. FIORE: Your Honor, at this

9           time I move to qualify Mr. Oliveri as an

10          expert in engineering.

11                  MRS. MULLINS: Your Honor, with all

12          due respect to Mr. Oliveri, I don't believe

13          that the District Attorney's elicited--

14                  MRS. FIORE: Town prosecutor.

15                  MRS. MULLINS: Town prosecutor,

16          elicited the appropriate and sufficient

17          information to have him qualified.

18                  MRS. FIORE: He is a licensed New

19          York State Engineer.

20                  THE COURT: That is correct and I'm

21          not going to second guess The New York

22          State Department of State and I qualify Mr.

23          Oliveri as an expert in engineering as it

24          relates to residential circumstance.

25                  MRS. MULLINS: Yes, Your Honor.

Proceedings                                    50

1              MRS. FIORE: Yes, Your Honor.

2         Q      Mr. Oliveri, approximately, how many

3    home inspections, if you know, have you performed

4    personally?

5         A      How many inspection, when you say

6    home inspections, that is kind of a different type

7    of thing. Just maybe a site inspection, is that

8    what you mean?

9         Q      Yes, sorry?

10        A      Probably hundreds.

11        Q      Over five hundred?

12        A      I don't know if it's over five

13   hundred, it could be.

14        Q      Over three hundred?

15        A      Probably.

16        Q      And have you performed engineering

17   services for the Town of Mamaroneck prior to this

18   occasion?

19        A      Yes.

20        Q      On how many occasions?

21        A      It is on a continuing basis, we are

22   the town consulting engineers.

23        Q      In connection with your consulting

24   with the Town of Mamaroneck, did you have occasion

25   to visit the premises of 5 Huguenot?

1           A       Yes.

2           Q       Could you explain to the Court

3    exactly what you did in connection with that?

4                   MRS. MULLINS: Could we have a time

5           frame?

6                   THE COURT: Yes.

7           A       I believe it was October 25th, it

8    was, I believe, the day before I issued my

9    statement, my report. Ron Carpaneto, the building

10   inspector, called and asked me to come and take a

11   look at the wall. I went out and met him. We looked

12   at the wall, measured it, looked at it form both

13   sides actually --

14          Q       When you say both sides, what is

15   the other side?

16          A       From 2 Lafayette and also from 5

17   Huguenot.

18          Q       So you were on both sides of the

19   subject wall; is it fair to say that?

20          A       That is right and he asked me to

21   issue a report.

22          Q       After you received the call from

23   Mr. Carpaneto, did you go to the premises of 5

24   Huguenot Drive?

25          A       Yes.

Proceedings                          52

1          Q      Did you observe the wall?

2          A      Yes.

3          Q      Could you tell the Court what you

4     observed?

5          A      What I saw was-- it seemed to be an

6     older stone and water retaining wall, which was

7     approximately fifteen feet high at the highest

8     point, which had a vertical crack about mid span of

9     the wall and it also had some evidence of-- well

10    there were tie back plates on the stone wall, which

11    were severely rusted.

12         Q      Excuse me, you said the wall at

13    it's highest height was fifteen feet?

14         A      The stone wall, on top of that was

15    the block wall, a concrete block.

16         Q      That was the height and how long

17    was the wall?

18         A      I did not measure the length.

19         Q      Do you recall?

20         A      Approximately, I would say forty

21    feet, maybe.

22         Q      In length?

23         A      Yes, I did not measure it. I only

24    measured the height at one point.

25         Q      When you say the top of the wall,

1    that you refer to as concrete block, could you

2    explain what you are referring to?

3              A        Approximately five feet of concrete

4    block wall seemed to have been built on top of the

5    stone wall. It did not seem to be original to the

6    wall or built at the same time as the stone wall.

7    The block wall had a number of cracks.

8                       It seemed to be leaning slightly

9    outward. You could tell by just the alignments of

10   the wall by looking at it. It also seemed to be

11   overhanging at one point where the stone wall had a

12   slight bend, the block wall was overhanging about

13   three to five inches. I did not measure it. I could

14   not get up to that point but visually you could see

15   the overhang.

16                      There were plates, steel plates on

17   the wall, which indicated that there were tie backs

18   at some point installed.

19             Q        What is a tie back?

20             A        That is something that consists of a

21   steel plate and a steel rod, which is driven

22   through the wall. At the end of the rod it might

23   have a screw type mechanism or something to anchor

24   it into the soil behind the wall.

25                      I was not sure really if this was

1    done originally with the construction of the wall

2    or maybe afterwards to stabilize it, you really

3    could not tell. But the wall at some point had

4    moved away from the lower wall and, you know, was

5    leaning slightly.

6                    The return part of wall that went

7    perpendicular to the property line had a poured

8    concrete wall, which was straight an true with the

9    stone wall. The concrete block wall had some issues

10   happening.

11            Q       You were describing and I

12   interrupted you but you were describing the

13   condition of the tie backs?

14            A       The tie backs on the stone wall,

15   the lower wall, were severely rusted even Ron and I

16   were able to chip off little pieces with our

17   fingernails. Those were most likely installed

18   sometime after the crack happened in the lower

19   stone wall.

20            Q       Described the crack you are

21   referring to now?

22            A       The stone wall about mid span or

23   mid length had a crack, which went from the bottom

24   of the wall to the top of the stone wall where the

25   concrete block wall began.

Proceedings                                    55

1          Q         It ran the entire length of the

2     stone wall?

3                    MRS. MULLINS: Height.

4          Q         Yes, it ran the entire height of

5     the stone wall?

6          A         Yes and the tie backs seemed to be

7     on either side of the crack and must have been put

8     in to stabilize that crack but they were very

9     rusted and how long they are going to last, I don't

10    know. I think there was some patch material in the

11    crack also, somebody tried to patch this crack.

12    When this was done, the concrete block wall was in

13    place at the time, that is anyone's guess.

14         Q         What happens when steel tie backs

15    used to support the wall or crack, were to continue

16    to rust through, as you described?

17         A         Well, if they were placed there to

18    stabilize the stone wall, if they rusted through,

19    then they have no more structural significance.

20         Q         What would the purpose be other

21    than supporting the stone wall?

22         A         There would be no other purpose

23    that I know of.

24         Q         How many tie backs did you observe

25    on the stone wall?

```
 1              A        I don't have a number, it was more
 2      than three, maybe four.
 3              Q        Were they also in the same
 4      condition?
 5              A        It seemed to be.
 6              Q        Rusted?
 7              A        Yes.
 8              Q        What other observations did you
 9      make?
10              A        On the stone wall or on the entire
11      wall?
12              Q        Not the perpendicular wall that you
13      said was straight and true but the retaining wall?
14              A        The block wall, like I said, had
15      seemed to move at some point. There was a gap also
16      where the block wall joined the stone wall, there
17      was a gap there.
18                       There might have been water in
19      there at some point that washed out when the wall
20      shifted, maybe it fell out. Like I said, there were
21      steel tie back plates, which were large plates and
22      again, I don't know if those were original to the
23      design or installed afterwards to stabilize the
24      wall, I don't know.
25              Q        What was the condition of those tie
```

Proceedings                              57

1    backs?

2            A        Those seemed to be in good

3    condition.

4            Q        What did you do after your visit to

5    the property and your observations?

6            A        I went back to my office and wrote

7    the report.

8            Q        Did you have a discussion with Mr.

9    Carpaneto about your findings?

10           A        We discussed it in the field when

11   we were out there and he needed the report and I

12   did it quickly and got back to him.

13           Q        In your opinion, as a licensed

14   engineer, could you issue an opinion about the

15   condition of this wall overall?

16           A        I would say, in my opinion, the

17   wall has moved, the concrete block wall has moved

18   that is on top of the stone wall. In my experience

19   a retaining wall is not meant to move. If it moves,

20   you could consider that a failure of the wall.

21                    Whether or not the tie backs were

22   original or were added later to stabilize is

23   unknown. If they were original and the wall moved

24   after the tie backs were in, then that is even a

25   worse condition but it certainly has moved and is

Proceedings                                    58

1    leaning and has an overhang and to me, that is a

2    failed design.

3                    MRS. FIORE: Thank you, I have no

4            more questions at this time.

5                    THE COURT: Mrs. Mullins, do you have

6            cross examination?

7                    MRS. MULLINS: Yes.

8    CROSS EXAMINATION BY MRS. MULLINS:

9            Q       Good morning, Mr. Oliveri.

10           A       Good morning.

11           Q       Do you have any notes from your

12   field visit to the site, any hand-written notes?

13           A       I have something, I do have

14   something back at the office, one sheet where I

15   just did a quick sketch.

16           Q       Did you take any photographs?

17           A       No.

18           Q       You testified that you took

19   measurements that day; is that right?

20           A       Yes, I took one measurement at the

21   corner of the wall at the highest point to get a

22   sense of the height of the wall and the height of

23   the concrete block.

24           Q       Is that the only measurement you

25   took?

Proceedings                         59

1            A       Yes.

2            Q       In your experience, could you

3    estimate for me the age of the lower stone portion

4    of the wall?

5            A       No.

6            Q       Could you give us some

7    indication --

8            A       I have no idea, it's old, that is

9    all I could say.

10           Q       Would you say it's probably

11   original to the construction of the homes there?

12           A       I have no idea.

13           Q       With regard to the upper block

14   portion, could you give us an estimate that--

15           A       The only thing I could say about

16   the age is because it's of different construction,

17   it seems to be done after the stone wall.

18           Q       And you testified with regard to

19   the tie back and so that we are all clear, there

20   are two sets of tie back, there are tie backs in

21   the stone portion of the wall and there are tie

22   backs in the upper block portion?

23           A       Yes.

24           Q       So your testimony is that the tie

25   backs that are in the stone older portion of the

Proceedings                                60

1    wall are rusted?

2             A       Right.

3             Q       And further it's your testimony

4    that they probably don't have any useful value any

5    longer?

6                     MRS. FIORE: Objection.

7                     THE COURT: Overruled, could you

8             answer at question.

9             A       Yes, there are rusting. They may

10   still have some value. When they fully rust

11   through, then the structural value will be gone.

12            Q       What is your opinion as to the

13   structure integrity of the bottom of the wall?

14            A       The bottom stone wall seems to be

15   straight. It did not seem to be leaning. The tie

16   backs that were put in may have stabilized, that

17   crack seemed like an old crack and not something

18   new, so, you know, I did not see any immediate

19   problems with the stone part of the wall, it was

20   more concentrated on the concrete of the wall.

21            Q       In your opinion, the stone wall

22   bottom portion is it in acceptable condition?

23            A       It seemed to appear that way.

24            Q       And further you testified that now

25   with regard to the block portion of the wall, five

1    feet you testified that is how high it is, is it

2    five feet continuously through it's length?

3            A       It was five feet at the corner that

4    is where I measured it. It might have tapered

5    slightly as it went, maybe it was to the left.

6            Q       When you look at it, it tapers down

7    to the left?

8            A       Right.

9            Q       Is it your testimony that the steel

10   tie backs that were installed in the block portion

11   are in good condition?

12           A       They seem to be.

13           Q       And you are not sure, are you

14   whether they were installed during the original

15   construction of that block wall or sometime after;

16   is that true?

17           A       That is true.

18           Q       Is it true that those steel tie

19   backs could have been installed to repair the

20   condition that was apparent to that stone block

21   portion?

22           A       They could have been installed to

23   stabilize it.

24           Q       Could you describe for the Court

25   how big those steel plates are?

1            A       I believe they were at least one

2     foot square plates, how long the rods were, I don't

3     know.

4            Q       How many were there, if you recall?

5            A       At least two, maybe three or four.

6            Q       Normally, the rod that you

7     testified that was attached to that large steel

8     plate, how long are they normally?

9            A       It all depends on the design.

10           Q       What are they normally designed to

11    do?

12           A       To keep the wall from tipping over

13    and this why I said it could be original and it may

14    not be, being that the block wall was built on top

15    of the stone wall, it would have a typical type of

16    footing, they might have put it in originally to

17    keep it from tipping and that is why I can't say

18    either way.

19                   MRS. MULLINS: I move to strike as

20               unresponsive.

21                   THE COURT: It is not stricken.

22           Q       I'm asking you with regard to that

23    rod that is attached, what factors vary on how long

24    those rods are?

25           A       The soil conditions and the height

1    of the wall.

2            Q       With a five foot wall, how long

3    should that rod be?

4            A       To the answer that, it would have

5    to be designed by a professional engineer.

6            Q       Such as yourself?

7            A       Yes or somebody who specializes in

8    that type of thing.

9            Q       The last part of your testimony was

10   with regard to your opinion as to the structural

11   stability of that block portion; is that right?

12           A       Yes.

13           Q       You testified that there was

14   clearly, in your mind, evidence of movement,

15   although you are not sure when that movement took

16   place; correct?

17           A       Yes.

18           Q       And that, in your mind, movement

19   means-- well, tell me what does that mean?

20           A       In my mind or any engineers mind,

21   if a retaining wall moves, it failed. A retaining

22   wall is not designed to move.

23           Q       Is it possible that after your

24   inspection of the wall, that the movement that has

25   occurred in that wall was remedied by the

Proceedings                                    64

1    installation of those tie backs?

2            A        I don't know because I don't know

3    if they were original or not.

4            Q        Could you estimate for us when that

5    movement took place?

6            A        No.

7            Q        Does it appear to you, after your

8    inspection of the premises, that it is a resent

9    event?

10           A        No.

11           Q        So tell me what is not resent to

12   you, years, more than five years, more than ten?

13           A        It's impossible to say, it did not

14   happen last week, it was not fresh.

15           Q        Or last month?

16           A        Right.

17           Q        Mr. Oliveri, after you prepared

18   your written report for the Town of Mamaroneck's

19   Building Department, did you have some

20   recommendations to them with regard to some further

21   action by the town?

22           A        We recommended that a structural

23   engineer do a full evaluation of the wall and that

24   also recommended that no vehicle park adjacent to

25   the top of the wall.

1              Q       Are you aware that the Defendants

2       in this case, the home owners, installed car stops

3       on the upper --

4              A       Yeah, I saw them when I was there.

5              Q       Did you have any recommendations

6       for the building department with regard to what

7       other measures should be taken with regard to this

8       wall?

9              A       No, just that a structural engineer

10      evaluate it.

11             Q       Is it your opinion that you are not

12      qualified to give an opinion with regard to the

13      structural integrity of the wall?

14             A       No, but in a case like this --

15                     MRS. FIORE: No, it's not your

16                 opinion or no you are not --

17                     THE COURT: You are not objecting, so

18                 let the witness answer the question.

19             A       It's not my opinion that I'm not

20      qualified any P.E. would be qualified to make a

21      statement about the wall, but we just felt that a

22      structural engineer, somebody that specializes in

23      retaining walls would be better suited to be give a

24      more thorough evaluation and examination.

25                     MRS. MULLINS: I have nothing

1          further.

2                    THE COURT: Mrs. Fiore, any redirect?

3                    MRS. FIORE: Yes.

4     REDIRECT EXAMINAITON BY MRS. FIORE:

5          Q     In your opinion, what would a more

6     thorough investigation entail by a structural

7     engineer?

8          A     A more detailed measurement of the

9     wall, they could go so far as doing investigation

10    of the soil behind the wall.

11         Q     What does investigation of the soil

12    show?

13         A     That would show what type of soils

14    are there, it might be an indication as to why tie

15    backs were put in, if it was sandy soil or

16    something, that would lead to an unstable wall,

17    that would give some explanation to the tie back

18    and also when you get a structural engineer, you

19    are just getting somebody who is more experienced

20    with this type of thing, with retaining walls in

21    particular, not that I'm not experienced with them

22    but a structural engineer specializes it. He is a

23    specialist, he would have a longer history with

24    this type of situation maybe he has seen something

25    like this before.

1          Q       The tie backs that you testified

2     that are present on the concrete block portion,

3     were they rusted anywhere?

4          A       There was some rust on them but not

5     severe like the lower tie backs.

6          Q       In comparison to the ones below,

7     they were better?

8          A       Yes.

9          Q       But there was some indication of

10    rust; is that correct?

11         A       Yes.

12         Q       In your experience, if there has

13    been a condition of rust, is it fair to say that

14    those tie backs have been on the wall for a length

15    of time, a short amount of time?

16                 MRS. MULLINS: I object, Your Honor

17                 it is a leading question.

18                 THE COURT: Overruled.

19         A       I could not say.

20         Q       If there is rust on a tie back, in

21    your experience, is it fair to say that it's been

22    on there for more than a year?

23         A       Sure, it's possible there was some

24    surface rust on it, it could have occurred very

25    quickly or it could have been like that for a long

1    time, I can't say from the rust.

2              Q       Was the concrete block portion of

3    the wall the same length as the stone wall all the

4    way down?

5              A       Yeah, on the property line face it

6    was along the whole length, just the return was

7    that not block.

8              Q       How many tie backs did you observe

9    on that concrete block wall?

10             A       You know, I don't recall exactly

11   how many, I have to go back and look at my notes,

12   maybe two, three or four maybe.

13             Q       Were they located in one spot or

14   were they located --

15             A       They were spaced along the wall.

16             Q       Spaced along down the concrete

17   block?

18             A       Yes.

19             Q       And there was a gap between the

20   stone?

21                     THE COURT: You can't redo your

22             direct.

23                     MRS. FIORE: Okay.

24             Q       You testified earlier that you

25   observed a gap between the two materials; is that

1    correct?

2              A      Yes.

3              Q      Did that gap that you observed run

4    also the entire length between the block and the

5    stone or was it only a portion?

6              A      I believe it was the entire length.

7              MRS. MULLINS: I object the witness

8              already answer but this is certainly

9              outside the scope of cross.

10             THE COURT: That is correct but you

11             did not object before he answered, so I

12             can't cut things off, even though I would

13             like to.

14             MRS. FIORE: The cross-examination

15             consisted of the two materials that existed

16             on wall, that is clearly within scope.

17             THE COURT: But we did not talk

18             about-- the gap came up on direct and that

19             was the end of it, so now think about what

20             was in cross-examination and do redirect

21             questions.

22             MRS. FIORE: We talked about the tie

23             backs and we talked about the material of

24             wall.

25             THE COURT: But not the gap, now go

 1                 on to the next question.

 2                 Q      Did you observe vehicles parked on

 3       the--

 4                 A      No.

 5                 Q      Property at that time?

 6                 A      No.

 7                 Q      How many of the stoppers, are they

 8       call?

 9                 A      Wheel stops.

10                 Q      Okay, wheel stops?

11                 A      I don't recall how many.

12                 Q      More than one?

13                 A      Yes.

14                        MRS. FIORE: I have nothing further

15                 at this time.

16                        THE COURT: Call your next witness.

17                        MRS. FIORE: The People call Mr.

18                 Greenwald.

19                        THE COURT: I will swear you in.

20       B L A I N E   G R E E N W A L D, a witness herein,

21       having been first duly sworn by the Court, was

22       examined and testified as follows:

23       EXAMINATION BY FIORE:

24                        MRS. MULLINS: I just ask if the

25                 town prosecutor could give the Court an

Proceedings                               71

1          indication of an offer of proof with regard

2          to this witness, since we know now that,

3          apparently, this witness made a complainant

4          to the building department and it was

5          followed up in some fashion by the building

6          department.

7                    So, I would just like to just know

8          what the relevance and probative value of

9          the testimony in general is at the outset.

10                   THE COURT: I don't think that is

11         necessary at this time, please take a seat

12         and proceed with the questioning.

13                   MRS. MULLINS: Thank you.

14         Q      Good morning, where do you reside?

15         A      2 Lafayette road.

16         Q      Does your property abut another

17    property?

18         A      Yes.

19         Q      Do you know the address of that

20    property?

21         A      5 Huguenot Drive.

22         Q      Is there a wall that separates your

23    two properties?

24         A      Yes.

25         Q      Have you had occasion to observe

Proceedings                                      72

1    that wall?

2              A      Yes.

3              Q      Could you describe for the Court

4    your visual observations of the wall?

5              A      The wall is a massive structure I

6    would guess ranges maybe ten to twenty feet at

7    different levels across the width of the backyard.

8              Q      Ten to twenty feet in height?

9              A      Yes, high that is just an estimate

10   and there are two parts to the wall, a stone part

11   that goes up probably, I don't know, maybe eight

12   feet and then a second part that looks like it was

13   built on top of that part made of cinder blocks and

14   that part of the wall has-- it's obvious if you

15   look at it, that it moved forward because there is

16   a gap between --

17              MRS. MULLINS: Move to strike, Your

18         Honor.

19              THE COURT: Overruled with one

20         notation, that this witness is not an

21         expert. I'm not crediting Mr. Greenwald's

22         conclusion because he is not an expert but

23         I can credit his eyewitness observations.

24              MRS. FIORE: Thank you.

25              Q      Did you have an occasion to contact

1    any local town officials regarding your
2    observations of this wall?
3              A     Yes.
4              Q     Who did you contact?
5              A     Well, first we contacted-- well,
6    actually first Mr. Rotenberg contacted us in April.
7              Q     April of 2006?
8              A     Yes, in order to request permission
9    to have a mason come onto our property, to my
10   understanding, cosmetically cover the wall. We
11   objected to that and both my wife and I had
12   discussions with Mr. Rotenberg that before you
13   bring an in mason to just cover the cosmetic
14   elements of the wall, shouldn't we have a
15   structural engineer to come and look at the wall
16   and this was in the wake of that collapse of the
17   wall on the Henry Hudson Parkway, so it was
18   highlighted as a concern to us.
19                   We then learned that Mr. Rotenberg
20   was selling his house. So when I spoke with him on
21   the phone, I said shouldn't we have a structural
22   engineer come to evaluate the safety of the wall
23   both for you, the potential buyers and us and our
24   family and Mr. Rotenberg indicated that he had no
25   intention of bringing a structural engineer and

1    "it's my wall and I will do what I want with it" .

2                   I was baffled by the attitude about

3    it because it seemed like it was appropriate to

4    bring somebody who was an expert and not just cover

5    it up.

6                   After that, it was that with a

7    backdrop that led us to communicate with the

8    building department about, look we don't want this

9    wall to be just cosmetically covered up, shouldn't

10   we have an engineer come.

11                  Then, nothing really happened and

12   we probably had a couple other phone calls to Mr.

13   Carpaneto but nothing really happened in terms of

14   any action and then finally we ended up getting a

15   name of an engineer whose name was Benny Salanitro

16   and we ended up asking him to come and do an

17   analysis, that analysis included both --

18                  MRS. MULLINS: Objection.

19                  THE COURT: Sustained.

20        Q        Did you retain the service of an

21   engineer?

22        A        Yes.

23        Q        Did that engineer come to the

24   property to inspect the wall to your knowledge?

25        A        Yes.

1          Q      Did he provide you with a report?

2          A      He provided the town with a report

3     and I just--

4                 THE COURT: No, answer the question

5          and wait for the next question.

6          Q      Have you noticed any change in the

7     wall regarding the condition that caused your

8     concern in the first place?

9          A      No, the mason came and did stuff on

10    his side and maybe at the neighbor to the right

11    side but not on our side because we said, look we

12    don't want anybody coming to just cover up the

13    wall.

14         Q      There has been no correction for

15    the condition that caused you to call the building

16    department in the first place?

17         A      Not to my knowledge, no.

18                MRS. FIORE: I have nothing further.

19                THE COURT: Cross examination?

20                MRS. MULLINS: Yes.

21    CROSS EXAMINATION BY MRS. MULLINS:

22         Q      Your testimony is that nothing was

23    done to the wall on your side; is that right?

24         A      Yes.

25         Q      And is it true that you denied

Proceedings                          76

1    access to the wall by Mr. Rotenberg's contractor?

2              A      Just Mr. Rotenberg statement of

3    having a mason come --

4              Q      No, my question is, did you deny

5    access to the property, to your side of the wall?

6              A      To Mr. Rotenberg's request to have

7    a mason come onto the property.

8              Q      Maybe my question is not clear, did

9    there come a time that Mr. Rotenberg's contractor

10   came to your premises to do work on on your side of

11   wall?

12             A      I'm not aware of it.

13             Q      You are not aware of it?

14             A      No, my wife may be aware of it but

15   she did not communicate that with me, other than

16   Mr. Rotenberg ringing our doorbell and I'm not

17   aware of anybody else coming because we basically

18   explicitly in April denied to Mr. Rotenberg the

19   ability to have a mason come as I keep saying

20   because we did not want the wall just covered up.

21             Q      Is it true that initially you gave

22   your permission to Mr. Rotenberg to have work done

23   on the wall?

24             A      If that happened-- you mean about

25   the mason coming?

Proceedings                          77

1          Q       My question is, did you give

2     permission to Mr. Rotenberg to have someone do some

3     repairs on the wall?

4          A       I never gave that permission.

5          Q       Did your wife give that permission?

6          A       To my knowledge, no but--

7          Q       Is it possible that your wife gave

8     permission?

9          A       It is possible that my wife gave

10    permission in early April after which she

11    communicated with me and I said it's possible and

12    I'm not sure about this, at which point I

13    immediately called Mr. Rotenberg and that was the

14    discussion that I recounted, so it's conceivable a

15    couple of days went by between that but then when I

16    communicated with Mr. Rotenberg, I explicitly

17    denied access when he said to me, it's my wall and

18    I will do what I want with it and I said, not by my

19    property because we should have an engineer come.

20         Q       Are you further aware that it is

21    possible that your wife denied access to Mr.

22    Rotenberg's contractor to do repairs on the wall?

23         A       I am not aware of that.

24         Q       When did you write your letter to

25    the building department?

```
 1              A       April 14tth, no the letter was to
 2    Mr. Rotenberg.
 3              Q       Did you send a copy of that letter
 4    to the building department?
 5              A       Yes, and it's in the building
 6    department's file.
 7              Q       When did you send that letter to
 8    Mr. Rotenberg and to the building department?
 9              A       April 14, 2006.
10              Q       Was that before or after you had
11    any conversation with Mr. Rotenberg?
12              A       That was immediately shortly after
13    I had my conversation with him because I wanted to
14    communicate to him that we held him responsible for
15    any damages associated should the wall fail and
16    that it was a letter of consolatory tone to say
17    shouldn't we work to have this evaluated because it
18    would be dangerous for him and anybody purchasing
19    it and us and that it seemed reasonable and that
20    the conclusion of letter was, let's work amicably
21    to try to get a good evaluation.
22              Q       When you wrote that letter, upon
23    what facts did you come to the conclusion that the
24    wall was in a dangerous condition?
25              A       Looking at it.
```

Proceedings                                    79

1              Q       You, yourself?

2              A       Yes and also the fact that Mr.

3    Carpaneto, I believe, had said that there was an

4    awareness of this wall over resent past because of

5    the fact that the town had addressed-- I'm sorry,

6    what happened is when it really, really rains on

7    Huguenot Street, and this relevant --

8                      MRS. MULLINS: I move to strike --

9              A       It's relevant to answer your

10                     question.

11                     THE COURT: You have to hold on. We

12                     are talking about the letter.

13             A       The thing is --

14                     THE COURT: No, don't say anything,

15                     that could come out in some other question.

16             Q       My question is, when you wrote the

17   letter in April and I think you said it was April

18   14th of 2006, what facts did you have to base your

19   opinion or your conclusion that the wall was

20   dangerous?

21             A       Two elements, one, my own

22   observations of the wall. It is actually three

23   elements, my own observation that it looked like

24   there is a problem because the top part overhangs

25   the bottom part.

1          Secondly, when we had a landscape

2   person come in to remove trees that were in that

3   backyard, she had commented that that wall ought to

4   be looked at.

5          Third, this is the point that made

6   me aware that the town had an awareness of the wall

7   because of when it rains on Huguenot Street the

8   water, prior to them fixing the curb, would

9   literally be like a waterfall coming over that left

10  part of that wall. That would come into our yard

11  and cause a flood like, like a river.

12          So, when the town attempted to fix

13  the curbs had commented that the ought to be looked

14  at because it's obvious --

15          Q      When was that.

16          A      Maybe a year before.

17          Q      Was it possible that was in the

18  time period when you complained about the other

19  neighbors work being done on 3 Huguenot Drive?

20          MRS. FIORE: Objection.

21          A      I could answer that.

22          THE COURT: Overruled.

23          Q      This time period that you are

24  referring to that the town being aware of this run

25  off issue, you said on the left side of the wall

Proceedings                        81

1    and I assume when you look at your wall from your

2    property, you mean the right side?

3             A       No, the part that comes from 5

4    Huguenot runs down the left part when you look and

5    even now it's still not perfect. It's like a river

6    when it really pours, it's like a river but the

7    other people's property is on the right side.

8             Q       So, my question is, could it be the

9    time period, the same time period as when you

10   complained formally and in writing to the building

11   inspector with regard to work that was being

12   performed by the owners of 3 Huguenot Drive?

13            A       Yes, it could have been, yes.

14            Q       How many times did you have

15   meetings with Mr. Carpaneto with regard to this

16   particular wall?

17            A       I don't know if I ever met him but

18   I met him around the time of the issue with when

19   the 3 Huguenot Road, which was-- you know, that

20   was a very  complicated circumstance because they

21   were in the process of people building --

22                    MRS. MULLINS: Your Honor, I move to

23            strike, I asked him with reference to this

24            wall.

25                    THE COURT: The last part of your

Proceedings                                    82

1              answer is stricken. Repeat the question.

2                   Q      How many meetings did you have with

3       Mr. Carpaneto concerning this wall?

4                   A      I don't believe I had any meetings

5       with him, my wife may have met him but it was not

6       more than once but I did not have meetings, we had

7       phone conversations but not meetings.

8                   Q      How many phone conversations did

9       you have with him?

10                  A      Two or three, something like that.

11                  Q      Your, yourself?

12                  A      Yes, those phone conversations were

13      was--

14                        THE COURT: No, stop. Mrs. Mullins,

15                  you have to object.

16                        MRS. MULLINS: I am trying to. He

17                  talks very quickly. Could we have the last

18                  question read back.

19                        (Whereupon, the last question was

20                  read back by the reporter.)

21                  Q      Those phone conversations that you

22      testified to were between yourself and Mr.

23      Carpaneto; is that correct?

24                  A      Yes.

25                  Q      Did your wife also have phone

Proceedings                                    83

1    conversations with Mr. Carpaneto?

2              A      She may have.

3              Q      Do you know how many?

4              A      No, but it would not be more than a

5    couple in my opinion.

6              Q      Do you know if your wife had any

7    meetings with Mr. Carpaneto?

8              A      I don't think so but when we wanted

9    to get the copy of something, she may have come and

10   tried to get a copy.

11             Q      How long have you lived at 2

12   Lafayette?

13             A      I guess we moved in December of

14   1988, so eighteen years.

15             Q      Have you ever, in the eighteen

16   years that you lived there, with the exception of

17   this present case, ever complained about this wall

18   to anyone?

19             A      Not formally.

20             Q      How about informally?

21             A      If you look at it, it's one of

22   those things --

23                    MRS. MULLINS: Move to strike.

24                    THE COURT: Stricken.

25             A      Only to family and friends.

Proceedings                                84

1          Q      Did you ever make any complaints

2     formal or informal to the Mr. Rotenbergs?

3          A      Not to my knowledge.

4          Q      To the building department?

5          A      Not to my knowledge.

6          Q      How were you made aware that Mr.

7     Rotenberg was selling the house?

8          A      My wife said that Mr. Rotenberg

9     said it and that is in our letter to him on April

10    14th.

11         Q      When were you made aware of that?

12         A      Before we wrote that letter on

13    April 14tth.

14         Q      Do you recall how you were made

15    aware?

16                MRS. FIORE: It's been asked and

17         answered.

18                THE COURT: Do you recall how, yes or

19         no.

20         A      No.

21         Q      Isn't it true that you learned that

22    the house was being listed for sale and you took

23    the opportunity to have an attempt to have

24    substantial work done on your side at this time?

25                MRS. FIORE: Objection.

1               THE COURT: Overruled, could you

2      answer that.

3               A       It's not our wall, it's his wall,

4      there is no dispute about that to my knowledge,

5      so --

6               MRS. MULLINS: Move to strike.

7               THE COURT: Stop.

8               A       Sorry.

9               Q       The question is, isn't it true that

10     you became aware that the house was being offered

11     for sale and you took this opportunity --

12              A       No, that is not true the trigger

13     was Mr. Rotenberg asking to have a mason

14     cosmetically repair the wall. We did not know he

15     was selling the house.

16              Q       But you testified that you became

17     aware that he was going to sell the house?

18              A       Yes, after that.

19              Q       And after that is when you wrote

20     your letter and contacted the building department

21     and had all of these conversations; isn't that

22     true?

23              A       Yes, but we did not want the damage

24     to the wall--

25              Q       Yes or no?

1          A      We did not want the damage to the

2     wall being covered by stucko covering it. It did

3     not seem fair to us or to the new buyers, it's a

4     potentially dangerous situation.

5          Q      You used the word cosmetic several

6     times, did Mr. Rotenberg ever use the word cosmetic

7     when he described to you what was going to be done

8     to your side of the wall?

9          A      Not to my knowledge.

10          Q      You did not have any conversations

11     with the contractor; did you?

12          A      A contractor of Mr. Rotenberg?

13          Q      Yes.

14          A      No.

15          Q      Did your wife have any conversation

16     with the contractor?

17          A      I don't know the answer to that but

18     Mr. Rotenberg --

19                THE COURT: Stop.

20                MRS. MULLINS: Nothing further, Your

21          Honor.

22                MRS. FIORE: Nothing further.

23                MR. GREENWALD: Am I permitted say

24          something?

25                THE COURT: You are here to testify,

1       that means you are here to respond to

2       questions. I heard the question and I heard

3       your testimony, so, I thank you for your

4       testimony and you are excused. If you wish,

5       you may remain in the courtroom and hear

6       the rest of the trial. You don't have to

7       but the court is open. You could stay if

8       you wish.

9               THE COURT: Do the People have any

10      other testimony or evidence they would like

11      to present.

12              MRS. FIORE: No, Your Honor at this

13      time the People rest.

14              THE COURT: Okay.

15              THE COURT: Mrs. Mullins?

16              MRS. MULLINS: At this time I would

17      like to make a motion and renew my prior

18      motion but on somewhat different grounds.

19              At this point, the Defendant's move

20      to dismiss the summons issued in this case

21      based on the fact that the People have

22      failed to prove beyond a reasonable doubt

23      that the Defendant has violated the section

24      302.7 of the New York State Building Code.

25              Further and in particular Your

Proceedings                                                    88

1          Honor, the testimony of the building

2          official is clear that he made no

3          inspections of the subject wall until a

4          couple of weeks before this trial.

5                  Certainly, no inspections, physical

6          or otherwise, were made by the building

7          inspector with the exception of drive-bys

8          prior to the issuance of the first notice

9          of violation, the second notice of

10         violations, the summons and then lastly,

11         the prosecutors information, which

12         interestingly enough Your Honor was served

13         upon me by Mr. Carpaneto and had a cover

14         letter with it calling it a supporting

15         deposition and it was in response to my

16         request for a supporting deposition, such

17         request was made in writing on October 30th

18         and as the Court could see, the prosecutors

19         information, also known as the supporting

20         deposition has no facts whatsoever, no

21         factual basis and the law is clear that in

22         order to even file and serve a summons of

23         this nature, one has to-- a complainant has

24         to set forth in nonhearsay fashion

25         allegations, factual allegations to support

Proceedings                                    89

1          the factual section of the accusatory

2          instrument.

3                     That was not done certainly when it

4          was served and now the People have put

5          forth three witnesses and that still has

6          not been established.

7                     Your Honor, based on that, the

8          Defendants move to dismiss the action with

9          prejudice.

10                    THE COURT: Okay, I'm going to

11         reserve my decision on your motion for a

12         direct verdict, which is what it is and ask

13         you to please proceed with your case.

14                    MRS. MULLINS: Could I have a short

15         break?

16                    MRS. FIORE: Before we take that

17         break, could I be heard as to my

18         application?

19                    THE COURT: I don't know what you

20         could have.

21                    MRS. FIORE: My application is also

22         for a direct verdict in favor of the People

23         Your Honor.

24                    THE COURT: You can't to that.

25                    MRS. FIORE: There is a prima facie

```
1              case --
2                      THE COURT: Whether or not you made a
3              prima facie case, the Defendant still has a
4              right to put on their own evidence, so this
5              is not a recognized motion.
6                      MRS. FIORE: Yes, Your Honor.
7                      THE COURT: Okay, let's have a five
8              minute break.
9                      MRS. MULLINS: I would like to speak
10             to my witnesses.
11                     (Whereupon, a short recess was taken
12             by all parties.)
13                     THE COURT: Mrs. Mullins, call  your
14             first witness.
15                     MRS. MULLINS: We call John
16             Annunziata, professional engineer.
17                     THE COURT: Remain standing and I
18             will swear you in.
19     J O H N   A N N U N Z I A T A , a witness herein,
20     having been first duly sworn by the Court, was
21     examined and testified as follows:
22     DIRECT EXAMINATION BY: MRS. MULLINS:
23             Q      Good morning Mr. Annunziata, could
24     you tell the Court your formal education in the
25     field of engineering?
```

1              A       Okay, well I started in the 1950's.

2      I was going to Westchester Community College and I

3      took two years of a building technology course.

4      After that, I went into the army and I joined

5      specifically a three year period to get into the

6      core of engineers and I did not spend all that time

7      in there but I did spend a good part of it in the

8      core of engineers.

9                      After I got out of the military, I

10     went to work at the New York City Housing Authority

11     and at that time, I realized to further my career,

12     I needed to do more courses so, I went to city

13     college at night, enrolled in The School of

14     Engineering and Architecture.

15                     I started that in 1961 and I

16     graduated in 1966 with a bachelors of civil

17     engineering degree.

18                     In 1971 I took engineering license

19     examination, passed that and became a licensed

20     engineer with civil speciality.

21             Q       Could you tell the Court other than

22     a civil engineer, are there other types of

23     engineers?

24             A       Yes, there are other branches of

25.    engineering. There is a mechanical, electrical

1    civil engineering and so forth.

2              Q      Could you describe for the Court

3    your employment in the field of engineering since

4    your license took place?

5              A      I started in 19857 working for the

6    New York City housing authority. We built, at that

7    time, high rise apartment buildings for low income

8    housing. I was involved in the engineering part, we

9    would drive piles, steel piles to create

10   foundations. I would monitor the driving of the

11   piles and I examined foundations as they were being

12   constructed, so that the soil or rock was

13   acceptable for placing down foundation. I inspected

14   the steel. Most of that work was designed by

15   outside consultants but some of it was in-house

16   design and I did some of the finishing work, like

17   the brickwork and the interior portion and so on.

18                    Somewhere along the line after

19   about ten years or so, I moved over to the New York

20   City Department of General Services. That

21   constructed more diverse buildings. They built

22   libraries, fire houses, police stations, community

23   service centers and I worked with them as

24   construction manager.

25                    By that time, I guess I had gotten

1    my professional engineers license and I was able

2    run these projects on my own. Not only did I

3    monitor all the construction going on but I was

4    responsible for it. I handled the payments, and

5    things of that nature.

6              Q       Did there come a time that you left

7    the employment of the City of New York?

8              A       Yes, I took early retirement in

9    1984. I started to work part time doing some

10   engineering work on my own and I decided that after

11   a point, I could actually make more money working

12   on the outside. I already achieved a level of

13   retirement benefits and I decided to go out on my

14   own and I did that in 1984.

15             Q       And you established your own

16   practice in 1984; correct?

17             A       Yes.

18             Q       Tell us what you services you

19   performed in your private practice?

20             A       Presently, I do things like design

21   small building structures. I work on projects like

22   when a person wants to add a deck at the back of

23   the house, plus when somebody wants to build a

24   two-car garage, I'm working on that. I'm doing for

25   another person who wants to do some work in

1    Greenburgh, I'm doing site survey, which includes

2    wetlands survey and slope survey.

3                     I do building inspections and house

4    inspections. I do design of structures. I

5    investigate retaining walls, such as the one in

6    question. I also designed retaining walls, so I

7    have right now sort of a diverse practice and I

8    keep my fingers involved in many things and I

9    consult with others and I take required engineering

10   renewal courses, so I have to stay up on a great

11   deal of what is going on.

12            Q       In connection with your practice as

13   a professional engineer since 1984 forward, have

14   you ever had occasion to testify in court?

15            A       Yes, I have.

16            Q       How many times?

17            A       I'm going who estimate maybe five

18   or six times.

19            Q       And in what capacity?

20            A       As an expert witness for either the

21   Plaintiff or the Defendant.

22            Q       In the field of course of civil

23   engineering?

24            A       Yes, engineering topics.

25            Q       Do you have memberships in any

1    professional society?

2             A       I belong to the National

3    Professional Engineering Society and American

4    Society of Civil Engineers. I belong to several

5    home inspection organizations, such as the national

6    academy of building inspectors. I belong to an

7    organization called ASHI. Those are about the

8    primary organizations I'm affiliated with.

9             Q       Mr. Annunziata, did you prepare a

10   curriculum vite which sets forth your education

11   employment, experience in the field of engineering?

12            A       Yes, I do I have it.

13                    MRS. MULLINS: May I approach?

14                    THE COURT: Yes.

15                    MRS. MULLINS: And the record will

16            reflect that I handed Mr. Annunziata a copy

17            of a curriculum vite with his name on it.

18            Q       That is that what you prepared and

19   forwarded to me?

20            A       That is the most resent one that we

21   have, yes.

22                    MRS. MULLINS: I would ask that it

23            be accepted into evidence.

24                    THE COURT: Please hand it to Mrs.

25            Fiore to take a look at it.

Proceedings                                        96

1              MRS. MULLINS: Yes.

2              MRS. FIORE: No objection.

3              THE COURT: I'll describe it and

4         admit it in evidence.

5              (Whereupon, a document was received

6         and marked as Defendant's Exhibit A, in

7         evidence, as of this date.)

8              THE COURT: We have Defendant's

9         Exhibit  A, which is a copy of the

10        curriculum vite of John J. Annunziata. It's

11        a one-page document and this now in

12        evidence.

13             MRS. MULLINS: Thank you.

14        Q     Mr. Annunziata, are you being paid

15   by Mr. Rotenberg and in connection with your

16   services in this case?

17        A     Yes.

18        Q     Are you charging an hourly rate for

19   your services?

20        A     Yes.

21        Q     What is your hourly rate?

22        A     $175.00 per hour.

23             MRS. MULLINS: Your Honor, as a

24        result of Mr. Annunziata's testimony I

25        would ask that he be qualified by the Court

1               as an expert in the field of civil

2               engineering.

3                       THE COURT: Okay, Mrs. Fiore do you

4               wish to be heard.

5                       MRS. FIORE: No objection, Your

6               Honor.

7                       THE COURT: All right, Mr. Annunziata

8               you are now qualified as and expert witness

9               in the area of civil engineering, please

10              continue with the answering questions.

11              Q       Mr. Annunziata, did there come a

12      time that were you contacted by my office in

13      connection with this case?

14              A       Yes.

15              Q       Do you recall when that was?

16              A       Less than a month ago, about a

17      month ago.

18              Q       What was your purpose in being

19      involved in the case?

20              A       Well, it was suggested that I take

21      a look at a retaining wall at the rear of 5

22      Huguenot Street in Larchmont and I did do that.

23              Q       And in connection with your

24      services in evaluating this wall, did you

25      personally inspect the premises including the wall?

Proceedings                98

1          A      Yes, I did.

2          Q      How many times did you inspect the

3     wall?

4          A      I was actually at that location

5     three times.

6          Q      When we refer to the location, are

7     you referring to the side of the wall both on Mr.

8     Rotenberg's side and on the other side, on the

9     Lafayette side?

10         A      Yes.

11         Q      What did you do during these

12    inspections?

13         A      The first time I went there, I

14    investigated the wall from the top side at 5

15    Huguenot and I investigated what was on the

16    property at the upper side.

17                Then I went around the block and

18    looked from the opposite side, from the bottom

19    looking up if you will. While I was there I made

20    notes and I took photos. The notes were the basis

21    of the report that I issued to you in regarding my

22    opinion of the wall.

23         Q      And you reduced your inspection and

24    evaluation to a written document?

25         A      Say that again.

Proceedings                                    99

1          Q      Did you reduce your writing notes

2     to a written document?

3          A      Yes.

4          Q      Do you have a copy of your report

5     with you?

6          A      I have it in my brief case.

7                 MRS. MULLINS: I have a copy here,

8          Your Honor.

9                 THE COURT: Fine.

10         A      I will recognize it.

11         Q      I will show this to the witness.

12         A      This is the document that I issued.

13         Q      Did you furnish me with any other

14    written materials other than the curriculum vite

15    and this report?

16         A      Say that again.

17         Q      Did you if furnish me or anyone

18    else with any other written documents?

19         A      No, I did not.

20                MRS. MULLINS: I will show it to

21         Mrs. Fiore.

22                MRS. FIORE: I have a copy.

23                MRS. MULLINS: I ask that it be

24         offered into evidence.

25                THE COURT: Is there any objection to

Proceedings                    100

1          this document, it appears to be letter

2          prepared by Mr. Annunziata, is there any

3          objection.

4                    MRS. FIORE: The report mentions

5          photos enclosed, as long as the record

6          would reflect that photographs are not part

7          of the report then --

8                    THE COURT: That is correct, this

9          particular document that is coming into

10         evidence is just two type written pages the

11         exhibit itself does not include pictures.

12                   MRS. FIORE: Correct.

13                   THE COURT: This document is now in

14         evidence as Defendant's Exhibit B. We will

15         have it marked.

16                   (Whereupon Defendant's Exhibit B was

17         received in evidence.)

18                   MRS. MULLINS: Thank you, Your Honor.

19                   THE COURT: Please continue.

20         Q         Could you describe for the Court the

21    wall in question, from the Lafayette side?

22         A         From the Lafayette side, you could

23    see a stone wall on the bottom, which is perhaps

24    two-thirds of the height of the wall, possibly

25    three quarters and above that, there is a concrete

1   block wall.

2                 The stone wall is quite old, in

3   fact, the block wall is old as well. The stone wall

4   through it's life developed some cracks but it's a

5   heavy gravity wall made of stone.

6                 During the life of that wall and

7   not at the time that I could identify, some efforts

8   were made to try to resecure that wall, there were

9   steel rods and plates driven through the stone

10  wall.

11                There were also openings created to

12  allow for drainage to occur. That seemed more, as

13  you look from the Lafayette side into the wall on

14  the right side of wall, the left side of the wall,

15  which is the larger portion does not have that type

16  of work as I recall.

17                The block wall above is about seven

18  courses of concrete block. There are some limited

19  cracks in the wall. There has been a minor amount

20  of displacement. The middle section or the middle

21  left session slid out about three or four inches or

22  something like that.

23                Either as part of the original

24  construction, there were deadman or rods that were

25  put through the wall with plates facing the

1   Lafayette side and those rods go into the ground,

2   probably to some type of secure system, such as a

3   large piece of concrete or similar. Now, obviously

4   I don't know what that is but it's an effort-- the

5   original construction to keep the wall fairly

6   stable or a corrective repair made after the wall

7   was constructed.

8           Q       Now, these plates and rods, you

9   refer to them as deadman?

10          A       Yes.

11          Q       Are they also commonly referred to

12  as tie backs?

13          A       Yes, that is another term used,

14  yes.

15          Q       Referring only to the tie backs or

16  the deadman that are in that upper portion,

17  customarily and ordinarily, what is at the end of

18  the those rods that are attached to the steel

19  plate?

20          A       Most likely one would find a fairly

21  large piece of concrete. It acts as an anchor and

22  the rod is embedded in the concrete or it's poured

23  around the rod and it is usually down at an angle

24  below grade and it's ment to hold the wall back.

25          Q       And you mentioned and I don't know

1    what term you used but you mentioned that were also

2    some other devices to allow water, could you

3    describe what those are?

4              A       Those are openings in the wall and

5    the openings are perhaps three or four inches in

6    diameter, which is designed or the intent was for

7    water to leak out.

8              Q       Are they also referred to as weep

9    holes?

10             A       That term is also used.

11             Q       Do you recall, approximately, how

12   many of those weep holes existed in the wall?

13             A       I would guess but I don't recall I

14   don't have any photos handy but I think it is

15   probably six or eight wholes in the wall, I don't

16   recall any in the block wall.

17             Q       Ordinarily, when constructing a

18   wall of this size, are those weep holes installed

19   during the original construction or are they

20   something that would have come later?

21             A       It was my feeling by looking at

22   this wall that work was done later, simply because

23   it was not done in the left three thirds of the

24   wall as you look in from the Lafayette side but

25   only on the side where they seem to be some

1    corrective work to the stone wall.

2              Q       Corrective work meaning the the--

3              A       The weep holes and tie rods that we

4    saw within the stone wall.

5              Q       Could you describe for the Court

6    the upper portion of the wall and what you observed

7    from the 5 Huguenot Drive side of the property?

8              A       I know that first going into the

9    property I noted that the driveway surface was

10   fairly young, it looked new.

11             At the end of the driveway is the

12   wall and the inside surface has been coated with

13   stucko. I observed that this were no cracks in

14   stucko and no separation.

15             About three to five feet from the

16   wall there were wheel stops, concrete devices to

17   prevent cars going too far forward and the edge of

18   the or the surface of the asphalt has been

19   contoured to divert the water from that area as you

20   are looking down the driveway to the right of the

21   yard.

22             The left side of that wall has a

23   concrete top aged undetermined, the block wall had

24   been recently resurfaced with stucko and there were

25   no cracks or signs of movement.

Proceedings                          105

1          Q        What effect, if any, does the

2    resealing or repaving of the driveway have on the

3    wall?

4          A        Well several benefits obviously,

5    it's easier to drive in, it is more convenient for

6    purposes but in this particular case it helped seal

7    the soil and diminish the amount of water that will

8    get behind the wall.

9          Q        What effect, if any, does the

10   contouring, as you put it, of the driveway toward

11   the wall --

12         A        I would think that the intent is to

13   take that water and divert it to side of the wall

14   or side yard where there is less of an impact on

15   that wall.

16         Q        With regard to the wheel stops,

17   what purpose do they serve?

18         A        Well, again, probably several

19   purposes. One of them would be to prevent a car

20   from hitting the wall and the other is to keep

21   vehicles away from the wall, a reasonable distance.

22         Q        You testified that there was a

23   fairly new stucko coating on the wall as well?

24         A        Yes.

25         Q        What, if any, purpose does that

1    serve?

2              A       The purpose I think was to act as--

3    well, again, there are several reasons for that

4    being done, the aesthetics obviously but it also

5    acts as a water seal to some degree.

6              Q       Mr. Annunziata, you testified and

7    again, I don't recall what word you used but you

8    testified that you observed a shifting, some

9    shifting in the wall?

10             A       Yes, the upper wall, yes.

11             Q       Is that right?

12             A       Yes.

13             Q       Do you have an opinion as to when

14   that shifting took place?

15             A       That is hard to judge but I am of

16   the opinion that it has not happened in quite some

17   time. Again, I can't tell if there were repairs

18   done using the steel plates, the rod, the deadman

19   correct that or that was part of the original

20   design and this was some movement that stabilized

21   that after but my guess is that it's quite some

22   time back and I would say probably fifteen years.

23             Q       Is it possible for you to indicate

24   to the Court whether it's more possible than not

25   that those steel plates and deadman were installed

Proceedings                                    107

1    during the original construction or after as a

2    reparative measure?

3            A       I thought about that several times

4    and in my original opinion it was probably the

5    original construction but the more I think about it

6    and go over there and look at it, it was done as a

7    corrective measure later on but in either case, it

8    was to try to keep this wall from moving.

9            Q       As a result of your visit to the

10   site and your inspection and evaluation, do you

11   have an opinion today, Mr. Annunziata with regard

12   to the structural stability of first the stone wall

13   below?

14           A       Yes, I consider the condition to be

15   stable.

16           Q       What is your opinion as to the

17   structural stability of the top portion of the

18   block wall?

19           A       I think it's stable.

20           Q       I don't think anybody has testified

21   about this but could you describe for the Court

22   when building a wall of that type, and I'm

23   referring to that stone wall below, does it just

24   sit on top of the ground or something else?

25           A       Usually, the stones are further

1     below the grade and they are larger and thicker and

2     then they just build up, slowly almost like a

3     narrow pyramid.

4            Q      What is the purpose of building in

5     that --

6            A      The weight of the stone, which is

7     quite heavy, is ment to retain the soil behind it

8     and I guess the density of the wall is also part of

9     the intent of holding the soil behind.

10           Q      Mr. Annunziata, over the course of

11    your career, as a professional engineer, civil

12    engineer, how many occasions would you say,

13    estimate for us, that you have inspected or been

14    involved in the design of a retaining wall?

15           A      Dozens and I looked at walls that

16    needed repair. I looked at walls that should have

17    been taken down a long time ago. I designed walls

18    so they would not fail and part of the general work

19    I do is the consulting work, I am involved with

20    things such as retaining walls.

21                  This wall is a very, very old wall,

22    I suspect it was done on the property of 5

23    Huguenot, which is old. So, it is just one of those

24    walls that stood for god knows how many years,

25    seventy-five, eighty-five years, it's an old wall.

Proceedings                              109

1          MRS. MULLINS: I have nothing

2     further, Your Honor.

3          THE COURT: I have two points of

4     information to clear in my own mind for the

5     picture of wall. You described the stone

6     wall as a gravity wall; is that correct and

7     then could you define that for me?

8     A     Yes, it's the weight of the wall is

9     pulled by gravity. It is such a heavy

10    substance that it sits there and resists

11    forces.

12          Now a days, walls like that are

13    pretty expensive to build and generally

14    they are not done but in areas of Larchmont

15    where there was so much stone excavated,

16    they used the stone on the site to build

17    the wall and just by the heavy weight,

18    gravity of it, they lasted.

19          THE COURT: If you are standing in

20    the Huguenot Drive property and facing the

21    wall, what is the height of wall that is

22    visible to you as you are standing in the

23    driveway.

24    A     I would say two and a half feet,

25    three feet and it's the block portion that

Proceedings                                        110

1            is visible that is covered with stucko.

2                    THE COURT: Mrs. Fiore, cross

3            examination?

4                    MRS. FIORE: Yes.

5    CROSS EXAMINATION BY MRS. FIORE:

6            Q      If you are standing in the driveway

7    of 5 Huguenot, you can't see the stone wall; am I

8    misunderstood?

9            A      Well, in the immediate area you

10   can't see. Again, looking from the driveway down

11   you could see the stone portion on the right side

12   but on left side you could see the stucko portion.

13           Q      Because it's a tapered wall, is

14   that what you are saying?

15           A      It's not perfectly level.

16           Q      Does the driveway intersect at the

17   most left portion of the wall or somewhere else?

18           A      Say that again.

19           Q      The driveway, does it intersept

20   with the wall on the far left side or somewhere

21   else?

22           A      Where the driveway meets the block

23   wall as well as the concrete wall on the left as

24   you are looking down the driveway.

25           Q      Did you have an opportunity and I

1    don't recall from your testimony, to observe the

2    wall from the Lafayette side?

3              A      Yes.

4              Q      Where were you standing with

5    respect of the Lafayette property when you observed

6    the wall?

7              A      I actually moved quite bit because

8    I took three photos and I looked at it from the

9    side part where the wall was concrete all the way

10   over to the other side and I actually walked along

11   the lower portion of the wall.

12             Q      How much of the stone wall is

13   visible where were you standing on the Lafayette

14   side?

15             A      Except for whatever is below grade,

16   the rest of the wall is visible.

17             Q      The entire structure?

18             A      Yes.

19             Q      How high is the wall at that point?

20             A      I would guess fifteen feet, twelve

21   feet.

22             Q      Including the second concrete block

23   portion?

24             A      Just the stone and then the upper

25   portion is four or five.

1              Q      You testified that the wall was

2       probably very old?

3              A      My guess.

4              Q      Is the adjacent property, the home

5       is constructed on also very, very old?

6              A      The stone part, I would say was

7       original to that property.

8              Q      Do you know, approximately, how old

9       is the property?

10             A      By the age of the house, I would

11      guess around a 1920 house.

12             Q      You don't know for sure?

13             A      No, not for sure but the

14      architecture and location, probably 1920.

15             Q      So, the wall would have been

16      constructed probably some point in time --

17             A      That would be my guess, the same as

18      the house.

19             Q      Did you notice any water damage on

20      the stone portion of the wall?

21             A      One of the times I was there was

22      wetness but I don't know about water damage.

23             Q      Is that common in stone walls?

24             A      Yes.

25             Q      If that condition is left

1    uncorrected in stonewalls, in your experience, what

2    happens?

3            A       Say that again.

4            Q       In your experience, what happens if

5    these corrected conditions are left uncorrected or

6    unrepaired?

7            A       It all depends also on the

8    conditions that occur behind the wall, the

9    thickness of the wall.

10           Q       How thick is this wall?

11           A       I don't know exactly because there

12   is no way of actually measuring it but on the left

13   hand side, it's about two feet at the top. My guess

14   is at bottom of that stone wall, it's about four

15   feet or maybe more.

16           Q       How many cracks did you observe?

17           A       I recall one crack and there may

18   be-- well three is an another crack on the right

19   hand side as you look from Lafayette past the

20   corner.

21           Q       Two cracks that you observed?

22           A       Yes.

23           Q       You testified and again I'm not

24   sure of the terminology but there were most likely

25   rod reinforcement?

Proceedings                          114

1              A       Yes.

2              Q       Is that for the stone portion of

3       the wall?

4              A       Yes, that is correct.

5              Q       Did you actually have an

6       opportunity to observe if those rods had been

7       reinforced?

8              A       If those rods were reinforced, yes,

9       there were steel plates on them but they were

10      somewhat rusty.

11             Q       You testified that most likely

12      those rods were reinforced with concrete?

13             A       I don't know about those in the

14      stone wall, I only referred to the so called

15      "deadman" that were holding the block wall.

16             Q       Okay?

17             A       But some type of rods were put

18      through the stone wall quite some time back.

19             Q       So there are two different types of

20      rods?

21             A       Yes, or to different types of

22      installations with similar rods.

23             Q       And the rods are also known as tie

24      backs, am I using the terms correctly?

25             A       Yes.

1          Q      And the reinforced rods or tie

2     backs that are reinforcing the stone wall you

3     observed rusting; is that accurate?

4               A      Say again that again.

5               Q      You observed rusting on those --

6               A      Yes.

7               Q      How many of those tie backs were

8     rusted?

9               A      Well each of them was and I don't

10    know the total number but I think it was anywhere

11    from four to six, maybe a bit more but they were

12    each rusted, yes.

13              Q      Now, the portion between the-- let

14    me refer to your respect, in your report you

15    mentioned that the upper wall shifted toward 2

16    Lafayette?

17              A      Yes.

18              Q      Could you describe what you mean by

19    shifted?

20              A      It was a lateral movement from 2

21    Lafayette.

22              Q      Meaning going straight across?

23              A      Yes, but I think also there was a

24    bit of a tilt that occurred as well.

25              Q      On the --

1          A       So it tilted a little towards 2

2    Lafayette and it slid.

3          Q       Was that obvious from the Huguenot

4    side as well as the Lafayette side?

5          A       Not as easily from the Huguenot

6    side but you could see that the tilt in the wall

7    occurred by the surface of the back of the wall and

8    the other part could be seen from 2 Lafayette.

9          Q       How far is that shift or leaning as

10   you said, was going along that --

11         A       A section of about perhaps a third

12   or a quarter where the wall shifted out, the rest

13   was reasonably aligned with the stone wall.

14         Q       And you believe the tie backs were

15   correcting that condition?

16         A       At which portion of the wall?

17         Q       Of that shift that you are

18   referring to that went about --

19         A       Two possibilities, again, it could

20   have been that originally these were installed and

21   ment to hold the block wall and prevent movement

22   and maybe those that were unseen below the grade

23   shifted slightly and finally took hold or

24   corrective work was done later putting in the rods

25   to devices concrete or whatever and it's the steel

1    plates that are visible.

2              Q       If the first scenario is true and

3    it's original construction, is it fair to say, in

4    your experience, that with time the condition will

5    only get worse?

6              A       Yes, that the condition had

7    stabilized.

8              Q       Stabilize or would get worse?

9              A       No, stabilize.

10             Q       Over time if a condition from old

11   construction has caused the wall to shift, you

12   would expect the shift to stop on it's own or would

13   you expect it to get worse?

14             A       I thought that if the rods were put

15   in and as part of the original construction, there

16   might have been some initial movement that finally

17   locked in by gravity by friction and that there was

18   not going to be any additional movement.

19             Q       And you would not expect any kind

20   of reinforcement to give way?

21             A       No.

22             Q       Over time?

23             A       No, I did not expect that to occur,

24   no.

25             Q       Interesting. And if it is work that

1       is done in a corrective fashion, would you say that

2       the condition has been corrected?

3                A       I think that was the intent, yes.

4                Q       Would you say the condition had

5       been corrected, regardless of whether the intent

6       was there or not, would you say the condition has

7       been corrected?

8                A       I would say the work was done

9       stabilizing and it correcting it, yes.

10               Q       Again, you did not investigate

11      whether or not these tie backs had actually been

12      reinforced with concrete, is that fair to say?

13               A       No, I did not have the opportunity

14      to do any investigation.

15               Q       Was it within your expertise to do

16      that sort investigation or further analysis?

17               A       No, it would require investigating

18      the rear yard to find out what the material is.

19               Q       I take it that is an expense, quite

20      a large expense?

21               A       Yes, it a large expense.

22               Q       Approximately, how much?

23               A       I don't know but it would be fairly

24      expensive, a new driveway would have to be torn up,

25      including other areas, so those places would have

1    to be restored and the expense would be

2    substantial.

3             Q      You said earlier that there were

4    several reasons for the stucko work, one of which

5    was to make the wall look nicer?

6             A      Yes.

7             Q      Again, with time and water and

8    elements, is it fair to say that the stucko would

9    eventually give way or wear out or something else?

10            A      It's possible with weather being

11   another condition.

12            Q      Approximately, how long with the

13   type of stucko and the type of cracks that you

14   observed?

15            A      I would think that if all things

16   stay as I see them, some cracks with the

17   temperature might develope on the wall but that is

18   about all I would expect.

19            Q      In your experience, do you consider

20   a wall to be stable if a portion of the wall has

21   shifted away?

22            A      It could be, yes, sure.

23            Q      It could be?

24            A      In this case, yes.

25            Q      It's possible that it could not be;

Proceedings                              120

1    correct?

2              A      It is possible, it's a matter of

3    opinion.

4              Q      You have expressed that opinion

5    without knowing the nature of this reinforced tie

6    back that you testified to earlier?

7                    MRS. MULLINS: Objection, Your

8              Honor.

9                    THE COURT: Overruled.

10             A      That is correct.

11                   MRS. FIORE: Thank you, no further

12             questions.

13                   THE COURT: Redirect?

14                   MRS. MULLINS: Just one question.

15   REDIRECT EXAMINATION BY MRS. MULLINS:

16             Q      The tie backs in the upper portion

17   of wall, these large one by one foot plates that

18   have rods I guess?

19             A      Yes.

20             Q      In your experience, in your thirty

21   years as an engineer, is it more probable than not

22   that something is at the end of those rods that

23   they are connected to?

24             A      It has to be.

25             Q      It would not make sense to insert a

1    rod without any fixation of that end of it; would

2    it?

3              A      It would be totally useless.

4              Q      You talked about the rusting of

5    some of tie backs, that was in reference to the

6    lower portion of the stone wall; is that correct?

7              A      Yes.

8              Q      And clearly your opinion is that

9    the wall is stable as is the upper portion; is that

10   right?

11             A      Yes.

12                    MRS. MULLINS: I have nothing

13             further, Your Honor.

14                    MRS. FIORE: One more question, Your

15             Honor.

16                    THE COURT: Please make it within the

17             scope of.

18                    MRS. FIORE: It is.

19   RECROSS EXAMINATION BY MRS. FIORE:

20             Q      What is the condition of those

21   upper tie back on the concrete?

22             A      The steel plates are rusted but the

23   rods are quite good looking, there is no rust on

24   the roads at all maybe they are stainless steel.

25             Q      Which portion is rusted?

Proceedings                     122

1            A      The upper portion, the block wall,

2       the tie backs.

3            Q      Those are the tie backs I'm talking

4       about, so which portion of-- you said they are

5       rusted, which portion is rusted?

6            A      The steel plates have some surface

7       rust, the rods themselves do not.

8                  MRS. FIORE: Thank you for your

9                  testimony.

10                 THE COURT: Call your next witness.

11                 MRS. MULLINS: We call John Coppola,

12                 an engineer.

13                 MRS. FIORE: I object. We already

14                 heard from one expert. I think that this is

15                 repetitive and unnecessary and I would like

16                 at this time if Your Honor is inclined to

17                 not grant my objection, I ask for an offer

18                 of proof.

19                 THE COURT: Let's hear an offer of

20                 proof.

21                 MRS. MULLINS: He going to very, very

22                 belief. There has been obviously sufficient

23                 testimony by Mr. Annunziata on the issues

24                 of the wall. I did have Mr. Coppola look at

25                 the wall and he also an engineer structural

1              civil engineer with many years of

2              experience and he would only render an

3              opinion as to the stability of the wall.

4              The case here --

5                      THE COURT: That is what the case is

6              about, so in light of offer of proof, I am

7              inclined to allow this witness to testify.

8                      MRS. MULLINS: Thank you.

9                      THE COURT: Step up and I will swear

10             you in.

11     J O H N   C O P P O L A, a witness herein, having

12     been first duly sworn by the Court, was examined

13     and testified as follows:

14     DIRECT EXAMINATION BY: MRS. MULLINS:

15             Q       Mr. Coppola, good morning. Could

16     you tell the Court your profession please?

17             A       Professional engineer in the State

18     of New York and have a bachelors degree in civil

19     engineering from Polytec University.

20             Q       When did you graduate from

21     engineering school?

22             A       1974 at night, evening division.

23             Q       Are you also licensed by the State

24     of New York?

25             A       Yes, I am.

1              Q       When did you receive your license?

2              A       1976.

3              Q       Could you briefly tell the Court

4       your employment history as an engineer?

5              A       In 1962 I worked with the City of

6       New York in the Department of Public Works. I

7       retired in 1992 in various positions within the

8       agency. Since 1992, I have been doing private work.

9       The last two or three years, I have been consulting

10      for a specific firm in Valhalla as a professional

11      engineer.

12             Q       During the course of your

13      employment and as an engineer for these years that

14      you were licensed, did you have occasion or did you

15      have occasion to view and inspector or be involved

16      in the design of retaining walls?

17             A       Yes, I have.

18             Q       Could you estimate, for the Court,

19      over the course of your career, in numbers, how

20      many retaining walls have you been involved with,

21      whether the inspection or design?

22             A       I designed approximately a dozen and

23      inspected the construction of and supervised the

24      construction of close to a hundred, not all the

25      walls I designed were concrete but I designed

```
 1   retaining walls.
 2          Q      Mr. Coppola, have you testified in
 3   court before as an expert?
 4          A      Yes.
 5          Q      Within the State of New York?
 6          A      Yes, and one in Connecticut.
 7          Q      Could you just tell the Court,
 8   approximately, how many times you testified as an
 9   expert?
10          A      Five or six times.
11          Q      On what subject did you testify?
12          A      A couple of cases where there was a
13   water intrusion from a neighbor onto the other
14   neighbor. One was a retaining wall and the other
15   was-- I think were foundation walls within the
16   building, cracked foundation walls.
17          Q      During those occasions where you
18   testified in court, were you qualified as an
19   engineer expert?
20          A      Yes.
21                 MRS. MULLINS: I ask that the Court
22                 qualify Mr. Coppola as an expert in the
23                 field of engineering at this time.
24                 THE COURT: Do you wish to make any
25                 inquiry?
```

Proceedings                                126

1            MRS. FIORE: No, thank you, Your

2       Honor.

3            THE COURT: I find that Mr. Coppola

4       is qualified as an expert witness in the

5       area of engineering, listen to the next

6       question.

7       Q    Did there come a time that you were

8  requested to view a wall that is the subject of

9  this case?

10       A    Yes.

11       Q    Did you inspect the wall?

12       A    Yes, I did this November 15th, this

13  year.

14       Q    Were you with anyone when you made

15  that inspection?

16       A    Mr. Annunziata who hired our firm

17  to do it.

18       Q    What did you observe?

19       A    Well, I observed a concrete block

20  wall resting on a stone wall from the Huguenot

21  Street property. Then we walked around to the back

22  and drove around and then I saw the stone wall

23  approximately ten to twelve feet high topped by a

24  concrete block wall approximately four feet high

25  and I found that the concrete block wall in the

Proceedings                                127

1   middle of the span had move out about three to four
2   inches. I saw the concrete block wall being
3   stabilized by four tie backs onto the property of
4   Huguenot Street.

5          Q        Could you describe for the Court
6   the size of those tie backs stabilizing the block
7   wall?

8          A        There were approximately ten feet
9   high. I would say the rod was about five to eight
10  inches in diameter and the plate looked like twelve
11  by twelve inches. There was a rod going back into
12  the property at 5 Huguenot and was approximately
13  five eighths of an inch in diameter.

14         Q        And in your professional opinion
15  Mr. Coppola, what is the purpose of those plates
16  and rods?

17         A        Well, tie backs by it's name and
18  definition, just holds back any lateral movement
19  that may occur in the wall, so they are anchored
20  into the property of Huguenot Street. It is a long
21  rod or a long bolt, if you will, anchored into and
22  I did not see them but anchored into concrete
23  blocks that are into the property here, so the
24  weight is being shifted back in this direction.

25         Q        In your experience in the design

1    and supervision of retaining walls, where these

2    type of tie backs are used, is there always some

3    mechanism that this rod ties into?

4              A       You mean always?

5              Q       Yes.

6              A       I don't suspect that that wall was

7    put in with tie backs originally, I think when they

8    noticed the movement a while after they constructed

9    it, they noticed some movement and I think they

10   installed the tie backs then but I can't tell how

11   long they have been there.

12             Q       Could you explain to the Court if

13   it was done subsequent the original construction,

14   how would that have taken place? How would the

15   construction of those tie backs have taken place?

16             A       How would they do it after the

17   construction of the wall?

18             Q       Yes.

19             A       They would have excavated into the

20   driveway. The driveway that they had in the back,

21   excavate a spot where the poured concrete block is

22   going to be and anchor the tie back rod back into

23   those blocks.

24                     Then, the front of the wall has a

25   plate, which is holding back, which is surfaced on

Proceedings                        129

1    the front face of the wall. The rods go through the

2    wall, through the soil and onto a concrete block.

3                    That is correctly done, I did not

4    see them, the rods are there.

5            Q       In your in professional opinion, is

6    the bottom portion of the wall that is made of

7    stone stable?

8            A       Yes, it appears to be stable.

9            Q       With regard to the upper portion --

10           A       The upper portion is stabilized

11   because there are tie backs holding it back. It had

12   moved in the center, I think I stated that before

13   but just the center was not aligned with the front

14   part of the stone wall and the two ends were still

15   lined up, just the middle had moved out.

16           Q       Could you estimate the length of

17   that middle area that moved out?

18           A       I should have measured it, I would

19   say approximately eight feet but at the widest part

20   it was three to four inches. It tapers out.

21           Q       When you went out to the site to

22   inspect and evaluate the wall below, did you also

23   have an occasion to look at the wall and inspect it

24   from the upper portion?

25           A       Yes.

Proceedings                              130

1            Q        Are you aware of any steps that
2    were taken by the home owner with regard to any
3    repairs to that top area?
4            A        Well, I was only there with Mr.
5    Annunziata and he showed me that the driveway had
6    been repaved a while ago. That day it was
7    completely full of leaves because it was after a
8    big rainstorm that we had.
9                     So, the driveway had be repaired
10   and the front part of the wall was stucko. It did
11   not appear to be a resent stucko job but the
12   driveway had been repaired or so I was told.
13           Q        So it was  a new driveway?
14           A        Relatively new driveway, then as
15   you face the house from the back of 5 Huguenot, it
16   was sloped that way.
17           Q        To your left?
18           A        To your left as you face the back
19   of the house.
20           Q        So, if you are standing with the
21   wall behind you?
22           A        It was sloped in that direction,
23   any water run off went this way.
24           Q        Did you notice whether or not the
25   wheel stops were installed in the driveway?

Proceedings                    131

1              A      Yes, there were three or four wheel
2    stops there.
3              Q      What is the purpose of wheel stops?
4              A      I'm sorry.
5              Q      What is the purpose of those wheel
6    stops?
7              A      To stop a car short of bumping into
8    the overhang of the wall with the bumper.
9                     MRS. MULLINS: I have nothing
10                 further, Your Honor.
11                    THE COURT: Okay.
12                    THE COURT: Mrs. Fiore?
13                    MRS. FIORE: Yes.
14   CROSS EXAMINATION BY MRS. FIORE:
15             Q      Did you take any notes?
16             A      Yes, I wrote a report and I took
17   pictures.
18                    MRS. FIORE: I will object to the
19                 witness entire testimony and that his
20                 testimony be stricken. I was not given any
21                 notice of a report or any provision that
22                 Mr. Coppola-- of his findings and I would
23                 object to his entire testimony.
24                    MRS. MULLINS: Your Honor, I did not
25                 even see the report myself and I certainly

1       did not provide it to her and I'm not

2       offering it, I am just merely offering the

3       testimony of Mr. Coppola's himself today

4       and based on that there is no reason to

5       strike any part of the his testimony.

6              MRS. FIORE: I would just add Your

7       Honor that the People were denied the

8       opportunity to provide their extra witness.

9              I'm working within the frame work of

10      a bureaucracy and the fact that the

11      Defendants had the opportunity to, get at

12      the last hour, another witness without

13      notice to the People.

14             THE COURT: The People had the

15      opportunity from July. The Defendant only

16      had an opportunity from October 17th.

17             MRS. FIORE: The People had an expert

18      available for the preparation of the case

19      as it went before Your Honor two or three

20      weeks ago.

21             Just because a notice of violation

22      or a summons has been issued, is there a

23      presumption that the case will go to trial

24      the fact that case has gone to trial, has

25      only been known--

Proceedings                    133

1          THE COURT: I already explained my

2     perspective on that --

3          MRS. FIORE: And I understand, yet

4     I'm being prejudiced here --

5          THE COURT: You are not being

6     prejudiced --

7          MRS. FIORE: For the record, I'm

8     being prejudiced because not only did I not

9     have the opportunity to call my witness --

10          THE COURT: Do you have another

11     witness that you would like to call, if you

12     have other witness available that you would

13     like to call, certainly you may call

14     another witness.

15          MRS. FIORE: I'll see if the witness

16     is available to come to court and testify.

17     I could certainly make that inquiry.

18          THE COURT: You went ahead --

19          MRS. FIORE: I was trying to provide

20     the Defendants with the proper notice, with

21     the report, with the findings of an expert,

22     the courtesy of which I was not given and I

23     object strenuously to this witnesses's

24     testimony.

25          THE COURT: So there are two issues.

1           One, objection to the testimony of this
2      witness. That objection is unfounded
3      because the Defendant, in a criminal
4      proceeding, could put on more than one
5      witness if they want.
6           MRS. FIORE: Yes.
7           THE COURT: They choose to avail
8      themselves of evidence and testimony and I
9      gave them that opportunity to avail
10     themselves with the rights and privileges
11     in the United States Constitution the right
12     of criminal defendant in their trial.
13          Second, you have been in front of me
14     enough to know that when I say we are going
15     to have a trial, we are going to have a
16     trial.
17          MRS. FIORE: I'm not disputing that
18     issue, Your Honor. What I'm disputing is
19     that from the vantage point of the town,
20     it's not within the purview of the town
21     prosecutor to go and engage and retain
22     experts. If it were within my purview, I
23     certainly would have done that. It's not
24     within my jurisdiction to go out on behalf
25     of the town and start retaining structural

Proceedings                          135

1    engineers, that is not my job.

2             THE COURT: But you know what, you

3    are missing the point of your roll as

4    representative --

5             MRS. FIORE: I'm not missing it.

6             THE COURT: It is late and now is not

7    the time for me to provide a seminar on

8    that topic.

9             MRS. FIORE: I'm not interested in

10   having a seminar nor do I need one. I have

11   been engaged with the town powers that be

12   and the responsible people who are

13   responsible for obtaining the expert

14   witness for this trial.

15             This witness has offered nothing

16   beyond the prior witnesses's testimony.

17   That was the grounds for my first

18   objection.

19             The second objection is, if you are

20   going to allow his testimony, the People

21   should be given the opportunity to provide

22   their witness who could rebut this

23   witness's testimony.

24             THE COURT: Okay, call the person

25   right now. You are excused. Do you have

Proceedings                        136

1              more questions.

2                      MRS. FIORE: I don't want to lose my

3              ground for objection by questioning the

4              witness.

5                      THE COURT: You won't, you could

6              question the witness, your objection is

7              noted on the record, it stays, it's on the

8              record, have a seat and you could cross

9              examine this witness if you wish.

10                     MRS. FIORE: Yes.

11             Q       You said earlier that you prepared a

12     report?

13             A       Yes.

14             Q       Did you provide Mrs. Mullins a copy

15     of that report?

16             A       Yes, I think it was addressed to

17     her and copy to Mr. Annunziata. This was late last

18     week, so I don't know if it went out really.

19             Q       But you prepared it?

20             A       Yes, I prepared it.

21                     MRS. FIORE: I have no further

22             questions.

23                     THE COURT: Okay, you are excused,

24             you could go home or sit in the courtroom.

25                     THE COURT: Do you have any other

Proceedings                                137

1        testimony or evidence you would like to

2        present?

3                    MRS. MULLINS: Yes, Mr. Rotenberg

4        will take the stand.

5                    THE COURT: Okay, Mrs. Fiore, if you

6        wish to contact your other witness, go

7        right ahead we have a few minutes.

8                    MRS. FIORE: I will be happy to do

9        that.

10                   THE COURT: We will take a break.

11                   (Whereupon, a short recess was taken

12       by all parties.)

13                   MRS. MULLINS: Just so I understand,

14       is Mrs. Fiore talking about consulting with

15       the witnesses that she has put on the stand

16       this morning?

17                   MRS. FIORE: No.

18                   THE COURT: She is telling me no.

19                   MRS. MULLINS: At this time, she is

20       going to have the opportunity to call

21       another witness.

22                   THE COURT: She could certainly

23       present a rebuttal case if they so choose,

24       that all I'm saying.

25                   MRS. MULLINS: Okay.

Proceedings                    138

1                    THE COURT: Call your next witness.

2                    MRS. MULLINS: We call Gary

3               Rotenberg.

4                    THE COURT: Remain standing and I

5               will swear you in.

6      G A R Y   R O T E N B E R G, the Defendant herein,

7      having been first duly sworn by the Court, was

8      examined and testified as follows:

9      DIRECT EXAMINATION BY MRS. MULLINS:

10               Q      Good afternoon, Mr. Rotenberg?

11               A      Good afternoon.

12               Q      Are you the one of the owners of 5

13     Huguenot Drive?

14               A      Yes.

15               Q      When did you purchase the property?

16               A      We purchased the property in April

17     or May of 1988 and we moved in August 3rd of 1988.

18               Q      With whom do you reside at 5

19     Huguenot, I'm sorry I know you don't reside there

20     presently but with whom did you reside?

21               A      My wife Jane Dickson.

22               Q      Do you have children?

23               A      Three children.

24               Q      And you resided there continuously

25     from 1988 through the resent past?

Proceedings                139

1         A      July of 2006.

2         Q      And what occurred in July of 2006?

3         A      We had purchased another house in

4    New Jersey and moved there.

5         Q      Did there come a time that you

6    listed 5 Huguenot Drive for sale?

7         A      Yes.

8         Q      When was that?

9         A      On or about March 22, 2006.

10        Q      And with whom do you list the

11   property for sale?

12        A      Cold Well Banker in Larchmont.

13        Q      What, if anything, occurred with

14   regard to the listing of the property?

15               MRS. FIORE: Objection, I was giving

16          a little --

17               THE COURT: Sustained, I don't really

18          need to know about the sale. We are not

19          talking about the house for sale, it's

20          about the wall.

21               MRS. MULLINS: It's in reference to

22          the wall.

23        Q      With regard to the wall that is the

24   subject of this case, what, if anything, occurred

25   when you listed the house?

1           A       It was brought to my attention that

2     there was a crack in the rear cinder block portion

3     of the wall that divides our property between 2

4     Lafayette Road.

5           Q       The crack is on your side or on the

6     Lafayette side?

7           A       Primarily on our side.

8           Q       What, if anything, did you do with

9     respect to coming into possession of that

10    information?

11          A       On or about March 30th of 2006, I

12    contacted Alfredo Calvi and Son(ph) a masonry

13    company located in Yonkers, with whom I done

14    business with before.

15          Q       They performed other masonry

16    services at your premises?

17          A       Yes, they worked on my premises

18    before and in the area.

19          Q       You had Mr. Calvi come out to the

20    property?

21          A       On or about April 7th of 2006, the

22    president of the company Fulvio Calvi came to the

23    premises and met me at the house and went to the

24    backyard, where I instructed him what I wanted done

25    to the property.

Proceedings                          141

1          Q        What instructions or information

2     did you give to Mr. Calvi(ph)?

3          A        I told Fulvio that we were putting

4     the house on the market and I wanted him to affect

5     what the repairs he thought were necessary and I

6     told him directly, if ther are any structural

7     problems with the wall, Fulvio, I want you to fix

8     them.

9          Q        That was what period of time?

10         A        That was probably around April 7th

11    because I contacted Fulvio around March 30th, he is

12    a busy man, so it took him about a week to get to

13    our house.

14         Q        As a result of your discussions

15    with Mr. Calvi, did he propose to do certain work

16    at the premises?

17         A        Yes, he did.

18         Q        Did that work involve the wall?

19         A        Yes.

20         Q        Did that work involve various areas

21    of the wall or parts of the wall?

22         A        Yes, it did.

23         Q        Could you describe what areas of

24    the wall it involved?

25         A        I observed the Calvi Firm working

Proceedings                                142

1    on the crack in the cinder block portion of the

2    wall and also the wall, the concrete wall that

3    separates the 3 Huguenot Drive address from the 5

4    Huguenot address, the left.

5         Q    Before you observed work being

6    done, with regard to the proposal for working, what

7    did the Calvi Firm propose to do to the wall?

8         A    They had also proposed to do work

9    on the other side of the wall facing 2 Lafayette

10   Road.

11        Q    What was the nature of that work?

12        A    The nature was water proofing. As

13   we know, water intruding into a wall causes

14   problems during the winter. Mr. Calvi had proposed

15   removing two cinder blocks from the cinder block

16   wall, which had turned slightly.

17        Q    On the Lafayette side?

18        A    Removing those two cinder blocks,

19   filling it with some kind of fill and concreting it

20   over and that is what he had proposed doing to make

21   certain that the wall was water tight for the next

22   buyers.

23        Q    As a result of the proposal by the

24   Calvi Firm to do work on both your side and the

25   other side of the wall, did there come a time that

Proceedings                                143

```
1      you contacted your neighbors at 2 Lafayette?
2              A       Yes, we did.
3              Q       Is this the first time that you had
4      any contact at all with the Greenwalds?
5              A       In the eighteen years in which we
6      lived in that house, we never heard one syllable
7      from them on any subject whatsoever.
8              Q       So, you contacted them for the
9      first time in what month of 2006?
10             A       I knocked on their door to contact
11     them at approximately April 8th, it was the day
12     after Mr. Calvi came by and gave me this proposal.
13             Q       Who answered the door?
14             A       A person whom I later learned was
15     Jane Greenwald.
16             Q       And --
17             A       I had never seen her before.
18             Q       And you had some discussions with
19     Mrs. Greenwald?
20             A       Yes, I did.
21             Q       Concerning the repairs to be done
22     to the wall?
23             A       Yes.
24             Q       Did you request anything of Mrs.
25     Greenwald at that time?
```

1          A       I knocked on the door and she

2    invited me in, normal pleasantries, we went to the

3    back of the house, looked at the wall and I told

4    her that we were planing to put the house on the

5    market and I just had my mason, the most expensive

6    one in Westchester, come and examine the wall and

7    he found it to be in structurally sound condition

8    but it needs some minor repair work in terms of

9    water proofing integrity.

10         Q       At that time, did you request

11   permission for the Calvi Firm to gain access to

12   that side of the wall?

13         A       Yes, I asked her directly if the

14   Calvis could have access to the backyard, they

15   estimated it would take maybe a day at the most to

16   effect the repairs but they did not want to do

17   anything without getting all the proper permission.

18         Q       Did the Calvi Firm indicate to you

19   in this proposal to do the work on that side, on

20   the left side they that would have to erect some

21   scaffolding?

22         A       And it would come down in a day.

23         Q       Did you inform Mrs. Greenwald of

24   that?

25         A       Yes.

Proceedings                                    145

```
 1                Q       What, if anything, did she do in
 2     response to your request?
 3                A       She granted the request and she
 4     then mentioned the West Side Highway collapse.
 5                Q       You had some further discussions?
 6                A       With Mrs. Greenwald, yes.
 7                Q       As a result of your conversation
 8     with Mrs. Greenwald, did you then contact Calvi to
 9     go ahead and perform the repairs?
10                A       Yes.
11                Q       Did that take place?
12                A       On or about April 10th, maybe two
13     days later, the Calvi Firm, Fred Calvi who was the
14     senior vice president, the number two man there,
15     arrived on my premises with a full crew of workers,
16     cement, stucko, all sorts of scaffolding equipment
17     and was driving down my driveway.
18                Q       Then what happened?
19                A       Simultaneously, with the arrival of
20     Fred Calvi in his truck, the phone rang and there
21     was a person who introduced himself as Blaine
22     Greenwald.
23                Q       And you had a conversation with Mr.
24     Greenwald at that time?
25                A       Yes, I had a conversation with him.
```

Proceedings                                146

1          Q      As a result of that conversation,
2     what happened?
3          A      Mr. Greenwald insisted that we get
4     a structural engineer because a mason knows nothing
5     and he does not trust a mason. I replied every
6     engineer will hire a mason to do all of the work
7     and we are paying alot of money to the Calvi Firm,
8     they have seen no problems with the wall and we
9     have to fix the water intrusion, such as it is,
10    because that would cause problems way down the
11    road.
12               I told that to Mr. Greenwald and he
13    refused, he said no, I want a structural engineer
14    and if you don't get one, I am withdrawing
15    permission to have access to my backyard.
16               I said the Calvi Firm is driving
17    down the driveway to setup the Scaffolding to start
18    work. He said they don't have permission to go to
19    my backyard and I said, I'm sorry I have to go
20    because I have to greet my masons.
21         Q      Was it your understanding that the
22    repairs to the Lafayette side could not be
23    effectuated without the access to the wall from
24    their property.
25         A      It would be impossible.

1        Q       As a result of that conversation

2    with Mr. Greenwald and the inability of the Calvi

3    Firm to do the work on that side of the wall, did

4    they perform other work at your property?

5        A       I had them on site, so I said, Fred

6    fix what you may. So, he looked at the left side of

7    wall, poured concrete and there was a crack along

8    the fence post, so I asked my neighbor and he gave

9    me permission and they put up the scaffolding

10   there, fixed that crack everything they could on

11   our side.

12       Q       Did they, at that time, apply the

13   stucko coat to your side of the wall that is

14   visible?

15       A       Yes.

16       Q       Did they to anything else at that

17   time?

18       A       Well they fixed the crack and I

19   observed all this. They drilled it out, they put

20   water proofing seal in it. This filed it down, they

21   sanded it, they filled it with concrete, a special

22   boding of water proof concrete and then they

23   applied the stucko and checked the wall for

24   structural integrity again. I was with Mr. Fred

25   Calvi when he did that.

Proceedings                           148

1          Q      What did you pay the Calvi Firm for

2     the work that you just described, that is, the work

3     to the number 3 Huguenot drive side of the wall and

4     your side of the wall?

5          A      That total came to approximately,

6     probably thirty-two hundred dollars, thirty-three

7     hundred dollars, though we did hot pay them at that

8     time because there might be more work to be done,

9     so we held that payment in obeyance.

10         Q      Did there come a time thereafter

11    that you had other work done at the house?

12         A      Yes.

13         Q      With regard to just the driveway,

14    what other work did you have done?

15         A      We had to remove an oil tank in the

16    driveway.

17                THE COURT: Now, I know Mrs. Fiore

18                is not objecting but we are getting too far

19                afield here.

20                MRS. FIORE: I will withdraw that

21                question.

22         Q      Did you have the driveway repaved

23    and resealed?

24         A      Yes, we did.

25         Q      Did you do that after you had the

1   oil tank removed?

2           A       Yes, we had to because the drive

3   was completely destroyed.

4           Q       With regard to the resealing and

5   resurfacing of the driveway, what, if anything, did

6   the contractors do where that driveway meets the

7   wall?

8           A       They put in a berm, which is about

9   a six inch swell in the blacktop in order to divert

10  the water such as it was coming down the driveway

11  to eliminate pressure on the wall and it channels

12  off to the right because there is no wall into the

13  backyard away from any interference with the wall.

14          Q       During the period from March or

15  April through the summer months, you were having

16  other work done at the house; is that right?

17          A       Yes.

18          Q       During that period of time, did

19  building officials from the Town of Mamaroneck ever

20  visit your premises?

21          A       Yes, they did.

22          Q       Who was that?

23          A       Kevin Moore.

24          Q       To your understanding, what

25  position does he hold with the building department?

1         A      He is Ron Carpaneto's assistant.

2         Q      What were the reasons for his

3    visits?

4         A      Initially on or about April 25th,

5    when the oil tank was being removed, we had to have

6    a building inspector examine it to make sure there

7    was no oil leek. So, Mr. Moore came by to examine

8    and check for all fundamental purposes.

9                He pronounced it all fine and he

10   pointed to the wall --

11        Q      Did you have some discussions with

12   him at that time?

13        A      We had a brief discussion at that

14   point about the wall and said this is the wall that

15   we heard about.

16        Q      At that point, had you been served

17   a notice of violation if you recall?

18        A      No.

19                MRS. FIORE: Excuse me, I don't see

20           the relevance of anything that has

21           occurred --

22                THE COURT: You have to say

23           objection.

24                MRS. FIORE: Objection, I don't see

25           any of the relevance to any of this given

1          the fact that this is all repairs done

2          prior to the notice of violation.

3                    THE COURT: We have gotten far afield

4          but you did not object, so then I had to

5          let it keep going. We are far afield.

6                    MRS. MULLINS: I wanted him to

7          testify as to the fact that the building

8          official was at the premises on several

9          occasions.

10                   THE COURT: Fine.

11         Q        In particular, with regard to the

12    wall, what if any statements were made?

13         A        Approximately, a month later Kevin

14    came back to the house to check other matters and

15    he then pointed to the wall and brought it up again

16    and said, this is the wall that everyone is talking

17    about in the Town of Mamaroneck. I described what

18    had been going on and Mr. Moore said well,

19    sometimes --

20                   MRS. FIORE: Objection, this is all

21         hearsay, I have to object.

22                   THE COURT: Sustained.

23         Q        As a result of your conversation

24    with Mr. Moore, was your understanding or opinion

25    changed in any way with regard to the wall?

Proceedings                                152

1          A      Yes, it was.

2                 MRS. FIORE: Objection.

3                 THE COURT: Overruled.

4          Q      How was it changed?

5          A      It was changed for the positive.

6          Q      I may have asked you this and if I

7    did I'm sure the prosecutor will remind me, but in

8    the eighteen years that you resided in the

9    premises, I know you clearly testified that you had

10   no communication from the Greenwalds but have you

11   had any conversation with respect to this wall from

12   anyone else whether it be an official from the Town

13   of Mamaroneck or another neighbor?

14         A      We have never heard one word about

15   this wall in the eighteen years we lived there.

16         Q      As a result of your discussions

17   with the contractor, the mason contractor who

18   inspected the wall and made proposals to you, with

19   regard to repair work, did you have all repair work

20   done to the wall that you were able to do?

21         A      Yes.

22         Q      There came a time, of course, that

23   you served with certain notices of violation in

24   this case, I think two of them and a summons in

25   this case, from the time of that service of that

1    first notice of violation throughout the entire

2    life span of this proceeding, were you ever

3    informed by any official from the Town of

4    Mamaroneck Building Department with regard to what

5    needed to be done in their estimation to this wall?

6              A       No, not one word.

7              Q       Mr. Rotenberg, you still own the

8    house?

9              A       Yes.

10             Q       And it's still listed for sale?

11                     MRS. FIORE: Objection.

12                     THE COURT: Sustained.

13                     MRS. Mullins: Is that because it

14             was leading, Your Honor?

15                     THE COURT: It's irrelevant.

16                     MRS. MULLINS: Your Honor, what I

17             think is very relevant and what I would

18             like to ask Mr. Rotenberg, with the Court's

19             permission, is about the circumstances,

20             very briefly two questions, with regard to

21             the fact that there are two outstanding

22             contracts of sale for the premises that

23             have not been executed because of this very

24             issue.

25                     THE COURT: I understand what you are

Proceedings                             154

1             saying and I accept what you are saying but

2             the issue in this case is, is the wall safe

3             or not safe. That is the only issue we are

4             here today to try.

5                  Q     The wheel stops that were testified

6        to, were they installed?

7                  A     Yes, three of them were installed

8        approximately five feet from the wall.

9                        MRS. MULLINS: I have nothing

10             further.

11                       THE COURT: Mrs. Fiore, would you

12             like to ask Mr. Rotenberg any questions?

13                       MRS. FIORE: Yes.

14       CROSS EXAMINATION BY MRS. FIORE:

15                  Q     Prior to moving from your residence

16       at 5 Huguenot, did you park your vehicle there?

17                  A     Yes?

18                  Q     Approximately, how many vehicles

19       would be parked there on an average?

20                  A     Two.

21                  Q     Was that your practice to park your

22       car there during the eighteen years that you lived

23       there?

24                  A     No.

25                  Q     Approximately, how long have you

Proceedings                    155

1    been parking your car there?

2            A       Since 2002, 2001.

3            Q       The repairs that you spoke of

4    earlier from the Calvi Firm --

5            A       Yes.

6            Q       They were performed, approximately,

7    April of 2006, was that your --

8            A       Approximately, April 10th of 2006.

9    That was when the wall was repaired.

10           Q       Were there any subsequent repairs

11   after April 2006?

12           A       There was the new driveway.

13           Q       To the wall, I'm sorry?

14           A       This abuts the wall, so it's part

15   of the system.

16           Q       Okay.

17           A       So, there was a driveway, which was

18   put in June and the parking stops were put in

19   September.

20           Q       Other than those three things that

21   you just mentioned, no other repairs to the wall

22   subsequent to the notice of violations?

23           A       Nothing else that we were capable

24   of doing.

25           Q       So, the condition of the wall, as

1    testified to by the building inspector earlier, is

2    the condition of the wall, that condition you heard

3    him testify to, has not been acted upon or

4    repaired?

5              A      I don't understand the question.

6              Q      I'll rephrase it.

7                     MRS. MULLINS: Objection.

8              Q      You received a notice of violation

9    in July of 2006; is that correct?

10             A      Actually, it was the end of June,

11   right before the July 4th weekend.

12             Q      You received the second notice of

13   violation; is that correct?

14             A      Yes.

15             Q      Subsequent to those notices of

16   violation, have there been repairs or any work done

17   to the wall in question?

18             A      I would have to check my records

19   but the wheel stops may have been put in after or

20   before the second notice.

21             Q      To the physical structure of the

22   wall itself, were any other repairs done since that

23   time?

24             A      No.

25                    MRS. FIORE: I have nothing further.

Proceedings                              157

1              THE COURT: Okay.

2              MRS. MULLINS: I have nothing

3       further.

4              THE COURT: Okay, would you like to

5       excuse Mr. Rotenberg?

6              MRS. MULLINS: Yes. Your Honor, we

7       have nothing further in way of witnesses.

8              THE COURT: Okay, do you rest your

9       case?

10             MRS. MULLINS: We do.

11             THE COURT: Okay, do the People have

12      a rebuttal case that they would like to

13      present?

14             MRS. FIORE: I was told the building

15      department was trying to locate the second

16      engineer, Your Honor.

17             THE COURT: By second engineer you

18      mean Mr. Geossl?

19             MRS. FIORE: No, Mr. Davis.

20             THE COURT: Okay, and could you tell

21      me who Mr. Davis is.

22             MRS. FIORE: He is with the firm of

23      Briggs and Davis(ph) engineering firm.

24             THE COURT: All right, let me just

25      backtrack, I was not clear enough. I don't

1          think I was clear enough when I explained

2          why I did not grant your application for an

3          adjournment in the first instance today.

4               You made your application on the

5          grounds that you wanted another witnesses

6          but at the time you made that application,

7          you, in fact, did not have an expert

8          witness, you had a guy who might render an

9          opinion, who had not yet seen the property

10         and based upon that opinion, you might call

11         him as a witness.

12              MRS FIORE: I--

13              THE COURT: I'm going by what you

14         told me at the beginning of the case, so

15         the People were asking for an adjournment

16         in order to continue their investigation in

17         essence.

18              The People don't get that in a

19         criminal case, unless there is new matter

20         or new material that arrises the People

21         could not have possibly known existed

22         before the trial date. The wall has been

23         there a alot longer than this trial has

24         been scheduled.

25              Now, I don't know if the person you

1    had in mind was Mr. Davis or somebody else.

2          I, of course, would give you an

3    opportunity to call a rebuttal witness,

4    which is relevant it could be Mr. Davis or

5    somebody else but I want to make it very

6    clear on the record, in case I was not

7    clear enough the first three times, why I

8    did not grant the People's application for

9    an adjournment today.

10          MRS. FIORE: If I may, Your Honor.

11   What I think I said at the outset of the

12   application's request, was that an expert

13   had been retained by the building

14   department, he had been to the premises but

15   that he did not have an opportunity to

16   prepare his report, which my understanding

17   is what is required by the People to the

18   Defendants prior to calling an expert

19   witness. Their notice of an expert witness

20   must be served within twenty or thirty

21   days. That is the rule in a criminal case.

22          The People were trying to satisfy

23   their obligations with respect to notice of

24   a witness, which is why I called counsel on

25   Friday the 17th, when it first came to my

Proceedings                    160

1        knowledge from the town administrator that

2        they had in fact retained an expert with

3        respect to this case.

4              THE COURT: Okay.

5              MRS. MULLINS: Well, Your Honor my

6        recollection of what Mrs. Fiore stated

7        initially was that he went to the site,

8        this Mr. Davis, in order to give the town

9        an estimate for his services and that he

10       did not inspect the wall with a view

11       towards rendering an opinion, he went there

12       only to, I guess, see what was involved in

13       terms of his time in the case.

14             Again, the issues that Mr.

15       Annunziata testified to and Mr. Coppola

16       have been in the building department's file

17       for many, many weeks.

18             MRS. FIORE: Mr. Coppola's name is

19       not even in the file, much less any kind of

20       documentation from Mr. Coppola, so let's

21       just be clear about what is existing in the

22       building department's file.

23             THE COURT: Either way --

24             MRS. FIORE: I understand but I want

25       the record to be accurate.

Proceedings                              161

1           THE COURT: Either way, Friday

2      afternoon or this morning, because this

3      morning is when the first application was

4      first made to me, Friday afternoon was too

5      little too late, regardless of whether the

6      individual went to the property or not,

7      that was not clear in your first

8      application but even if he had gone to the

9      property, he is not here and we don't have

10      an opinion, okay.

11           So, now, how do you wish to proceed?

12           MRS. FIORE: My objection was also to

13      the second expert witness, again on the

14      same grounds, I had no notice and he

15      prepared a report and the People were not

16      provided with a copy of that report, nor

17      his name, nor his address, nor his

18      qualifications, nothing.

19           I renew my application to strike his

20      entire testimony.

21           THE COURT: Well, I have to think

22      about that one because it might be

23      irrelevant. Now, what would you like to do?

24           MRS. FIORE: I would like an

25      opportunity to provide a rebuttal case with

1        the expert witness.

2              THE COURT: Okay, could you do that

3        now?

4              MRS. FIORE: I don't know, the last

5        call to his office was that he was not

6        there and the building department was going

7        to notify me.

8              THE COURT: So, it sounds like he is

9        not there.

10              MRS. FIORE: The building department

11       could not reach and him his office was

12       going to try to reach him, I don't know.

13              THE COURT: We are going to take a

14       short break. I would like everyone to be

15       here in a few minutes.

16              (Whereupon, a short recess was taken

17       by all parties.)

18              MRS. FIORE: Your Honor, at this

19       time my witness is not available.

20              THE COURT: Does anyone care to make

21       a closing statement?

22              MRS. MULLINS: I do, Your Honor.

23              MRS. FIORE: Yes, Your Honor.

24              THE COURT: Okay, Mrs. Mullins.

25              MRS. MULLINS: Your Honor, as the

Proceedings                              163

1    Court is well aware, the summons that was

2    served in this case alleges that a

3    particular violation of section 302.7 of

4    the New York State Building Code has been

5    violated and the reading of that section

6    reveals as follows:

7              It's entitled accessory structures

8    and it says all accessory structures

9    including detached garages, fences and

10   walls, shall be maintained structurally

11   sound and in good repair.

12             I think that the People have failed

13   to sustain their burden of proof, which in

14   this case, of course, is beyond a

15   reasonable doubt with regard to the proof

16   of the elements of that violation of that

17   statute.

18             As argued earlier by the Defendants,

19   the accusatory instruments that were filed

20   in this case, both the summons and the

21   prosecutors information or supporting

22   deposition, have absolutely no factual

23   basis whatsoever.

24             The testimony of Mr. Carpaneto added

25   nothing to the fact that there was no

Proceedings                                    164

1       factual basis whatsoever. He basically

2       testified that as a result of a call to the

3       building department from a neighbor, he

4       issued the summons or the notice of

5       violation which led to the issuance of the

6       summons.

7               He never inspected the wall prior to

8       the notice of violation or the summons in

9       this case. In fact, he admitted that the

10      first time he visited the site was on

11      October 20th.

12              I don't believe that in a criminal

13      matter the People can prove their case by

14      boot strapping the testimony and/or report

15      of an engineer in proving the violation of

16      that section, that the testimony of Mr.

17      Oliveri, I believe, did not even establish

18      a violation of that section.

19              Basically, what Mr. Oliveri

20      testified to and what his report said was

21      you need somebody who is an expert to look

22      at this wall and tell us if there is a

23      structural issue.

24              The Defendants put on two expert

25      witness that clearly rendered opinions that

Proceedings                                    165

1          the wall is structurally sound.

2                    Based upon that, Your Honor, we

3          respectfully request a directed verdict

4          dismissing the charges pending before this

5          court in their entirety with prejudice and

6          that the violation and summons their

7          existence be expunged from the building

8          department of the Town of Mamaroneck, thank

9          you.

10                   THE COURT: Okay, Mrs. Fiore.

11                   MRS. FIORE: Your Honor, yes the

12         People believe they have sustained their

13         burden of proof contrary to what Counsel

14         just stated. Mr. Carpaneto did visually

15         inspect the wall. He testified credibly

16         that he had visited the premises and noted

17         that the wall had cracks and had shifted

18         between the two different materials that

19         comprise the wall and accordingly, he

20         issued a notice of violations, the

21         condition had not been corrected and

22         therefore he issued a second notice of

23         violation.

24                   The pertinent building code section

25         as stated by defense counsel, all accessory

Proceedings                                                      166

1       structures including detached garages,

2       fences and wall shall be maintained

3       structurally sound and in good repair. I

4       suggest, Your Honor, that Mr. Carpaneto's

5       testimony alone shows that if there is a

6       shift in a wall or a listing, I believe he

7       testified to a listing, a crack and a shift

8       that is clearly within the purview of this

9       statute, not in good repair.

10              As the Peoples's expert witness, Mr.

11      Oliveri testified, he also visited the

12      premises and inspected the premises and

13      found, in his opinion, that the retaining

14      wall has failed. He gave creditable

15      testimony concerning the condition of the

16      steel tie backs that were on the stone wall

17      and on the concrete block portion of the

18      wall rusted and could not say whether or

19      not that the tie backs would suffice in

20      keeping the wall structurally sound.

21              Mr. Greenwald gave testimony stating

22      his call to the building department, which

23      prompted the town's involvement in this

24      case and his concern as a neighbor and as a

25      possible victim of the unsoundness of the

1      law, if you will, of the structurally

2      deficient aspects of wall, have a huge

3      impact on him and on his property.

4              I suggest, Your Honor, that the

5      Defendant's witnesses who testified could

6      not say with certainty whether or not the

7      wall was properly reinforced.

8              I think that it was clear that in

9      order to determine with certainty and with

10     specificity whether or not those tie backs

11     are still performing the functions that

12     they were designed to perform would require

13     an excavation of the driveway and a digging

14     into the ground to find the source if there

15     is concrete or if there is foundation

16     support within the bottom of that stone

17     wall.

18              However, even if the stone wall is

19     structurally sound, even if Your Honor

20     finds that to be the case, clearly the top

21     portion of the wall that has separated

22     almost three quarters of the way along the

23     length of the wall has shifted between--

24     and it was testified to by all of the

25     expert witnesses between three to five

Proceedings                    168

1    inches of a gap, between those two

2    surfaces.

3              I submit, Your Honor, that a wall

4    could hot be structurally sound with rusted

5    tie backs if it has shifted to the point

6    where it's moving off it's original place.

7              The tie backs could not be said to

8    be secure in such a way, so as to prevent

9    that continuous shift and I would submit,

10   Your Honor, that the People have more than

11   met their burden in satisfying the fact

12   that the Defendants have violated section

13   302.7.

14             THE COURT: All right, I'll need ten

15   minutes to put together my decision here,

16   If someone from the building department

17   could be here, if you want to have Mr.

18   Carpaneto or whoever he wants to send in

19   here, I think that it would be the right

20   thing to do.

21             MRS. FIORE: Okay.

22             THE COURT: I just need ten minutes.

23             (Whereupon, a short recess was taken

24   by all parties).

25             THE COURT: As the People have

1       clearly stated, this case, as brought by

2       the People, is a criminal offense, as such

3       requires that the people establish the

4       allegation set forth in the information

5       with proof beyond a reasonable doubt.

6               Today I must base my decision on the

7       evidence presented here today. The People

8       have not met their burden and I'm going to

9       explain why.

10              The statute requires that all

11      accessory structures, including retaining

12      walls, as in the instant case, shall be

13      maintained structurally sound and in good

14      repair.

15              The People's case included the clear

16      and descriptive testimony of Mr. Carpaneto,

17      our town building inspector. He explained

18      what he saw when he inspected the wall.

19              He was not able to render an opinion

20      that the wall was structurally unsound

21      within the meaning of the statute, which is

22      reasonable given what Mr. Carpaneto was

23      here to testify to.

24              So, the People then presented an

25      expert witness. Mr. Oliveri then described

1       the wall, described it's problems but he

2       did not testify that it was structurally

3       unsound. In fact, he testified that the

4       bottom stone portion appeared to be stable,

5       the top, while it had moved out, which he

6       considered to be a failure of the wall, it

7       seemed that the tie backs were in

8       acceptable condition.

9               I  want to make one side point about

10      the photographs, I think I had excellent

11      descriptive conditions of the wall. I don't

12      think I needed the photographs to make a

13      decision in the case.

14              The People could have put them in,

15      if they choose with some additional follow

16      up questions, but again, we had excellent

17      descriptions and I don't think I needed

18      them.

19              In addition to Mr. Carpaneto's

20      testimony, Mr. Oliveri's testimony and Mr.

21      Greenwald credibly testified as a concerned

22      neighbor and behaved as a reasonable

23      person, he saw what he saw, he sees what he

24      sees and was concerned and came here today

25      and gave his eyewitness testimony and

1       expressed his concerns.

2                  The wall looks troubling to me, but

3       I have to be governed in this case by the

4       statute and by applying the reasonable

5       doubts standard to the evidence presented

6       in order to support any findings under that

7       statute.

8                  All these standards require is that

9       the Defendant raise a reasonable doubt

10      concerning the People's proof.

11                 Even if I don't consider Mr.

12      Coppola's testimony and I won't for the

13      purpose of this decision, Mr. Annunziata's

14      testimony is sufficient to raise such

15      doubts. He creditably testified that both

16      the top and bottom portion of this wall

17      were structurally sound.

18                 He explained and I credit his

19      opinion that any shifting that appeared in

20      the upper wall was not recent. He explained

21      that the shifting occurred over a one

22      quarter to one third of that portion of the

23      wall and he applied that the condition had

24      stabilized and the tie backs were doing the

25      job that they intended to do.

Proceedings                          172

1              As a result of all the testimony and

2       evidence presented here today, I am

3       compelled to conclude that the Defendants

4       are not guilty of the allegations set forth

5       in the information.

6              This brings me to various procedural

7       issues that have been addressed as we went

8       along.

9              The accusatory instrument in this

10      case after I know I initially ruled that it

11      would not be dismissed, in hearing the

12      evidence and learning what the case was

13      about and doing my research on the statute

14      which I never heard of before in this case

15      and doing my own research on the statute,

16      if this particular case were to appealed,

17      it's my opinion that this information would

18      be bounced out on it's ear, you can't just

19      file an information, which is a criminal

20      accusatory instrument under the CPL and

21      merely site a statute. You have to flesh it

22      out. You have to give nonhearsay

23      allegations to both inform the Defendant of

24      exactly what his offense is, here it's your

25      retaining wall is not stable and you have

Proceedings                    173

1      to fix it and give justification.

2              Now, the justification does not have

3      to be an expert witnesses opinion but it

4      has it be some facts that support a charge

5      being brought against the Defendant. That

6      is just to highlight errors I might have

7      made in this case in the past.

8              Furthermore, and finally, I made my

9      findings today base upon the evidence

10     today. However, this wall is not going

11     anywhere. It's a large high, old, retaining

12     wall. It's certainly not going to improve

13     it's condition over time. The proof may not

14     have been sufficient today to sustain the

15     charges. I can't tell anyone what to do and

16     I am not going to tell anyone what to do.

17             As I stated, this wall is not going

18     away and I encourage the partys to work

19     together in the future. I know you are

20     moving but I also encourage the building

21     department to-- what could I say, keep an

22     eye on this property, but the charges today

23     are dismissed, thank you.

24             MRS. MULLINS: Thank you.

25

Proceedings                                    174

C E R T I F I C A T I O N

        Certified to be a true and accurate
transcript of the aforesaid proceeding.

                    _____
                    Maureen A. O'Hare

**$**
175.00
[ ] 96:22

---

**1**

[ ] 21:10
[ ]0/20/06
[ ] 20:24
[ ]0530
[ ] 1:22
[ ]0538
[ ] 2:14 10:9
[ ]06.6
[ ] 7:22
[ ]0th
[ ] 145:12 155:8
[ ]11
[ ] 1:22
[ ]4
[ ] 78:9
[ ]4th
[ ] 79:18 84:10
[ ]4th
[ ] 78:1 84:13
[ ]5th
[ ] 126:12
[ ]51.11
[ ] 7:24
[ ]7th
[ ] 3:12 4:14 132:16 159:25
[ ]920
[ ] 112:11 112:14
[ ]950's
[ ] 91:1
[ ]51
[ ] 91:15
[ ]962
[ ] 124:5
[ ]966
[ ] 91:16
[ ]971
[ ] 91:18
[ ]974
[ ] 123:22
[ ]976
[ ] 124:2
[ ]984
[ ] 93:9 93:14 93:16 94:13
[ ]857
[ ] 92:5
[ ]988
[ ] 83:14 138:17 138:17 138:25
[ ]989
[ ] 48:4
[ ]992
[ ] 124:7 124:8
[ ]995
[ ] 48:19
[ ]997
[ ] 48:15

---

**2**

[ ]5] 15:6 15:10 15:11 22:5 22:5 51:16 71:15 83:11
[ ]5:15 115:20 116:1 116:8 140:3 142:9 143:1

[ ] 7:8 37:4 37:5 37:15
[ ]001
[ ] 2:13 155:2
[ ]002

---

**2006**
[25] 1:8 10:11 10:12 14:20 14:22 24:15 24:16 25:6 37:
4 37:15 39:4 41:9 73:7 78:9 79:18 139:1 139:2 139:9
140:11 140:21 143:9 155:7 155:8 155:11 156:9
**20th**
[3] 21:17 37:10 164:11
**22**
[1] 139:9
**25th**
[2] 51:7 150:4
**29th**
[1] 10:12

---

**3**

**3**
[5] 80:19 81:12 81:19 142:3 148:3
**3.02.7**
[1] 10:14
**302.7**
[3] 87:24 163:3 168:13
**30th**
[5] 6:9 6:10 88:17 140:11 141:11
**3rd**
[2] 10:11 138:17

---

**4**

**4th**
[1] 156:11

---

**5**

**5**
[39] 10:8 14:25 15:12 22:2 22:5 22:8 23:5 25:2 26:2
26:11 26:14 26:18 26:23 27:1 27:3 27:8 36:15 36:17
37:3 38:13 38:19 39:3 50:25 51:16 51:23 71:21 81:3
97:21 98:14 104:7 108:22 110:7 127:12 130:15 138:12
138:18 139:6 142:3 154:16

---

**6**

**684-0201**
[1] 1:23
**6th**
[2] 5:3 6:11

---

**7**

**740**
[2] 1:7 2:5
**7th**
[2] 140:21 141:10

---

**8**

**8th**
[1] 143:11

---

**9**

**914**
[1] 1:23
**9:00**
[1] 1:9

---

**A**

**A.m.**
[1] 1:9
**Ability**
[1] 76:19
**Able**
[4] 54:16 93:1 152:20 169:19
**Absolutely**
[1] 163:22
**Abut**
[1] 71:16
**Abuts**

---

**Academy**
[1] 95:6
**Accept**
[1] 154:1
**Acceptable**
[3] 60:22 92:13 170:8
**Accepted**
[1] 95:23
**Access**
[8] 76:1 76:5 77:17 77:21 144:11 144:14 146:15 146:
23
**Accessory**
[5] 10:15 163:7 163:8 165:25 169:11
**According**
[2] 14:2 14:3
**Accordingly**
[1] 165:19
**Accurate**
[5] 21:5 21:19 115:3 160:25 174:13
**Accusatory**
[4] 89:1 163:19 172:9 172:20
**Achieved**
[1] 93:12
**Act**
[3] 41:7 41:8 106:2
**Acted**
[1] 156:3
**Action**
[4] 38:18 64:21 74:14 89:8
**Acts**
[2] 102:21 106:5
**Actual**
[1] 14:10
**Add**
[3] 6:22 93:22 132:6
**Added**
[2] 57:22 163:24
**Addition**
[2] 26:2 170:19
**Additional**
[2] 117:18 170:15
**Address**
[4] 71:19 142:3 142:4 161:17
**Addressed**
[3] 79:5 136:16 172:7
**Adequate**
[1] 6:12
**Adjacent**
[2] 64:24 112:4
**Adjournment**
[6] 3:10 3:13 4:11 158:3 158:15 159:9
**Administer**
[1] 11:25
**Administrator**
[2] 3:17 160:1
**Admissible**
[1] 26:1
**Admit**
[1] 96:4
**Admitted**
[1] 164:9
**Advising**
[1] 3:12
**Aero**
[1] 47:25
**Aesthetics**
[1] 106:4
**Affect**
[1] 141:4
**Affiliated**
[1] 95:8
**Afield**

---

foresaid
[1] 148:19 151:3 151:5
[1] 174:14
fternoon
[1] 138:10 138:11 161:2 161:4
erwards
[2] 54:2 56:23
ge
[3] 59:3 59:16 112:10
ged
[1] 104:23
gency
[1] 124:8
go
[6] 5:4 7:1 24:9 97:16 97:17 108:17 130:6 132:20
head
[4] 3:7 10:3 133:18 137:7 145:9
ir
[1] 13:7
lfredo
[1] 140:12
ligned
[2] 116:13 129:13
lignments
[1] 53:9
llegation
[1] 169:4
llegations
[5] 7:10 8:7 88:25 88:25 172:4 172:23
lleges
[1] 163:2
llow
[5] 45:6 101:12 103:2 123:7 135:20
lmost
[2] 108:2 167:22
lone
[1] 166:5
t
[2] 146:7 158:23
lteri
[1] 3:16
mend
[1] 4:25
merican
[1] 95:3
micably
[1] 78:20
mount
[6] 7:16 19:13 41:14 67:15 101:19 105:7
mple
[1] 4:18
nalysis
[3] 74:17 74:17 118:16
nchor
[3] 53:23 102:21 128:22
nchored
[3] 127:19 127:21 127:22
ngle
[1] 102:23
nnunziata
[17] 90:16 90:23 95:9 95:16 96:10 96:14 97:7 97:11 100:2 106:6 107:11 108:10 122:23 126:16 130:5 136:7 160:15
nnunziata's
[2] 96:24 171:13
nswer
[14] 35:23 37:12 38:3 39:8 60:8 63:4 65:18 69:8 75:4 79:9 80:21 82:1 85:2 86:17
nswered
[3] 39:11 84:17 143:13
swering
[1] 97:10
nthony
[4] 22:21 25:12 43:24 46:23

Apartment
[1] 92:7
Apparent
[1] 61:20
Appealed
[1] 172:16
Appear
[4] 34:23 60:23 64:7 130:11
Appeared
[2] 170:4 171:19
Application
[13] 3:6 3:9 5:24 5:25 89:18 89:21 158:2 158:4 158:6 159:8 161:3 161:8 161:19
Application's
[1] 159:12
Applied
[2] 147:23 171:23
Apply
[1] 147:12
Applying
[1] 171:4
Approach
[1] 95:13
Appropriate
[2] 49:16 74:3
Approximate
[1] 24:2
April
[20] 73:6 73:7 76:18 77:10 78:1 78:9 79:17 79:17 84:9 84:13 138:16 140:21 141:10 143:11 145:12 149:15 150:4 155:7 155:8 155:11
Architect
[1] 12:25
Architectural
[1] 12:1
Architecture
[3] 28:7 91:14 112:14
Area
[8] 18:12 97:9 104:19 110:9 126:5 129:17 130:3 140:18
Areas
[5] 30:16 109:14 118:25 141:20 141:23
Argued
[1] 163:18
Army
[1] 91:4
Arrises
[1] 158:20
Arrival
[1] 145:19
Arrived
[2] 17:20 145:15
ASHI
[1] 95:7
Aspects
[1] 167:2
Asphalt
[1] 104:18
Assign
[1] 49:1
Assistant
[2] 39:1 150:1
Associated
[1] 78:15
ASSOCIATES
[1] 1:21
Assume
[1] 81:1
Attached
[3] 62:7 62:23 102:18
Attempt
[1] 84:23
Attempted
[1] 80:12

Attempting
[1] 45:25
Attention
[3] 14:19 15:4 140:1
Attitude
[1] 74:2
Attorney
[2] 2:4 2:12
Attorney's
[1] 49:13
Attorneys
[1] 42:3
August
[1] 138:17
Authority
[2] 91:10 92:6
Avail
[2] 134:7 134:9
Available
[5] 20:1 132:18 133:12 133:16 162:19
Avenue
[2] 1:22 2:13
Average
[1] 154:19
Aware
[20] 38:17 38:22 39:2 39:15 65:1 76:12 76:13 76:14 76:17 77:20 77:23 80:6 80:24 84:6 84:11 84:15 85:10 85:17 130:1 163:1
Awareness
[2] 79:4 80:6

B

Bachelor
[1] 47:25
Bachelors
[2] 91:16 123:18
Backdrop
[1] 74:7
Backs
[56] 18:7 18:10 18:14 18:17 34:1 34:10 34:22 35:3 53:17 54:13 54:14 55:6 55:14 55:24 57:1 57:21 57:24 59:20 59:22 59:25 60:16 61:10 61:19 64:1 66:15 67:1 67:5 67:14 68:8 69:23 102:12 102:15 114:24 115:2 115:7 116:14 118:11 120:16 121:5 122:2 122:3 127:3 127:6 127:17 128:2 128:7 128:10 128:15 129:11 166:16 166:19 167:10 168:5 168:7 170:7 171:24
Backtrack
[1] 157:25
Backyard
[8] 22:1 72:7 80:3 140:24 144:14 146:15 146:19 149:13
Backyards
[2] 16:2 19:25
Bad
[2] 34:6 39:25
Baffled
[1] 74:2
Banker
[1] 139:12
Base
[4] 17:24 79:18 169:6 173:9
Based
[11] 7:9 8:6 29:7 29:12 32:13 35:17 87:21 89:7 132:4 158:10 165:2
Basis
[8] 14:16 21:18 42:24 50:21 88:21 98:20 163:23 164:1
Became
[3] 85:10 85:16 91:19
Becomes
[1] 32:12
Began
[2] 36:24 54:25
Beginning
[1] 158:14

Case 7:08-cv-04709-SCR   Document 26-15   Filed 06/19/2009   Page 1 of 1

**Behalf**
[1] 29:23 42:3 43:10 134:24

**Behaved**
[1] 170:22

**Behind**
8:8 18:16 53:24 66:10 105:8 108:7 108:9 113:8
;:21

**Belief**
[1] 122:22

**Belong**
[3] 95:2 95:4 95:6

**Below**
[7] 15:12 67:6 102:24 107:13 107:23 108:1 111:15
16:22 129:22

**Bend**
[1] 53:12

**Benedict**
[1] 29:14

**Benefits**
[2] 93:13 105:4

**Benny**
[1] 74:15

**Berm**
[1] 149:8

**Beth**
[4] 2:11 3:11 46:6 46:9

**Better**
[2] 65:23 67:7

**Between**
[18] 6:8 16:1 18:5 19:11 22:2 36:3 68:19 68:25 69:4
2:16 77:15 82:22 115:13 140:3 165:18 167:23 167:25
68:1

**Beyond**
[3] 10:5 11:1 43:14 48:6 49:4 87:22 135:16 163:14
69:5

**Big**
[2] 61:25 130:8
'*
5:19 111:7 115:11 115:24

**Blacktop**
[1] 149:9

**Blaine**
[1] 145:21

**Block**
[55] 17:25 19:1 19:2 52:15 52:15 53:1 53:4 53:7 53:12
4:9 54:25 55:12 56:14 56:16 57:17 58:23 59:13 59:
'2 60:25 61:10 61:15 61:20 62:14 63:11 67:2 68:2 68:
' 68:9 68:17 69:4 98:17 101:1 101:3 101:17 101:18
03:16 104:23 107:18 109:25 110:22 111:22 114:15
16:21 122:1 126:19 126:24 126:25 127:2 127:6 128:
:1 129:2 140:2 142:1 142:15 166:17

**Blocks**
[5] 72:13 127:23 128:23 142:15 142:18

**Board**
[3] 11:25 12:1 12:1

**Boding**
[1] 147:22

**Bolt**
[1] 127:21

**Boot**
[1] 164:14

**Boston**
[2] 1:7 2:5

**Bottom**
[14] 18:25 19:8 54:23 60:13 60:14 60:22 79:25 98:18
100:23 113:14 129:6 167:16 170:4 171:16

**Bounced**
[1] 172:18

**Branches**
[1] 91:24

**Beak**
9:15 89:17 90:8 137:10 162:14

**BRESCIA**
[1] 1:11

**Brickwork**

**Brief**
[2] 99:6 150:13

**Briefly**
[4] 15:25 48:8 124:3 153:20

**Briggs**
[1] 157:23

**Bring**
[2] 73:13 74:4

**Bringing**
[1] 73:25

**Brings**
[1] 172:6

**Broker**
9:15

**Brought**
[5] 8:17 140:1 151:15 169:1 173:5

**Build**
[5] 13:24 93:23 108:2 109:13 109:16

**Building**
[83] 3:15 4:17 6:23 9:7 10:20 11:20 11:23 11:24 12:2
12:12 12:19 14:21 16:23 17:2 20:13 21:1 27:7 29:2 29:
8 29:16 29:18 29:23 31:1 31:19 31:21 32:3 32:9 37:2
38:10 38:11 38:18 39:1 39:9 39:12 40:17 40:21 44:5
49:6 51:9 64:19 65:6 71:4 71:5 74:8 75:15 77:25 78:4
78:5 78:8 81:10 81:21 84:4 85:20 87:24 88:1 88:6 91:
3 93:21 94:3 95:6 107:22 108:4 125:16 149:19 149:25
150:6 151:7 153:4 156:1 157:14 159:13 160:16 160:22
162:6 162:10 163:4 164:3 165:7 165:24 166:22 168:16
169:17 173:20

**Buildings**
[4] 27:22 49:1 92:7 92:21

**Built**
[8] 14:3 17:25 53:4 53:6 62:14 72:13 92:6 92:21

**Bumper**
[1] 131:8

**Bumping**
[1] 131:7

**Burden**
[4] 163:13 165:13 168:11 169:8

**Bureaucracy**
[1] 132:10

**Business**
[1] 140:14

**Busy**
[1] 141:12

**Buyers**
[3] 73:23 86:3 142:22

**Bys**
[1] 88:7

## C

**Calvi**
[21] 140:12 140:19 140:22 141:15 141:25 142:7 142:
14 142:24 143:12 144:11 144:18 145:8 145:13 145:13
145:20 146:7 146:16 147:2 147:25 148:1 155:4

**Calvi(ph**
[1] 141:2

**Calvis**
[1] 144:14

**Cannot**
[1] 5:14

**Capable**
[1] 155:23

**Capacity**
[3] 11:19 14:21 94:19

**Car**
[5] 65:2 105:19 131:7 154:22 155:1

**CARBONE**
[1] 1:21

**Care**
[1] 162:20

**Career**
[3] 91:11 108:11 124:19

**Carpaneto**

**Carpaneto**
[19] 2:13 8:6 30:1 33:6 35:17 78:24 81:12 31:
23 32:6 34:18 43:23 46:18 51:9 51:23 57:9 74:13 79:3
81:15 82:3 82:23 83:1 83:7 88:13 163:24 165:14 168:
18 169:16 169:22

**Carpaneto's**
[3] 150:1 166:4 170:19

**Carried**
[1] 12:14

**Carry**
[1] 12:19

**Cars**
[1] 104:17

**Case**
[68] 4:15 6:13 6:15 6:16 6:24 6:25 7:25 8:18 8:22 28:
18 29:4 29:7 30:1f 42:12 42:19 44:3 45:2 65:2 65:14
83:17 87:20 89:13 90:1 90:3 96:16 97:1 97:19 99:6
105:6 107:7 119:24 123:4 123:5 126:9 132:18 132:23
132:24 137:23 138:24 152:24 152:25 154:2 157:9 157:
12 158:14 158:19 159:6 159:21 160:3 160:13 161:25
163:2 163:14 163:20 164:9 164:13 166:24 167:20 169:
1 169:12 169:15 170:13 171:3 172:10 172:12 172:14
172:16 173:7

**Cases**
[1] 125:12

**Caused**
[3] 75:7 75:15 117:11

**Causes**
[1] 142:13

**Cement**
[2] 19:1 145:16

**Center**
[2] 129:12 129:13

**Centers**
[1] 92:23

**Central**
[1] 1:22

**Certain**
[5] 15:20 41:14 141:15 142:21 152:23

**Certainly**
[11] 44:7 57:25 69:8 88:5 89:3 131:25 133:13 133:17
134:23 137:22 173:12

**Certainty**
[2] 167:6 167:9

**Certification**
[1] 49:7

**Certified**
[3] 12:21 49:1 174:13

**Change**
[2] 4:25 75:6

**Changed**
[3] 151:25 152:4 152:5

**Channels**
[1] 149:11

**Charge**
[1] 173:4

**Charged**
[2] 7:11 8:8

**Charges**
[3] 165:4 173:15 173:22

**Charging**
[1] 96:18

**Check**
[5] 13:24 13:25 150:8 151:14 156:18

**Checked**
[1] 147:23

**Children**
[2] 138:22 138:23

**Chip**
[1] 54:16

**Choose**
[4] 7:23 134:7 137:23 170:15

**Cinder**
[8] 17:24 19:1 72:13 140:2 142:1 142:15 142:15 142:
18

**Circumstance**

| 49:24 81:20
circumstances
] 153:19
itation
¹ 27:6
y
, ₃1:10 91:12 92:6 92:20 93:7 124:5
ivil
2] 48:14 91:16 91:20 91:22 92:1 94:22 95:4 97:1 97:
108:11 123:1 123:18
:lear
4] 37:13 59:19 76:8 88:2 88:21 109:4 157:25 158:1
59:6 159:7 160:21 161:7 167:8 169:15
:learly
] 28:20 63:14 69:16 121:8 152:9 164:25 166:8 167:
0 169:1
:lients
] 39:13
:lose
] 28:22 124:24
:loser
] 44:24 44:25
:losing
] 162:21
:O
] 14:11
:oat
] 147:13
:oated
] 104:12
:oating
] 105:23
:ode
3] 7:12 7:19 7:21 10:13 27:12 27:14 27:15 27:21 43:
2 44:5 87:24 163:4 165:24
:old
] 139:12
:llapse
3:16 145:4
:olleague
3] 17:17 21:1 24:22
:olleagues
] 26:14
:ollege
3] 13:4 91:2 91:13
:oming
] 19:6 46:11 75:12 76:17 76:25 80:9 100:9 140:9
49:10
:ommented
2] 80:3 80:13
:ommon
] 112:23
:ommonly
] 102:11
:ommunicate
3] 74:7 76:15 78:14
:ommunicated
2] 77:11 77:16
:ommunication
] 152:10
:ommunity
2] 91:2 92:22
:ompany
3] 48:16 140:13 140:22
:omparable
] 12:5
:omparison
] 67:6
:ompelled
¹¹ 172:3
mplainant
⁻, 71:3 88:23
:omplained
] 80:18 81:10 83:17

[1] 84:1
Completely
[2] 130:7 149:3
Complicated
[1] 81:20
Comprise
[1] 165:19
Comprised
[1] 21:25
Conceivable
[1] 77:14
Concentrated
[1] 60:20
Concern
[3] 73:18 75:8 166:24
Concerned
[2] 170:21 170:24
Concerning
[5] 27:7 82:3 143:21 166:15 171:10
Concerns
[2] 15:22 171:1
Conclude
[1] 172:3
Conclusion
[4] 72:22 78:20 78:23 79:19
Concrete
[43] 14:1 52:15 53:1 53:3 54:8 54:9 54:25 55:12 57:17
58:23 60:20 67:2 68:2 68:9 68:16 100:25 101:18 102:
3 102:21 102:22 104:16 104:23 110:23 111:9 111:22
114:12 116:25 118:12 121:21 124:25 126:19 126:24
126:25 127:2 127:22 128:21 129:2 142:2 147:7 147:21
147:22 166:17 167:15
Concreting
[1] 142:19
Condition
[37] 19:3 34:21 34:24 44:23 54:13 56:4 56:25 57:3 57:
15 57:25 60:22 61:11 61:20 67:13 75:7 75:15 78:24
107:14 112:25 116:15 117:4 117:6 117:10 118:2 118:4
118:6 119:11 121:20 144:7 155:25 156:2 156:2 165:21
166:15 170:8 171:23 173:13
Conditions
[5] 13:8 62:25 113:5 113:8 170:11
Connected
[1] 120:23
Connecticut
[1] 125:6
Connection
[9] 13:16 47:13 47:23 50:23 51:3 94:12 96:15 97:13
97:23
Consider
[4] 57:20 107:14 119:19 171:11
Considered
[1] 170:6
Consisted
[1] 69:15
Consists
[1] 53:20
Consolatory
[1] 78:16
Constitutes
[1] 27:13
Constitution
[1] 134:11
Constructed
[6] 92:12 92:21 102:7 112:5 112:16 128:8
Constructing
[1] 103:17
Construction
[20] 49:2 54:1 59:11 59:16 61:15 92:24 93:3 101:24
102:5 103:19 107:1 107:5 117:3 117:11 117:15 124:23
124:24 128:13 128:15 128:17
Consult
[1] 94:9
Consultants

Consulting
[9] 22:23 22:25 25:9 25:11 50:22 50:23 108:19 124:9
137:14
Contact
[8] 42:2 44:9 72:25 73:4 137:6 143:4 143:10 145:8
Contacted
[8] 73:5 73:6 85:20 97:12 140:12 141:11 143:1 143:8
Contained
[2] 14:10 32:8
Contains
[1] 32:7
Continue
[3] 32:16 55:15 97:10 100:19 158:16
Continuing
[2] 10:12 50:21
Continuous
[1] 168:9
Continuously
[2] 61:2 138:24
Contoured
[1] 104:19
Contouring
[1] 105:10
Contractor
[8] 76:1 76:9 77:2 86:11 86:12 86:16 152:17 152:17
Contractors
[2] 14:18 149:6
Contracts
[2] 5:17 153:22
Contrary
[1] 165:13
Control
[1] 14:8
Controversial
[1] 17:17
Convenient
[1] 105:5
Conversation
[16] 17:18 25:13 25:16 40:5 40:7 43:4 78:11 78:13 86:
15 145:7 145:23 145:25 146:1 147:1 151:23 152:11
Conversations
[11] 3:14 40:14 40:23 42:20 82:7 82:8 82:12 82:21 83:
1 85:21 86:10
Copies
[1] 40:18
Coppola
[10] 122:11 122:24 123:15 125:2 125:22 126:3 127:15
131:22 160:15 160:20
Coppola's
[3] 132:3 160:18 171:12
Copy
[14] 30:10 30:12 31:11 78:3 83:9 83:10 95:16 96:9 99:
4 99:7 99:22 136:14 136:17 161:16
Core
[2] 91:6 91:8
Corner
[4] 17:22 58:21 61:3 113:20
Correct
[33] 7:14 8:13 20:11 22:6 25:7 26:21 28:8 28:13 32:19
33:11 36:5 40:8 41:15 44:17 45:3 46:1 49:20 63:16 67:
10 69:1 69:10 82:23 93:16 100:8 100:12 106:19 109:6
114:4 120:1 120:10 121:6 156:9 156:13
Corrected
[5] 113:5 118:2 118:5 118:7 165:21
Correcting
[2] 116:15 118:9
Correction
[2] 45:9 75:14
Corrective
[6] 102:6 104:1 104:2 107:7 116:24 118:1
Correctly
[2] 114:24 129:3
Cosmetic

] 73:13 86:5 86:6
osmetically
] 73:10 74:9 85:14
ost
3:24
 unsel
, 3:11 159:24 165:13 165:25
COUNTY
] 1:1
Couple
] 23:13 40:15 74:12 77:15 83:5 88:4 125:12
Course
2] 9:14 13:11 13:14 48:10 91:3 94:22 108:10 124:12
24:19 152:22 159:2 163:14
Courses
] 48:21 91:12 94:10 101:18
Court
204] 1:1 3:1 3:7 4:3 4:5 4:8 4:14 5:18 5:24 5:25 6:20
3 7:6 7:15 7:20 8:4 8:14 8:25 9:2 9:11 9:18 9:25 10:
11:3 11:7 11:12 11:21 13:3 16:19 23:19 24:10 24:14
:24 28:4 29:11 29:21 30:15 30:19 31:16 32:10 32:
5 32:24 35:22 37:12 38:2 38:6 39:7 40:4 43:16 43:18
3:18 44:13 46:17 46:21 46:24 47:1 49:20 51:2 51:6
2:3 58:5 60:7 61:24 62:21 65:17 66:2 67:18 68:21 69:
0 69:17 69:25 70:16 70:19 70:21 70:25 71:10 72:3
2:19 74:19 75:4 75:19 79:11 79:14 80:22 81:25 82:
4 83:24 84:18 85:1 85:7 86:19 86:25 87:7 87:9 87:14
7:15 88:18 89:10 89:19 89:24 90:2 90:7 90:13 90:17
0:20 90:24 91:21 92:2 94:14 95:14 95:24 96:3 96:8
0 100:2 104:5 106:24 107:21 109:3 109:19 110:2 120:9 120:
3 121:16 122:10 122:19 123:5 123:9 123:12 123:16
0 133:16 133:18 133:25 134:7 135:2 135:6 135:24
36:5 136:23 136:25 137:5 137:10 137:18 137:22 138:
138:4 138:7 139:17 148:17 150:22 151:3 151:10 151:
2 152:3 153:12 153:15 153:25 154:11 157:1 157:4
57:8 157:11 157:17 157:20 157:24 158:13 160:4 160:
8 161:1 161:21 162:2 162:8 162:13 162:20 162:24
5 165:5 165:10 168:14 168:22 168:25
 urt's
] 153:18
ourtesy
] 133:22
ourtroom
] 87:5 136:24
over
] 73:10 73:13 74:4 75:12 88:13
overed
] 74:9 76:20 86:2 110:1
overing
] 86:2
PL
] 8:19 172:20
rack
0] 52:8 54:18 54:20 54:23 55:7 55:8 55:11 55:11 55:
5 60:17 60:17 113:17 113:18 140:2 140:5 142:1 147:
147:10 147:18 166:7
racked
] 125:16
racking
] 19:6 35:8 45:1
racks
0] 53:7 101:4 101:19 104:13 104:25 113:16 113:21
19:13 119:16 165:17
reate
] 92:9
reated
] 101:11
redibly
] 165:15 170:21
 edit
2:23 171:18
reditable
] 166:14
reditably

Crediting
[1] 72:21
Crew
[1] 145:15
Crime
[3] 7:11 7:13 8:8
Criminal
[11] 7:8 7:8 7:24 7:25 134:3 134:12 158:19 159:21
164:12 169:2 172:19
Cross
[12] 28:4 28:5 58:6 58:8 69:9 75:19 75:21 110:2 110:5
131:14 136:8 154:14
Cross-examination
[2] 69:14 69:20
Curb
[1] 80:8
Curbs
[1] 80:13
Current
[1] 47:7
Curriculum
[4] 95:10 95:17 96:10 99:14
Customarily
[1] 102:17
Cut
[1] 69:12

## D

Damage
[4] 85:23 86:1 112:19 112:22
Damages
[1] 78:15
Dangerous
[5] 27:19 78:18 78:24 79:20 86:4
Date
[13] 5:5 6:9 6:10 6:11 20:22 23:16 26:20 37:5 37:6 37:
13 41:4 96:7 158:22
Dated
[1] 21:17
Dave
[1] 17:14
David
[6] 20:8 21:3 24:22 33:16 37:23 41:2
Davis
[5] 157:19 157:21 159:1 159:4 160:8
Davis(ph
[1] 157:23
Days
[6] 45:8 45:15 77:15 109:12 145:13 159:21
Deadman
[6] 101:24 102:9 102:16 106:18 106:25 114:15
Deal
[1] 94:11
December
[1] 83:13
Decide
[1] 38:2
Decided
[3] 3:17 93:10 93:13
Decision
[5] 89:11 168:15 169:6 170:13 171:13
Deck
[1] 93:22
Defendant
[14] 1:6 2:12 7:16 10:6 87:23 90:3 94:21 132:15 134:3
134:12 138:6 171:9 172:23 173:5
Defendant's
[6] 87:19 96:6 96:8 100:14 100:16 167:5
Defendants
[14] 11:2 38:17 41:25 43:11 44:2 65:1 89:8 132:11
133:20 159:18 163:18 164:24 168:12 172:3
Defense
[1] 165:25

Deficient
[1] 167:2
Define
[1] 109:7
Definition
[1] 127:18
Degree
[6] 47:23 48:3 48:6 91:17 106:5 123:18
Degrees
[2] 19:14 36:13
Denied
[6] 6:1 75:25 76:18 77:17 77:21 132:7
Density
[1] 108:8
Deny
[1] 76:4
Department
[44] 4:17 6:23 9:7 11:23 16:24 17:2 21:2 27:7 29:2 29:
8 29:16 29:18 29:24 31:19 37:2 38:10 38:11 40:17 40:
21 49:22 64:19 65:6 71:4 71:6 74:8 75:16 77:25 78:4
78:8 84:4 85:20 92:20 124:6 149:25 153:4 157:15 159:
14 162:6 162:10 164:3 165:8 166:22 168:16 173:21
Department's
[6] 20:13 31:21 42:25 78:6 160:16 160:22
Depicted
[1] 21:22
Deposition
[4] 88:15 88:16 88:20 163:22
Describe
[18] 15:17 15:25 18:4 18:6 19:3 27:13 44:20 61:24 72:
3 92:2 96:3 100:20 103:3 104:5 107:21 115:18 127:5
141:23
Described
[8] 54:20 55:16 86:7 109:5 148:2 151:17 169:25 170:1
Describing
[2] 54:11 54:12
Descriptions
[1] 170:17
Descriptive
[2] 169:16 170:11
Design
[11] 56:23 58:2 62:9 92:16 93:20 94:4 106:20 108:14
124:16 124:21 127:25
Designed
[11] 62:10 63:5 63:22 92:14 94:6 103:6 108:17 124:22
124:25 124:25 167:12
Destroyed
[1] 149:3
Detached
[2] 163:9 166:1
Detail
[1] 5:8
Detailed
[1] 66:8
Detective
[1] 29:14
Determination
[1] 36:19
Determine
[2] 14:12 167:9
Develope
[1] 119:17
Developed
[1] 101:4
Devices
[3] 103:2 104:16 116:25
Diameter
[3] 103:6 127:10 127:13
Dickson
[1] 138:21
Difference
[1] 19:11
Different
[9] 18:5 47:18 50:6 59:16 72:7 87:18 114:19 114:21

65:18
Digging
1] 167:13
Diminish
105:7
ect
14:19 31:25 68:22 69:18 89:12 89:22 90:22 123:14
38:9
Directed
1] 165:3
Direction
2] 127:24 130:22
Directly
2] 141:6 144:13
Director
2] 11:20 11:22
Discuss
2] 5:19 26:1
Discussed
1] 57:10
Discussion
4] 26:25 57:8 77:14 150:13
Discussions
7] 44:1 73:12 141:14 143:18 145:5 150:11 152:16
Dismiss
2] 87:20 89:8
Dismissed
2] 172:11 173:23
Dismissing
1] 165:4
Displacement
1] 101:20
Dispute
1] 85:4
Disputing
2] 134:17 134:18
repair
2:12
Distance
2] 33:8 105:21
District
1] 49:13
Diverse
2] 92:21 94:7
Divert
3] 104:19 105:13 149:9
Divides
1] 140:3
Division
1] 123:22
Dixson
1] 5:10
Document
9] 8:19 96:5 96:11 98:24 99:2 99:12 100:1 100:9 100:
3
Documentation
2] 6:5 160:20
Documents
1] 99:18
Dollars
2] 148:6 148:7
Dolph
5] 22:24 43:24 47:8 47:10 47:13
Done
40] 4:21 42:14 43:11 44:4 46:3 54:1 55:12 59:17 75:
23 76:22 80:19 84:24 86:7 89:3 103:22 103:23 106:4
106:18 107:6 108:22 109:14 116:24 118:1 118:8 128:
13 129:3 134:23 140:13 140:24 142:6 143:21 148:8
148:11 148:14 149:16 151:1 152:20 153:5 156:16 156:
or
4] 40:3 143:10 143:13 144:1
Doorbell
1] 76:16

Doubt
6] 10:6 11:1 87:22 163:15 169:5 171:9
Doubts
2] 171:1 171:15
Down
23] 5:4 6:15 17:23 22:13 24:4 32:24 38:15 61:6 68:4
68:16 81:4 92:13 102:23 104:20 108:17 110:10 110:24
144:22 145:17 146:10 146:17 147:20 149:10
Dozen
2] 18:19 124:22
Dozens
1] 108:15
Drainage
1] 101:12
Draining
2] 14:4 14:5
Drilled
1] 147:19
Drive
30] 10:9 15:1 22:8 23:5 25:3 26:2 26:12 26:15 26:18
27:1 27:4 27:8 37:3 38:13 38:19 39:3 51:24 71:21 80:
19 81:12 88:7 92:9 104:7 105:5 109:20 138:13 139:6
142:3 148:3 149:2
Drive-bys
1] 88:7
Driven
2] 53:21 101:9
Driveway
33] 22:13 104:9 104:11 104:20 105:2 105:10 109:23
110:6 110:10 110:16 110:19 110:22 110:24 118:24
128:20 128:20 130:5 130:9 130:12 130:13 130:14 130:
25 145:17 146:17 148:13 148:16 148:22 149:5 149:6
149:10 155:12 155:17 167:13
Driving
3] 92:10 145:17 146:16
Drove
2] 38:15 126:22
Dry
1] 14:9
Due
1] 49:12
Duly
6] 11:12 47:1 70:21 90:20 123:12 138:7
During
16] 36:23 38:9 39:3 42:16 45:22 61:14 98:11 101:6
103:19 107:1 124:12 125:17 142:14 149:14 149:18
154:22
Duties
2] 47:12 47:15

E

Ear
1] 172:18
Early
4] 28:12 36:25 77:10 93:8
Earth
2] 15:19 18:16
Easier
1] 105:5
Easily
1] 116:5
Eastchester
1] 48:13
Edge
3] 18:1 19:10 104:17
Education
5] 12:18 13:1 48:6 90:24 95:10
Effect
3] 105:1 105:9 144:16
Effected
1] 9:22
Effectuated
1] 146:23
Effort

Efforts
1] 101:7
Eight
5] 13:15 72:11 103:15 127:9 129:19
Eighteen
6] 83:14 83:15 143:5 152:8 152:15 154:22
Eighths
1] 127:13
Eighty-five
1] 108:25
Either
8] 28:11 55:7 62:18 94:20 101:23 107:7 160:23 161:1
Elaborate
4] 11:21 13:3 13:21 15:21
Electrical
3] 14:7 27:23 91:25
Element
2] 7:11 8:7
Elements
5] 73:14 79:21 79:23 119:8 163:16
Elicited
2] 49:13 49:16
Eliminate
1] 149:11
Embedded
1] 102:22
Employed
3] 11:15 11:17 47:9
Employee
1] 38:23
Employment
7] 47:7 48:10 92:3 93:7 95:11 124:4 124:13
Enclosed
1] 100:5
Encourage
2] 173:18 173:20
End
8] 24:12 53:22 69:19 102:17 104:11 120:22 121:1
156:10
Ended
2] 74:14 74:16
Ends
1] 129:14
Engage
2] 3:18 134:21
Engaged
2] 4:19 135:11
Engineer
56] 3:19 3:22 4:20 4:20 5:1 10:23 17:15 22:23 25:9
25:11 26:24 47:19 47:21 48:17 48:21 48:23 48:25 49:
3 49:19 57:14 63:5 64:23 65:9 65:22 66:7 66:18 66:22
73:15 73:22 73:25 74:10 74:15 74:21 74:23 77:19 90:
16 91:20 91:22 94:13 108:11 108:12 120:21 122:12
122:25 123:1 123:17 124:4 124:11 124:13 125:19 146:
4 146:6 146:13 157:16 157:17 164:15
Engineer's
3] 4:2 46:11 49:7
Engineering
34] 28:7 29:13 43:25 45:18 47:8 48:1 48:9 48:14 48:
16 48:20 49:10 49:23 50:16 90:25 91:14 91:17 91:18
91:25 92:1 92:3 92:8 93:10 94:9 94:23 94:24 95:3 95:
11 97:2 97:9 123:19 123:21 125:23 126:5 157:23
Engineers
11] 9:14 9:17 47:17 50:22 63:20 91:6 91:8 91:23 93:1
95:4 135:1
Enrolled
1] 91:13
Entail
1] 66:6
Entire
10] 55:1 55:4 56:10 69:4 69:6 111:17 131:19 131:23
153:1 161:20
Entirety
1] 165:5

ntitled
] 30:15 163:7
quipment
] 145:16
ect
: 44:20
rosion
14:8
rrors
] 173:6
SQ
] 2:3 2:11
ssence
] 5:7 10:15 158:17
stablish
] 164:17 169:3
stablished
] 23:15 89:6 93:15
stimate
] 59:3 59:14 64:4 72:9 94:17 108:13 124:18 129:16
10:9
stimated
] 36:6 144:15
stimation
] 153:5
valuate
] 65:10 73:22 129:22
valuated
] 78:17
valuating
] 97:24
valuation
] 3:19 3:24 64:23 65:24 78:21 98:24 107:10
vening
] 123:22
vent
] 5:21 64:9
entually
] 119:9
vidence
2] 6:7 6:13 21:9 52:9 63:14 87:10 90:4 95:23 96:4
:7 96:12 99:24 100:10 100:14 100:17 134:8 137:1
9:7 171:5 172:2 172:12 173:9
videntiary
] 8:16
xactly
] 12:17 17:1 17:3 23:9 31:4 31:16 42:13 51:3 68:10
3:11 172:24
XAMINAITON
] 66:4
xamination
] 11:14 28:4 28:5 44:15 47:3 58:6 58:8 65:24 70:23
:19 75:21 90:22 91:19 110:3 110:5 120:15 121:19
3:14 131:14 138:9 154:14
xamine
] 136:9 144:6 150:6 150:7
xamined
] 11:13 47:2 70:22 90:21 92:11 123:12 138:8
xcavate
] 128:21
xcavated
] 109:15 128:19
xcavation
] 167:13
xcellent
] 170:10 170:16
xcept
] 18:12 111:15
xception
: 9:24 8:25 83:16 88:7
:cuse
] 46:17 52:12 150:19 157:5
xcused
] 87:4 135:25 136:23

Executed
[1] 153:23
Exhibit
[5] 96:6 96:9 100:11 100:14 100:16
Existed
[4] 21:6 69:15 103:12 158:21
Existence
[1] 165:7
Existing
[1] 160:21
Expect
[5] 117:12 117:13 117:19 117:23 119:18
Expense
[4] 118:19 118:20 118:21 119:1
Expensive
[3] 109:13 118:24 144:5
Experience
[14] 12:24 18:13 57:18 59:2 67:12 67:21 95:11 113:1
113:4 117:4 119:19 120:20 123:2 127:25
Experienced
[2] 66:19 66:21
Expert
[31] 9:9 49:10 49:23 72:21 72:22 74:4 94:20 97:1 97:8
122:14 125:3 125:9 125:19 125:22 126:4 132:17 133:
21 135:13 158:7 159:12 159:18 159:19 160:2 161:13
162:1 164:21 164:24 166:10 167:25 169:25 173:3
Expertise
[1] 118:15
Experts
[1] 134:22
Explain
[4] 51:2 53:2 128:12 169:9
Explained
[5] 133:1 158:1 169:17 171:18 171:20
Explanation
[1] 66:17
Explicitly
[2] 76:18 77:16
Explore
[1] 30:16
Expressed
[2] 120:4 171:1
Expunged
[1] 165:7
Extra
[1] 132:8
Eye
[1] 173:22
Eyewitness
[2] 72:23 170:25

F

Face
[5] 19:11 68:5 129:1 130:15 130:18
Facie
[2] 89:25 90:3
Facing
[3] 101:25 109:20 142:9
Fact
[18] 8:11 8:18 40:7 79:2 79:5 87:21 101:3 132:10 132:
24 151:1 151:7 153:21 158:7 160:2 163:25 164:9 168:
11 170:3
Factors
[1] 62:23
Facts
[4] 78:23 79:18 88:20 173:4
Factual
[5] 88:21 88:25 89:1 163:22 164:1
Fail
[2] 78:15 108:18
Failed
[5] 58:2 63:21 87:22 163:12 166:14
Failure
[2] 57:20 170:6

[9] 12:14 21:4 51:19 67:13 67:21 86:3 117:3 118:12
119:8
Fairly
[7] 19:13 34:25 102:5 102:20 104:10 105:23 118:23
Fall
[1] 24:8
Family
[2] 73:24 83:25
Far
[11] 14:9 27:17 29:5 45:1 66:9 104:17 110:20 116:9
148:18 151:3 151:5
Fashion
[3] 71:5 88:24 118:1
Favor
[1] 89:22
Faxed
[1] 4:13
Feet
[24] 17:22 17:23 52:7 52:13 52:21 53:3 61:1 61:2 61:3
72:6 72:8 72:12 104:15 109:24 109:25 111:20 111:21
113:13 113:15 126:23 126:24 127:8 129:19 154:8
Fell
[1] 56:20
Felt
[4] 15:15 15:23 25:22 65:21
Fence
[1] 147:8
Fences
[2] 163:9 166:2
Fencing
[1] 14:9
Few
[2] 137:7 162:15
Field
[8] 57:10 58:12 90:25 92:3 94:22 95:11 97:1 125:23
Fifteen
[5] 17:23 52:7 52:13 106:22 111:20
File
[24] 4:18 20:13 20:14 29:13 30:22 30:25 31:1 31:2 31:
6 31:12 31:19 31:20 31:21 31:22 32:1 32:3 32:9 32:11
78:6 88:22 160:16 160:19 160:22 172:19
Filed
[5] 7:7 8:15 38:18 147:20 163:19
Fill
[1] 142:19
Filled
[2] 18:25 147:21
Filling
[1] 142:19
Final
[1] 45:5
Finally
[4] 74:14 116:23 117:16 173:8
Financial
[1] 5:12
Findings
[7] 25:14 26:5 57:9 131:22 133:21 171:6 173:9
Fine
[4] 39:20 99:9 150:9 151:10
Fingernails
[1] 54:17
Fingers
[1] 94:8
Finish
[2] 35:13 37:25
Finishing
[1] 92:16
Fiore
[137] 2:3 3:3 3:5 3:8 4:13 6:18 6:21 7:4 7:14 7:18 8:3
8:13 8:23 9:1 9:6 10:2 10:4 11:9 11:14 15:7 21:8 23:
18 23:23 27:3 28:2 29:10 29:19 32:5 32:20 35:21 37:
11 37:25 39:6 40:2 41:22 43:13 44:14 44:15 46:14 46:
19 46:23 47:3 49:8 49:14 49:18 50:1 58:3 60:6 65:15
66:2 66:3 66:4 68:23 69:14 69:22 70:14 70:17 70:23

2:24 75:18 80:20 84:16 84:23 86:2 88:6
1 89:25 90:6 95:25 96:2 97:3 97:5 99:21 99:22 100:4
00:12 110:2 110:4 110:5 120:11 121:14 121:18 121:
9 122:8 122:13 126:1 131:12 131:13 131:14 131:18
32:6 132:17 133:3 133:7 133:15 133:19 134:6 134:17
  17 139:15 148:17 148:20 150:19 150:24 151:20
:2 153:11 154:11 154:13 154:14 156:25 157:14
57:19 157:22 158:12 159:10 160:6 160:18 160:24
61:12 161:24 162:4 162:10 162:18 162:23 165:10
65:11 168:21

**Fire**
2] 14:7 92:22

**Firm**
16] 48:13 124:10 126:16 141:25 142:7 142:24 144:11
144:18 145:13 146:7 146:16 147:3 148:1 155:4 157:22
157:23

**First**
47] 4:6 6:16 11:7 11:12 16:12 16:13 17:2 17:13 21:11
21:16 23:11 23:20 24:3 24:10 24:22 28:9 41:5 41:8 41:
12 41:19 42:17 47:1 70:21 73:5 73:6 75:8 75:16 88:8
80:14 90:20 98:13 104:8 107:12 117:2 123:12 135:17
138:7 143:3 143:9 153:1 158:3 159:7 159:25 161:3
161:4 161:7 164:10

**Five**
24] 19:11 19:14 34:16 36:7 36:13 50:11 50:12 53:3
53:13 60:25 61:2 61:3 63:2 64:12 90:7 94:17 104:15
108:25 111:25 125:10 127:9 127:13 154:8 167:25

**Fix**
6] 45:25 80:12 141:7 146:9 147:6 173:1

**Fixation**
1] 121:1

**Fixed**
2] 147:10 147:18

**Fixing**
1] 80:8

**Flesh**
1] 172:21

**Flood**
  90:11
  iow
 .., 170:15

**Followed**
2] 6:4 71:5

**Following**
2] 6:1 37:23

**Follows**
7] 11:13 47:2 70:22 90:21 123:13 138:8 163:6

**Foot**
3] 62:2 63:2 120:17

**Footing**
2] 13:23 62:16

**Footings**
2] 13:19 13:20

**Force**
1] 18:16

**Forces**
1] 109:11

**Forever**
1] 30:19

**Forget**
1] 46:4

**Form**
1] 51:12

**Formal**
7] 12:18 13:1 27:6 28:6 48:5 84:2 90:24

**Formally**
3] 10:8 81:10 83:19

**Forms**
1] 13:25

**Forth**
  :12 32:2 88:24 89:5 92:1 95:10 169:4 172:4
  ,ty
1] 52:20

**Forward**
6] 6:14 6:25 8:22 72:15 94:13 104:17

**Forwardee**
1] 95:19

**Foundation**
4] 92:13 125:15 125:16 167:15

**Foundations**
2] 92:10 92:11

**Four**
19] 13:14 19:11 19:14 34:16 36:7 36:13 56:2 62:5 68:
12 101:21 103:5 111:25 113:14 115:11 126:24 127:1
127:3 129:20 131:1

**Frame**
2] 51:5 132:9

**Fred**
4] 145:13 145:20 147:5 147:24

**Fresh**
1] 64:14

**Friction**
1] 117:17

**Friday**
4] 3:12 159:25 161:1 161:4

**Friends**
1] 83:25

**Front**
5] 128:24 129:1 129:13 130:10 134:13

**Full**
1] 64:23 130:7 145:15

**Fully**
2] 38:4 60:10

**Fulvio**
4] 140:22 141:3 141:7 141:11

**Functions**
1] 167:11

**Fundamental**
1] 150:8

**Furnish**
2] 99:13 99:17

**Furnished**
1] 26:24

**Furthermore**
1] 173:8

**Future**
1] 173:19

## G

**G-E-O-S-S-L**
1] 33:5

**Gain**
1] 144:11

**Gap**
11] 36:2 36:3 56:15 56:17 68:19 68:25 69:3 69:18 69:
25 72:16 168:1

**Garage**
1] 93:24

**Garages**
2] 163:9 166:1

**Gary**
4] 1:5 3:3 10:7 138:2

**Gather**
2] 6:7 6:12

**General**
3] 71:9 92:20 108:18

**Generally**
1] 109:13

**Geossi**
5] 17:14 20:8 21:3 33:3 157:18

**Given**
8] 8:21 14:15 44:7 131:20 133:22 135:21 150:25 169:
22

**God**
1] 108:24

**Governed**
1] 171:3

**Grade**

**Graduate**
1] 123:20

**Graduated**
1] 91:16

**Graduating**
1] 48:12

**Grant**
4] 5:24 122:17 158:2 159:8

**Granted**
1] 145:3

**Gravity**
5] 101:5 109:6 109:9 109:18 117:17

**Great**
1] 94:10

**Greedwalds**
1] 15:6

**Greeenwald**
1] 10:22

**Greenburgh**
1] 94:1

**Greenwald**
20] 9:8 29:9 40:7 40:20 41:1 70:18 86:23 143:15 143:
19 143:25 144:23 145:6 145:8 145:22 145:24 146:3
146:12 147:2 166:21 170:21

**Greenwald's**
1] 72:21

**Greenwalds**
7] 15:10 17:7 29:24 40:14 40:24 143:4 152:10

**Greet**
1] 146:20

**Ground**
6] 13:25 14:3 102:1 107:24 136:3 167:14

**Grounds**
5] 6:1 87:18 135:17 158:5 161:14

**Guess**
17] 36:2 41:8 49:21 55:13 72:6 83:13 92:25 103:13
106:21 108:8 111:20 112:3 112:11 112:17 113:13 120:
18 160:12

**Guilty**
1] 172:4

**Guy**
1] 158:8

## H

**Half**
2] 18:22 109:24

**Hall**
1] 9:20

**Hand**
4] 58:12 95:24 113:13 113:19

**Hand-written**
1] 58:12

**Handed**
1] 95:16

**Handled**
1] 93:4

**Handy**
2] 32:1 103:14

**Happy**
3] 4:23 32:3 137:8

**Hard**
1] 106:15

**Hartsdale**
1] 1:22

**Hear**
6] 4:3 9:21 45:20 46:8 87:5 122:19

**Heard**
12] 6:19 45:16 87:2 87:2 89:17 97:4 122:14 143:6
150:15 152:14 156:2 172:14

**Hearing**
1] 172:11

**Hearsay**
1] 151:21

eating
] 13:7
eavy
] 101:5 108:7 109:9 109:17
ight
] 52:13 52:16 52:24 55:3 55:4 58:22 58:22 62:25
d 100:24 109:21
eld
] 78:14 148:9
elp
] 18:15
elped
] 105:6
enry
] 73:17
erein
] 11:11 46:25 70:20 90:19 123:11 138:6
igh
] 13:4 16:6 52:7 61:1 72:9 92:7 111:19 126:23 126:
] 127:9 173:11
ighest
] 52:7 52:13 58:21
ighlight
] 173:6
ighlighted
] 73:18
ighway
] 145:4
imself
] 132:3 145:21
ire
] 146:6
ired
] 17:15 126:16
listory
] 66:23 124:4
itting
05:20
Jd
] 12:5 18:15 79:11 102:24 116:21 116:23 149:25
olding
] 18:11 108:9 114:15 128:25 129:11
olds
] 15:19 127:18
oles
] 103:9 103:12 103:18 104:3
ome
] 5:12 14:17 27:1 27:2 27:3 39:24 41:20 41:24 42:
] 43:5 43:9 44:2 45:24 50:3 50:6 65:2 95:5 112:4
30:2 136:24
omes
] 13:10 59:11
ON
] 1:11
onor
58] 4:7 4:9 5:3 5:20 5:21 7:5 8:3 9:1 10:4 11:6 39:6
0:3 49:8 49:11 49:25 50:1 67:16 72:18 81:22 86:21
7:12 88:1 88:12 89:7 89:23 90:6 96:23 97:6 99:8 100:
8 109:2 120:8 121:13 121:15 122:16 126:2 131:10
31:24 132:7 132:19 134:18 153:14 153:16 157:6 157:
6 159:10 160:5 162:18 162:22 162:23 162:25 165:2
65:11 166:4 167:4 167:19 168:3 168:10
onor's
] 8:24
ot
] 148:7 168:4
our
] 96:22 132:12
ourly
] 96:18 96:21
use
] 5:10 5:14 13:24 49:5 73:20 84:7 84:22 85:10 85:
5 85:17 92:15 93:23 94:3 112:10 112:11 112:18 130:
15 130:19 139:3 139:19 139:25 140:23 141:4 141:13
43:6 144:3 144:4 148:11 149:16 151:14 153:8

Houses
[1] 92:22
Housing
[3] 91:10 92:6 92:8
Hudson
[1] 73:17
Huge
[1] 167:2
Huguenot
[50] 10:9 14:25 15:12 16:5 22:5 22:8 23:5 25:3 26:2
26:12 26:15 26:18 26:23 27:1 27:4 27:8 37:3 38:13 38:
19 39:3 50:25 51:17 51:24 71:21 79:7 80:7 80:19 81:4
81:12 81:19 97:22 98:15 104:7 108:23 109:20 110:7
116:3 116:5 126:20 127:4 127:12 127:20 130:15 138:
13 138:19 139:6 142:3 142:4 148:3 154:16
Hundred
[7] 13:15 50:11 50:13 50:14 124:24 148:6 148:7
Hundreds
[1] 50:10

⎯⎯⎯ I ⎯⎯⎯

Idea
[4] 24:2 24:5 59:8 59:12
Identify
[1] 101:7
Immediate
[2] 60:18 110:9
Immediately
[2] 77:13 78:12
Impact
[2] 105:14 167:3
Impossible
[2] 64:13 146:25
Improve
[1] 173:12
Improvement
[1] 45:10
In-house
[1] 92:15
Inability
[1] 147:2
Inch
[3] 19:11 127:13 149:9
Inches
[9] 36:7 53:13 101:21 103:5 127:2 127:10 127:11 129:
20 168:1
Inclined
[1] 122:16 123:7
Include
[2] 11:22 100:11
Included
[2] 74:17 169:15
Includes
[1] 94:1
Including
[6] 97:25 111:22 118:25 163:9 166:1 169:11
Income
[1] 92:7
Indeed
[1] 23:4
Indicate
[2] 106:23 144:18
Indicated
[2] 53:17 73:24
Indication
[6] 44:2 45:24 59:7 66:14 67:9 71:1
Individual
[3] 21:12 23:1 161:6
Inform
[3] 42:23 144:23 172:23
Informal
[1] 84:2
Informally
[1] 83:20

Information
[23] 7:8 7:9 8:6 8:15 8:16 8:18 26:11 31:3 31:4 31:24
32:8 44:8 49:17 88:11 88:19 109:4 140:10 141:1 163:
21 169:4 172:5 172:17 172:19
Informed
[2] 39:20 153:3
Initial
[4] 6:3 6:9 45:22 117:16
Inquiry
[2] 125:25 133:17
Insert
[1] 120:25
Inside
[1] 104:12
Insisted
[1] 146:3
Inspect
[12] 5:1 14:13 23:5 28:21 74:24 97:25 98:2 126:11
129:22 129:23 160:10 165:15
Inspected
[10] 26:8 28:10 29:2 92:13 108:13 124:23 152:18 164:
7 166:12 169:18
Inspection
[28] 4:21 13:23 14:6 14:6 14:7 14:7 21:6 21:17 32:18
32:21 32:22 32:25 33:6 35:2 35:18 37:10 39:14 39:16
39:18 50:5 50:7 63:24 64:8 95:5 98:23 107:10 124:21
126:15
Inspections
[10] 11:24 13:9 13:17 50:3 50:6 88:3 88:5 94:3 94:4
98:12
Inspector
[14] 3:15 10:21 12:3 12:12 12:20 14:21 39:1 51:10 81:
11 88:7 124:15 150:6 156:1 169:17
Inspectors
[1] 95:6
Installation
[1] 64:1
Installations
[1] 114:22
Installed
[15] 53:18 54:17 56:23 61:10 61:14 61:19 61:22 65:2
103:18 106:25 116:20 128:10 130:25 154:6 154:7
Instance
[2] 49:3 158:3
Instant
[1] 169:12
Instructed
[1] 140:24
Instructions
[1] 141:1
Instrument
[3] 89:2 172:9 172:20
Instruments
[1] 163:19
Integrity
[5] 3:20 60:13 65:13 144:9 147:24
Intend
[1] 10:18
Intended
[1] 171:25
Intent
[5] 103:6 105:12 108:9 118:3 118:5
Intention
[1] 73:25
Interested
[1] 135:9
Interesting
[1] 117:25
Interestingly
[1] 88:12
Interference
[1] 149:13
Interior
[1] 92:17
Interrupted

**K**

Keep
[14] 15:7 21:21 32:1 39:17 45:14 62:12 62:17 76:19 94:8 102:5 105:20 107:8 151:5 173:21
Keeping
[1] 166:20
Kevin
[4] 38:22 39:23 149:23 151:13
Kind
[8] 27:20 27:24 34:21 49:2 50:6 117:19 142:19 160:19
Knocked
[2] 143:10 144:1
Knowing
[1] 120:5
Knowledge
[12] 8:9 26:16 38:12 40:22 74:24 75:17 77:6 84:3 84:5 85:4 86:9 160:1
Known
[4] 88:19 114:23 132:25 158:21
Knows
[3] 8:9 108:24 146:4

**L**

Lafayette
[31] 15:6 15:10 15:11 16:4 20:15 22:5 38:16 51:16 71:15 83:12 98:9 100:21 100:22 101:13 102:1 103:24 111:2 111:5 111:13 113:19 115:16 115:21 116:2 116:4 116:8 140:4 140:6 142:9 142:17 143:1 146:22
Landscape
[1] 80:1
Larchmont
[2] 5:14 10:9 97:22 109:14 139:12
Large
[8] 56:21 62:7 102:3 102:21 118:20 118:21 120:17 173:11
Larger
[2] 101:15 108:1
Last
[12] 43:20 55:9 63:9 64:14 64:15 81:25 82:17 82:19 124:9 132:12 136:17 162:4
Lasted
[1] 109:18
Lastly
[2] 43:23 88:10
Late
[6] 28:11 36:24 38:9 135:6 136:17 161:5
Lateral
[2] 115:20 127:18
Law
[2] 88:21 167:1
Lay
[1] 13:21
Lead
[1] 66:16
Leading
[2] 67:17 153:14
Leak
[1] 103:7
Leaning
[6] 19:18 53:8 54:5 58:1 60:15 116:9
Learned
[3] 73:19 84:21 143:14
Learning
[1] 172:12
Least
[4] 18:22 19:14 62:1 62:5
Leaves
[1] 130:7
Led
[2] 74:7 164:5
Leek
[1] 150:7

Left
[24] 22:12 22:14 61:5 61:7 80:9 80:25 81:4 93:6 101:14 101:21 103:23 104:22 110:12 110:17 110:20 110:23 112:25 113:5 113:12 130:17 130:18 142:4 144:20 147:6
Length
[12] 52:18 52:22 54:23 55:1 61:2 67:14 68:3 68:6 69:4 69:6 129:16 167:23
Less
[3] 97:16 105:14 160:19
Letter
[18] 4:4 4:13 5:9 42:4 77:24 78:1 78:3 78:7 78:16 78:20 78:22 79:12 79:17 84:9 84:12 85:20 88:14 100:1
Level
[3] 48:15 93:12 110:15
Levels
[1] 72:7
Libraries
[1] 92:22
License
[5] 48:19 91:18 92:4 93:1 124:1
Licensed
[8] 48:20 48:23 48:25 49:18 57:13 91:19 123:23 124:14
Life
[3] 101:4 101:6 153:2
Lifting
[4] 19:13 19:16 19:17 36:11
Light
[1] 123:6
Likely
[4] 54:17 102:20 113:24 114:11
Limited
[1] 101:18
Line
[4] 30:17 54:7 68:5 92:18
Lined
[1] 129:15
List
[1] 139:10
Listed
[4] 84:22 139:6 139:25 153:10
Listen
[1] 126:5
Listing
[4] 36:19 139:14 166:6 166:7
Literally
[1] 80:9
Lived
[5] 83:1 83:16 143:6 152:15 154:22
Local
[1] 73:1
Locate
[1] 157:15
Located
[4] 10:10 68:13 68:14 140:13
Location
[9] 10:10 14:12 14:25 15:3 17:20 20:5 98:4 98:6 112:14
Locked
[1] 117:17
Look
[36] 15:14 15:24 16:9 16:14 17:8 18:3 20:16 20:19 20:19 22:22 23:25 25:18 32:19 33:10 38:16 44:25 51:11 61:6 68:11 72:15 73:15 74:8 75:11 81:1 81:4 83:21 95:25 97:21 101:13 103:24 107:6 113:19 119:5 122:24 129:23 164:21
Looked
[18] 18:6 19:22 36:21 36:21 39:20 51:11 51:12 79:23 80:4 80:13 98:18 104:10 108:15 108:16 111:8 127:10 144:3 147:6
Looking
[10] 22:8 34:18 53:10 78:25 98:19 103:21 104:20 110:10 110:24 121:23
Looks

**J**

Jail
[1] 7:17
Jane
[5] 1:5 3:3 10:7 138:21 143:15
JEAN
[1] 1:11
Jersey
[1] 139:4
Job
[6] 13:17 38:2 38:3 130:11 135:1 171:25
John
[3] 90:15 96:10 122:11
Joined
[2] 56:16 91:4
Judge
[1] 106:15
July
[7] 10:11 41:8 132:15 139:1 139:2 156:9 156:11
June
[2] 155:18 156:10
Jurisdiction
34:24
JUSTICE
[1] 1:11
Justification

**I** (partial left column)
54:12
Intersect
[1] 110:16
Intersept
[1] 110:19
Intervened
46:10
Introduced
[1] 145:21
Intruding
[1] 142:13
Intrusion
[2] 125:13 146:9
Investigate
[2] 94:5 118:10
Investigated
[2] 98:14 98:15
Investigating
[1] 118:17
Investigation
[6] 66:6 66:9 66:11 118:14 118:16 158:16
Invited
[1] 144:2
Involve
[2] 141:18 141:20
Involved
[6] 92:8 94:8 97:19 108:14 108:19 124:15 124:20 141:4 160:12
Involvement
[1] 166:23
Irrelevant
[2] 153:15 161:23
Issuance
[2] 4:16 29:3 41:5 42:17 88:8 164:5
Issue
[16] 11:24 14:11 26:17 27:6 41:17 43:8 45:13 51:21 57:14 80:25 81:18 134:18 153:24 154:2 154:3 164:23
Issued
6:22 26:21 26:22 29:7 39:10 39:12 41:12 41:19 42:9 42:19 45:3 45:17 45:24 46:4 46:12 51:8 87:20 98:1 99:12 132:22 164:4 165:20 165:22
Issues
[5] 54:9 122:23 133:25 160:14 172:7
Issuing
[3] 28:17 28:24 37:20
Itself
[2] 100:11 156:22

**M**

...ose
[1] 136:2
...ow
[1] 192:7
...wer
[1] 16:5 18:9 54:4 54:15 54:18 59:3 67:5 111:11 121:6
...LTD
[1] 1:21

Maintain
[1] 30:23
Maintained
[1] 10:16 163:10 166:2 169:13
Maintenance
[7] 7:21 10:13 27:12 27:14 27:15 27:18 27:21
Mamaroneck
[23] 1:1 1:8 2:4 2:6 3:2 10:11 10:21 10:22 10:24 11:18 12:3 12:16 14:22 15:1 17:15 47:20 50:17 50:24 149:9 151:17 152:13 153:4 165:8
Mamaroneck's
[1] 64:18
Man
[2] 141:12 145:14
Manager
[5] 47:14 47:16 48:18 92:24
March
[4] 139:9 140:11 141:11 149:14
MARIE
[1] 1:11
Marked
[4] 6:15 6:25 96:6 100:15
Market
[3] 5:10 141:4 144:5
Mary
[2] 2:11 3:11 46:5 46:9
...son
[5] 73:9 73:13 75:9 76:3 76:7 76:19 76:25 85:13 144:6 146:4 146:5 146:6 152:17
Masonry
[2] 17:24 19:1 34:11 34:14 35:3 36:4 140:12 140:15
Masons
[1] 146:20
Massive
[1] 72:5
Material
[4] 18:23 55:10 69:23 118:18 158:20
Materials
[4] 18:5 68:25 69:15 99:14 165:18
Matter
[6] 3:2 5:4 6:2 41:5 120:2 158:19 164:13
Matters
[1] 151:14
Maureen
[2] 1:21 174:19
Mean
[6] 19:17 35:11 50:8 63:19 76:24 81:2 115:18 128:4 157:18
Meaning
[2] 16:18 104:2 115:22 169:21
Means
[3] 19:12 63:19 87:1
Meant
[1] 57:19
Measure
[3] 36:8 52:18 52:23 53:13 107:2 107:7
Measured
[2] 51:12 52:24 61:4 129:18
...asurement
[2] 8:20 58:24 66:8
Measurements
[3] 33:12 33:15 58:19
Measures

Measuring
[1] 113:12
Mechanical
[4] 14:8 91:25
Mechanism
[2] 53:23 128:3
Meet
[3] 16:2 20:1 22:16
Meetings
[6] 81:15 82:2 82:4 82:6 82:7 83:7
Meets
[2] 110:22 149:6
Memberships
[1] 94:25
Memo
[1] 30:6
Ment
[4] 35:4 102:24 108:7 116:21
Mentioned
[6] 39:24 102:25 103:1 115:15 145:4 155:21
Mentions
[1] 100:4
Merely
[2] 132:2 172:21
Message
[2] 30:6 30:8
Met
[7] 51:11 81:17 81:18 82:5 140:23 168:11 169:8
Mid
[3] 52:8 54:22 54:23
Middle
[5] 101:20 101:20 127:1 129:15 129:17
Might
[13] 46:5 53:22 56:18 61:4 62:16 66:14 117:16 119:17 148:8 158:8 158:10 161:22 173:6
Military
[1] 91:9
Mind
[6] 63:14 63:18 63:20 63:20 109:4 159:1
Minor
[2] 101:19 144:8
Minute
[1] 90:8
Minutes
[5] 31:15 137:7 162:15 168:15 168:22
Missing
[2] 135:3 135:5
Misunderstood
[1] 110:8
Money
[2] 93:11 146:7
Monitor
[2] 92:10 93:3
Month
[7] 24:9 24:11 64:15 97:16 97:17 143:9 151:13
Months
[4] 38:9 38:10 39:3 149:15
Moore
[7] 38:22 39:2 39:19 149:23 150:7 151:18 151:24
Morning
[10] 47:4 47:5 58:9 58:10 71:14 90:23 123:15 137:16 161:2 161:3
Mortgages
[1] 5:14
Most
[9] 54:17 92:14 95:20 102:20 110:17 113:24 114:11 144:5 144:15
Mostly
[1] 48:13
Motion
[4] 87:17 87:18 89:11 90:5
Move
[16] 6:14 21:8 40:1 49:9 56:15 57:19 62:19 63:22 72:

Moved
[19] 18:1 35:9 35:12 35:15 54:4 57:17 57:17 57:23 57:25 72:15 83:13 92:19 111:7 129:12 129:15 129:17 138:17 139:4 170:5
Movement
[17] 18:5 19:8 35:18 63:14 63:15 63:18 63:24 64:5 104:25 106:20 115:20 116:21 117:16 117:18 127:18 128:8 128:9
Moves
[2] 57:19 63:21
Moving
[7] 35:8 35:10 35:11 107:8 154:15 168:6 173:20
Mr.Carpaneto
[1] 9:10
Mullins
[101] 2:11 3:11 4:3 4:7 4:9 5:20 9:11 9:13 11:3 11:5 16:15 21:11 21:20 23:14 25:23 27:2 28:5 31:11 31:18 32:15 34:17 37:24 40:1 41:24 44:12 46:16 49:11 49:15 49:25 51:4 55:3 58:7 58:8 62:19 65:25 67:16 69:7 70:24 71:13 72:17 74:18 75:20 75:21 79:8 81:22 82:14 82:16 83:23 85:6 86:20 87:15 87:16 89:14 90:9 90:13 90:15 90:20 95:13 95:15 95:22 96:1 96:13 96:23 99:7 99:20 99:23 100:18 109:1 120:7 120:14 120:15 121:12 122:11 122:21 123:8 123:14 125:21 131:9 131:24 136:14 137:3 137:13 137:19 137:25 138:2 138:9 139:21 151:6 153:13 153:16 154:9 156:7 157:2 157:6 157:10 160:5 162:22 162:24 162:25 173:24
Municipal
[1] 49:2
Must
[3] 55:7 159:20 169:6
Mystery
[1] 8:1

**N**

Name
[8] 29:25 30:2 74:15 74:15 95:17 127:17 160:18 161:17
Named
[1] 10:6
Narrow
[1] 108:3
National
[2] 95:2 95:5
Natural
[1] 18:25
Nature
[9] 8:16 15:13 27:10 48:11 88:23 93:5 120:5 142:11 142:12
Necessary
[2] 71:11 141:5
Need
[9] 6:14 27:16 27:17 49:6 135:10 139:18 164:21 168:14 168:22
Needed
[8] 14:16 43:11 57:11 91:12 108:16 153:5 170:12 170:17
Needs
[1] 144:8
Neighbor
[8] 75:10 125:13 125:14 147:8 152:13 164:3 166:24 170:22
Neighbors
[3] 16:22 80:19 143:1
Never
[7] 40:19 77:4 143:6 143:17 152:14 164:7 172:14
New
[34] 1:2 1:8 1:22 2:6 2:14 5:1 5:6 10:9 10:14 12:22 48:20 49:18 49:21 60:18 86:3 87:24 91:10 92:6 92:19 93:7 104:10 105:23 118:24 123:18 123:24 124:6 125:5 130:13 130:14 139:4 155:12 158:19 158:20 163:4
Next
[10] 9:10 38:6 46:21 70:1 70:16 75:5 122:10 126:5 138:1 142:21
Nicer
[1] 119:5

**ight**
[] 5:7 91:13 123:22
**ine**
[] 12:13
**nbody**
9:1
**onhearsay**
[] 7:10 8:7 88:24 172:22
**ormal**
[] 41:13 144:2
**ormally**
[] 17:16 41:13 42:11 62:6 62:8 62:10
**orth**
[] 1:22
**otation**
[] 72:20
**ote**
[] 8:23
**oted**
[] 8:25 104:9 136:7 165:16
**otes**
[] 33:21 58:11 58:12 68:11 98:20 98:20 99:1 131:15
**othing**
[4] 41:17 41:20 44:12 46:3 65:25 70:14 74:11 74:13 118:75:22 86:20 86:22 109:1 121:12 131:9 135:15 16:4 154:9 155:23 156:25 157:2 157:7 161:18 163:25
**otice**
[7] 43:1 43:3 43:14 45:5 45:23 88:8 88:9 112:19 130: 131:21 132:13 132:21 133:20 150:17 151:2 153:1 55:22 156:8 156:12 156:20 159:19 159:23 161:14 54:4 164:8 165:20 165:22
**oticed**
[] 17:21 75:6 128:8 128:9
**otices**
[] 28:18 152:23 156:15
**otification**
[] 14:25
**ified**
:5
**otify**
[] 162:7
**ovember**
[] 1:8 3:12 4:14 5:3 6:10 126:12
**udged**
[] 45:19 45:21
**umber**
[] 53:7 56:1 115:10 145:14 148:3
**umbers**
[] 124:19

**O**

**'Hare**
[] 1:21 174:19
**beyance**
[] 148:9
**bject**
[7] 4:10 16:16 21:11 21:18 32:5 32:9 39:6 67:16 69:7
:11 82:15 122:13 131:18 131:23 133:23 151:4 151:
**bjected**
[] 73:11
**bjecting**
[] 65:17 148:18
**bjection**
[2] 25:23 29:10 29:19 32:20 35:21 37:11 40:2 43:13 :6 74:18 80:20 84:25 96:2 97:5 99:25 100:3 120:7 :2:17 134:1 134:2 135:18 135:19 136:3 136:6 139:15 50:23 150:24 151:20 152:2 153:11 156:7 161:12
**bjections**
:12
**..igations**
[] 159:23
**bservation**
[] 35:1 79:23
**bservations**
[11] 22:20 33:14 35:17 36:14 44:21 56:8 57:5 72:4 72: 23 73:2 79:22
**Observe**
[11] 17:13 17:19 52:1 55:24 68:8 70:2 71:25 111:1 113:16 114:6 126:18
**Observed**
[16] 44:16 52:4 68:25 69:3 104:6 104:13 106:8 111:5 113:21 115:3 115:5 119:14 126:19 141:25 142:5 147: 19
**Observing**
[1] 22:7
**Obtaining**
[1] 135:13
**Obvious**
[7] 30:13 33:25 36:22 44:22 72:14 80:14 116:3
**Obviously**
[7] 4:10 9:18 18:8 102:3 105:4 106:4 122:22
**Occasion**
[12] 21:16 26:7 37:3 38:12 50:18 50:24 71:25 72:25 94:14 124:14 124:15 129:23
**Occasions**
[5] 40:13 50:20 108:12 125:17 151:9
**Occur**
[5] 35:18 101:12 113:8 117:23 127:19
**Occurred**
[10] 41:8 63:25 67:24 115:24 116:7 139:2 139:13 139: 24 150:21 171:21
**October**
[15] 6:5 6:9 6:10 21:17 24:13 25:6 28:12 37:4 37:5 37: 10 37:15 51:7 88:17 132:16 164:11
**Offense**
[2] 169:2 172:24
**Offer**
[5] 21:9 71:1 122:17 122:19 123:6
**Offered**
[3] 85:10 99:24 135:15
**Offering**
[2] 132:2 132:2
**Office**
[11] 16:18 20:14 30:23 31:9 31:23 39:18 57:6 58:14 97:12 162:5 162:11
**Official**
[5] 31:20 88:2 151:8 152:12 153:3
**Officials**
[2] 73:1 149:19
**Oil**
[4] 148:15 149:1 150:5 150:7
**Old**
[12] 59:8 60:17 101:2 101:3 108:21 108:23 108:25 112:2 112:5 112:8 117:10 173:11
**Older**
[2] 52:6 59:25
**Oliveri**
[23] 9:9 10:23 22:22 23:4 24:18 25:12 25:14 26:5 26:8 43:24 46:23 47:4 47:6 49:9 49:12 49:23 50:2 58:9 64: 17 164:17 164:19 166:11 169:25
**Oliveri's**
[1] 170:20
**Once**
[4] 14:3 24:19 25:20 82:6
**One**
[48] 8:8 12:6 29:21 30:3 30:17 38:7 40:10 42:14 47:19 52:24 53:11 58:14 58:20 62:1 68:13 70:12 72:19 79: 21 83:21 88:23 94:5 95:20 102:20 105:19 108:23 112: 21 113:17 119:4 120:14 121:14 122:14 122:14 125:6 125:14 134:1 134:4 135:10 138:12 143:6 144:6 146:14 152:14 153:6 161:22 170:9 171:21 171:22
**One-page**
[1] 96:11
**Ones**
[3] 34:6 34:7 67:6
**Open**
[1] 87:7
**Opened**
[1] 40:2
**Opening**
[1] 10:1
**Openings**
[3] 101:11 103:4 103:5
**Opinion**
[36] 23:2 57:13 57:14 57:16 60:12 60:21 63:10 65:11 65:12 65:16 65:19 66:5 79:19 80:5 98:22 106:13 106: 16 107:4 107:11 107:16 120:3 120:4 121:8 123:3 127: 14 129:5 151:24 158:9 158:10 160:11 161:10 166:13 169:19 171:19 172:19 173:3
**Opinions**
[1] 164:25
**Opportunity**
[17] 4:18 84:23 85:11 110:25 114:6 118:13 132:8 132: 11 132:15 132:16 133:9 134:9 135:21 137:20 159:3 159:15 161:25
**Opposite**
[1] 98:18
**Order**
[9] 36:18 43:12 73:8 88:22 149:9 158:16 160:8 167:9 171:6
**Ordinarily**
[2] 102:17 103:17
**Organization**
[1] 95:7
**Organizations**
[2] 95:5 95:8
**Original**
[21] 45:10 53:5 56:22 57:22 57:23 59:11 61:14 62:13 64:3 101:23 102:5 103:19 106:19 107:1 107:4 107:5 112:7 117:3 117:15 128:13 168:6
**Originally**
[4] 54:1 62:16 116:20 128:7
**Otherwise**
[4] 42:24 43:9 44:3 88:6
**Ought**
[2] 80:3 80:13
**Outset**
[2] 71:9 159:11
**Outside**
[4] 9:4 69:9 92:15 93:12
**Outstanding**
[1] 153:21
**Outward**
[1] 53:9
**Overall**
[1] 57:15
**Overhang**
[3] 53:15 58:1 131:8
**Overhanging**
[2] 53:11 53:12
**Overhangs**
[1] 79:24
**Overruled**
[12] 29:11 32:24 35:22 39:7 43:16 60:7 67:18 72:19 80:22 85:1 120:9 152:3
**Own**
[12] 7:22 79:21 79:23 90:4 93:2 93:10 93:14 93:15 109:4 117:12 153:7 172:15
**Owner**
[2] 42:20 130:2
**Owners**
[14] 14:17 27:1 27:2 27:3 39:24 41:21 41:24 43:5 43:9 44:2 45:25 65:2 81:12 138:12

**P**

**P.E.**
[2] 12:25 65:20
**Pad**
[1] 33:23
**Pages**
[1] 100:10
**Paid**
[1] 96:14
**Palmer**

2:13
...rk
1:22 64:24 154:16 154:21
...rked
70:2 154:19
...king
155:1 155:18
...rkway
73:17
...rt
...] 18:1 20:12 54:6 60:19 63:9 72:10 72:12 72:13 72:
...] 79:24 79:25 80:10 81:3 81:4 81:25 91:7 92:8 93:9
...]:6 101:23 106:19 108:8 108:18 111:9 112:6 116:8
...7:15 129:14 129:19 130:10 132:5 155:14
...rticular
...] 38:11 66:21 81:16 87:25 100:9 105:6 151:11 163:3
2:16
...rticulars
...] 42:21 43:5
...rties
... 90:12 137:12 162:17 168:24
...rts
... 72:10 141:21
...rty
... 14:7
...rtys
... 9:14 9:18 173:18
...assage
... 8:21 42:6 42:16
...assed
... 91:19
...ast
... 79:4 113:19 138:25 173:7
...atch
... 55:10 55:11
...ay
... 148:1 148:7
...ving
... 13 146:7
...ayment
... 148:9
...ayments
... 93:4
...enalties
... 7:23 7:24
...ending
... 4:15 5:16 165:4
...eople
...] 1:2 3:5 3:8 3:25 6:6 6:12 9:4 10:5 10:18 10:25 11:
...6:23 41:14 46:13 70:17 81:21 87:9 87:13 87:21 89:
...9:22 132:7 132:13 132:14 132:17 135:12 135:20
...7:11 158:15 158:18 158:20 159:17 159:22 161:15
...3:12 164:13 165:12 168:10 168:25 169:2 169:3 169:
...169:24 170:14
...eople's
...] 5:25 21:10 81:7 159:8 169:15 171:10
...eoples's
...] 166:10
...er
...] 96:22
...erfect
...] 81:5
...erfectly
...] 110:15
...erform
...] 35:5 145:9 147:4 167:12
...erformed
...] 13:10 23:19 50:3 50:16 81:12 93:19 140:15 155:6
...erforming
...] 35:4 167:11
...haps
...] .00:23 103:5 116:11
...eriod
...] 35:20 35:25 38:20 80:18 80:23 81:9 81:9 91:5
...1:9 149:14 149:18

Permission
[14] 17:8 73:8 76:22 77:2 77:4 77:5 77:8 77:10 144:11
144:17 146:15 146:18 147:9 153:19
Permit
[2] 39:9 49:6
Permits
[3] 11:25 38:18 39:12
Permitted
[1] 86:23
Perpendicular
[4] 19:19 22:17 54:7 56:12
Person
[10] 13:21 40:25 80:2 93:22 93:25 135:24 143:14 145:
21 158:25 170:23
Personally
[9] 12:23 12:24 16:21 17:4 28:10 33:19 42:14 50:4 97:
25
Perspective
[1] 133:2
Pertinent
[1] 165:24
Phone
[13] 3:10 29:8 29:12 30:8 30:13 73:21 74:12 82:7 82:8
82:12 82:21 82:25 145:20
Photograph
[2] 21:4 21:23
Photographs
[11] 20:2 20:4 20:17 20:23 20:25 21:9 34:19 58:16
100:6 170:10 170:12
Photos
[7] 21:12 21:15 44:24 98:20 100:5 103:14 111:8
Physical
[2] 88:5 156:21
Physically
[1] 38:14
Picture
[1] 109:5
Pictures
[5] 20:12 37:7 37:8 100:11 131:17
Piece
[2] 102:3 102:21
Pieces
[1] 54:16
Piles
[3] 92:9 92:9 92:11
Place
[12] 47:7 55:13 63:16 64:5 75:8 75:16 92:4 106:14
128:14 128:15 145:11 168:6
Placed
[1] 55:17
Places
[1] 118:25
Placing
[1] 92:13
Plaintiff
[1] 94:21
Plan
[4] 9:12 10:5 14:4 26:2
Planing
[1] 144:4
Planning
[1] 11:25
Plans
[4] 11:25 14:2 49:1 49:4
Plate
[5] 53:21 62:8 102:19 127:10 128:25
Plates
[18] 52:10 53:16 53:16 56:21 56:21 61:25 62:2 101:9
101:25 102:8 106:18 106:25 114:9 117:1 120:17 121:
22 122:6 127:15
Pleasantries
[1] 144:2
Plumbing
[13] 7 14:6

Plus
[2] 29:13 93:23
Point
[28] 3:21 15:20 18:2 22:21 26:17 40:12 46:10 52:8 52:
24 53:11 53:14 53:18 54:3 56:15 56:19 58:21 77:12
80:5 87:19 93:11 111:19 112:16 134:19 135:3 150:14
150:16 168:5 170:9
Pointed
[2] 150:10 151:15
Points
[1] 109:3
Police
[1] 92:22
Policy
[2] 17:16 41:18
Polytec
[2] 48:1 123:19
Portion
[60] 18:9 19:23 19:25 22:4 22:15 34:8 34:9 34:11 34:
14 35:4 36:3 36:4 59:3 59:14 59:21 59:22 59:25 60:22
60:25 61:10 61:21 63:11 67:2 68:2 69:5 92:17 101:15
102:16 104:6 107:17 109:25 110:11 110:12 110:17
111:11 111:23 111:25 112:20 114:2 115:13 116:16
119:20 120:16 121:6 121:9 121:25 122:1 122:4 122:5
129:6 129:9 129:10 129:24 140:2 142:1 166:17 167:21
170:4 171:16 171:22
Portions
[1] 22:16
Position
[4] 12:5 12:10 38:25 149:25
Positions
[1] 124:7
Positive
[1] 152:5
Possession
[1] 140:9
Possibilities
[1] 116:19
Possibility
[1] 46:20
Possible
[13] 63:23 67:23 77:7 77:9 77:11 77:21 80:17 106:23
106:24 119:10 119:25 120:2 166:25
Possibly
[3] 27:18 100:24 158:21
Post
[3] 1:7 2:5 147:8
Potential
[1] 73:23
Potentially
[1] 86:4
Pour
[1] 13:25
Poured
[4] 54:7 102:22 128:21 147:7
Pours
[1] 81:6
Powers
[1] 135:11
Practice
[5] 93:16 93:19 94:7 94:12 134:21
Predicament
[1] 5:13
Prejudice
[2] 89:9 165:5
Prejudiced
[3] 133:4 133:6 133:8
Preliminary
[1] 3:23
Premises
[21] 3:23 5:1 10:8 50:25 51:23 64:8 76:10 97:25 140:
16 140:17 140:23 141:16 145:15 149:20 151:8 152:9
153:22 159:14 165:16 166:12 166:12
Preparation
[4] 4:1 48:22 132:18

repare
[4] 18:9 95:9 159:16
repared
[2] 64:17 95:18 100:2 136:11 136:19 136:20 161:15
resent
[...] 17:12 18:18 20:10 23:6 36:25 67:2 83:17 87:11
...:2 137:23 157:13
resented
[3] 169:7 169:24 171:5 172:2
resently
[2] 93:20 138:20
resident
[2] 140:22 145:14
ressure
[1] 149:11
resumption
[2] 6:24 132:23
retty
[1] 109:13
revent
[4] 104:17 105:19 116:21 168:8
reviously
[1] 6:2
rima
[2] 89:25 90:3
rimarily
[1] 140:7
rimary
[1] 95:8
rivate
[4] 13:10 49:4 93:19 124:8
rivileges
[1] 134:10
robable
[1] 120:21
robative
[1] 71:8
...blem
[2] 45:10 79:24
roblems
[5] 60:19 141:7 142:14 146:8 146:10 170:1
rocedural
[1] 172:6
roceed
[6] 3:4 4:8 5:22 6:17 6:24 71:12 89:13 161:11
roceeding
[2] 134:4 153:2 174:14
roceeds
[1] 8:20
rocess
[1] 81:21
rofession
[1] 123:16
rofessional
[4] 48:21 49:3 49:7 63:5 90:16 93:1 94:13 95:1 95:3
8:11 123:17 124:10 127:14 129:5
roject
[2] 47:14 47:15 48:17
rojects
[2] 47:18 93:2 93:21
rompted
[1] 166:23
ronounced
[1] 150:9
roof
[12] 71:1 122:18 122:20 123:6 147:22 163:13 163:15
5:13 169:5 171:10 173:13
roofed
[1] 11:1
oofing
[...42:12 144:9 147:20
roper
[2] 133:20 144:17
roperly

Properties
[16] 1: 19:19 36:17 71:23
Property
[70] 7:21 10:13 14:10 15:12 17:9 17:13 19:21 21:5 23:
11 24:11 24:18 24:21 24:23 24:25 25:2 26:8 27:8 27:
12 27:14 27:15 27:21 36:15 36:16 37:14 38:13 38:15
39:13 44:19 54:7 57:5 68:5 70:5 71:16 71:17 71:20 73:
9 74:24 76:5 76:7 77:19 81:2 81:7 98:16 104:7 104:9
108:22 109:20 111:5 112:4 112:7 112:9 126:21 127:3
127:12 127:20 127:23 138:15 138:16 139:11 139:14
140:3 140:20 140:25 146:24 147:4 158:9 161:6 161:9
167:3 173:22
Proposal
[4] 142:6 142:23 143:12 144:19
Proposals
[1] 152:18
Propose
[2] 141:15 142:7
Proposed
[3] 142:8 142:14 142:20
Prosecutor
[6] 4:19 49:14 49:15 70:25 134:21 152:7
Prosecutors
[3] 88:11 88:18 163:21
Prove
[4] 10:5 10:18 87:22 164:13
Provide
[8] 75:1 132:1 132:8 133:19 135:7 135:21 136:14 161:
25
Provided
[2] 75:2 161:16
Proving
[1] 164:15
Provision
[1] 131:21
Public
[1] 124:6
Pulled
[1] 109:9
Purchase
[1] 138:15
Purchased
[3] 5:11 138:16 139:3
Purchasing
[1] 78:18
Purpose
[13] 18:14 22:25 55:20 55:22 97:18 105:17 105:25
106:2 108:4 127:15 131:3 131:5 171:13
Purposes
[3] 105:6 105:19 150:8
Purview
[3] 134:20 134:22 166:8
Pushing
[1] 19:12
Put
[24] 5:6 55:7 60:16 62:16 66:15 89:4 90:4 101:25 105:
10 114:17 117:14 128:7 134:4 137:15 144:4 147:9 147:
19 149:8 155:18 155:18 156:19 164:24 168:15 170:14
Putting
[3] 14:1 116:24 141:3
Pyramid
[1] 108:3

Q

Qualifications
[1] 161:18
Qualified
[10] 48:24 48:25 49:17 65:12 65:20 65:20 96:25 97:8
125:18 126:4
Qualify
[3] 49:9 49:22 125:22
Quarter
[2] 116:12 171:22
Quarters

Questioning
[4] 30:17 32:11 71:12 136:3
Questions
[15] 28:3 29:20 30:12 38:4 46:14 58:4 69:21 87:2 97:
10 120:12 136:1 136:22 153:20 154:12 170:16
Quick
[1] 58:15
Quickly
[3] 57:12 67:25 82:17
Quite
[8] 101:2 106:16 106:21 108:7 111:7 114:18 118:19
121:23

R

Rains
[2] 79:6 80:7
Rainstorm
[1] 130:8
Raise
[2] 171:9 171:14
Ran
[2] 55:1 55:4
Rang
[1] 145:20
Ranges
[1] 72:6
Rate
[2] 96:18 96:21
Reach
[2] 162:11 162:12
Read
[6] 4:5 7:20 43:19 43:21 82:18 82:20
Reading
[1] 163:5
Ready
[3] 3:4 5:21 5:23
Realized
[1] 91:11
Really
[13] 5:18 20:1 23:19 46:7 53:25 54:2 74:11 74:13 79:6
79:6 81:6 136:18 139:17
Rear
[4] 22:4 97:21 118:18 140:2
Reason
[3] 5:15 26:22 132:4
Reasonable
[11] 10:5 11:1 78:19 87:22 105:21 163:15 169:5 169:
22 170:22 171:4 171:9
Reasonably
[1] 116:13
Reasons
[4] 4:11 106:3 119:4 150:2
Rebar
[1] 14:1
Rebut
[1] 135:22
Rebuttal
[4] 137:23 157:12 159:3 161:25
Recalling
[1] 46:20
Receive
[7] 14:24 16:21 26:4 26:10 30:10 48:2 124:1
Received
[17] 16:13 16:17 17:2 29:8 29:17 29:18 29:24
43:25 45:24 48:5 48:19 51:22 96:5 100:17 156:8 156:
12
Recent
[1] 171:20
Recently
[1] 104:24
Recess
[4] 90:1 137:11 162:16 168:23
Recognize

**Recognized**
[1] 99:10
[1] 90:5
**Recollection**
[?] 41:11 160:6
**...commendations**
[?] 54:20 65:5
**Recommended**
[2] 64:22 64:24
**Record**
[14] 5:6 6:18 7:4 23:15 34:17 39:13 47:7 95:15 100:5
33:7 136:7 136:8 159:6 160:25
**Recorded**
[1] 30:6
**Records**
[2] 23:25 156:18
**Recounted**
[1] 77:14
**Recross**
[2] 46:16 121:19
**Redirect**
[7] 44:13 44:15 66:2 66:4 69:20 120:13 120:15
**Redo**
[1] 68:21
**Reduce**
[1] 99:1
**Reduced**
[1] 98:23
**Refer**
[4] 53:1 98:6 102:9 115:14
**Reference**
[3] 81:23 121:5 139:21
**Referred**
[4] 31:24 102:11 103:8 114:14
**Referring**
[14] 32:21 32:22 32:25 40:12 41:22 43:10 43:14 53:2
54:21 80:24 98:7 102:15 107:23 116:18
**...ers**
[:7
**Reflect**
[3] 34:18 95:16 100:6
**Refresh**
[1] 41:11
**Refused**
[1] 146:13
**Regard**
[29] 21:13 34:1 59:13 59:18 60:25 62:22 63:10 64:20
55:6 65:7 65:12 71:1 81:11 81:15 105:16 107:11 129:
0 130:2 139:14 139:23 142:6 148:13 149:4 151:11 151:
25 152:19 153:4 153:20 163:15
**Regarding**
[12] 14:25 15:10 25:14 26:5 26:11 27:1 32:17 42:20
13:5 73:1 75:7 98:21
**Regardless**
[2] 118:5 161:5
**Registered**
[1] 42:4
**Reinforced**
[7] 114:7 114:8 114:12 115:1 118:12 120:5 167:7
**Reinforcement**
[2] 113:25 117:20
**Reinforcing**
[1] 115:2
**Reinspect**
[1] 13:19
**Relates**
[1] 49:24
**Relationship**
[1] 16:1
**...latively**
30:14
**...elevance**
[3] 71:8 150:20 150:25
**Relevant**

**Remain**
[3] 87:5 90:17 138:4
**Remedied**
[1] 63:25
**Remember**
[2] 37:18 42:13
**Remind**
[1] 152:7
**Remove**
[2] 80:2 148:15
**Removed**
[2] 149:1 150:5
**Removing**
[2] 142:15 142:18
**Render**
[3] 123:2 158:8 169:19
**Rendered**
[4] 4:22 164:25
**Rendering**
[1] 160:11
**Renew**
[2] 87:17 161:19
**Renewal**
[1] 94:10
**Repair**
[14] 8:12 10:17 27:17 61:19 85:14 102:6 108:16 144:8
152:19 152:19 163:11 166:3 166:9 169:14
**Repaired**
[6] 19:20 19:22 130:9 130:12 155:9 156:4
**Repairs**
[15] 77:3 77:22 106:17 130:3 141:5 143:21 144:16
145:9 146:22 151:1 155:3 155:10 155:21 156:16 156:
22
**Reparative**
[1] 107:2
**Repaved**
[2] 130:6 148:22
**Repaving**
[1] 105:2
**Repeat**
[1] 82:1
**Repetitive**
[2] 32:7 122:15
**Rephrase**
[2] 16:19 156:6
**Replied**
[1] 146:5
**Report**
[34] 4:22 4:24 25:15 25:17 26:4 26:24 29:13 43:25 45:
19 46:11 51:9 51:21 57:7 57:11 64:18 75:1 75:2 98:21
99:4 99:15 100:4 100:7 115:14 131:16 131:21 131:25
133:21 136:12 136:15 159:16 161:15 161:16 164:14
164:20
**Reporter**
[3] 43:19 43:21 82:20
**Representation**
[1] 21:5
**Representative**
[1] 135:4
**Request**
[12] 4:11 5:23 73:8 76:6 88:16 88:17 143:24 144:10
145:2 145:3 159:12 165:3
**Requested**
[1] 126:8
**Requesting**
[1] 3:10
**Require**
[4] 13:18 118:17 167:12 171:8
**Required**
[2] 94:9 159:17
**Requires**
[4] 10:15 49:3 169:3 169:10
**Resealed**

**Resealing**
[2] 105:2 149:4
**Research**
[2] 172:13 172:15
**Resecure**
[1] 101:8
**Resent**
[6] 64:8 64:11 79:4 95:20 130:11 138:25
**Reserve**
[3] 11:4 11:5 89:11
**Reside**
[4] 71:14 138:18 138:19 138:20
**Resided**
[3] 10:8 138:24 152:8
**Residence**
[1] 154:15
**Resident**
[2] 9:8 10:23
**Residential**
[3] 48:14 48:15 49:24
**Resists**
[1] 109:10
**Resolution**
[1] 45:10
**Respect**
[7] 49:12 111:5 115:14 140:9 152:11 159:23 160:3
**Respectfully**
[4] 5:23 6:21 8:23 165:3
**Respond**
[1] 87:1
**Response**
[5] 4:4 16:7 17:5 88:15 145:2
**Responsibilities**
[3] 11:22 12:15 12:19
**Responsibility**
[1] 13:17
**Responsible**
[4] 78:14 93:4 135:12 135:13
**Rest**
[5] 87:6 87:13 111:16 116:12 157:8
**Resting**
[1] 126:20
**Restored**
[1] 119:1
**Result**
[13] 22:19 30:5 96:24 107:9 141:14 142:23 145:7 146:
1 147:1 151:23 152:16 164:2 172:1
**Resurfaced**
[1] 104:24
**Resurfacing**
[1] 149:5
**Retain**
[3] 74:20 108:7 134:21
**Retained**
[6] 3:22 10:24 25:8 43:24 159:13 160:2
**Retaining**
[27] 8:10 15:15 15:17 28:1 49:5 52:6 56:13 57:19 63:
21 63:21 65:23 66:20 94:5 94:6 97:21 108:14 108:20
124:16 124:20 125:1 125:14 128:1 134:25 166:13 169:
11 172:25 173:11
**Retired**
[1] 124:7
**Retirement**
[2] 93:8 93:13
**Return**
[3] 30:8 54:6 68:6
**Reveals**
[1] 163:6
**Review**
[1] 12:1
**Rights**
[1] 134:10
**Ringing**

76:16
ise
] 92:7
iver
80:11 81:5 81:6
ad
] 1:7 2:5 16:4 16:5 16:6 25:1 28:19 28:20 32:23 37:
44:17 45:1 71:15 81:19 140:4 142:10 146:11
oads
] 121:24
ock
] 92:12
od
5] 53:21 53:22 62:6 62:23 63:3 102:22 102:23 106:
113:25 121:1 127:9 127:11 127:21 128:3 128:22
ods
5] 62:2 62:24 101:9 101:24 102:1 102:8 102:18 104:
114:6 114:8 114:12 114:17 114:20 114:22 114:23
115:1 116:24 117:14 120:18 120:22 121:23 122:7 127:
129:1 129:4
oll
] 135:3
on
] 3:14 9:6 51:9 54:15 150:1
onald
] 10:20 11:10
Rotenberg
2] 1:5 3:3 5:9 10:7 73:6 73:12 73:19 73:24 76:2 76:
76:18 76:22 77:2 77:13 77:16 78:2 78:8 78:11 84:7
84:8 85:13 86:6 86:12 86:18 96:15 137:3 138:3 138:
153:7 153:18 154:12 157:5
Rotenberg's
] 76:1 76:6 76:9 77:22 98:8
Rotenbergs
] 41:23 84:2
otfeld
] 43:25 47:8 47:10 47:13
otfeld(ph
2:24
.ie
] 159:21
Ruled
] 172:10
uler
] 36:8
Ruling
] 8:24
un
] 14:9 69:3 80:24 93:2 130:23
uns
] 17:23 19:18 19:20 22:1 22:2 81:4
ust
0] 55:16 60:10 67:4 67:10 67:13 67:20 67:24 68:1
21:23 122:7
usted
2] 18:9 18:11 18:21 34:4 34:5 34:7 34:23 52:11 54:
55:9 55:18 56:6 60:1 67:3 115:8 115:12 121:22
21:25 122:5 122:5 166:18 168:4
usting
] 60:9 115:3 115:5 121:4
usty
] 114:10

## S

afe
] 15:16 15:24 154:2 154:3
afety
] 73:22
alanitro
2] 29:14 74:15
'e
:17 84:22 85:11 139:6 139:11 139:18 139:19 153:
0 153:22
anded
] 147:21

Sandy
[1] 66:15
Satisfy
[1] 159:22
Satisfying
[1] 168:11
Saw
[11] 25:1 28:19 40:19 52:5 65:4 104:4 126:22 127:2
169:18 170:23 170:23
Scaffolding
[4] 144:21 145:16 146:17 147:9
Scenario
[1] 117:2
Scheduled
[1] 158:24
School
[3] 13:4 91:13 123:21
Schools
[1] 13:5
Science
[1] 47:25
Scope
[3] 69:9 69:16 121:17
Screw
[1] 53:23
Seal
[5] 49:1 49:4 105:6 106:5 147:20
Seat
[2] 71:11 136:8
Second
[17] 23:21 41:15 42:9 42:15 42:18 49:21 72:12 88:9
111:22 134:13 135:19 156:12 156:20 157:15 157:17
161:13 165:22
Secondly
[3] 5:2 21:14 80:1
Secretary
[2] 30:1 30:7
Section
[12] 10:13 19:20 87:23 89:1 101:20 116:11 163:3 163:
5 164:16 164:18 165:24 168:12
Secure
[2] 102:2 168:8
See
[26] 4:4 18:2 18:11 24:25 28:20 38:1 44:22 44:23 44:
25 53:14 60:18 88:18 100:23 110:7 110:10 110:11 110:
12 116:6 119:16 127:22 129:4 131:25 133:15 150:19
150:24 160:12
Seeking
[1] 3:13
Seem
[11] 18:9 18:10 34:4 34:6 34:7 35:2 53:5 60:15 61:12
86:3 103:25
Sees
[2] 170:23 170:24
Sell
[2] 5:14 85:17
Selling
[3] 73:20 84:7 85:15
Seminar
[2] 135:7 135:10
Send
[4] 43:3 78:3 78:7 168:18
Senior
[1] 145:14
Sense
[2] 58:22 120:25
Sent
[3] 4:5 42:4 43:1
Sentence
[1] 7:15
Separate
[2] 31:1 31:2
Separated
[1] 167:21

Separates
[2] 71:22 142:3
Separation
[2] 19:7 104:14
September
[9] 4:17 8:4 6:8 10:12 24:12 25:5 28:12 37:10 155:19
Serve
[3] 88:22 105:17 106:1
Served
[8] 6:3 45:6 88:12 89:4 150:16 152:23 159:20 163:2
Service
[4] 3:25 74:20 92:23 152:25
Services
[11] 3:18 25:9 43:24 50:17 92:20 93:18 96:16 96:19
97:24 140:16 160:9
Session
[1] 101:21
Set
[6] 4:12 5:4 7:23 88:24 169:4 172:4
Sets
[3] 7:22 59:20 95:10
Setup
[1] 146:17
Seven
[1] 101:17
Seventy
[1] 108:25
Seventy-five
[1] 108:25
Several
[10] 3:14 43:15 86:5 95:4 105:4 105:18 106:3 107:3
119:4 151:8
Severe
[1] 67:5
Severely
[2] 52:11 54:15
Shall
[3] 163:10 166:2 169:12
Sheet
[1] 58:14
Shift
[7] 116:9 116:17 117:11 117:12 166:6 166:7 168:9
Shifted
[11] 19:9 56:20 115:15 115:19 116:12 116:23 119:21
127:24 165:17 167:23 168:5
Shifting
[6] 44:25 106:8 106:9 106:14 171:19 171:21
Short
[8] 67:15 89:14 90:11 131:7 137:11 162:14 162:16
168:23
Shortly
[1] 78:12
Show
[4] 66:12 66:13 99:11 99:20
Showed
[1] 130:5
Shows
[1] 166:5
Side
[65] 19:21 22:2 51:15 55:7 75:10 75:11 75:11 75:23
76:5 76:10 80:25 81:2 81:7 84:24 86:8 98:7 98:8 98:8
98:9 98:14 98:16 98:18 100:21 100:22 101:13 101:14
101:14 102:1 103:24 103:25 104:7 104:22 105:13 105:
14 110:11 110:12 110:20 111:2 111:9 111:10 111:14
113:13 113:19 116:4 116:4 116:6 140:5 140:6 140:7
142:9 142:17 142:24 142:25 143:12 144:19 144:20
145:4 146:22 147:3 147:6 147:11 147:13 148:3 148:4
170:9
Sides
[3] 51:13 51:14 51:18
Sidewalks
[1] 27:23
Sidewall
[1] 22:11
Signature

] 49:3
ignificance
] 55:19
igns
104:25

, 14:9
imilar
] 102:3 114:22
imply
] 103:22
imultaneously
] 145:19
it
] 32:24 107:24 136:24
ite
4] 4:21 28:10 28:17 41:2 50:7 58:12 94:1 107:10
09:16 129:21 147:5 160:7 164:10 172:21
ited
] 22:3
its
] 109:10
ituation
] 66:24 86:4
ix
] 94:18 103:15 115:11 125:10 149:9
ize
] 103:18 127:6
ketch
] 58:15
lid
] 101:21 116:2
light
] 53:12
lightly
] 53:8 54:5 61:5 116:23 142:16
lope
4:2
ped
] 130:16 130:22
lowly
] 108:2
mall
] 48:13 93:21
ociety
] 95:1 95:3 95:4
oil
] 53:24 62:25 66:10 66:11 66:15 92:12 105:7 108:7
08:9 129:2
oils
] 66:13
olely
] 5:15
omeone
] 8:9 77:2 168:16
omers
] 12:9 12:11
ometime
] 28:11 54:18 61:15
ometimes
] 151:19
omewhat
] 87:18 114:10
omewhere
] 28:14 30:12 92:18 110:17 110:20
on(ph
] 140:12
orry
] 45:20 50:9 79:5 85:8 131:4 138:19 146:19 155:13
rt
:2 30:6 94:7 118:16
orts
] 145:16
ound

Sounds
[2] 41:13 162:8
Source
[1] 167:14
Sources
[1] 26:11
Space
[1] 47:25
Spaced
[2] 68:15 68:16
Span
[4] 52:8 54:22 127:1 153:2
Special
[1] 147:21
Specialist
[1] 66:23
Speciality
[1] 91:20
Specializes
[3] 63:7 65:22 66:22
Specific
[1] 124:10
Specifically
[4] 5:6 7:21 15:21 91:5
Specificity
[1] 167:10
Spell
[1] 33:4
Spend
[2] 91:6 91:7
Spot
[2] 68:13 128:21
Spring
[3] 5:11 36:25 38:9
Square
[1] 62:2
Stability
[4] 63:11 107:12 107:17 123:3
Stabilize
[8] 54:2 55:8 55:18 56:23 57:22 61:23 117:8 117:9
Stabilized
[6] 60:16 106:20 117:7 127:3 129:10 171:24
Stabilizing
[2] 118:9 127:6
Stable
[9] 102:6 107:15 107:19 119:20 121:9 129:7 129:8
170:4 172:25
Staff
[2] 16:25 42:15
Stainless
[1] 121:24
Stairs
[1] 27:22
Stand
[2] 137:4 137:15
Standard
[1] 171:5
Standards
[1] 171:8
Standing
[8] 90:17 109:19 109:22 110:6 111:4 111:13 130:20
138:4
Start
[3] 30:20 134:25 146:17
Started
[5] 48:17 91:1 91:15 92:5 93:9
State
[14] 1:2 10:14 12:22 47:6 48:8 48:20 49:19 49:22 49:
22 87:24 123:17 123:23 125:5 163:4
Statement
[4] 51:9 65:21 76:2 162:21
Statements

States
[1] 134:11
Stating
[1] 166:21
Stations
[1] 92:22
Statute
[9] 163:17 166:9 169:10 169:21 171:4 171:7 172:13
172:15 172:21
Stay
[5] 9:16 9:19 87:7 94:10 119:16
Stays
[1] 136:7
Steel
[25] 18:7 34:1 34:22 35:3 53:16 53:21 53:21 55:14 56:
21 61:9 61:18 61:25 62:7 92:9 92:14 101:9 102:18
106:18 106:25 114:9 116:25 121:22 121:24 122:6 166:
16
Step
[2] 16:11 123:9
Steps
[1] 130:1
Steve
[1] 3:16
Still
[8] 60:10 81:5 89:5 90:3 129:14 153:7 153:10 167:11
Stone
[76] 17:24 18:1 18:25 19:4 19:5 19:10 34:8 34:9 36:3
52:6 52:10 52:14 53:5 53:6 53:11 54:9 54:14 54:19 54:
22 54:24 55:2 55:5 55:18 55:21 55:25 56:10 56:16 57:
18 59:3 59:17 59:21 59:25 60:14 60:19 60:21 61:20
62:15 68:3 68:20 69:5 72:10 100:23 101:2 101:3 101:
5 101:9 104:1 104:4 107:12 107:23 108:6 109:5 109:
15 109:16 110:7 110:11 111:12 111:24 112:6 112:20
112:23 113:14 114:2 114:14 114:18 115:2 116:13 121:
6 126:20 126:22 129:7 129:14 166:16 167:16 167:18
170:4
Stones
[1] 107:25
Stonewalls
[1] 113:1
Stood
[1] 108:24
Stop
[6] 32:11 82:14 85:7 86:19 117:12 131:7
Stoppers
[1] 70:7
Stops
[12] 65:2 70:9 70:10 104:16 105:16 130:25 131:2 131:
3 131:6 154:5 155:18 156:19
Straight
[4] 54:8 56:13 60:15 115:22
Strapping
[1] 164:14
Street
[6] 79:7 80:7 97:2 126:21 127:4 127:20
Strenuously
[2] 4:10 133:23
Stricken
[5] 40:4 62:21 82:1 83:24 131:20
Strike
[9] 40:1 62:19 72:17 79:8 81:23 83:23 85:6 132:5 161:
19
Structural
[28] 3:18 3:19 3:20 3:21 4:2 48:15 55:19 60:11 63:10
64:22 65:9 65:13 65:22 66:6 66:18 66:22 73:15 73:21
73:25 107:12 107:17 122:25 134:25 141:6 146:4 146:
13 147:24 164:23
Structurally
[14] 8:11 10:16 144:7 163:10 165:1 166:3 166:20 167:
1 167:19 168:4 169:13 169:20 170:2 171:17
Structure
[6] 27:24 27:25 60:13 72:5 111:17 156:21
Structures
[10] 10:15 27:16 27:17 27:20 93:21 94:4 163:7 163:8

**tucko**
5] 86:2 104:13 104:14 104:24 105:23 110:1 110:12
9:4 119:8 119:13 130:10 130:11 145:16 147:13 147:

**iff**
5:9

**iubject**
0] 3:20 22:4 27:21 46:1 51:19 88:3 125:11 126:8
39:24 143:7

**iubmit**
] 168:3 168:9

**iubsequent**
] 128:13 155:10 155:22 156:15

**iubstance**
] 109:10

**iubstantial**
] 84:24 119:2

**iubstantiating**
] 7:10

**iuffice**
] 166:19

**iufficient**
] 6:6 49:16 122:22 171:14 173:14

**iuggest**
] 166:4 167:4

**iuggested**
] 97:20

**iuited**
] 65:23

**iummarize**
] 48:9

**iummer**
2] 4:16 6:3 10:7 16:10 26:18 26:21 27:9 27:11 28:17
9:3 29:7 37:20 41:7 41:17 42:19 45:13 45:17 45:18
3 46:4 46:12 87:20 88:10 88:22 132:22 152:24
] 163:20 164:4 164:6 164:8 165:6

**iummonses**
] 6:22 26:19

**iupervise**
] 47:17

**iupervised**
] 124:23

**iupervision**
] 128:1

**iupplement**
] 4:25

**iupplied**
] 25:15

**iupport**
] 55:15 88:25 167:16 171:6 173:4

**iupporting**
] 55:21 88:14 88:16 88:19 163:21

**iupposed**
] 7:9

**iurface**
] 67:24 104:9 104:12 104:18 116:7 122:6

**iurfaced**
] 128:25

**iurfaces**
] 168:2

**iurrounding**
] 30:16

**iurvey**
] 20:1 94:1 94:2 94:2

**iUSAN**
] 2:3

**ispect**
08:22 128:6

**iustain**
] 163:13 173:14

**iustained**

12 165:12

**Swear**
[5] 46:24 70:19 90:18 123:9 138:5

**Swell**
[1] 149:9

**Sworn**
[6] 11:12 47:1 70:21 90:20 123:12 138:7

**Syllable**
[1] 143:6

**System**
[2] 102:2 155:15

---

# T

**Talks**
[1] 82:17

**Tall**
[1] 17:22

**Tank**
[3] 148:15 149:1 150:5

**Tapered**
[2] 61:4 110:13

**Tapers**
[2] 61:6 129:20

**Task**
[1] 35:4

**Technicians**
[1] 47:18

**Technology**
[1] 91:3

**Telephone**
[2] 40:24 41:3

**Temperature**
[1] 119:17

**Ten**
[12] 12:4 45:8 45:15 47:11 64:12 72:6 72:8 92:19 126:
23 127:8 168:14 168:22

**Term**
[4] 13:21 102:13 103:1 103:10

**Terminology**
[1] 113:24

**Terms**
[4] 74:13 114:24 144:8 160:13

**Testified**
[51] 11:13 23:16 24:21 30:22 31:12 32:6 36:1 36:10
37:19 40:6 43:15 47:2 58:18 59:18 60:24 61:1 62:7 63:
13 67:1 68:24 70:22 82:22 85:16 90:21 105:22 106:6
106:8 107:20 112:1 113:23 114:11 120:6 123:13 125:2
125:8 125:18 138:8 152:9 154:5 156:1 160:15 164:2
164:20 165:15 166:7 166:11 167:5 167:24 170:3 170:
21 171:15

**Testify**
[14] 9:3 9:16 9:24 21:13 24:6 86:25 94:14 123:7 125:
11 133:16 151:7 156:3 169:23 170:2

**Testifying**
[2] 16:16 31:25

**Testimony**
[47] 9:21 28:9 29:15 32:14 32:17 33:9 34:3 59:24 60:3
61:9 63:9 71:9 75:22 87:3 87:4 87:10 88:1 96:24 111:
1 122:9 122:23 131:19 131:20 131:23 132:3 132:5 133:
24 134:1 134:8 135:16 135:20 135:23 137:1 161:20
163:24 164:14 164:16 166:5 166:15 166:21 169:16
170:20 170:20 170:25 171:12 171:14 172:1

**Themselves**
[3] 122:7 134:8 134:10

**Ther**
[1] 141:6

**Thereafter**
[1] 148:10

**Therefore**
[2] 6:17 165:22

**Thick**
[1] 113:10

**Thicker**
[1] 108:1

[1] 113:9

**Third**
[4] 14:6 80:5 116:11 171:22

**Thirds**
[1] 103:23

**Thirty**
[1] 120:20 159:20

**Thirty-three**
[1] 148:6

**Thirty-two**
[1] 148:6

**Thorough**
[3] 4:21 65:24 66:6

**Three**
[32] 10:19 13:14 29:20 50:14 53:13 56:2 62:5 68:12
79:22 82:10 89:5 91:5 98:5 100:25 101:21 103:5 103:
23 104:15 109:25 111:8 113:18 124:9 127:1 129:20
131:1 132:19 138:23 154:7 155:20 159:7 167:22 167:
25

**Throughout**
[1] 153:1

**Tie**
[67] 18:7 18:10 18:14 18:17 34:1 34:10 34:22 35:3 52:
10 53:17 53:19 54:13 54:14 55:6 55:14 55:24 56:21
56:25 57:21 57:24 59:19 59:20 59:20 59:21 59:24 60:
15 61:10 61:18 64:1 66:14 66:17 67:1 67:5 67:14 67:
20 68:8 69:22 102:12 102:15 104:3 114:23 115:1 115:
7 116:14 118:11 120:5 120:16 121:5 121:21 122:2 122:
3 127:3 127:6 127:17 128:2 128:7 128:10 128:15 128:
22 129:11 166:16 166:19 167:10 168:5 168:7 170:7
171:24

**Ties**
[1] 128:3

**Tight**
[1] 142:21

**Tilt**
[2] 115:24 116:6

**Tilted**
[1] 116:1

**Tipping**
[2] 62:12 62:17

**Title**
[1] 47:24

**Today**
[18] 5:19 6:11 6:14 6:17 31:7 107:11 132:3 154:4 158:
3 159:9 169:6 169:7 170:24 172:2 173:9 173:10 173:
14 173:22

**Together**
[2] 168:15 173:19

**Tone**
[1] 78:16

**Took**
[25] 16:9 20:7 21:12 30:3 37:7 37:22 38:16 46:11 58:
18 58:20 58:25 63:15 64:5 84:22 85:11 91:3 91:18 92:
4 93:8 98:20 106:14 111:8 116:23 131:16 141:12

**Top**
[23] 17:25 17:25 18:10 19:9 19:9 52:14 52:25 53:4 54:
24 57:18 62:14 64:25 72:13 79:24 98:14 104:23 107:
17 107:24 113:13 130:3 167:20 170:5 171:16

**Topic**
[1] 135:8

**Topics**
[1] 94:24

**Topped**
[1] 126:23

**Torn**
[1] 118:24

**Total**
[2] 115:10 148:5

**Totally**
[1] 121:3

**Toward**
[2] 105:10 115:15

**Towards**
[2] 116:1 160:11

## Town
[57] 1:1 1:11 1:11 2:4 3:2 3:16 3:16 3:17 7:12 7:19 7:22
:23 9:7 9:8 9:9 10:10 10:21 10:22 10:24 11:18 12:3
12:9 12:10 12:16 14:21 15:1 17:14 17:15 22:23 47:19
*:19 49:14 49:15 50:17 50:22 50:24 64:18 64:21 70:
3:1 75:2 79:5 80:6 80:12 80:24 134:19 134:20
.25 135:11 149:19 151:17 152:12 153:3 160:1 160:
.3 165:8 169:17

## Town's
1] 166:23

## Track
1] 39:17

## Trade
1] 13:5

## Training
1] 28:7

## Transcript
1] 174:14

## Treat
1] 7:25

## Trees
1] 80:2

## Trial
16] 5:4 6:9 6:15 6:25 7:1 8:20 87:6 88:4 132:23 132:
24 134:12 134:15 134:16 135:14 158:22 158:23

## Tried
2] 55:11 83:10

## Trigger
1] 85:12

## Troubling
1] 171:2

## Truck
1] 145:20

## True
21] 28:16 28:21 28:23 29:1 29:6 39:19 39:22 39:23
4:8 56:13 61:16 61:17 61:18 75:25 76:21 84:21 85:9
* 12 85:22 117:2 174:13

## st
., 146:5

## Truthfully
1] 38:4

## Try
3] 8:17 18:15 45:14 78:21 101:8 107:8 154:4 162:12

## Trying
4] 82:16 133:19 157:15 159:22

## Turn
1] 32:12

## Turned
1] 142:16

## Twelve
5] 17:23 111:20 126:23 127:10 127:11

## Twenty
1] 17:22 72:6 72:8 159:20

## Twice
1] 6:2

## Two
18] 5:3 5:13 5:17 7:1 9:13 9:17 13:4 16:1 18:5 19:19
9:25 21:25 22:16 31:15 39:24 45:3 59:20 62:5 68:12
8:25 69:15 71:23 72:10 79:21 82:10 91:3 100:10 109:
109:24 113:13 113:21 114:19 116:19 124:9 129:14
32:19 133:25 142:15 142:18 145:12 145:14 152:24
53:20 153:21 154:20 164:24 165:18 168:1

## Two-car
] 93:24

## Two-thirds
] 100:24

## Type
5] 50:6 53:23 62:15 63:8 66:13 66:20 66:24 100:10
*:15 102:2 107:22 114:17 119:13 119:13 128:2

## pes
1] 91:22 114:19 114:21

## Typical
] 62:15

---

## U

## Uncorrected
[2] 113:1 113:5

## Under
[6] 7:12 7:19 7:24 8:19 171:6 172:20

## Undetermined
[2] 7:16 104:23

## Unfortunately
[1] 5:11

## Unfounded
[1] 134:2

## United
[1] 134:11

## University
[2] 48:1 123:19

## Unknown
[1] 57:23

## Unless
[1] 158:19

## Unnecessary
[1] 122:15

## Unrepaired
[1] 113:6

## Unresponsive
[1] 62:20

## Unseen
[1] 116:22

## Unsound
[2] 169:20 170:3

## Unsoundness
[1] 166:25

## Unstable
[1] 66:16

## Up
[26] 6:4 15:8 17:18 28:22 33:1 42:18 46:7 53:14 69:18
71:5 72:11 74:5 74:9 74:14 74:16 75:12 76:20 94:10
98:19 108:2 118:24 123:9 129:15 147:9 151:15 170:16

## Upkeep
[1] 27:17

## Upper
[18] 34:6 59:13 59:22 65:3 98:16 102:16 104:6 106:10
111:24 115:15 120:16 121:9 121:21 122:1 129:9 129:
10 129:24 171:20

## Useful
[1] 60:4

## Useless
[1] 121:3

---

## V

## Valhalla
[1] 124:10

## Value
[4] 60:4 60:10 60:11 71:8

## Vantage
[1] 134:19

## Various
[4] 30:16 124:7 141:20 172:6

## Vary
[1] 62:23

## Vehicle
[2] 64:24 154:16

## Vehicles
[3] 70:2 105:21 154:18

## Verdict
[3] 89:12 89:22 165:3

## Vertical
[1] 52:8

## Vice
[1] 145:14

## Victim
[1] 166:25

## View

---

## Viewing
[1] 21:23

## Violate
[3] 10:12 43:12 44:5

## Violated
[4] 27:16 87:23 163:5 168:12

## Violation
[40] 7:18 10:19 22:4 27:11 28:18 41:5 41:12 41:14 41:
15 41:16 41:19 42:9 42:15 42:17 42:18 42:21 42:25
43:1 43:3 43:6 43:14 45:5 45:23 88:9 132:21 150:17
151:2 152:23 153:1 156:8 156:13 156:16 163:3 163:16
164:5 164:8 164:15 164:18 165:6 165:23

## Violations
[12] 5:16 10:25 27:14 28:24 29:3 29:6 42:5 45:3 46:1
88:10 155:22 165:20

## Visible
[6] 109:22 110:1 111:13 111:16 117:1 147:14

## Visit
[15] 23:11 23:15 23:18 23:20 23:21 24:18 26:14 28:17
38:12 40:16 50:25 57:4 58:12 107:9 149:20

## Visited
[6] 4:20 24:20 24:22 164:10 165:16 166:11

## Visits
[1] 150:3

## Visual
[4] 32:18 32:20 32:22 72:4

## Visually
[4] 36:21 44:17 53:14 165:14

## Vite
[4] 95:10 95:17 96:10 99:14

## Voice
[1] 15:7

---

## W

## Wait
[3] 38:6 45:12 75:5

## Waited
[2] 46:3 46:3

## Wake
[1] 73:16

## Walk
[1] 33:1

## Walked
[2] 111:10 126:21

## Wall
[445] 3:20 8:10 14:2 14:9 15:10 15:15 15:15 15:18 15:
23 16:2 17:21 17:22 17:24 17:25 17:25 18:2 18:3 18:6
18:8 18:8 18:12 18:15 18:18 18:23 19:4 19:12 19:12
19:18 19:23 20:5 21:22 21:25 22:1 22:3 22:5 22:7 22:
9 22:16 22:22 23:3 23:5 23:17 24:25 25:14 25:19 25:
22 26:5 26:8 28:1 28:11 28:19 28:20 28:22 29:2 30:14
32:18 33:1 33:7 33:10 33:13 34:11 34:15 35:2 35:8 35:
9 35:10 36:22 37:21 39:20 39:24 43:12 44:4 44:16 44:
21 44:23 49:5 51:11 51:12 51:19 52:1 52:6 52:9 52:10
52:12 52:14 52:15 52:17 52:25 53:4 53:5 53:6 53:6 53:
7 53:10 53:11 53:12 53:17 53:22 53:24 54:1 54:3 54:4
54:6 54:8 54:9 54:14 54:15 54:19 54:22 54:24 54:
24 54:25 55:2 55:5 55:12 55:15 55:18 55:21 55:25 56:
10 56:11 56:12 56:13 56:14 56:16 56:16 56:19 56:24
57:15 57:17 57:17 57:18 57:19 57:20 57:23 58:21 58:
22 59:4 59:17 59:21 60:1 60:13 60:14 60:19 60:20 60:
21 60:25 61:15 62:12 62:14 62:15 63:1 63:2 63:21 63:
22 63:24 63:25 64:23 64:25 65:8 65:13 65:21 66:9 66:
10 66:16 67:14 68:3 68:3 68:5 69:1 69:6 69:24 71:
22 72:1 72:4 72:5 72:10 72:14 73:2 73:10 73:14 73:15
73:17 73:22 74:1 74:9 74:24 75:7 75:13 75:23 76:1 76:
5 76:11 76:20 76:23 77:3 77:17 77:22 78:15 78:24 79:
4 79:19 79:22 80:3 80:6 80:10 80:25 81:1 81:16 81:24
82:3 83:17 85:3 85:3 85:14 85:24 86:2 86:8 88:3 97:
21 97:24 97:25 98:9 98:7 98:14 98:22 100:21 100:23
100:24 101:1 101:2 101:3 101:3 101:5 101:6 101:8
101:10 101:13 101:14 101:17 101:19 101:25
102:5 102:6 102:24 103:4 103:12 103:15 103:16 103:
18 103:22 103:24 104:1 104:4 104:6 104:12 104:16
104:22 104:23 105:3 105:8 105:11 105:13 105:15 105:
20 105:21 105:23 106:9 106:10 107:8 107:12 107:18
107:22 107:23 108:8 108:14 108:21 108:21 108:25
109:5 109:6 109:6 109:8 109:17 109:21 109:21 110:7

Proceedings-Rotenberg                                                            194

10:13 110:17 110:20 110:22 Case 7:08-cv-04703-6:04 114   Document 26-16      Filed 08/04/2008      Page 14 of 14
111:11 111:12 111:16 111:19 112:1 112:15 112:20
13:8 113:9 113:10 113:14 114:3 114:14 114:15 114:
3 115:2 115:15 116:6 116:7 116:12 116:13 116:16
16:21 117:11 119:5 119:17 119:20 119:20 120:17
'·6 121:9 122:1 122:24 122:25 123:3 125:14 126:8
11 126:20 126:20 126:22 126:24 126:25 127:2
.7 127:19 128:6 128:17 128:24 129:1 129:2 129:6
29:14 129:22 129:23 130:10 130:21 131:8 139:20
39:22 139:23 140:3 141:7 141:18 141:21 141:21 141:
4 142:2 142:2 142:2 142:7 142:9 142:13 142:16 142:
1 142:25 143:22 144:3 144:6 144:12 146:8 146:23
47:3 147:7 147:13 147:23 148:3 148:4 149:7 149:11
49:12 149:13 150:10 150:14 150:14 151:12 151:15
51:16 151:25 152:11 152:15 152:18 152:20 153:5
54:2 154:8 155:9 155:13 155:14 155:21 155:25 156:2
56:17 156:22 158:22 160:10 164:7 164:22 165:1 165:
5 165:17 165:19 166:2 166:6 166:14 166:16 166:18
66:20 167:2 167:7 167:17 167:18 167:21 167:23 168:
169:18 169:20 170:1 170:6 170:11 171:2 171:16 171:
0 171:23 172:25 173:10 173:12 173:17

**Valls**
2] 8:10 27:22 65:23 66:20 94:5 94:6 108:15 108:16
08:17 108:20 108:24 109:12 112:23 124:16 124:20
24:25 125:1 125:15 125:16 128:1 163:10 169:12

**Vants**
] 93:22 93:23 93:25 168:18

**Vashed**
] 56:19

**Vater**
4] 14:4 19:6 52:6 56:18 80:8 103:2 103:7 104:19
05:7 105:13 106:5 112:19 112:22 119:7 125:13 130:
3 142:12 142:13 142:21 144:9 146:9 147:20 147:22
49:10

**Vaterfall**
] 80:9

**Vear**
] 119:9

**Veather**
] 119:10

**·ek**
:1 23:12 64:14 136:18 141:12

**veekend**
] 156:11

**Veeks**
] 5:3 7:1 23:13 88:4 132:20 160:17

**Veep**
] 103:8 103:12 103:18 104:3

**Veight**
] 108:6 109:8 109:17 127:24

**Vest**
] 1:7 2:5 145:4

**Vestchester**
] 1:1 8:2 91:2 144:6

**Vetlands**
] 94:2

**Vetness**
] 112:22

**Vhatsoever**
] 88:20 143:7 163:23 164:1

**Vheel**
0] 70:9 70:10 104:16 105:16 130:25 131:1 131:3
31:5 154:5 156:19

**Vhole**
] 68:6

**Vholes**
] 103:15

**Videst**
] 129:19

**Vidth**
] 72:7

**Vife**
· 73:11 76:14 77:5 77:7 77:9 77:21 82:5 82:25 83:6
86:15 138:21

**·illing**
] 45:15 45:16 46:13

**Vinter**

---

**Wish**
[10] 9:25 11:3 46:17 87:4 87:8 97:4 125:24 136:9 137:
6 161:11

**Withdraw**
[1] 148:20

**Withdrawing**
[1] 146:14

**Witness**
[53] 11:8 11:11 16:16 37:12 46:22 46:25 65:18 69:7
70:16 70:20 71:2 71:3 72:20 90:14 90:19 94:20 97:8
99:11 122:10 123:7 123:11 126:4 131:19 132:8 132:12
133:9 133:11 133:12 133:14 133:15 134:2 134:5 135:
14 135:15 135:22 136:4 136:6 136:9 137:6 137:21 138:
1 158:8 158:11 159:3 159:19 159:19 159:24 161:13
162:1 162:19 164:25 166:10 169:25

**Witness's**
[2] 32:14 135:23

**Witnesses**
[11] 5:22 9:20 10:19 89:5 90:10 137:15 157:7 158:5
167:5 167:25 173:3

**Witnesses's**
[2] 133:23 135:16

**Word**
[6] 36:3 86:5 86:6 106:7 152:14 153:6

**Workers**
[1] 145:15

**Works**
[2] 22:23 124:6

**Worse**
[4] 57:25 117:5 117:8 117:13

**Write**
[1] 77:24

**Writing**
[7] 42:23 43:4 43:9 44:3 81:10 88:17 99:1

**Written**
[11] 4:22 4:24 24:4 30:6 58:12 64:18 98:24 99:2 99:14
99:18 100:10

**Wrote**
[6] 57:6 78:22 79:16 84:12 85:19 131:16

---

## Y

**Yard**
[7] 22:2 22:8 24:24 80:10 104:21 105:14 118:18

**Year**
[8] 12:21 13:11 13:15 48:2 67:22 80:16 91:5 126:13

**Years**
[21] 12:4 12:13 13:4 47:11 64:12 64:12 83:14 83:16
91:3 92:19 106:22 108:24 108:25 120:21 123:1 124:9
124:13 143:5 152:8 152:15 154:22

**Yonkers**
[1] 140:13

**York**
[21] 1:2 1:8 1:22 2:6 2:14 10:9 10:14 12:22 48:20 49:
19 49:21 87:24 91:10 92:6 92:19 93:7 123:18 123:24
124:6 125:5 163:4

**Young**
[1] 104:10

**Yourself**
[5] 47:21 63:6 79:1 82:11 82:22

---

## Z

**Zoning**
[1] 12:1

---

EXHIBIT K

NOTICE OF CLAIM AGAINST THE TOWN OF MAMARONECK

Local Government
General Municipal Law
Article 4.  Negligence and Malfeasance of Public Officers; Taxpayers' Remedies

Section 50-e Form 1. Notice of Claim Against City

**PLEASE TAKE NOTICE** that the undersigned claimants hereby make a claim against the Town of Mamaroneck, New York as follows:

CLAIMANTS' NAMES: Gary R. Rotenberg & Jane J. Dickson

CLAIMANTS' DATES OF BIRTH: 7/15/49 & 6/3/52

CLAIMANTS' ADDRESS: 109 Brooklake Road. Florham Park, New Jersey 07932

TELEPHONE NUMBERS WHERE CLAIMANTS CAN BE REACHED: Residence: 973-377-5406; Mr. Rotenberg's office: 973-377-5407; Ms Dickson's office: 973-355-4077

CLAIMANTS' ATTORNEYS: Pro Se, Gary R. Rotenberg, Esq., & Jane J. Dickson, Esq., both admitted to the Bar of the State of New York

ATTORNEYS' ADDRESS: 109 Brooklake Road, Florham Park, New Jersey 07932

The nature of the claim:  To recover damages for severe financial loss sustained by the Claimants by reason of the negligence and misconduct of said Town, its officers, agents, servants and employees as hereinafter set forth:

The time when the claim arose was November 20, 2006 at or about 3:00 PM.

The location where the claim arose was at the Town of Mamaroneck Town Court where claimants were acquitted, after a trial before a Justice of the Town of Mamaroneck, under Summons No. 666-06, of "a violation of Property Maintenance Code 302.7 of New York State – Accessory Structures – All accessory structures, including detached garages, fences and walls, shall be maintained structurally sound and in good repair. of the Town of Mamaroneck."

1

The items of injury and/or damage to claimants are as follows (describe in detail with particulars):

1. Substantial and irremediable loss of value to the sale price of their residence located at 5 Huguenot Drive, Larchmont, NY 10538
2. Substantial legal fees incurred to contest the filing of Violation 350-06 and to defend against the criminal charges and trial to which claimants were improperly subjected by the Town of Mamaroneck
3. Substantial expert engineer witness fees incurred to contest the filing of Violation 350-06 and to defend against the criminal charges and trial to which claimants were improperly subjected by the Town of Mamaroneck

The negligence and misconduct on the part of the Town of Mamaroneck is as follows (describe in detail the acts of omissions by the Town that caused your loss/damage)

The filing of Violation 350-06 in Property File 130-415, pursuant to Property Maintenance Article, Section PM302.7, NY State Code, Accessory Structures: All accessory structures, including detached garages, fences and walls, shall be maintained structurally sound and in good repair was made without any detailed inspection of the wall in question by the appropriate Town of Mamaroneck official. Additionally, the Town of Mamaroneck filed Summons No. 666-06, which subjected Claimants to the threat of fines and/or imprisonment. The Town of Mamaroneck never provided at any time during the pendency of this matter any information as to the nature of any work, repairs, or modifications they required of Claimants to cure the undisclosed violation on the undisclosed structure.

Identify, if possible, the Town employees, if any, who witnessed or were involved in your loss:

1. Ronald A. Carpaneto, Director of Building
2. Steven V. Altieri, Town Administrator
3. William Maker, Esq.

The Claimants hereby claim damages in the amount of $350,000.00.

2

**STATE OF NEW JERSEY**                    ss:
**COUNTY OF MORRIS**

_GARY R. ROTENBERG_____, being duly sworn, deposes and says that he is the claimant named above; that he has read the foregoing notice of claim and knows the contents thereof; that the same is true to the knowledge of deponent, except as to matters stated therein to be alleged on information and belief and that as to those matters he believes it to be true.

Claimant's Signature _____

Subscribed and sworn before me this _12 TH_ day of _FEBRUARY_ 2007.

_____
Notary Public

KATHLEEN M. LAMKEN
Notary Public of New Jersey
My Commission Expires March 18, 2009

**STATE OF NEW JERSEY**                    ss:
**COUNTY OF MORRIS**

_JANE J. DICKSON_____, being duly sworn, deposes and says that she is the claimant named above; that she has read the foregoing notice of claim and knows the contents thereof; that the same is true to the knowledge of deponent, except as to matters stated therein to be alleged on information and belief and that as to those matters he believes it to be true.

Claimant's Signature _____

Subscribed and sworn before me this _12 TH_ day of _FEBRUARY_, 2007.

_____
Notary Public

KATHLEEN M. LAMKEN
Notary Public of New Jersey
My Commission Expires March 18, 2009